1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JIPC MANAGEMENT, INC.,

               Plaintiff,

    vs.

INCREDIBLE PIZZA CO., INC.;
INCREDIBLE PIZZA FRANCHISE
GROUP, LLC; and CJM RACING, LLC,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 08-04310 MMM (PLAx)

ORDER DENYING PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION

      Plaintiff JIPC Management, Inc. filed this trademark infringement and unfair competition action against defendants Incredible Pizza Co., Inc., Incredible Pizza Franchise Group, LLC, and CJM Racing, LLC on June 30, 2008.  Plaintiff licenses and manages restaurants in California under the name "John's Incredible Pizza Co."   The restaurants offer all-you-can-eat pizza buffets in an entertainment complex featuring theme rooms, video games, miniature golf, and bumper cars.  Defendants Incredible Pizza Co., Inc. and Incredible Pizza Franchise Group, LLC license and manage similar all-you can eat pizza restaurants and entertainment complexes in other parts of the United States.  Defendant CJM Racing, LLC owns, operates, and markets the No. 11 Chevrolet Race Car in the Nascar Nationwide Series; this car is presently sponsored by defendant Incredible Pizza Franchise Group, LLC.

On July 7, 2008, plaintiff filed a motion for preliminary injunction.[1]  Plaintiff asserts that defendants' recent use of the name "Incredible Pizza Company" in California infringes its rights in the marks "Incredible Pizza Co." and "John's Incredible Pizza Co."[2]  Plaintiff seeks a preliminary injunction prohibiting defendants from (1) using the phrases "Incredible Pizza," "Incredible Pizza Company," "John's Incredible Pizza Co." and the like in connection with the advertising, offering for sale, sale, or provision, within or into California, of restaurant services, entertainment services, or restaurant franchising services; (2) attempting to pass off the use of infringing marks in connection with services within California as services affiliated with or sponsored by plaintiff; (3) committing acts likely to cause purchasers in California to believe falsely that defendants' services are associated with plaintiff; (4) displaying any infringing marks on defendant CJM Racing's cars, uniforms, and signage in any manner that causes the marks to be displayed during any event held in or broadcast into California; and (5) transporting any car, uniform, or signage bearing infringing marks into or within California.  For the reasons stated below, the court denies plaintiff's motion for preliminary injunction.

# I.  FACTUAL BACKGROUND

## A.    Plaintiff's Business

Plaintiff JIPC Management, Inc. ("JIPC") is in the business of licensing and managing restaurants under the name "John's Incredible Pizza Co."  The restaurants offer all-you-can-eat buffets of pizza, pasta, salad, and desserts, in an entertainment complex featuring theme rooms, video games, redemption games, miniature golf, bumper cars, and go-karts [3]  The first John's

---

[1]On July 8, 2008, plaintiff filed an *ex parte* application requesting that the court set an expedited hearing on a motion for preliminary injunction.  On July 11, 2008, the court denied the application.  Plaintiff's motion was set for hearing on August 25, 2008.

[2]JIPC Management, Inc.'s Memorandum in Support of Motion for Preliminary Injunction ("Pl.'s Mem.") at 1-2.

[3]Declaration of John Parlet in Support of Motion for Preliminary Injunction ("Parlet Decl."), ¶ 3.

Incredible Pizza Co. store opened in Victorville, California in September 1997.[4] It was owned and operated by John's Incredible Pizza Co., Inc. ("JIPC, Inc."), a California corporation formed by John Parlet on June 3, 1997.[5] On May 11, 1998, Parlet formed plaintiff JIPC for the purpose of controlling the intellectual property of the John's Incredible Pizza Co. brand, and serving as the managing entity for all John's Incredible Pizza Co. stores.[6] Once formed, JIPC assumed management of the Victorville store.[7] Since that time, JIPC has continuously managed each of the John's Incredible Pizza Co. stores from the date each store opened to the present, under agreements with the separate entities that own the stores.[8]

There are currently eight John's Incredible Pizza Co. stores operating in California.[9] Together, they serve, on average, approximately 50,000 customers per week.[10] From September 1997 to the present, goods and services sold under the John's Incredible Pizza Co. name have generated more than $220,000,000 in revenue.[11] During the same period, expenditures for

---

[4]*Id.*, ¶ 10.

[5]*Id.*

[6]*Id.*, ¶ 14. Parlet is the president and CEO of plaintiff JIPC. (*Id.*, ¶ 2.) He is also the CEO and sole shareholder of JIPC Management Holdings, Inc., JIPC's parent company. (*Id.*).

[7]*Id.*, ¶ 15.

[8]*Id.*

[9]*Id.*, ¶ 4. These stores are located in (1) Victorville, CA – opened September 1997; (2) Bakersfield, CA – opened November 1998; (3) Fresno, CA – opened June 2000; (4) Stockton, CA – opened August 2002; (5) Modesto, CA – opened July 2003; (6) Montclair, CA – opened January 2005; (7) Roseville, CA – opened March 2007; and (8) Riverside, CA – opened October 2007. (*Id.*). A ninth John's Incredible Pizza Co. store is scheduled to open in Buena Park, CA in early 2009. (*Id.*).
With the exception of the Victorville store, all of the John's Incredible Pizza Co. stores are owned by entities controlled by Parlet. (*Id.*, ¶ 17.)

[10]*Id.*, ¶ 27.

[11]*Id.*, ¶ 28.

1    advertising and marketing have totaled approximately $2,850,000.[12]

2        **B.    Plaintiff's Marks**

3        JIPC asserts that the "John's Incredible Pizza Co." mark has been continuously used in

4    commerce since September 1997.[13]  On March 31, 1999, JIPC, Inc., the alleged predecessor

5    owner of the mark, assigned JIPC all right, title, and interest in and to the "tradename 'John's

6    Incredible Pizza Company.'"[14]  Since that time, JIPC has licensed use of the "John's Incredible

7    Pizza Co." mark to each of the eight stores.[15]

8        On April 9, 2004, JIPC filed a trademark application with the United States Patent and

9    Trade Office ("USPTO"), stating its intent to use the "John's Incredible Pizza Co." mark.[16]  Two

10   "John's Incredible Pizza Co." marks were ultimately registered for use in connection with

11   restaurant and entertainment services on December 13, 2005 and February 14, 2006, and assigned

12   Registration Numbers 3,025,377 and 3,058,427, respectively.[17]  JIPC has also filed Application

13   Serial Nos. 78/436,085 and 78/435,080 seeking registration for use of the service mark

14   "Incredible Pizza Co." in connection with restaurant and entertainment services.[18]

15       JIPC offers its goods and services in local and regional markets in California, where all

16   of JIPC's operations and stores are located.[19] It has promoted the marks through multiple channels,

17   including newspaper advertisements, brochures, coupons, in-store displays, trade shows, direct

18   mail, gift cards, the John's Incredible Pizza Co. VIP Card frequent customer program, and JIPC's

19   _____

20   [12]*Id.*

21   [13]*Id.*, ¶ 6.

22   [14]*Id.*, Exh. 5.

23   [15]See *id.*, Exhs. 6, 7.

24   [16]*Id.*, Exhs. 1, 2.

25   [17]*Id.*

26   [18]*Id.*, ¶ 6.

27   [19]*Id.*, ¶ 24.

28

website.[20]  In addition, all store employees wear uniforms that include shirts and hats displaying the marks.[21]  The John's Incredible Pizza Co. stores have been the subject of, or mentioned in, articles published in magazines and newspapers with regional, and occasionally, national circulation.[22]  They have also received numerous awards and been annually recognized in local "Best of" customer recognition surveys.[23]

### C.  Defendants' Business and Adoption of the "Incredible Pizza Co." Marks

Like plaintiff JIPC, defendant Incredible Pizza Co., Inc. ("IPC") operates restaurants offering all-you-can-eat buffets of pizza, pasta, salad, and desserts in an entertainment complex featuring theme rooms, games, miniature golf, and bumper cars.[24]  IPC's founder, owner, and CEO, Rick Barsness, met Parlet in the late 1980s or early 1990s when Barsness came to California to see a pizza order entry system Parlet had in place at a pizza restaurant he then owned.[25]  At the time, Barsness owned and operated franchised pizza restaurants in Texas under the mark "Mr. Gatti's."[26]  In 1995 or 1996, Parlet told Barsness about Parlet's plans to open a new restaurant featuring an all-you-can-eat pizza buffet and game room under the John's Incredible Pizza Co. name.[27]  Barsness knew by the summer of 1997 that the Victorville John's Incredible Pizza Co.

---

[20]*Id.*

[21]*Id.*, ¶ 23.

[22]*Id.*, ¶ 25, Exh. 15.

[23]*Id.*, ¶ 26, Exh. 16.

[24]Declaration of Steven E. Klein in Support of JIPC Management, Inc.'s Motion for Preliminary Injunction ("Klein Decl."), Exhs. A, C.

[25]*Id.*, Exh. B.  Barsness and his wife also own and control defendant Incredible Pizza Franchise Group, LLC ("IPFG"). (*Id.*, Exh. D).

[26]*Id.*, Exh. A.

[27]*Id.*, Exhs. A, B; Parlet Decl., ¶ 32.

was about to open.[28]  In late 1997, after the Victorville store had commenced operations, Barsness visited the store.  While there, he toured the store and saw the John's Incredible Pizza Co. name displayed throughout.[29]

In 1996 or 1997, Barsness and his wife began developing "Incredible Pizza" marks to use in connection with their new stores.[30]  By October 1998, Barsness had decided to call his new restaurant "Incredible Pizza Co.," and began working with a graphic designer to develop a logo.[31]  Barsness considered no other names in developing the stores.[32]  On September 21, 1999, Barsness filed an intent-to-use application, Serial No. 75/805,643, to register a composite mark (words plus design) that combined the words "Incredible Pizza Co.," the tagline "Great Food, Fun, Family & Friends," and a distinctive design.[33]  In his application, Barsness declared under penalty of perjury that he believed he was entitled to use the Incredible Pizza Co. mark in commerce, and that to the best of his knowledge, no other person or firm "had the right to use the mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods of such other person, to cause confusion."[34]  The mark "Incredible Pizza Company – Great Food, Fun, Family & Friends" was registered on October 23, 2001, and

---

[28]Klein Decl., Exh. B.

[29]*Id.*, Exh. A.

[30]Declaration of Richard Barsness ("Barsness Decl."), ¶¶ 3-4.  Barsness asserts that he first decided to use the name "Incredible Pizza Company" in the mid-1990s during discussions with plaintiff's founder, Parlet.  Barsness understood that he had an agreement with Parlet that each would use "Incredible Pizza" in the name of their restaurants and would divide the country geographically.  (*Id.*, ¶ 3).

[31]Klein Decl., Exh. A.

[32]*Id.*, Exh. B.

[33]*Id.*, Exhs. A, B.

[34]*Id.*, Exh. A.

assigned Registration Number 2,500,872.[35]

In October 1999, after seeking federal protection for the IPC mark, Barsness opened the first IPC-branded stores in Amarillo, Texas, converting them from franchises of Mr. Gatti's restaurants.[36]   Shortly thereafter, Barsness sold the Amarillo stores to an individual named Madison Scott.  In a letter agreement with Scott dated October 14, 1999, Barsness confirmed that with regard to the operation of an "Incredible Pizza" restaurant and concept, "someone else [i.e., Parlet] [was] operating under [the "Incredible Pizza"] name and concept in California and possibly in other places."[37]

In August 2002, Barsness opened an IPC location in Springfield, Missouri.[38]  In August 2004, IPC opened a new store in Tulsa, Oklahoma.[39]  IPC soon entered into numerous franchise agreements, particularly in Texas, where IPC entered into a 30-store franchise deal.[40]  In 2005, IPC opened stores in Warr Acres, Oklahoma; Conroe, Texas; and Sugarland, Texas.[41]  Over time, it has opened 15 stores, at a cost of approximately $4 million to $8 million per store, and sold more than 85 IPC franchises.[42]

IPC has successfully marketed its stores and franchises.  In December 2001, IPC registered the domain name "incrediblepizza.com," which it has used as its main website address

---

[35]Parlet Decl., Exh. 19.

[36]Barsness Decl., ¶ 7.

[37]Klein Decl., Exh. A.  IPC filed an application to register the mark "America's Incredible Pizza Co. – Great Food, Fun, Family & Friends" on February 25, 2005.  This application is still pending.

[38]Barsness Decl., ¶ 9.

[39]Declaration of Steven C. Lawrence ("Lawrence Decl."), Exh. 11.

[40]Declaration of George R. Ward II ("Ward Decl."), ¶ 3.

[41]*Id.*

[42]*Id.*, ¶¶ 4-8.

7

1   continuously since July 2002.[43]   The website has generated millions of hits from Internet users

2   across the country.[44]  IPC's success has been the subject of several articles during the last several

3   years in local and national print publications for the pizza industry, including Pizza Marketing

4   Quarterly and Food & Drink Quarterly.[45]   The March/April 2005 edition of Pizza Marketing

5   Quarterly, for instance, prominently featured the America's IPC mark and Barsness on the cover,

6   and contained a lengthy article about IPC.[46]

7        **D.      Plaintiff's Objections to IPC's Use of the "Incredible Pizza" Marks**

8        In October 1999, Parlet heard a rumor that Barsness was planning to open a restaurant in

9   Texas using the "Incredible Pizza Co." name.[47]  Parlet called Barsness, objected to his use of the

10   name, and demanded that he select a different name.[48]   Barsness refused, and incorporated

11   Incredible Pizza Co., Inc. on December 23, 1999.[49]  In a subsequent conversation in May 2000,

12   Parlet reiterated his objection to Barsness' use of the name.[50]   Barsness suggested that they split

13   use of the name geographically.  Parlet indicated that this was unacceptable, as he did not know

14   if he would ultimately want to use the name nationwide.[51]

15        In late 2003 or early 2004, Parlet learned that IPC had started offering franchises under

16   the Incredible Pizza Co. name.[52]  On March 16, 2004, JIPC's attorneys sent Barsness and IPC

17   _____

18   [43]Declaration of Treyson Abbe ("Abbe Decl."), ¶ 3.

19   [44]*Id.*

20   [45]Ward Decl., ¶ 10.

21   [46]*Id.*, ¶ 11, Exh. 3.

22   [47]Parlet Decl., ¶ 37.

23   [48]*Id.*

24   [49]*Id.*, ¶ 38; Klein Decl., Exh. K.

25   [50]Parlet Decl., ¶¶ 39-40.

26   [51]*Id.*, ¶ 40; Klein Decl., Exh. C.

27   [52]Parlet Decl., ¶ 43.

28

1  letters demanding that they immediately cease and desist use of the IPC marks.[53]  IPC responded

2  that it had successfully registered the "Incredible Pizza Co." mark in 2001, and that it believed

3  JIPC had no right to use the mark outside California.[54]

4        Since April 2004, the Uniform Franchise Offering Circular for franchises offered by IPC

5  and IPFG has disclosed to potential franchisees that JIPC (1) claims ownership of and senior rights

6  in the Incredible marks and (2) has objected to IPC's use of the IPC marks.[55]  On May 21, 2004,

7  JIPC commenced an action before the Trademark Trial and Appeal Board ("TTAB") to cancel

8  IPC's registration of the Incredible Pizza Co. mark and design.[56]  On April 19, 2006, JIPC

9  commenced a second action opposing IPC's application to register the mark "America's Incredible

10  Pizza Co. Great Food, Fun, Family & Friends."[57]  Both actions are still pending before the

11  TTAB.

12      **E.**    **IPC's Recent Activities in California**

13        IPC has not yet sold franchises or opened stores in California.[58]  In May 2008, however,

14  IPC added a section to its website titled "Available Markets" on the page discussing IPC franchise

15  opportunities.[59]  The section includes a map of the United States and invites the viewer to "click

16  desired states to view available cities."[60]  Selecting California brings up a list of 27 cities in the

17  state where IPC franchises are available.  Among the cities listed are Bakersfield, Fresno,

18

19

20  [53]*Id.*, ¶ 43, Exh. 18.

21  [54]*Id.*, Exh. 19.

22  [55]Klein Decl., Exh. G.

23  [56]Parlet Decl., ¶ 44; Klein Decl., Exh. M.  Barsness originally obtained the registration
and transferred it to IPC.

24

25  [57]Parlet Decl., ¶ 44; Klein Decl., Exh. N.

26  [58]Ward Decl., ¶ 7.

27  [59]Parlet Decl., ¶ 52, Exh. 25.

28  [60]*Id.*

Modesto, Stockton, and Riverside, where John's Incredible Pizza Co. stores are located.[61]   A visitor to the site can print the list with the IPC mark logo displayed at the top.[62]

In March 2008, IPFG entered into a sponsorship agreement with defendant CJM Racing LLC ("CJM") to sponsor nationally the No. 11 America's Incredible Pizza Company Racing Chevrolet and the No. 11 Race Team on the Nascar Nationwide Series.[63]   Pursuant to the agreement, CJM displays America's Incredible Pizza Company's logos on the No. 11 race car and other equipment and apparel associated with the No. 11 Race Team.[64]   The No. 11 car made its first appearance at the Las Vegas Motor Speedway on March 1, 2008.[65]   As of late June 2008, the No. 11 car had participated in sixteen races across the United States; it is scheduled to compete in eight more races prior to the end of August 2008.[66]   Since April 5, 2008, each race in the Nascar Nationwide Series in which the No. 11 car has competed has been broadcast nationwide, including in California, on either the ABC, ESPN, or ESPN2 networks.[67]

The No. 11 car is scheduled to race in the Camping World 300 on August 30, 2008 at the Auto Club Speedway in Fontana, California.[68]   The car will not bear the IPC mark in this race, but instead will be presented as the Monster Truck Challenge car.[69]   While the driver and pit crew will wear clothing that bears the Monster Truck Challenge marks (or that has no logos at all),

---

[61]*Id.*, Exh. 26.

[62]*Id.*, Exh. 27.

[63]Declaration of Tony Mullet in Opposition of JIPC Management, Inc.'s Motion for Preliminary Injunction ("Mullet Decl."), ¶ 6.

[64]*Id.*

[65]*Id.*, ¶ 7.

[66]*Id.*

[67]Parlet Decl., ¶ 49, Exh. 23.

[68]Mullet Decl., ¶ 9.

[69]*Id.*

1  some incidental accessory items may continue to bear the IPC marks and logo.[70]  The use of the

2  Monster Truck Challenge mark is a one-time event; future races will be run using the IPC

3  marks.[71]

4  **F.    Procedure**

5      On June 30, 2008, JIPC commenced this action against defendants IPC, IPFG, and CJM

6  for trademark infringement and unfair competition.  It filed a motion for preliminary injunction

7  on July 7, 2008.

8

9  **II.  DISCUSSION**

10  **A.    Standard Governing Entry of Preliminary Injunctive Relief**

11      The basis for injunctive relief in federal court is irreparable injury and inadequacy of legal

12  remedies.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  The Ninth Circuit has

13  described the test for obtaining preliminary injunctive relief in two ways:

14      "Under the 'traditional' criteria, a plaintiff must show '(1) a strong likelihood of

15      success on the merits, (2) the possibility of irreparable injury to plaintiff if

16      preliminary relief is not granted, (3) a balance of hardships favoring the [moving

17      party], and (4) advancement of the public interest (in certain cases).'  Alternatively,

18      a court may grant the injunction if the [moving party] 'demonstrates *either* a

19      combination of probable success on the merits and the possibility of irreparable

20      injury *or* that serious questions are raised and the balance of hardships tips sharply

21      in his favor.'"  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir.

22      2005) (quoting *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th

23      Cir. 1995) (emphasis original)).[72]

24  _____

25  [70]*Id.*

26  [71]*Id.*

27  [72]A "serious question" is one as to which the moving party has "a fair chance of success

28  on the merits."  *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir.

See also *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir. 1985) ("A plaintiff is entitled to a preliminary injunction in a trademark case when he demonstrates *either* (1) a combination of probable success on the merits *and* the possibility of irreparable injury *or* (2) the existence of serious questions going to the merits *and* that the balance of hardships tips sharply in his favor," citing *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 523 (9th Cir. 1984), and *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 86 (9th Cir. 1975) (emphasis original)).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc*, 204 F.3d 867, 874 (9th Cir. 2000); see also *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1100 (9th Cir. 1998) (describing the two tests as "not separate [ ] but rather outer reaches of a single continuum").

       "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary K. Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2948, at 129-130 (1995)); see also 5 J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 30:45 (4th ed. 2007) ("Plaintiff's showing of a strong case and a probability of prevailing on the merits is perhaps the most important evidentiary point on a motion for preliminary injunction.  The Restatement goes so far as to state that: 'Absent special circumstances, courts will ordinarily grant a preliminary injunction in a trademark infringement action if there is strong evidence of a likelihood of confusion,' quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 35, cmt. h (1995)).

       **B.     Trademark Infringement Claim – Likelihood of Success on the Merits**

       Trademarks represent "a limited property right in a particular word, phrase, or symbol." *New Kids on the Block v. New Am. Publishing, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992).  To prevail on its trademark infringement claim, plaintiff must prove "(1) that it has a protectible ownership interest in [a] mark; and (2) that the defendant[s'] use of the [Incredible Pizza Co.]

_____

1984) (quotations omitted).

mark is likely to cause consumer confusion, thereby infringing upon the [plaintiff's] rights to the mark." *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (en banc)).

### 1.      Ownership and Validity

#### a.      John's Incredible Pizza Co. Mark

JIPC contends that it possesses valid rights in the John's Incredible Pizza Co. and Incredible Pizza Co. marks.[73] It asserts that John's Incredible Pizza Co., Inc., a corporation formed and owned at the time by John Parlet, adopted the John's Incredible Pizza Co. mark in 1997.[74] On March 31, 1999, JIPC, Inc., assigned to plaintiff JIPC all right, title, and interest in and to the "tradename 'John's Incredible Pizza Company.'"[75] Since that time, JIPC has licensed use of the "John's Incredible Pizza Co." mark to eight JIPC stores.[76] In 2005 and 2006, it obtained U.S. Trademark Registration Nos. 3,025,377 and 3,058,427 for use of the John's Incredible Pizza Co. mark in connection with restaurant and entertainment services.[77]

Under 15 U.S.C. § 1115(a), registration of a mark is "prima facie evidence of the validity of the registered mark[,] . . . of the registrant's ownership of the mark, and . . . [of the] exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration." 15 U.S.C. § 1115(a). Citing evidence that it owns registrations in the John's Incredible Pizza Co. mark, JIPC contends that it has established that it possesses a

---

[73]Pl.'s Mem. at 16.

[74]*Id.*, ¶ 10. Parlet no longer owns JIPC, Inc.; since September 2003 it has been owned by his former wife, Betty Parlet. (*Id.*, ¶ 17).

[75]*Id.*, Exh. 5.

[76]See *id.*, Exhs. 6, 7.

[77]Parlet Decl., Exhs. 1, 2.

protectable ownership interest in the mark.[78]

IPC disputes this claim, asserting that the 1999 "Tradename Assignment Agreement" between plaintiff JIPC and Parlet's former corporation, JIPC, Inc., solely assigned rights to the trade name "John's Incredible Pizza Co.," not the rights to the trademark.[79]  IPC contends that Parlet's declaration that this assignment included "all trademark rights in the name" is false, as trade name and trademark are distinct concepts.[80]  IPC asserts that, in stating that JIPC, Inc. assigned to plaintiff JIPC "all of its right, title, and interest in and to the Tradename, including all goodwill associated therewith, free from any notice or claim asserted or threatened by any third party due to the infringement of any trade name, trademark, service mark, copyright, or license of any person or organization," the agreement itself distinguished between the trade name and trademarks.[81]  IPC also contends that subsequent trademark license agreements between JIPC and the various JIPC stores do not establish that JIPC rightfully owns the marks.[82]

IPC is correct that trade names and trademarks are "technically distinct."  See *Accuride Intern., Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir. 1989).  "Trade names symbolize the reputation of a business as a whole.  In contrast, trademarks and service marks are designed to identify and distinguish a company's goods and services."  *Id.* (citing *New West Corp. v. NYM Co.*, 595 F.2d 1194, 1201 (9th Cir. 1979)).[83]  "As a practical matter, courts are rarely called upon

---

[78]Pl.'s Mem. at 16.

[79]Defendants IPC and IPFG's Opposition to Plaintiff's Motion for Preliminary Injunction ("Def. IPC's Opp.") at 18.

[80]*Id.*; see Parlet Decl., ¶ 19.

[81]Parlet Decl., Exh. 5; Def. IPC's Opp. at 18.

[82]Def. IPC's Opp. at 19; see, e.g., Parlet Decl., Exh. 7.

[83]The Lanham Act defines a trade name as "any name used by a person to identify his or her business or vocation."  15 U.S.C. § 1127.  A trademark includes "any word, name, symbol, or device, or any combination thereof – (1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter, to identify and distinguish his or her goods, including a unique product, from those

14

to distinguish between trade names, trademarks and service marks.  Trade names often function as trademarks or service marks as well." *Id.* "The major legal distinction between trademarks and trade names[, however,] is that trade names cannot be registered and are therefore not protected under 15 U.S.C. § 1114." *Id.* (citing *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1163 (11th Cir. 1982)).  Analogous actions for trade name infringement, however, may be brought under section 43(a) of the Lanham Act. *Id.* (citing *New West*, 595 F.2d at 1198-1201, and *Walt-West Enterprises, Inc. v. Gannett Co.*, 695 F.2d 1050, 1054 n. 6 (7th Cir. 1982)).

Although trade names and trademarks are legally distinct, JIPC argues that the assignment did not use "Tradename" in the technical sense.[84]  It contends that the term "Tradename" was defined in the agreement as the "John's Incredible Pizza Co." name, and that, when the business name is substituted for the defined term, the assignment clause reads, "all right, title, and interest in and to the [John's Incredible Pizza Co. name].[85]  JIPC maintains that, reasonably construed, the clause conveys "all rights" in and to the John's Incredible Pizza Co. name, including trademark, service mark, and trade name rights.[86]  JIPC also notes that the clause's reference to claims for infringement of "any trade name" shows that "Tradename" was not given its technical meaning.[87]

The assignment agreement states that it is governed by California law.[88]  "Under California law, the fundamental goal of contract interpretation is to give effect to the mutual intent of the

_____

manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Id.*

[84]JIPC Management, Inc.'s Reply Memorandum in Support of Motion for Preliminary Injunction ("Pl.'s Reply") at 24.

[85]*Id.*

[86]*Id.*

[87]*Id.*

[88]Parlet Decl., Exh. 5.

15

parties as it existed at the time of contracting." *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002) (citing CAL. CIV. CODE § 1636, and *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal.App.4th 445, 474 (1998)). "When a contract is reduced to writing, this intent 'is to be ascertained from the writing alone, if possible.'" *Id.* (citing CAL. CIV. CODE § 1639, and *Brinton v. Bankers Pension Servs., Inc.*, 76 Cal.App.4th 550, 559 (1999)).

Because the words of a written instrument "often lack a clear meaning apart from the context in which the words were written," however, "courts may preliminarily consider any extrinsic evidence offered by the parties." *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 989-90 (9th Cir. 2006). "'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'" *Id.* at 989 (quoting *Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37 (1968), and citing *United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988)). "'If the court decides, after consideration of this evidence, that the language of a contract, in the light of all the circumstances, is "fairly susceptible of either one of the two interpretations contended for," extrinsic evidence relevant to prove either of such meanings is admissible.'" *Id.* at 990 (quoting *Pacific Gas*, 69 Cal.2d at 38-40, and citing *U.S. Cellular Invest. Co.*, 281 F.3d at 939). "Extrinsic evidence includes testimony regarding the circumstances in which a contract was written, the subsequent conduct of the parties, and the common usage of particular terms in a given industry." *Id.* (citing *Pacific Gas*, 69 Cal.2d at 38-39; *U.S. Cellular Invest. Co.*, 281 F.3d at 937, and *United Cal. Bank v. THC Financial Corp.*, 557 F.2d 1351, 1360 (9th Cir. 1977)).

As noted, the March 1999 "Tradename Assignment Agreement" conveyed to JIPC "all of [the] right, title, and interest in and to the Tradename, including all goodwill associated therewith, free from any notice or claim asserted or threatened by any third party due to the infringement of

any trade name, trademark, service mark, copyright, or license of any person or organization."[89] It did not explicitly convey to JIPC the right to the John's Incredible Pizza Co. trademark. The term "name," however, is incorporated in the Lanham Act's definition of a trademark. See 15 U.S.C. § 1127. Moreover, the agreement refers both to a specific "Tradename" and non-specific "trade name" in a single clause, suggesting that the two terms are intended to have a different meaning. Because the agreement is ambiguous on its face and reasonably susceptible to multiple interpretations, the court will consider extrinsic evidence regarding JIPC, Inc.'s and JIPC's intent at the time they executed the agreement.[90]

One type of extrinsic evidence that is relevant in interpreting the assignment agreement is the "Tradename License Agreement" the parties executed contemporaneously. "'Where two or more written *instruments* are executed contemporaneously, with reference to each other, for the purpose of attaining a preconceived object, they must all be construed together, and effect given if possible to the purpose intended to be accomplished.'" *Harm v. Frasher*, 181 Cal.App.2d 405, 412-13 (1960) (quoting *Burnett v. Piercy*, 149 Cal. 178, 189 (1906) (emphasis original to *Frasher*); see also CAL. CIV. CODE § 1642 ("Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together"); *Deluca v. Massachusetts Mut. Life Ins. Co.*, CV 05-0632 OWW DLB, 2005 WL 1562033, *6 (E.D. Cal. June 28, 2005) ("'The general principle of joint consideration of several instruments as one agreement is applicable whether they expressly refer to each other or it appears from extrinsic evidence that they were executed as a part of one transaction,'" quoting *Frasher*,

---

[89]Parlet Decl., Exh. 5.

[90]Cf. *Miller*, 454 F.3d at 990 ("The 1956 license agreement conveyed to GMP 'the right and license to use the name and likeness of Glenn Miller . . . in connection with the business activities of [GMP].' The license agreement does not explicitly convey to GMP either the right to license any existing Glenn Miller trademark or Glenn Miller's publicity rights, or both. However, the terms 'name' and/or 'likeness' are found in both the Lanham Act definition of a trademark and in the definitions of California's statutory and common law rights to publicity. Because the 1956 agreement is ambiguous on its face and is reasonably susceptible to multiple interpretations, extrinsic evidence is admissible to prove the parties' intent when they executed the agreement," citing *Pacific Gas*, 69 Cal.2d at 38-40).

1    181 Cal.App.2d at 413).

2        The assignment agreement states that "[i]n further consideration for the assignment

3    contemplated by this Agreement, Assignee shall, concurrently with the execution of this

4    Agreement, execute a License Agreement in form appended hereto as Exhibit A."[91]  Because the

5    assignment expressly refers to the license agreement, it is appropriate to consider the two contracts

6    together.  The license agreement provides, as a condition of "use of the Tradename," that JIPC,

7    Inc., the licensee, "will not commence the use of the Tradename until it has taken all actions and

8    obtained all registrations in the Territory which are required of trademark and service mark

9    licensees or trademark and service mark users or which Licensor otherwise deems desirable."[92]

10   As JIPC points out, if the assignment and license agreements pertained only to the John's

11   Incredible Pizza Co. trade name, "there would be no reason or purpose to require that the licensee

12   ensure that it complied with all requirements of 'trademark and service mark' users."[93]  It thus

13   appears that the parties intended that the assignment encompass both the John's Incredible Pizza

14   Co. trademark and trade name.

15       Additionally, Parlet states that it was the parties' intention to transfer rights to both the

16   name and the trademark.[94]  This interpretation of the assignment is borne out by the parties'

17   subsequent conduct, i.e., that JIPC has licensed the use of the John's Incredible Pizza Co.

18   trademark to other JIPC stores pursuant to oral and written agreements.[95]  Because the extrinsic

19   evidence demonstrates that the parties intended to transfer trademark rights, the court is

20   unpersuaded by IPC's alternate construction of the agreement.

21       The fact that it is common to use the terms "trade name" and "trademark" interchangeably

22

23       [91]Parlet Decl., Exh. 5.

24       [92]Id., Exh. 6.

25       [93]Pl.'s Reply at 25.

26       [94]See Parlet Decl., ¶ 19.  Parlet represented both JIPC, Inc., the assignor, and JIPC, the

27   assignee, and the contract bears his signature on behalf of both parties.  (Id., Exhs. 5, 6).

28       [95]Id., ¶ 20.

18

further supports JIPC's interpretation that the agreement assigned rights in both the John's Incredible Pizza Co. trademark and trade name. See, e.g., *Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839, 841 n. 2 (5th Cir. 1990) ("For purposes of this opinion the term 'trademark' includes trade names and service marks. . . . There are differences between each classification with respect to registrability, etc. under the Lanham Act, but the terms are often used interchangeably and such differences as do exist are not relevant to our decision in this case," citing *Blinded Vet. Ass'n v. Blinded Am. Vet. Foundation*, 872 F.2d 1035, 1040 n. 11 (D.C. Cir. 1989) ("[W]e denote as a 'trademark' the name of a product, service or business enterprise that may be appropriated to the use of one party under the common law or the Lanham Act")); *Accuride Intern., Inc.*, 871 F.2d at 1535 ("[T]he Ninth Circuit has said that '[t]rade name infringement . . . is based on considerations similar to trade-mark infringement,' and that both 'preclude one from using another's distinctive mark or name if it will cause a likelihood of confusion or deception as to the origin of the goods,'" quoting *New West*, 595 F.2d at 1201, and citing *West Des Moines State Bank v. Hawkeye Bancorp.*, 722 F.2d 411, 413 (8th Cir. 1983) ("[t]rade names (business names) are under modern law accorded the same protection as trademarks"); *Walt-West Enterprises*, 695 F.2d at 1054 n. 6 (using "the terms trademark, service mark and trade name interchangeably in conformity with contemporary judicial parlance"); *Blacks In Government v. National Ass'n of Blacks Within Government*, 601 F.Supp. 225, 227 (D.D.C. 1983) ("the law protecting trademark infringement is essentially the same as that protecting commercial and corporate trade names")); 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 4:14 (noting that, for practical purposes, trademarks, trade names and service marks "are subject to the same substantive rules of validity and infringement").

Because JIPC has shown that it received an assignment of the rights to the John's Incredible Pizza Co. trademark and that it successfully obtained trademark registrations for the mark, the court concludes that it is likely to succeed on its claim that it owns protectable rights in the John's Incredible Pizza Co. mark.

1

### b.   Incredible Pizza Co. Mark

2      JIPC has filed two applications seeking registration of the service mark "Incredible Pizza

3   Co." for use in connection with restaurant and entertainment services.[96]  A pending trademark

4   application, however, "does not entitle [the applicant] to any statutory presumption of ownership,

5   validity, or the exclusive right to use the mark in commerce." *Pollution Denim & Co. v. Pollution*

6   *Clothing Co.*, 547 F.Supp.2d 1132, 1139 (2007) (citing *Glow Industries, Inc. v. Lopez*, 252

7   F.Supp.2d 962, 976 (C.D. Cal. 2002), *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, Inc.,

8   332 F.3d 264, 267 (4th Cir.2003) ("When more than one user claims the exclusive right to use

9   an unregistered trademark, priority is determined by the first actual use of the mark in a genuine

10  commercial transaction"), and 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR

11  COMPETITION § 16:2 (4th ed. 2007)).  JIPC must consequently prove priority of use to establish

12  its ownership of the "Incredible Pizza Co." mark.  See *id.* (citing *Glow Industries*, 252 F.Supp.2d

13  at 980 ("Because neither party presently holds a registration for [the mark at issue], neither can

14  take advantage of the presumption of protectability provided by trademark registration. [Plaintiff]

15  thus must establish that it is the senior user of [the mark] in connection with [the goods sold]

16  before it can prevail in its infringement action").

17      JIPC argues that it is the senior user of the Incredible Pizza Co. mark because the mark

18  is a component of the John's Incredible Pizza Co. trademark it obtained by assignment and

19  subsequently registered.[97]  The assignment agreement makes no mention of the mark "Incredible

20  Pizza Co.," however, and refers only to the "John's Incredible Pizza Co." mark.[98]  It thus appears

21  that JIPC, in effect, seeks to "tack on" its use of the "John's Incredible Pizza Co." mark to use

22  of the "Incredible Pizza Co." mark in order to establish priority of use.[99]

23  _____

24      [96]*Id.*, ¶ 6.

25      [97]Pl.'s Mem. at 16-17.

26      [98]See Parlet Decl., Exh. 5.

27      [99]But see *American Italian Pasta Company v. Barilla Alimentare S.p.A.*, Opp. No.

28  91161373, 2008 WL 2385971 (T.T.A.B. May 13, 2008) (star pages not available) ("As to

"Under the tacking doctrine, a mark owner 'essentially seeks to "tack" his first use date in the earlier mark onto the subsequent mark.'"   *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 758 (9th Cir. 2006) (quoting *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1048 (9th Cir. 1999)).   "Tacking permits a mark owner 'to claim priority in a mark based on the first use date of a similar, but technically distinct, mark – but only in the exceptionally narrow instance where the previously used mark is the legal equivalent of the mark in question or indistinguishable therefrom such that consumers consider both as the same mark.'"   *Id.* (quoting *Brookfield Communications*, 174 F.3d at 1047-48)).   "'The standard for tacking . . . is exceedingly strict: The marks must create the same, continuing commercial impression, and the later mark should not materially differ from or alter the character of the mark attempted to be tacked.'"   *Id.* (quoting *Brookfield Communications*, 174 F.3d at 1048; see also *Pro-Cuts v. Schilz-Price Enterprises Inc.*, 27 U.S.P.Q.2d 1224, 1226-27 (T.T.A.B. 1993); 3 J. Thomas McCarthy,  1 McCarthy on Trademarks & Unfair Competition § 17:26.   "The later mark must be indistinguishable from the original mark at the time that the later mark is introduced." *Quiksilver, Inc.*, 466 F.3d at 758-59 (citing *Brookfield Communications, Inc.*, 174 F.3d at 1048, and *KeyCorp v. Key Bank & Trust*, 99 F.Supp.2d 814, 820 (N.D. Ohio 2000)).

A threshold requirement for application of the tacking doctrine is actual use in commerce of the later-developed mark by the party claiming priority of use.   See, e.g., *Pro-Cuts*, 27 U.S.P.Q.2d at 1226 ("A party seeking to 'tack' its use of an earlier mark *onto its use of a later mark* for the same goods or services may do so only if the earlier and later marks are legal equivalents, or are indistinguishable from one another" (emphasis added)).   In *Brookfield Communications,* for instance, plaintiff brought a trademark infringement suit against defendant

applicant's arguments that whatever rights opposer's predecessor-in-interest may have had in this phrase was not conveyed to opposer, it is true that the listing of trademarks named in the agreement's schedule of marks is most abbreviated, and certainly does not include this phrase. Nonetheless, the entire agreement makes clear the intentions of the parties, and we are satisfied that whatever rights opposer's predecessor had in this phrase – along with the explicitly-named terms like 'Mueller's,' and including the other reputation-based components of Mueller's trade dress and overall branding image – [were] conveyed to opposer, along with the goodwill that passed to opposer as a result of this agreement").

for using plaintiff's "MovieBuff" trademark in its domain name, moviebuff.com. *Brookfield Communications*, 174 F.3d at 1041-42.  Defendant had obtained a registration in the service mark, "The Movie Buff's Movie Store," in 1991.  *Id.* at 1042.  Because defendant did not *actually* use "moviebuff.com" in commerce until 1996, however, it sought to tack its first use date in "The Movie Buff's Movie Store" onto its subsequent use of "moviebuff.com."  *Id.* at 1047-48.  The Ninth Circuit rejected defendant's attempt to tack, determining that the marks were substantially different and defendant could not show that consumers would view those terms as identical.  *Id.* at 1049.

JIPC does not adduce evidence that it has *actually used* the mark "Incredible Pizza Co." in commerce.  Nor does it state any intention to use the mark in commerce in the future.  In an interrogatory propounded by IPC, JIPC was asked to state the exact date on which it began using as a separate mark each mark that includes the word "incredible," and the exact nature of its use.[100]  JIPC responded that it had used the following marks: "John's Incredible Pizza Company," "Incredible Fun," "Incredible Food," "Incredible Entertainment," "Incredible Atmosphere," "John's Incredible Funworld," "Experience the Incredible," "John's Incredible Pizza Company All You Can Eat Food and Fun."[101]  In a separate interrogatory, JIPC was asked to identify with particularity whether it had used several marks, including "Incredible Pizza Co." and "Incredible Pizza Company," and if so, how, and where.[102]  It responded that it had used "Incredible Pizza Co." and "Incredible Pizza Company" "only as part of 'John's Incredible Pizza Co.'"[103]

Because JIPC has presented adduced no evidence that it has offered restaurant and entertainment services under the "Incredible Pizza Co." mark or that it intends to do so in the future, the tacking doctrine does not apply, and it cannot contend that it is the senior user of the

---

[100]Lawrence Decl., Exh. 6.

[101]*Id.*

[102]*Id.*, Exh. 7.

[103]*Id.*

mark.  Cf. *Pollution Denim & Co.*, 547 F.Supp.2d at 1139 ("[T]here is absolutely no evidence in the record indicating when plaintiff first began to market and sell apparel under the "Pollution Denim & Co." mark, only that it filed a trademark application for the mark on an intent to use basis on June 22, 2006").  As a result, JIPC has failed to demonstrate that it is the senior user of the "Incredible Pizza Co." mark, and thus has failed to show a likelihood of success on the merits of its claim that defendants infringed the mark.[104]

### 2.    Likelihood of Confusion

"The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod.Group, Inc. v. SKG Studio, d/b/a Dreamworks SKG*, 142 F.3d 1127, 1129 (9th Cir. 1998) (footnote omitted).  The Ninth Circuit has identified eight factors that should be considered in making this assessment: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the marks' similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree to which the parties' marketing channels converge; (6) the type of goods and the degree of care customers are likely to exercise in purchasing them; (7) evidence of defendants' intention in selecting and using the allegedly infringing mark; and (8) the likelihood that the parties will expand their product lines.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979); see also *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (reciting the eight *Sleekcraft* factors).

"The[se] factors should not be rigidly weighed." *Dreamwerks*, 142 F.3d at 1129.  Rather, they "are intended to guide the court in assessing the basic question of likelihood of confusion," *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992).  The court need not address all of the factors, nor must plaintiff establish that each weighs in its favor to show likelihood of confusion.  See *C & C Org. v. AGDS, Inc.*, 676 F.Supp. 204, 206 (C.D. Cal. 1987) (citing *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 526 (9th Cir. 1984)).  Indeed,

---

[104]The court expresses no opinion as to whether defendant IPC is the senior user of the Incredible Pizza Co. mark.

1    some *Sleekcraft* factors are more important in certain contexts than in others.   See, e.g.,

2    *Brookfield Communications, Inc.*, 174 F.3d at1054 ("A word of caution: this eight-factor test for

3    likelihood of confusion is pliant.   Some factors are much more important than others, and the

4    relative importance of each individual factor will be case-specific.   Although some factors – such

5    as the similarity of the marks and whether the two companies are direct competitors – will always

6    be important, it is often possible to reach a conclusion with respect to likelihood of confusion after

7    considering only a subset of the factors"); *Dreamwerks Production Group*, 142 F.3d at 1130 &

8    n. 6 (noting that three of the *Sleekcraft* factors were "pivotal" and that the remainder did not

9    "provide much insight in this case and thus carr[ied] little weight").

10                              **a.     Strength of the Mark**

11                              **i.     Distinctiveness**

12            "The strength of a given mark rests on its distinctiveness." *Miss World (UK) Ltd. v. Mrs.*

13   *America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir. 1988), abrogated on other grounds in *Levi*

14   *Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir. 1985) (en banc).   A "mark's

15   strength can be measured in terms of its location along a continuum stretching from arbitrary,

16   inherently strong marks, to suggestive marks, to descriptive marks, to generic, inherently weak

17   marks." *Id.* at 1448 (quoting *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1218 (9th

18   Cir. 1987)); see *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1080 (9th Cir.

19   2005) ("A generic mark is the least distinctive, and an arbitrary or fanciful mark is the most

20   distinctive," citing *GoTo.com,*, 202 F.3d at 1207), cert. denied, 547 U.S. 1069 (2006); *Japan*

21   *Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 872 (9th Cir. 2002) (noting that

22   trademarks fall into one of four categories of distinctiveness: (1) generic, (2) descriptive,

23   (3) suggestive, or (4) arbitrary or fanciful).

24            Generic terms cannot be protected as trademarks because "they are common words or

25   phrases that 'describe a class of goods rather than an individual product,'" and thus do not relate

26   exclusively to the product of the trademark owner. *Japan Telecom*, 287 F.3d at 872 (citing *New*

27   *Kids on the Block*, 971 F.2d at 306).   Descriptive terms "suffer from the same problem." *Id.*

28   Descriptive terms relate more directly to a particular product than do generic terms, as they

                                         24

"describe[ ] a person, a place or an attribute of [the] product." They will not support the grant of an exclusive property right, however, "[b]ecause they tend to consist of common words that might be the only way to describe a category of goods." *Id.*; see also *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n. 8 (9th Cir. 1998) ("Descriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood").

Terms that are suggestive, or arbitrary and fanciful, by contrast, are inherently distinctive, and protectable as trademarks. *Japan Telecom*, 287 F.3d at 872 (noting that such terms are protectable "without a showing of secondary meaning"). A suggestive mark "conveys an impression of a good [or service] but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature." *Brookfield Communications,* 174 F.3d at 1058 n. 19 (using "Roach Motel" insect traps as an example); see also *Kendall-Jackson Winery*, 150 F.3d at 1047 n. 8 (a suggestive mark is one for which "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, [because] the mark does not *describe* the product's features, but *suggests* them" (emphasis original)). Arbitrary and fanciful marks "have no intrinsic connection to the product with which the mark is used; [arbitrary marks] consist[ ] of words commonly used in the English language [e.g. 'Black & White' scotch whiskey], whereas [fanciful marks] are wholly made-up terms [e.g. 'Clorox' bleach]." *Brookfield Communications*, 174 F.3d at 1058 n. 19 (citations omitted).

JIPC contends that the court must presume that the John's Incredible Pizza Co. mark is be inherently distinctive because the PTO issued a trademark registration for the mark without requiring proof of secondary meaning.[105] Defendants IPC and CJM disagree, asserting that the word "incredible" is merely a laudatory term used to describe JIPC's pizza.[106] Descriptive marks

---

[105]Pl.'s Mem. at 16.

[106]Def. IPC's Opp. at 20; Defendant CJM Racing, LLC's Memorandum in Opposition of Motion for Preliminary Injunction ("Def. CJM's Opp.") at 7.

must acquire secondary meaning in the marketplace to be afforded protection.[107]   When a descriptive mark is registered, however, the registration carries with it a presumption that the mark has acquired secondary meaning.  See *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir. 1992) ("We believe . . . that the district court gave insufficient weight to the presumptive effect of Amtra's federal registration.  As applied to a descriptive mark such as Amtra's, the registration carries a presumption of secondary meaning," citing *Lois Sportswear*, 799 F.2d at 871 ("[R]egistered trademarks are presumed to be distinctive and should be afforded the utmost protection"); 1 J. Thomas McCarthy, Trademarks and Unfair Competition § 15:11, at 687 (2d ed. 1984)).  This presumption can be rebutted upon a showing by a preponderance of the evidence that the mark is not protectable.  See *555-1212.com, Inc. v. Communication House Int'l, Inc.*, 157 F.Supp.2d 1084, 1089 (N.D. Cal. 2001) (citing *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769 (9th Cir. 1981)).

"Laudatory marks that describe the alleged merit of the goods are descriptive because they simply describe the characteristics or quality of the goods in a condensed form."  *In re Nett Designs, Inc.*, 236 F.3d 1339, 1341 (Fed. Cir. 2001); see also *Hoover Co. v. Royal Appliance Mfg. Co.*, 238 F.3d 1357, 1360 (Fed. Cir. 2001) (holding that the mark "Number One in Floorcare" was a "generally laudatory phrase" that was not entitled to trademark protection absent evidence of secondary meaning, and noting that "[s]elf-laudatory or puffing marks are regarded as a condensed form of describing the character or quality of the goods"); *In re Best Software,*

---

[107]"Secondary meaning refers to a mark's actual ability to trigger in consumers' minds a link between a product or service and the source of that product or service.  That is, a mark has secondary meaning 'when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.'"  *Grupo Gigante SA De CV v. Dallo & Co.*, Inc., 391 F.3d 1088, 1095 (9th Cir. 2004) (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000)).  "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant."  *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999) (citing 2 J. Thomas McCarthy, Trademarks and Unfair Competition § 15:30 (4th ed. 1997)).

1    *Inc.*, 58 U.S.P.Q.2d 1314 (T.T.A.B. 2001) (star pages not available) ("the words 'BEST' and

2    'PREMIER' are merely descriptive laudatory words which should be disclaimed"); *In re Dos*

3    *Padres Inc.*, 49 U.S.P.Q.2d 1860, 1862 (T.T.A.B. 1998) (finding that "supreme" is a laudatory

4    term that had not acquired distinctiveness, and thus that it was merely descriptive of the applicant's

5    product); *In re Consolidated Cigar Co.*, 35 U.S.P.Q.2d 1290, 1293 (T.T.A.B. 1995) (finding that

6    "super buy" was a descriptive mark, and observing that "[m]arks that are merely 'laudatory' and

7    descriptive of the alleged merit of a product are also regarded as being 'descriptive.' This includes

8    such terms as SPEEDY, FRIENDLY, DEPENDABLE, PREFERRED, DELUXE, GOLD

9    MEDAL, BLUE RIBBON, and the like").

10    CJM notes that "incredible" is defined, *inter alia*, as "marvelous," "fabulous," and

11    "astonishing."[108] JIPC has used the John's Incredible Pizza Co. mark with the phrases "Incredible

12    Fun," "Incredible Food," and "Incredible Entertainment."[109] Additionally, brochures describing

13    the food and entertainment services offered at JIPC's stores invite customers to "Experience the

14    Incredible."[110] The court agrees, therefore, that "incredible" promotes the perception among

15    consumers that John's Incredible Pizza Co. is marvelous or fabulous. Consequently, it is a

16    laudatory descriptive phrase that touts the merits of John's Incredible Pizza Co. store. Cf., e.g.,

17    *In re Nett Designs, Inc.*, 236 F.3d at 1342 ("The Board noted that dictionary definitions of

18    ULTIMATE include '[r]epresenting or exhibiting the greatest possible development or

19    sophistication: the ultimate bicycle,' and 'greatest or highest possible.' The advertising brochure,

20    which Nett Designs submitted as a specimen of use for its application, advances such meanings

21    by stating, 'The "Load Llama The Ultimate Bike Rack" allows users of bicycles to enjoy the ride

22    without constant apprehension that carried-along objects may fall off the carrier,' and 'this is the

23    rack, a basket without the bulk.' Such statements advance the consumer perception that Nett

24    _____

25    [108]Declaration of Andrew P. Lycans in Opposition of JIPC Management, Inc.'s Motion for

26    Preliminary Injunction ("Lycans Decl."), Exh. Q.

27    [109]Lawrence Decl., Exh. 6.

28    [110]Parlet Decl., Exhs. 12-13.

Designs' bike racks represent or exhibit the greatest possible development or sophistication. Accordingly, substantial evidence supports the Board's finding that consumers will immediately regard THE ULTIMATE BIKE RACK as a laudatory descriptive phrase that touts the superiority of Nett Designs' bike racks").

JIPC contends that "incredible" is not laudatory because alternative definitions include "so implausible as to elicit disbelief," while synonyms include "flimsy," "improbable," "shaky," "unconvincing," and "weak."[111]  It is not likely, however, that JIPC intended to use the term in a negative manner, or that consumers perceive the mark as having these meanings.  Because the court concludes that defendants have rebutted the presumption of secondary meaning by showing that the John's Incredible Pizza Co. mark is a laudatory descriptive phrase.  Consequently, JIPC is not likely to prove that the mark is conceptually strong and entitled to protection.

### ii.    Commercial Strength

"'Placement on the spectrum of distinctiveness does not end the enquiry as to the strength of a mark: it is only the first step.  The second step is to determine the strength of th[e] mark in the marketplace[,] [t]hat is, its degree of recognition in the minds of the relevant customer class.'" *Miss World*, 856 F.2d at 1449 (quoting 1 J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 11:1 (2d ed. 1984)); see also *Petro Shopping Centers v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997) (". . . the placement of a mark in either the suggestive or descriptive category is merely the first step in assessing the strength of a mark for purposes of likelihood of confusion test. . . .   [C]ourts must examine, in addition to the mark's characterization as suggestive or descriptive, the extent of secondary meaning a mark has acquired in the eyes of consumers"); *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 479 (3d Cir. 1994) ("Distinctiveness on the scale of trademarks is one measure of a mark's strength. . . . Commercial strength, or marketplace recognition of the mark, is another"); *John J. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983) (the distinctiveness of the mark and

[111]Pl.'s Reply at 28; Reply Declaration of Steven E. Klein in Support of JIPC Management, Inc.'s Motion for Preliminary Injunction ("Klein Reply Decl."), Exhs. 22-23.

the extent of third party use "both . . . should be considered when analyzing the strength of a particular trademark"); *Sun Banks of Florida, Inc. v. Sun Fed. Savings & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981) (after holding that plaintiff's mark was arbitrary, the court stated: "The ultimate strength of a mark, [however,] the key inquiry before us, is determined by a number of factors which establish its standing in the marketplace"); 2 J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 11.83 (4th ed. 2006) ("While some courts have made the strong-weak evaluation solely upon the place of a term on the spectrum of marks, such an approach is incomplete.  One must in addition look at the marketplace strength of the mark at the time of the litigation or at the time registration is sought").

"[A] suggestive or descriptive mark, which is conceptually weak, can have its overall strength as a mark bolstered by its commercial success." *M2 Software, Inc.*, 421 F.3d at 1081 (citing, *inter alia*, *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002) (recognizing that an otherwise inherently weak mark "may be strengthened by such factors as extensive advertising, length of exclusive use, public recognition"); *GoTo.com*, 202 F.3d at 1208 (stating that GoTo's "tremendous success" strengthened its otherwise suggestive mark)).

JIPC proffers evidence that it has used the John's Incredible Pizza Co. mark in commerce since September 1997, and that it has generated over $220,000,000 in revenue based on marketing and advertising expenditures of approximately $2,850,000.[112]  JIPC's eight stores together serve, on average, approximately 50,000 customers per week.[113]  In addition, the stores have received numerous awards and have annually been recognized in local "Best of" customer recognition surveys.[114]  This suggests that although the mark is descriptive, it has acquired some commercial strength.

Defendants contend, however, that the field of pizza purveyors using the term "incredible"

---

[112]Parlet Decl., ¶ 28.

[113]*Id.*,

[114]*Id.*, ¶ 26, Exh. 16.

is a crowded one.[115]  It is well-established that "extensive third-party use of a term can dilute the strength of a mark."  *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC.*, 447 F.Supp.2d 266, 273 (S.D.N.Y. 2006).  In particular, third-party use of similar terms for similar products is evidence that a trademark holder operates in a "crowded field" of marks.  *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1088 (9th Cir. 2005) ("Use of similar marks by third-party companies in the relevant industry weakens the mark at issue"); see also *Nabisco v. Warner-Lambert Co.*, 32 F.Supp.2d 690, 698-99 (S.D.N.Y. 1999) (extensive third-party use and/or registration of the term "Ice" within the confections industry weakened the "Ice Breakers" mark); *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 744-45 (S.D.N.Y.1997) (substantial third-party use of the name Columbia in connection with a variety of businesses, including hospitals, healthcare services, and institutions, weakened the mark).

"In a 'crowded' field of similar marks, each member of the crowd is relatively 'weak' in its ability to prevent use by others in the crowd."  *Miss World*, 856 F.2d at 144 (citing 1 J. McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 11:26 (2d ed. 1984)).  This is because "a mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive.'  It is merely one of a crowd of marks.  In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other."  *Id.*  The "field" is "defined with particular reference to the context in which a particular mark is used."  *Halo Management, LLC v. Interland, Inc.*, 308 F.Supp.2d 1019, 1034 n.15 (N.D. Cal. 2003).  Thus, in *Halo Management*, the court refused to consider evidence that "halo" had been used in "business[es] completely unrelated to the computer-related ventures plaintiff offer[ed]."  *Id.*

In *Miss World*, Miss World (UK) Ltd. brought suit against Mrs. America Pageants, Inc., alleging that the latter's "Mrs. of the World" pageant infringed its "Miss World" trademark.  856 F.2d at 1447.  The court concluded that Miss World's trademark was "relatively weak" because most beauty pageants use a mark "composed of a martial prefix and a defining geographic term,"

---

[115]Def. CJM's Opp. at 8; Def. IPC's Opp. at 24.

creating a "crowded field." *Id.* at 1449-50; see also *Glow Indus.*, 252 F.Supp.2d at 990-92 (finding that "GLOW" was a relatively weak mark given the crowded field of beauty products using the word "glow").

Defendants argue that numerous pizza restaurants have registered trademarks or formed corporations using some variant of the term "incredible pizza."[116] They cite, for example, trademark applications and registrations for "Pop's Incredible Gourmet Pizza," "The Incredible Flying Pizza Society," "Incredible Pizza Factory," and "The Incredible Pizza Factory."[117] Defendants also cite the operation of pizza restaurants under similar names – e.g., Eric's Incredible Pizza Co. in Ohio; Incredible Pizza, LLC in Delaware; Incredible Pizza, Inc. in Florida; and Incredible Pizza, Inc. in Illinois.[118] IPC notes that in Stockton, California – a city in which JIPC operates a store – "VIPizza - Very Incredible Pizza" has operated since 2001.[119]

Although defendants contend that various entities have used "incredible" in connection with pizza, apart from the Stockton, California pizza establishment, they do not adduce evidence as to whether the third-party marks are still in use or the length of their use. Indeed, some of defendants' evidence indicates that registrations have been abandoned or that the corporations in question have dissolved.[120] Moreover, they do not assert that other pizza restaurants in California use the name "incredible." Absent evidence of the location, extent, and length of competitors' use of similar marks, the court is unable to evaluate whether JIPC indeed uses its mark in a crowded field. Cf. *Electropix v. Liberty Livewire Corp.*, 178 F.Supp.2d 1125, 1130 (C.D. Cal. 2001) ("Defendants argue that extensive third-party use of the mark weighs against finding that the mark is strong. Defendants present a trademark search report displaying over 200 companies

---

[116]Def. CJM's Opp. at 8.

[117]*Id.*

[118]*Id.*

[119]Def. IPC's Opp. at 25; Declaration of Heidi Lahren ("Lahren Decl."), ¶¶ 3-5.

[120]See Lycans Decl., Exhs. R, T.

using 'Livewire' and point out that several of those companies are in the same industry as Plaintiff. Defendants, however, paint an exaggerated picture. Many of these registrations have either been cancelled or abandoned. Many of the companies listed do not use the mark 'Livewire' in their names. . . . Furthermore, Defendants point to only two examples of companies using the mark 'Livewire' that are in the same or similar industry as Plaintiff, and both of these companies do business outside the Los Angeles area, where Plaintiff's injunction is sought. 'Evidence of other unrelated potential infringers is irrelevant to claims of trademark infringement,'" quoting *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 457, 462 (N.D. Cal. 1991); *Charles Schwab & Co., Inc. v. Hibernia Bank*, 665 F.Supp. 800, 806 (N.D. Cal. 1987) ("The defendant has offered no evidence beyond citing the registrations and telephone listings of third party users of the trademark. Such citation is not proof of third party *uses* for showing a crowded field and relative weakness of the mark. As one court pointed out: 'the existence of these registrations is not evidence of what happens in the market place or that customers are familiar with their use.' *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976) (citations omitted). The defendant has the burden of showing how extensive the uses are and how long they have continued," citing 1 J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION (2d ed. 1984) § 11:26 and *Miss Universe, Inc. v. Little Miss U.S.A., Inc.*, 212 U.S.P.Q. 425 (N.D. Ga. 1981)).

IPC has presented evidence, however, that "VIPizza - Very Incredible Pizza" has operated approximately two miles from the Stockton JIPC store for seven years.[121] JIPC asserts that it had never heard of VIPizza before defendants raised it, and that it was not aware the business used a logo that included the phrase "Very Incredible Pizza."[122] JIPC has since learned that VIPizza is a small operation located in the back of a business center, with 28 seats and an "L"-shaped bar.[123]

---

[121]Lahren Decl., ¶¶ 3-5.

[122]Pl.'s Reply at 30.

[123]Declaration of Walter Bielawski in Support of Motion for Preliminary Injunction ("Bielawski Decl."), ¶¶ 5-6.

There are six games located on one side of the room, three of which are "crane" games; there are also five televisions.[124]  VIPizza serves an all-you-can-eat lunch buffet Monday through Friday.[125]  JIPC has demanded that VIPizza cease using the phrase "Very Incredible Pizza."[126]  VIPizza does not appear to offer food and entertainment services on the same scale as JIPC, suggesting that its use has not significantly weakened the commercial success of JIPC's mark.  Cf. *Elizabeth Taylor Cosmetics Co., Inc. v. Annick Goutal, S.A.R.L.*, 673 F.Supp. 1238, 1244-45 (S.D.N.Y. 1987) ("Taylor's evidence of the use of 'Passion' in fragrance products has not weakened Goutal's mark.  None of these low cost items compete either in quality, price, or location with Goutal").  As a result, because JIPC's mark is conceptually weak, but commercially strong, the court finds that this *Sleekcraft* factor weighs somewhat in its favor.  Cf., e.g., *Herbalife Intern., Inc. v. Lumene North America LLC*, CV 07-5040 AHM (RCx), 2007 WL 4225776, *6 (C.D. Cal. Oct. 15, 2007) ("Herbalife has shown that it is likely to succeed in showing that RADIANT C is suggestive as applied to skin care products and that it has achieved marketplace recognition.  Considering the overall strength of the mark, the Court finds that its commercial strength largely offsets its conceptual weakness.  This factor weighs slightly in favor of Herbalife").

### b.    Proximity or Relatedness of the Goods

Goods are proximate or related if they "are similar in use and function," and "would be reasonably thought by the buying public to come from the same source if sold under the same mark.'"  *Sleekcraft*, 599 F.2d at 348 n. 10, 350 (quoting *Standard Brands, Inc. v. Smidler*, 151 F.2d 34, 37 (2d Cir. 1945)); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir. 1963) ("The use need not be the same as, nor one in competition with the original use.  The question is, are the uses related so that they are likely to be connected in the mind of a prospective purchaser"); see also *Brookfield Communications*, 174 F.3d at 1056 (holding that

---

[124]*Id.*, ¶ 6.

[125]*Id.*

[126]Pl.'s Reply at 30-31.

1   because "both companies offer products and services relating to the entertainment industry

2   generally, and their principal lines of business both relate to movies specifically," there was

3   sufficient relatedness of goods to support a finding of likelihood of confusion); 4 J. Thomas

4   McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 24.24 (4th ed. 2006) ("Goods are 'related'

5   if consumers are likely to mistakenly think that the infringer's goods come from the same source

6   as the senior user's goods or are sponsored or approved by the senior user").

7       JIPC argues that it and IPC offer identical restaurant and entertainment services, including

8   all-you-can-eat pizza buffets, party rooms, and an entertainment center featuring games and

9   rides.[127]  It also contends that IPC and IPFG's restaurant franchising services are directly related

10  to the restaurant services offered by JIPC.  With respect to defendant CJM, JIPC contends that

11  both parties offer entertainment services and that CJM's viewers are likely to watch Nascar races

12  at restaurants and bars such as JIPC's.[128]

13      Although defendants contend that their franchising and racing activities are substantially

14  different than the restaurant and entertainment services offered by JIPC, defendants' use "need

15  not be the same as, nor one in competition with the original use.  The question is, are the uses

16  related so that they are likely to be connected in the mind of a prospective purchaser."

17  *Fleischmann Distilling Corp.*, 314 F.2d at 159.  Because defendants' franchising and racing

18  activities are used to promote, expand and/or advertise the restaurant and entertainment services

19  offered by IPC, the court agrees with JIPC that the parties' goods and services are proximate or

20  related.  Cf. *Maids to Order of Ohio, Inc. v. Maid-to-Order, Inc.*, 78 U.S.P.Q.2d 1899, 1909-10

21  (T.T.A.B. 2006) ("The class 37 'maid services' set forth in MTO-Ohio's registration are highly

22  similar, if not identical, to the services set forth in MTO's registration, namely, 'the cleaning of

23  domestic and business premises.'  Moreover, because the class 35 franchising services set forth

24  in MTO-Ohio's registration involve the franchising of maid services, such franchising services are

25  also similar to the services of cleaning of domestic and business premises set forth in MTO's

26

27      [127]Pl.'s Mem. at 20.

28      [128]*Id.* at 21.

34

1   registration").   Accordingly, the court finds that JIPC will probably be able to prove that this

2   factor favors a finding of likelihood of consumer confusion.

3                   **c.      Similarity of the Marks**

4           The "central element" of trademark infringement is likelihood of confusion, or "whether

5   'the similarity of the marks is likely to confuse customers about the source of the products.'"

6   *GoTo.com*, 202 F.3d at 1205 (quoting *Official Airline Guides v. Goss*, 6 F.3d 1385, 1391 (9th

7   Cir. 1993)); see also *Perfumebay.com, Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007)

8   ("'The similarity of the marks will always be an important factor.   Where the two marks are

9   entirely dissimilar, there is no likelihood of confusion,'" quoting *Brookfield Communications*, 174

10  F.3d at 1054).

11          "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*,

12  599 F.2d at 351.   When judging similarity, trademarks should be considered as they are

13  encountered in the marketplace, taking into account the normal circumstances surrounding

14  purchase of the type of goods they represent.   *Id.*; *Nutri/System, Inc. v. Con-Stan Indus.*, Inc.,

15  809 F.2d 601, 605-06 (9th Cir. 1987) ("[D]etermination of 'similarity' involves consideration of

16  'the marks and names in their entirety and as they appear in the marketplace,'" quoting *Alpha

17  Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980)); *Lindy Pen

18  Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984), cert. denied, 469 U.S. 1188 (1985);

19  *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 759 (9th Cir. 1978).

20          "Different packaging, coloring, and labeling can be significant factors in determining

21  whether there is a likelihood of confusion." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 644

22  (7th Cir. 2001); see also *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 47 (2d Cir. 2000)

23  ("Our inquiry does not end with a comparison of the marks themselves.   Rather, in determining

24  whether two marks are confusingly similar, we must 'appraise the overall impression created by

25  . . . the context in which they are found and consider the totality of factors that could cause

26  confusion among prospective purchasers'"); *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d

27  739, 744 (2d Cir. 1998) ("In determining whether the two marks are similar, and therefore likely

28  to provoke confusion among prospective purchasers, courts appraise 'the overall impression

created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers,'" quoting *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993)); *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) ("Even if the trade names are similar, the likelihood of confusion is reduced if the two trademarks, taken as a whole, are visually distinct"); *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, C 05-587 MHP, 2005 WL 701599, *5 (N.D. Cal. Mar. 23, 2005) ("In comparing the parties' marks, the court must focus on how each of the marks are perceived by the ordinary consumer in the marketplace, taking into account similarities in the marks' appearance and pronunciation as well as their respective definitions," citing *Brookfield Communications*, 174 F.3d at 1054, and *Dreamwerks*, 142 F.3d at 1131).

Visually, the parties' marks are dissimilar. Although both utilize the same words, JIPC's mark utilizes a stylized font, with the word "John's" displayed prominently above the words "Incredible Pizza Co." in a different font, size, and color.[129] The writing in JIPC's mark is commonly yellow, purple, and white. In the design mark, the words are superimposed on the image of a globe, with "John's" above and "Incredible Pizza Co." below on a purple banner that wraps around the globe.[130] IPC's mark, by contrast, employs a different stylized font, with the words printed in white and red.[131] The word "Pizza" is in the largest font size, and the mark spells out the word "Company." On IPC's design mark, the words are superimposed on a yellow pizza-shaped triangle; the portion depicting the top of the crust is green. Below the words "Incredible Pizza Company" is a blue strip with the phrase "Great Food, Fun, Family & Friends"; a black and white checkered rectangle appears below the blue strip at the point of the triangle.

Given these differences – in particular the fact that the word "John's" visually dominates JIPC's mark, the "sight" subfactor favors defendants. See *Jansen Enterprises, Inc. v. Israel Rind*

---

[129]Def. IPC's Opp. at 2.

[130]*Id.*

[131]

36

and Stuart Stone, 85 U.S.P.Q.2d 1104, *5 (T.T.A.B. 2007) ("We find that [despite prominent graphic features,] the literal portion [i.e., the words] of respondent's mark dominates respondent's mark and that, in turn, the literal portion is dominated by the arbitrary name 'IZZY'S.'  The name 'IZZY'S' clearly is the most distinctive feature of the literal portion of respondent's mark and is the portion most likely to be remembered by consumers and used when referring to respondent's restaurant services.  In particular, the name 'IZZY'S' is in larger font size than the other words, and is placed toward the top of the literal portion. . . .  Accordingly, the name 'IZZY'S' is the dominant element of respondent's mark and is therefore accorded greater weight in determining the likelihood of confusion" (citations omitted)); see also Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 47-48 (2d Cir. 2000) (holding that the presentation of competing marks "in starkly different typefaces and styles," as well as differences in the shape, dimensions and color patterns of the product packages created "distinctly different commercial impressions," and negated any likelihood of consumer confusion).

Aurally and conceptually, the marks incorporate many of the same words, suggesting that they have similar sounds and meaning.  Such similarities are undercut, however, by JIPC's prominent use of the word "John's" in its mark.  In addition to being the first word in the mark, IPC has presented evidence that JIPC often appears to shorten its mark to just "John's."  JIPC's website, for instance, states "Welcome to John's!"; "John's has everything you want and more!"; "Enjoy all of the following at all John's Locations"; and "Birthday parties at John's are the best!"[132]  It thus appears that consumers are likely to focus on the word "John's" in JIPC's mark. Cf. Jansen Enterprises, Inc., 85 U.S.P.Q.2d at *5 ("As earlier noted, the words 'The Authentic Flavor Brooklyn Bagels Kosher' and the Star of David design are disclaimed in view of their generic or descriptive nature. These disclaimed features, not to mention the boy design and the Brooklyn Bridge design, are unlikely to be used in calling for the services. Accordingly, the name 'IZZY'S' is the dominant element of respondent's mark and is therefore accorded greater weight in determining the likelihood of confusion.  Although we acknowledge the Federal Circuit's

---

[132]Lawrence Decl., Exh. 15.

caution that there is no general rule as to whether a word or a design dominates in any particular mark, it is highly unlikely that consumers will refer to respondent's restaurant as anything other than 'IZZY'S.'  Given the easily pronounced and distinctive name 'IZZY'S' and the common knowledge that restaurants often are identified by a person's name, consumers are more likely to remember 'IZZY'S' than the other elements of the mark").

"'According to the "anti-dissection" rule, courts may not dissect marks to examine and compare their component parts.  Although the court may give greater weight to a dominant feature of a mark ( i.e., that which is likely to make a greater impression on an ordinary buyer), in the end the court's analysis must consider and compare the marks in their entirety.'"  *Abercrombie and Fitch Co. v. Moose Creek, Inc.*, CV 06-6245 AHM (SSx), 2007 WL 4973852, *11 (C.D. Cal. Aug. 17, 2007) (quoting *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F.Supp.2d 1214, 1226-27 (C. D. Cal. 2004)); see also *Karoun Dairies Inc. v. Los Altos Food Products Inc.*, 107 Fed. Appx. 785, 788 (9th Cir. Aug. 19, 2004) (Unpub. Disp.) ("[U]nder the anti-dissection rule, 'the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace'").

There is no evidence that JIPC ever uses its mark without including the lead word "John's."  IPC, by contrast, ordinarily uses its mark with the lead word "America's" or the name of the city in which the IPC restaurant is located – e.g., "Springfield's."[133]  Viewing the marks as a whole, the court does not perceive strong similarities in sound and meaning between "John's Incredible Pizza Co." and "America's Incredible Pizza Co." or, e.g., "Springfield's Incredible Pizza Co."  Cf. *Karoun Dairies Inc.*, 107 Fed. Appx. at 788 ("The district court correctly found that the initial word found in the parties' marks, "Karoun" and "Byblos," [of "Karoun's Cailfornia Cheese" and "Byblos California Cheese"] are substantially different in sight and sound. Moreover, "Karoun" and "Byblos" lack any similar meaning.  The only words of the marks that are similar are "California Cheese," which Karoun concedes is an unprotectable descriptive phrase

---

[133]See, e.g., Parlet Decl., Exh. 22.  The CJM No. 11 Race Car, for example, bears IPC's "America's Incredible Pizza Co." mark.  (*Id.*).

1   that lacks secondary meaning.  The trademark as a whole is in no way confusing").

2           Under Ninth Circuit case law,"similarities in [sight, sound, and meaning] 'weigh more

3   heavily than differences.'" *E. & J. Gallo Winery*, 967 F.2d at 1291 (quoting *Sleekcraft*, 599 F.2d

4   at 351).   Although both marks use the words "Incredible Pizza," the fact that each uses a

5   different, dominant lead word ("John's" in JIPC's mark and "America's" or a location name in

6   IPC's mark) causes the court to conclude that the sound and meaning of the marks is only

7   minimally similar.   There are, moreover, striking differences in the visual appearance of the

8   marks.   Consequently, the court concludes that, at best, this third *Sleekcraft* factor weighs only

9   slightly in favor of a finding that JIPC will be able to prove likelihood of confusion.   See

10  *Entrepreneur Media, Inc*, 279 F.3d at 1146 (noting that "visual difference is not always decisive"

11  in assessing consumer reaction because "[e]ven silent readers usually 'hear' words as they read

12  and are likely to notice syllabic differences"); *Tse, Saiget, Watanabe and McClure, Inc. v.*

13  *Gentlecare Systems, Inc.*, 936 F.2d 580, 1991 WL 108770, *4 (9th Cir. June 19, 1991) (Unpub.

14  Disp.) (affirming the district court's finding that marks were similar because, while "[c]ertainly

15  there are differences in the visual logos of Gentle Dental and GentleCare[,] . . . the sounds of

16  'Gentle Dental' and 'GentleCare Dental Centers' are certainly similar, as are the meanings"); see

17  also *A.C. Legg Packing Co. v. Olde Plantation Spice Co.*, 61 F.Supp.2d 426, 430-31 (D. Md.

18  1999) ("OPSC's OLDE PLANTATION SPICE mark is nearly identical in appearance to A.C. Legg's

19  OLD PLANTATION mark, differing only in the spelling of 'olde' and the addition of the generic

20  word 'spice.'  The marks are identical in sound and connotation").   Compare *Surfvivor Media,*

21  *Inc. v. Survivor Productions*, 406 F.3d 625, 633 (9th Cir. 2005) ("The visual subfactor favors

22  Survivor.  Survivor makes a strong argument that because its mark is usually accompanied by the

23  distinctive slogan "outwit [,] outplay[,] outlast," or a stylized graphic, the marks are dissimilar.

24  . . .  The 'sound' subfactor favors Deptula.  Phonetically, 'Survivor' and 'Surfvivor' are nearly

25  identical.  However, the 'meaning' subfactor slightly favors Survivor.  The word 'survivor'

26  evokes its commonly understood meaning: one who 'continue[s] to exist or live.'  However

27  'surfvivor,' a coined term, connotes a more precise reference to surfing.  Examining the marks

28  in their relative entirety does not reflect the existence of a material issue of fact regarding the

similarity of the marks.  The subfactors do not weigh in favor of either party").

### d.    Evidence of Actual Confusion

Evidence of actual confusion is not necessary to prevail on an infringement claim or to secure injunctive relief; it can, however, be persuasive proof that future confusion is likely.  See *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) ("[A]ctual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act"); *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987) ("Evidence of actual confusion is strong evidence of likelihood of confusion, but it is not determinative"); *Levi Strauss*, 778 F.2d at 1360 ("The absence of evidence of actual confusion need not give rise to an inference of no likelihood of confusion"); *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir. 1990) (affirming the grant of an injunction for plaintiff despite the absence of evidence of actual consumer confusion); *Sleekcraft*, 599 F.2d at 352 (proof of actual confusion "is persuasive proof that future confusion is likely").

Parlet, JIPC's president and CEO, asserts that JIPC has received numerous emails and inquires from consumers that display confusion regarding a possible affiliation between JIPC and IPC.[134]   JIPC has received inquiries from customers looking for information on IPC stores, attempting to contact IPC stores or book events there, wondering why IPC stores were not listed on JIPC's website or asking whether JIPC was affiliated with IPC's website.[135]  Additionally, JIPC has received inquiries from individuals who want to obtain information on franchising, or who are interested in being hired at IPC locations.[136]   JIPC contends that its outside accountant was confused regarding IPC's sponsorship of the No. 11 Race Car, and wrote Parlet an email on June 25, 2008 stating, "I was watching Nascar qualifying over the weekend and was surprised to see a car with the large words 'Incredible Pizza Company' on it.  I did a double-take and had to pause

---

[134]Parlet Decl., ¶ 59.

[135]*Id.*, Exh. 30.

[136]*Id.*

my Tivo to confirm that the smaller letters actually said 'America's' and not 'John's.'"[137]

While JIPC has adduced evidence of some instances of purported confusion between the parties' marks, its showing is not adequate to establish that there is a likelihood of confusion.  As defendants note, although the parties have used somewhat similar marks for nearly nine years, and JIPC claims to serve 50,000 customers per week, JIPC proffers minimal evidence of actual confusion – i.e., approximately 20 examples of purported confusion occurring within the last four years: two in 2004; 13 in 2005; two in 2006; two in 2007; and one in 2008.[138]  As defendants also note, JIPC has presented no evidence that the misdirected emails and inquiries were the result of actual customer confusion regarding the marks as opposed to carelessness or inattention. Cf. *Studio Red Inc. v. Rockwell Architecture Planning and Design, P.C.*, C 07-396 CW, 2007 WL 1462458, *3-4 (N.D. Cal. May 18, 2007) ("Defendant also argues that Plaintiff's allegations that it has received correspondence and telephone calls at its offices intended for Defendant and that it has received inquiries regarding its New York telephone number when it does not do business in New York are not enough to establish actual confusion. Defendant notes that Plaintiff makes only these general allegations and does not indicate when it received the correspondence and inquiries, or the frequency or nature of the communications. Defendant cites *Duluth News-Tribune v. Mesabi Publishing Co.*, 84 F.3d 1093 (8th Cir. [1996]) in support of its argument.  In *Duluth News*, the Eighth Circuit held that misdirected mail and phone calls failed to raise a factual dispute regarding actual confusion because the evidence was unreliable hearsay and because it found 'the evidence to be de minimis and to show inattentiveness on the part of the caller or sender rather than actual confusion.' *Id.* at 1098. [¶] Plaintiff provides no additional details about the misdirected communications in its reply.  Instead, Plaintiff notes that California courts have accepted such evidence and argues that these communications are enough to establish the likelihood of confusion. However, Plaintiff offers nothing to establish how these phone calls, even if admissible, show confusion rather than 'inattentiveness'").

---

[137]*Id.*, ¶ 50, Exh. 24.

[138]Def. CJM's Opp. at 11-13.

41

In addition, JIPC concedes that it has no evidence of actual confusion that customers have patronized its stores believing them to be IPC's stores.[139]   JIPC's contention that its outside accountant was *almost* confused by the sponsorship of the CJM car, moreover, does not evidence *actual* customer confusion.   See *Surfvivor Media*, 406 F.3d at 633 (holding that this factor favored defendant because there was "scant evidence of actual confusion in the record.  A single retailer and a single customer mistook one Survivor product as Deptula's"); *Nautilus Group, Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330, 1338 (Fed. Cir. 2004) ("'A reasonable juror may . . . find *de minimis* evidence of actual confusion unpersuasive as to the ultimate issue of likelihood of confusion.'  This is appropriate because trademark infringement is only actionable when a mark is likely to 'confuse an *appreciable* number of people as to the source of the product.'  We agree with ICON that the relatively small number of calls presented by Nautilus renders this evidence too unreliable to establish actual confusion," quoting *Entrepreneur Media*, 279 F.3d at 1150, 1151 (emphasis original)); *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 729 (7th Cir. 1998) ("[D]e minimus evidence of actual confusion" does not establish a likelihood of consumer confusion); *Accuride Intern., Inc.*, 871 F.2d at 1537 (district court did not err in finding that anecdotal evidence of actual confusion was "too weak to support a finding of actual confusion," citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978) (evidence of 19 misdirected letters over 4 years was insufficient to establish actual confusion)).  Compare *Chronicle Pub. Co. v. Chronicle Publications, Inc.*, 733 F.Supp. 1371, 1377-78 (N.D. Cal. 1990) ("Plaintiff has provided substantial evidence of actual confusion in the form of over 100 instances of customer confusion.  These include book wholesalers requesting copies of defendant's publications from plaintiff, retailers and wholesalers attempting to return unused copies of defendant's books to plaintiff, bills for defendant's advertising being sent to plaintiff and congratulations on defendant's sales figures being conveyed to plaintiff. . . .  This constitutes substantial evidence of actual confusion and weighs heavily in favor of plaintiff").  The limited evidence of actual confusion JIPC has

---

[139]Lawrence Decl., Exh. 10.

1   developed to date is insufficient to tip this factor in favor of a finding that it will probably be able

2   to prove a likelihood of confusion.

3                 **e.**    **Degree to Which the Parties' Marketing Channels Converge**

4        The marketing channels factor requires the court to consider whether the predominant

5   purchasers of the parties' goods are similar or different, and whether the marketing approaches

6   used resemble each other.  See *Gray v. Meijer, Inc.*, 295 F.3d 641, 649 (6th Cir. 2002); see also

7   *Frehling Enterprises, Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1338 (11th Cir.

8   1999) ("'Dissimilarities between the retail outlets for and the predominant customers of plaintiff's

9   and defendant's goods lessen the possibility of confusion, mistake, or deception.' . . .  This factor

10  takes into consideration where, how, and to whom the parties' products are sold," quoting *Amstar*

11  *Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir.), cert. denied, 449 U.S. 899 (1980)).

12       The parties need not be in direct competition with one another for this factor to weigh in

13  favor of a finding of likelihood of confusion.  Similarly, the parties' outlets and customer bases

14  need not be identical; rather, some degree of overlap suffices.  *Frehling Enterprises*, 192 F.3d at

15  1339; see also *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 877 (Fed.

16  Cir. 1992) ("An opposer need not establish the sale of both parties' services by the same vendor

17  to show employment of the same trade channels. . . .  Rather, this factor covers 'similarity and

18  dissimilarity of established, likely-to-continue trade channels.' . . .  This court does not limit

19  channels of trade to identical stores or agents.  Rather a channel of trade includes the same type

20  of distribution channel.  For example, this court has held channels of trade identical when products

21  were sold under opposing marks in supermarkets and grocery stores across the country. . . .  An

22  opposer does not have the burden to show sales of an infringing product by a specific chain of

23  supermarkets or agents").

24       JIPC asserts that it use many of the same advertising and promotional techniques as IPC,

25  including Internet marketing.[140]  It concedes, however, that until recently, the companies pursued

26  their marketing efforts in geographically remote areas – JIPC in California and IPC in the

27  _____

28      [140]Pl.'s Mem. at 21.

Midwest. Disparate geographic marketing of this nature is permissible and would not support a finding of likely confusion between the marks.  See *Brookfield Communications*, 174 F.3d at 1054 ("Even where there is precise identity of a complainant's and an alleged infringer's mark, there may be no consumer confusion – and thus no trademark infringement – if the alleged infringer is in a different geographic area or in a wholly different industry," citing *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 515-16, 521-22 (C.C.P.A. 1980) (permitting concurrent use of "Weiner King" as a mark for restaurants featuring hot dogs in New Jersey and "Wiener King" as a mark for restaurants in North Carolina), and *Pinocchio's Pizza Inc. v. Sandra Inc.*, 11 U.S.P.Q.2d 1227, 1228 (T.T.A.B. 1989) (permitting concurrent use of "PINOCCHIO'S" as a service mark for restaurants in Maryland and "PINOCCHIOS" as a service mark for restaurants elsewhere in the country)).  JIPC maintains that in April 2008, however, IPC, in conjunction with CJM, began specifically targeting California, bringing the companies into direct competition, and increasing the chance that potential purchasers within JIPC's territory will encounter both marks.[141]

IPC acknowledges that some of the marketing channels the parties use in their respective geographic areas are similar, but asserts that JIPC has never used the marketing techniques that apparently triggered this lawsuit – a Nascar sponsorship and the offering of franchises.[142] "[M]arketing channels that do not overlap diminish the likelihood of confusion." *eAcceleration Corp. v. Trend Micro, Inc.*, 408 F.Supp.2d 1110, 1118 (W.D. Wash. 2006).  Apart from the fact that JIPC and IPC operate websites promoting their stores, JIPC has adduced no evidence that the parties have used similar marketing channels in the region where the alleged infringement occurred – i.e., California.  The court therefore concludes that this factor is not likely to support a finding of likelihood of confusion.

### f.    Degree of Care Exercised by Consumers

"It is generally assumed that consumers with expertise or who are buying expensive

---

[141]*Id.* at 21-22.

[142]Def. IPC's Opp. at 28; see also Def. CJM's Opp. at 13.

products or services exercise a greater degree of care when doing so and are thus less easily confused." *Edge Wireless, LLC v. U.S. Cellular Corp.*, 312 F.Supp.2d 1325, 1333 (D. Or. 2003) (citing *Brookfield Communications*, 174 F.3d at 1060 ("What is expected of this reasonably prudent consumer depends on the circumstances. We expect him to be more discerning – and less easily confused – when he is purchasing expensive items")). By contrast, "[w]hen dealing with inexpensive products, consumers are likely to exercise less care, thus making confusion more likely." *Discovery Communications, Inc. v. Animal Planet, Inc.*, 172 F.Supp.2d 1282, 1290 (C.D. Cal. 2001) (citing *Brookfield Communications*, 174 F.3d at 1060 and *E. & J. Gallo Winery*, 967 F.2d at 1293).

JIPC argues that its consumers are unlikely to exercise care in purchasing due to the relatively inexpensive nature of the parties' restaurant and entertainment services.[143] It observes that both it and IPC charge approximately $4.99 to $12 for their all-you-can-eat buffets. Games and rides costs less. Furthermore, a significant portion of the parties' overlapping target audience comprises children 16 or younger, who are less sophisticated and more susceptible to confusion.[144]

While the court agrees that consumers at the parties' stores are not likely to exercise great care in making their purchasing decisions, as with the marketing channels factor, the utility of this factor is limited by the fact that at the present time, consumers in California do not have the opportunity to visit IPC's stores. Currently, the only activities IPC has directed towards California are the offering of franchises in the state (none has yet been sold) and sponsoring the No. 11 Race Car (which has not yet raced in California). Because the degree of care JIPC's customers exercise in choosing to visit JIPC stores does not directly correlate with these activities, this *Sleekcraft* factor does not weigh in favor of a finding that JIPC will probably be able prove a likelihood of consumer confusion.

### g. Defendants' Intent

Knowing adoption of a mark closely similar to one used by another is a basis for inferring

---

[143]Pl.'s Mem. at 22.

[144]*Id.* at 22-23; Parlet Decl., ¶ 56.

intent to deceive.   See *Official Airline Guides*, 6 F.3d at 1394 ("When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public"); *Nutri/System, Inc.*, 809 F.2d at 606 ("When an alleged infringer knowingly adopts a mark similar to another's, the court examines his good faith and intent in developing and marketing it," citing *Sleekcraft*, 599 F.2d at 354, and *Carson Mfg. Co. v. Carsonite Int'l Corp., Inc.*, 686 F.2d 665, 671 (9th Cir. 1981), cert. denied, 460 U.S. 1052 (1983)); see also *Daddy's Junky Music Stores, Inc., v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 286 (6th Cir. 1997) ("[T]he use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying").

JIPC argues that IPC selected its mark in bad faith because Barsness was aware of JIPC's use of the John's Incredible Pizza Co. mark when (1) he decided to adopt and use the Incredible Pizza Co. mark in connection with future restaurant and entertainment services; (2) Barsness applied to register the Incredible Pizza Co. mark and design on an intent to use basis and failed to disclose JIPC's prior use to the PTO; and (3) IPC opened its first locations in 1999 and 2002 despite JIPC's objections to IPC's use of the mark.[145]

Although it is true that a court may presume intent to deceive when an alleged infringer knowingly adopts a mark similar to plaintiff's, see *E. & J. Gallo Winery*, 967 F.2d at 1293, "a junior user's knowledge of another's mark does not necessarily compel a finding of bad faith." *Sunenblick v. Harrell*, 895 F.Supp. 616, 633 (S.D.N.Y. 1995); see also *Sweats Fashions v. Pannill Knitting Co.*, 833 F.2d 1560, 1565 (Fed. Cir. 1987) ("Prior to any use, Pannill obtained a trademark search on the mark ULTRA SWEATS and an opinion of counsel (which is of record) that the mark was available, *inter alia*, notwithstanding Fashions' marks.  Fashions would have us infer bad faith because of Pannill's awareness of Fashions' marks.  However, an inference of 'bad faith' requires something more than mere knowledge of a prior similar mark.  That is all that the record here shows").  It is undisputed that IPC's founder, Barsness, knew of JIPC's mark at

---

[145]Pl.'s Mem. at 23.

the time he chose to utilize the Incredible Pizza Co. mark for his restaurants.[146]  JIPC, however, presents no evidence that IPC selected its mark to deceive customers or to benefit from JIPC's California use of "John's Incredible Pizza Co."   Until recently, IPC conducted its business entirely outside California – the only region where JIPC's stores are located.   Compare *E. & J. Gallo Winery*, 967 F.2d at 1293 ("Joseph had told Ernest Gallo that he would not use his name as a trademark, and Ernest had informed him that the Winery would object if he did.  Later, a potential sales manager recommended that Joseph use his name in order to benefit from the familiarity of the GALLO mark. A label designer made the same recommendation. While Joseph seemed reluctant to follow their recommendations at first, ultimately he overcame his reluctance. Shortly after he began selling the cheese under the JOSEPH GALLO mark, Ernest called him and told him that the mark violated their prior understanding.  Joseph responded that he could make more money by using the mark.  Taken together, these findings provide adequate support for the district court's determination that Joseph intended to take advantage of the goodwill of the GALLO mark").

JIPC notes that IPC failed to advise the USPTO of JIPC's mark when attempting to register its own.  This failure to notify the PTO does not necessarily constitute fraud, however.  Cf. *Quiksilver, Inc.*, 466 F.3d at 755 ("In the application process, Robert McKnight, Quiksilver's Chief Executive Officer, signed an oath on behalf of Quiksilver attesting that he believed Quiksilver to be the owner of the 'ROXY' mark and that, 'to the best of his knowledge and belief, no other person, firm, corporation or association has the right to use [the 'ROXY'] mark in commerce . . .'  In the face of McKnight's attestation, mere knowledge of the existence of the 'ROXYWEAR' mark does not constitute fraud," citing *Yocum v. Covington*, 216 U.S.P.Q. 210, 216-17 (T.T.A.B.1982) ("[T]he statement of an applicant that no other person 'to the best of his knowledge' has the right to use the mark does not require the applicant to disclose those persons whom he may have heard are using the mark *if he feels that the rights of such others are not superior to his*")).  Although Barsness knew of JIPC's mark, he contends he "believed in good

---

[146]See Barsness Decl., ¶ 3.

1  faith that [his] mark was sufficiently different from any other mark, including any marks used by

2  Parlet, such that no likelihood of confusion of existed."[147]   The fact that JIPC uses the word

3  "John's" as the dominant element in its mark lends credence to Barsness' claim.   Accordingly,

4  the court concludes that JIPC has not shown that this factor is likely to support a finding of

5  likelihood of confusion.

6  **h.   Likelihood That the Parties Will Expand Their Product Lines**

7  "A '"strong possibility" that either party may expand [its] business to compete with the

8  other will weigh in favor of finding that the present use is infringing.'" *Tillamook Country*

9  *Smoker, Inc. v. Tillamook County Creamery Ass'n*, 311 F.Supp.2d 1023, 1044 (D. Or. 2004)

10  (quoting *Sleekcraft*, 599 F.2d at 354).

11  JIPC notes that it offers services identical to IPC's; due to the geographic distance between

12  them, there has previously been no overlap in their respective markets.[148] Recently, however, IPC

13  has indicated that it intends to offer franchises in California and has sponsored a CJM race car that

14  will likely race in California.   The court therefore finds that this factor weighs in JIPC's favor in

15  showing a likelihood of confusion.

16  **3.   Evaluation of the Factors**

17  "To prevail on the ultimate question toward which the *Sleekcraft* analysis is directed – the

18  likelihood of confusion of consumers – [plaintiff] must show sufficient evidence to permit a

19  rational trier of fact to find that confusion is 'probable,' not merely 'possible.'" *M2 Software*, 421

20  F.3d at 1085 (citing *Murray v. CNBC*, 86 F.3d 858, 861 (9th Cir. 1996)).   The court has found

21  it probable that two of the *Sleekcraft* factors will weigh in favor of a finding of likelihood of

22  confusion, that two weigh slightly in favor of such a finding, and that four do not support such

23  a finding.   As noted, the factors should not be applied mechanistically, but used as a guide in

24  assessing likelihood of confusion.   See *Dreamwerks*, 142 F.3d at 1129; *Thane Int'l, Inc. v. Trek*

25  *Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002) ("The list of [*Sleekcraft*] factors is not a score-

26  ─────────────

27  [147]*Id.*, ¶ 4.

28  [148]Pl.'s Mem. at 24.

48

1    card – whether a party 'wins' a majority of the factors is not the point.  Nor should '[t]he factors

2    . . . be rigidly weighed; we do not count beans," citing *Dreamwerks*, 142 F.3d at 1129).

3        Applying the factors as *Dreamwerks* directs, the court concludes JIPC has shown only a

4    fair chance that it will be able to prove likelihood of consumer confusion.  The two factors that

5    strongly support its claim are that JIPC and IPC's goods are proximately related and that IPC is

6    likely to expand its product line into JIPC's geographic market.  With respect to the most

7    important factors in assessing likelihood of consumer confusion, however – i.e., the strength of

8    plaintiff's mark and similarity of the marks, see *Goto.com*, 202 F.3d at 1205 (similarity of the

9    marks "has always been considered a critical question in the likelihood-of-confusion analysis")

10   – JIPC has not shown that they strongly support its claim of likely confusion.  JIPC has failed to

11   demonstrate that its mark is conceptually strong, and its showing on commercial strength results

12   only in a finding that the factor weighs somewhat in its favor. Regarding the similarity of the

13   marks, the court has concluded that the marks are visually distinct as they appear in the

14   marketplace and that JIPC's showing respecting similar sound and meaning is undercut by the

15   prominent use of the lead word "John's" in its mark.

16       As to the remaining factors – evidence of actual confusion, the degree to which the parties'

17   marketing channels presently converge, the type of goods and degree of consumer care, and

18   defendants' intent in selecting its mark – the court has determined that these are unlikely to

19   support JIPC's claim of likelihood of confusion.  Consequently, after assessing the *Sleekcraft*

20   factors, and concluding that JIPC is unlikely to prove its allegation that it owns the "Incredible

21   Pizza Co." mark, the court finds that, at best, JIPC has raised serious questions regarding likely

22   consumer confusion, and thus regarding its ability to succeed on the merits of its trademark

23   infringement claim.[149]

24   ───────────────

25   [149]At the hearing, counsel for JIPC advanced numerous arguments in support of claims
     (1) that JIPC owns the rights to the "Incredible Pizza Co." mark (as opposed to the "John's
26   Incredible Pizza Co." mark); (2) that the John's Incredible Pizza Co. mark is not merely
     descriptive, but suggestive or arbitrary; and (3) that JIPC's and IPC's marks are similar and will
27   cause consumer confusion.  Assuming *arguendo* that all of these points were resolved in JIPC's
28   favor, and the court determined that it was likely to succeed on the merits of its infringement

1

**C.        Unfair Competition Claims – Likelihood of Success on the Merits**

2      In addition to seeking a preliminary injunction on its trademark infringement claim,

3  plaintiff requests that the court enter an injunction based on its claims of unfair competition under

4  § 43(a)(1) of the Lanham Act and California's Unfair Competition Law, California Business &

5  Professions Code §§ 17200 et seq.  Under the Lanham Act, "[t]he elements necessary to establish

6  trademark infringement and unfair competition claims are identical."  *Affinity Group, Inc. V.*

7  *Balser Wealth Management, LLC*, CV 05-1555 WQH LSP, 2007 WL 1111239, *2 (S.D. Cal.

8  Apr. 10, 2007) (citing *Brookfield Communications*, 174 F.3d at 1046 n. 6, 1047 n. 8). "Federal

9  trademark infringement claims under § 32 of the Lanham Act apply to registered marks, while

10  unfair competition claims under § 43(a) of the Lanham Act apply to both registered and

11  unregistered marks and protect against a wider range of practices."  *Id.* (citing *Brookfield*

12  *Communications*, 174 F.3d at 1046-47; 15 U.S.C. § 1114; 15 U.S.C. § 1125(a)(1)).  "In both

13  cases, the plaintiff must 'prove the existence of a trademark and the subsequent use by another in

14  a manner likely to create consumer confusion.'" *Id.* (quoting *Comedy III Prod., Inc. v. New Line*

15  *Cinema*, 200 F.3d 593, 594 (9th Cir. 2000)).

16      Section 17200 of the California Business & Professions Code provides an independent

17  cause of action for business practices that violate other laws.  See *Leonel v. American Airlines,*

18  *Inc.*, 400 F.3d 702, 707 (9th Cir. 2005).  Like federal unfair competition claims, "[f]ederal

19  trademark infringement and state unfair competition are . . . coextensive: Where a likelihood of

20  confusion has been established for infringement purposes, it has been established for unfair

21  competition purposes as well."  *Halo Management, LLC v. Interland, Inc.*, 308 F.Supp.2d 1019,

22  1027 n. 10 (N.D. Cal. 2003) (citing *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175,

23  1178 (9th Cir. 1988); CAL. BUS & PROF. CODE § 17200); see also *Entrepreneur Media*, 279 F.3d

24  at 1153 (" . . . 'actions pursuant to . . . § 17200 are "substantially congruent" to claims made

25  under the Lanham Act,'" quoting *Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994)).

26  _____

27  claim, the court would nonetheless deny JIPC's motion for preliminary injunction because, as
   discussed *infra*, it has failed to establish the other element necessary to obtain injunctive relief –

28  that it faces imminent irreparable harm.

1    Because JIPC's § 43(a)(1) and § 17200 unfair competition claims are predicated on

2    trademark infringement, and because it has raised serious questions regarding the merits of its

3    trademark infringement claim, the court concludes that JIPC has also raised serious questions

4    respecting its ability to prove the state law unfair competition claim.

5    **D.    Irreparable Harm**

6    Courts deciding whether to issue a preliminary injunction in favor of a plaintiff that has

7    shown a likelihood of success on a trademark infringement claim have, in the past, presumed that

8    the party will suffer irreparable harm.  See, e.g., *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,

9    4 F.3d 819, 826 (9th Cir. 1993) ("In trademark cases, once the plaintiff establishes a likelihood

10   of confusion between the plaintiff's mark and the defendant's, it is ordinarily presumed the

11   plaintiff will suffer irreparable harm if injunctive relief is not granted").  Recently, however, in

12   *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the Supreme Court held that the

13   Federal Circuit erred in adopting a categorical rule that permanent injunctive relief is generally

14   available once a patentee establishes infringement and validity.  *Id.* at 392-94.

15   Although *eBay* involved the issuance of a permanent injunction, "it has been applied to

16   preliminary, as well as permanent, injunctions, and has been read to limit the presumption of

17   irreparable harm [based] solely upon the finding of infringement."  *Hologic, Inc. v. Senorx, Inc.*,

18   C 08-133 RMW, 2008 WL 1860035, *15 (N.D. Cal. Apr. 25, 2008) ("[I]t does not appear that

19   [a] presumption of irreparable harm should be extended to preliminary injunction applications

20   involving patents"); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197,

21   1214 (C.D. Cal. 2007) (declining to apply a presumption of irreparable harm in a copyright case);

22   *Chamberlain Group, Inc. v. Lear Corp.*, C 05-3449,  2007 WL 1017751, *5 (N.D. Ill. Mar. 30,

23   2007) (citations omitted)); see also *Seitz v. Envirotech Sys. Worldwide Inc.*, CV H 02-4782, 2007

24   WL 1795683, *2 (S.D. Tex. June 19, 2007) (recognizing that *eBay* "clarified the standard for

25   issuing a[ ] [preliminary] injunction in a patent case," and that now "[a] court cannot automatically

26   issue an injunction based on infringement allegations," but must instead independently consider,

27   *inter alia*, whether the movant "has suffered an irreparable injury"); *Torspo Hockey Intern., Inc.*

28   *v. Kor Hockey Ltd.*, 491 F.Supp.2d 871, 881 (D. Minn. 2007) ("[Counter-claimant] argues that

1    if it has established a likelihood of success on the merits, it is entitled to a presumption of

2    irreparable harm.  [It] cites various pre-2006 Federal Circuit cases to support its position.  In light

3    of the Supreme Court's decision in *eBay*[ ], the Court finds that it may not presume that a patentee

4    who is likely to succeed on the merits at trial will suffer irreparable harm in the absence of a

5    preliminary injunction"); *Erico Int'l Corp. v. Doc's Marketing, Inc.*, No. CV 05-2924, 2007 WL

6    108450, *7 (N.D. Ohio. Jan. 9, 2007) ("In *Ebay*, the Supreme Court held that traditional

7    principles of equity generally applied in determining whether it is appropriate to issue a permanent

8    injunction *apply with equal force in patent cases*.  As such, the Court instructed that the Federal

9    Circuit cannot alter the traditional standard.  While *Ebay* involved a permanent injunction

10   specifically, the Court did not limit its holding to that context; the Court's reasoning likely applies

11   with even greater force at the preliminary injunction stage" (emphasis original)); *Canon, Inc. v.*

12   *GCC Int'l Ltd.*, 450 F.Supp.2d 243, 254 (S.D.N.Y. 2006) ("The Supreme Court's decision in

13   *eBay*[ ] makes plain that the mere fact that the Patent Act describes 'the right to exclude others

14   from making, using, offering for sale or selling the invention,' does not mean that an application

15   for a[ ] [preliminary] injunction in a patent case is exempt from the 'traditional principles of

16   equity.'  Consistent with those equitable principles, the movant must demonstrate the likelihood

17   of irreparable injury in the absence of a grant of the requested injunction" (citation omitted)).[150]

18

19       [150]The Federal Circuit has expressly declined to address whether, following *eBay*, the

20   presumption of irreparable harm continues to apply in the context of a motion for preliminary

21   injunction, see *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 n. 9 (Fed. Cir. 2006),.

22   and there appears, as yet, to be no definitive guidance from the Ninth Circuit on the issue.  In the

23   absence of binding precedent, the court finds persuasive the reasoning of numerous district courts

24   that have disregarded the presumption in preliminary injunction proceedings.  As Judge O'Malley

25   recognized in *Erico International Corp.*, "the [*eBay*] Court did not limit its holding" to permanent

26   injunctions, and the Court's "reasoning likely applies with even greater force at the preliminary

27   injunction stage."  2007 WL 108450 at *7.  This is because entitlement to a permanent injunction

28   requires a showing of *actual* success on the merits rather than merely a showing of *likelihood* of

     success on the merits.  See *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12

     (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent

     injunction with the exception that the plaintiff must show a likelihood of success on the merits

     rather than actual success"); accord *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir.

     2004).  If irreparable harm cannot be presumed in the case of a trademark holder who has

1

2    The *eBay* holding is not limited to patent cases, as the Ninth Circuit recently applied it in

3    a trademark case.  See *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1137 (9th Cir.

4    2006) (discussing *eBay* in the context of a motion for permanent injunction).[151]

5    Here, as JIPC has not shown a likelihood of success on the merits of its trademark

6    infringement and unfair competition claims, but only raised serious questions regarding them, it

7    would not be entitled to a presumption of irreparable harm in any event.  The court must therefore

8    consider whether it has adduced sufficient evidence that it is likely to suffer irreparable harm if

9    an injunction does not issue.  "Irreparable harm," for purposes of obtaining preliminary injunctive

10   relief, is harm "that cannot be redressed by legal or equitable remedy following trial."

11   *Optinrealbig.com, LLC v. Ironport Systems, Inc.*, 323 F.Supp.2d 1037, 1050 (N.D. Cal. 2004)

12   (citing *Public Util. Comm'n v. FERC*, 814 F.2d 560, 562 (9th Cir. 1987)); see also 11A Charles

13   Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL

14   2D § 2948.1, at 139-49 (1995) ("Only when the threatened harm would impair the court's ability

15   to grant an effective remedy is there really a need for preliminary relief" (footnoted omitted));

16

17   ───────────────

18   conclusively demonstrated to the trier of fact that his mark has been infringed, *a fortiori* it should

     not be presumed in the case of a trademark holder who has shown only likely infringement based

19   on the under-developed factual record available at the preliminary injunction stage.

20   [151]A recent case in this district holds that because *eBay* discussed infringement only in the

21   patent and copyright context, it does not apply to trademark actions, and the presumption of

     irreparable harm still applies in such cases.  See *Canfield v. Health Communications, Inc.*, CV

22   08-890 SVW JTLx, 2008 WL 961318, *2 (C.D. Cal. Apr. 1, 2008).  Citing *Abercrombie & Fitch

     Co. v. Moose Creek, Inc.*, 486 F.3d 629, 633 (9th Cir. 2007), the court stated that "[t]he Ninth

23   Circuit's rulings on injunction relief in the trademark infringement context were undisturbed and

     have been reaffirmed subsequent to *eBay*."  *Id.*

24   The court disagrees with *Canfield*.  While it is true that *Abercrombie* states that

25   "[i]rreparable injury is ordinarily presumed upon a showing of a likelihood of success," the Ninth

     Circuit did not have occasion to apply a presumption of irreparable harm, as it determined, in

26   part, that plaintiff was not likely to succeed on the merits of its claim, and it remanded to the

     district court for further proceedings.  *Abercrombie*, 486 F.3d at 637-38.  Moreover, as noted,

27   the Ninth Circuit has applied *eBay* to trademark cases.  See *Reno Air Racing Ass'n, Inc.*, 452 F.3d

28   at 1137.

see also, e.g., *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held").

JIPC does not directly address the manner in which it will be irreparably harmed if an injunction does not issue, since it argues that it has shown a reasonable likelihood of success on the merits and is therefore entitled to a presumption of irreparable harm.[152]  In his declaration in support of the motion, however, Parlet argues that JIPC will be harmed by IPC's use of its marks. Parlet contends that JIPC's California customers may visit IPC's incrediblepizza.com website and believe it to be affiliated with JIPC.[153]   He posits, for example, that a customer who has a favorable impression of JIPC may look for a JIPC store to visit on an upcoming trip to Texas, find IPC's website, and believe that IPC's stores are affiliated with or licensed by JIPC.[154]   If this customer visits an IPC location on his trip and has a bad or less than satisfactory experience, Parlet asserts, JIPC's goodwill and reputation will be injured.[155]  Parlet also expresses concern that California consumers may see special offers or coupons advertised on IPC's website and attempt to redeem them at a JIPC store.[156]  This, he asserts, would place JIPC "in the unenviable position of having to either refuse the customer's request, potentially damaging the relationship with its customer, or honor the request and thereby turn over control of its pricing and services in part to IPC."[157]   As respects CJM's activities, Parlet contends that JIPC's reputation could be detrimentally affected by CJM's use of the America's Incredible Pizza Co. mark on the No. 11 Race Car if, for instance, the car is involved in a crash or accident that results in harm to

---

[152]Pl.'s Mem. at 24-25.

[153]Parlet Decl., ¶ 64.

[154]*Id.*

[155]*Id.*

[156]*Id.*, ¶ 65.

[157]*Id.*

bystanders, or if the CJM team displays poor sportsmanship.[158]

Additionally, Parlet contends that IPC's offering of franchise opportunities in California will cause JIPC irreparable harm.  He asserts that a potential investor seeking to franchise a restaurant or entertainment property could come across IPC's website and mistakenly believe that a JIPC franchise is being offered.[159]  Parlet maintains that this possibility of confusion is compounded by IPC's sponsorship of the CJM race car.  He contends that even if a potential investor realizes that JIPC and IPC are not affiliated, they may nonetheless decide to invest in an IPC franchise in California, causing JIPC to lose a potential investor and IPC to establish a presence in JIPC's territory.[160]

Although JIPC has suggested a variety of harms it *could* suffer as a result of defendants' use of the IPC marks, it fails to meet the imminence requirement for a preliminary injunction.  "[I]rreparable harm must not be speculative or merely alleged to be imminent; in other words, 'a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.'"  *Financial & Sec. Prods. Ass'n v. Diebold, Inc.*, C 04-4347 WHA, 2005 WL 1629813, *6 (N.D. Cal. July 8, 2005) (quoting *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988)(emphasis original)); see also, e.g., *IC Marketing, Inc. v. The Taunton Press, Inc.*, CV 03-3069 CO, 2005 WL 503180, *14 (D. Or. Mar. 3, 2005) ("'Irreparable harm is an injury that is not remote or speculative but actual and imminent . . . ,'" quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995)).

Parlet's concerns regarding IPC's website– e.g., that customers will download IPC coupons and seek to redeem them at JIPC stores – are not probative of imminent harm, as IPC has operated its incrediblepizza.com site continuously since July 2002 and there is no indication that incidents

---

[158]Parlet Decl., ¶ 63.  At the hearing, JIPC's counsel asserted that use of the IPC mark on CJM's No. 11 Race Car would make California Nascar viewers aware of IPC's website, incrediblepizza.com, which to date they have viewed only if they "stumbled upon" it.  This, it contends, will increase consumer confusion and lead to irreparable harm.

[159]Parlet Decl., ¶ 66.

[160]*Id.*

of this kind have occurred.[161]  Likewise, JIPC has not demonstrated that IPC will imminently open a franchise in JIPC's territory, as IPC has not yet sold any franchises in California.  JIPC itself, moreover, has presented evidence showing that IPC's and IPFG's Uniform Franchise Offering Circular discloses to potential franchisees that JIPC (1) claims ownership of and senior rights in the Incredible marks and (2) has objected to IPC's use of the IPC marks, thereby mitigating the risk that a potential investor will confuse the two companies. The remaining examples of possible harm cited by Parlet are purely speculative in nature.  JIPC has failed to demonstrate that the CJM race car is likely to get in an accident or that its team will display poor sportsmanship.  The claim that a California consumer patronizing an IPC store in Texas may believe it to be a JIPC store as a result of confusion generated by the parties' websites similarly strains credulity.  In effect, as JIPC's counsel argued at the hearing, the harm JIPC foresees is that it will, at some unknown point in the future, lose control of its mark in California.  JIPC has failed to demonstrate, however, that such harm is imminent.  *Caribbean Marine Servs.*, 844 F.2d at 674 ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."); see also *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1099 (9th Cir. 2007) (same).  JIPC has failed to meet its burden of showing "immediate threatened injury" sufficient to grants its request for preliminary injunctive relief.

Although JIPC has raised serious questions going to the merits of its trademark infringement and unfair competition claims, its failure to show that it is in danger of suffering imminent irreparable harm necessitates denial of its motion for preliminary injunction.[162]  See, e.g., *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) ("Because, irrespective of relative or public harms, a movant must establish both a likelihood of success on the merits and irreparable harm . . . , the district court may deny a preliminary injunction based

---

[161]Ward Decl., ¶ 10.

[162]Because the court concludes that JIPC has failed, as a factual matter, to establish the possibility of irreparable harm, it need not consider defendants' arguments that JIPC's action is barred by laches, the statute of limitations, and unclean hands.

on the movant's failure to establish either of these two crucial factors without making additional findings respecting the other factors"); *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987) ("Under any formulation of the test [i.e., likelihood of success or serious questions going to the merits], the moving party must demonstrate a significant threat of irreparable injury," citing *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985)); see also *RasterOps v. Radius, Inc.*, 861 F.Supp. 1479, 1489 (N.D. Cal. 1994) ("Because the court finds that RasterOps has failed to establish *both* of the crucial factors, and therefore *cannot* grant the requested injunction, the court declines to make findings on the third and fourth factors").

### III. CONCLUSION

For the reasons stated, the court denies plaintiff's motion for preliminary injunction.

DATED:  August 26, 2008

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE