# EXHIBIT 1

1   RONALD OINES (SBN #145016)
2   roines@rutan.com
    RUTAN & TUCKER, LLC
3   611 Anton Boulevard, Suite 1400
4   Costa Mesa, California 92626-1931
    Telephone: (714) 641-5100
5
6   RANDOLPH C. FOSTER (OSB #784340)
    rcfoster@stoel.com (to apply *pro hac vice*)
7   STEVEN E. KLEIN (OSB#051165)
8   seklein@stoel.com (to apply *pro hac vice*)
    STOEL RIVES LLP
9   900 SW Fifth Avenue, Suite 2600
10  Portland, OR 97204
    Telephone: (503) 224-3380
11
12  Attorneys for Plaintiff
    JIPC Management, Inc.
13

14
15                UNITED STATES DISTRICT COURT
16              CENTRAL DISTRICT OF CALIFORNIA
17                    WESTERN DIVISION

18  JIPC Management Inc                  Case No.  CV08-04310 MMM (PLAx)
19
20              Plaintiff,              EXPERT REPORT OF DR. BRUCE
                                        R. ISAACSON, D.B.A., M.B.A.
21       v.
22
23  Incredible Pizza Inc and Incredible
    Pizza Franchise Group Inc
24              Defendants.
25
26
27
28

## I.   MY PERSONAL QUALIFICATIONS

1. I am the owner and President of Marylander Marketing Research ("MMR"), a marketing research and consulting firm, and am an expert in research, surveys, and marketing.

2. For approximately 34 years, my firm, MMR, has provided marketing research and consulting, consisting primarily of the design, execution, and analysis of thousands of surveys, as well as expertise related to marketing and strategy. Our experience includes many surveys used in intellectual property litigation.  Our recent clients include well-known organizations, such as:

- Hewlett Packard
- Blue Cross of California/WellPoint
- Islands Restaurants
- Several regions of the American Automobile Association
- Nestlé USA, Inc.
- Smart & Final Stores
- Goodyear Tire & Rubber Company

3. MMR has specific industry expertise and experience with chain restaurants, who represent an area of focus for our firm.  I regularly consult with restaurants, and have spoken at restaurant-industry conferences.

4. I received a Bachelor of Science degree in engineering from the Technological Institute at Northwestern University in 1985, and Master of Business Administration and Doctor of Business Administration degrees from the Harvard Graduate School of Business Administration in 1991 and 1996. At Harvard, I received my MBA with highest distinction as a Baker Scholar and was a Dean's Doctoral Fellow, writing 14 publications on marketing and strategy, including best-selling teaching materials. I have taught marketing and strategy for executive groups and executive MBA programs, and my research won awards from institutions including The Institute for the Study of Business Markets at Penn State University, and Harvard University.

5. In terms of professional experience, I have been a marketing and strategy consultant at the Boston Consulting Group, Senior Vice President at a publicly traded data processing company called Digital Insight, Division President at a media services company now called Move, and

- 1 -

1   Vice President responsible for marketing and strategy at a national financial services company

2   that was then a division of Cendant Corporation. I also served as the West Coast Practice Leader

3   of Monitor Executive Development, a division of Monitor Group, an international strategy

4   consulting firm, where my responsibilities included developing curriculum and serving as lead

5   faculty for executive education programs in marketing and strategy.

6   6.      I am a member of the American Marketing Association and the Marketing Research

7   Association. My firm is a member of the Council of American Survey Research Organizations

8   and the International Trademark Association. I am also on the editorial board of the Journal of

9   Business to Business Marketing. I regularly consult with clients on issues relating to marketing,

10  research, and strategy, and also address associations and groups on the same issues. My public

11  speaking includes addresses to law firms and bar associations on the use of research and surveys

12  in intellectual property litigation.  I recently co-authored an article published in the Intellectual

13  Property Law Newsletter of the American Bar Association, Intellectual Property Law Section, on

14  the use of surveys on Intellectual Property research.

15  7.      Over my career, I have personally, designed, overseen, and analyzed numerous research

16  studies. I have also provided expertise in marketing, branding and consumer behavior to many

17  clients in a variety of industries on topics such as new products, market and consumer

18  segmentation, and pricing. A copy of my curriculum vitae and litigation expert witness

19  experience is attached as Exhibit 1.

20

21  **II.     COMPENSATION**

22  8.      I have been retained to perform consulting and expert services for the law firm of Stoel

23  Rives, LLP, attorneys for the plaintiffs JIPC Management Inc. ("JIPC") in this litigation. My

24  compensation is $450 per hour for consulting and expert services; I also charge for expenses.

25

26  **III.    MATERIALS REVIEWED**

27  9.      For purposes of this report, I have reviewed materials that include legal documents, such

28  as complaints and motions; relevant websites and online search engine results; displays of

- 2 -

1   retailers/restaurants in relevant product categories; sample marketing materials and other

2   documents provided by the parties during discovery; and published literature and cases relevant to

3   the issues and theories in this matter. I have consulted with colleagues, such as Dr. Jonathan

4   Hibbard, a marketing professor at the Boston University School of Management. In addition, I

5   further rely on my knowledge in the field of marketing, branding, consumer behavior, consumer

6   surveys and market research.

7   10.     As I understand it, there are still a significant number and category of document still to be

8   produced by the defendants and third parties, such as CJM Racing. I also understand there is a

9   protective order that the parties have submitted that covers the disclosure of confidential

10  information which cannot be provided at this time.  After documents such as these have been

11  produced, I reserve the right to update or supplement my analysis and opinion based on any

12  additional information that is made available to me between now and the time of the trial in this

13  matter.

14

15      **IV.   SUMMARY**

16  11.     My expert opinion, after reviewing the facts of the case and conducting an analysis of the

17  key marketing elements, is that it is likely that a substantial number of customers and/or potential

18  customers of John's Incredible Pizza Company (JIPC) restaurants could believe that JIPC is the

19  same, connected or affiliated with the restaurant chain America's Incredible Pizza Company

20  (IPC).  I conclude that the likelihood of confusion is lower as long as the two companies operate

21  in separate markets, but that two events have made it substantially more likely that IPC will have

22  a presence in markets where previously only JIPC operated.

23  12.     First, IPC entered into an agreement with CJM Racing LLC to nationally sponsor the No.

24  11 America's Incredible Pizza Company Racing Chevrolet (now Toyota) and the No. 11 Race

25  Team on the Nascar Nationwide Series; the Nascar Nationwide Series will air advertising and

26  events in California, including within the market of JIPC's restaurants. Second is that IPC is or

27  may be selling franchises within the market area of JIPC's restaurants;  as IPC locates franchises

28  in the California market area of JIPC's restaurants, it is likely that a substantial number of

- 3 -

1  customers and/or potential customers could believe that IPC is the same, connected, or affiliated

2  with JIPC.

3  13.   I have been asked to provide my opinion and expertise as it relates to the possible

4  likelihood of confusion on the part of customers and potential customers.  To develop my

5  conclusions, I have conducted analysis using relevant theories from marketing and consumer

6  behavior.  My analysis has focused on items such as the proximity or relatedness of the brands

7  and their offerings; the marks' similarity in appearance, sound, and meaning; the strength of the

8  JIPC and IPC brands among the relevant set of customers; the marketing and advertising channels

9  used to promote the brands; and the degree of care likely to be exercised by consumers.

10  14.   To examine these factors and assess their impact on the likelihood of confusion, I have

11  employed several well-known and generally-accepted concepts and theories from marketing.  I

12  will explain each of these marketing concepts and theories, and discuss their applications to the

13  issues I have been requested to analyze.  These include (a) theories of how brands acquire

14  meaning and value, (b) the concept of target markets, and (c) the marketing mix, which consists

15  of product, price, place, and promotion.

16  15.   Brands uniquely identify a firm's market offering to consumers and signal the presence of

17  particular attributes, benefits, and meanings that represent value for the consumer. Brands can

18  also help consumers identify trusted sources of market offerings. Brand differentiation is the

19  extent to which a brand's market impression is unique or "stands out" to consumers in relation to

20  the impressions created by other brands in the product category. When brands are differentiated in

21  consumers' minds, consumers can identify desired products more quickly and accurately. When

22  brand names are undifferentiated, consumers experience difficulty in distinguishing between

23  firms' offerings and are deprived of the right to make efficient and informed decisions.

24  16.   A brand's name and/or logo works in conjunction with the efforts of the marketer to

25  imbue the brand with differentiated meaning for the relevant target market of consumers. To

26  understand how brand names and/or logos are connected to brand meaning and differentiation, we

27  must consider several factors which I refer to as brand naming conventions, brand name and/or

28  logo information processing by consumers, and the brand's overall market impression.

- 4 -

17.   <u>Brand naming conventions</u>: Consumers are exposed each day to thousands of brand names and logos and marketing messages. This exposure leads to knowledge structures regarding brand naming conventions and facilitates identification of varied offerings from a single source or similar offerings from affiliated sources.

18.   <u>Brand name and/or logo information processing by consumers</u>: There are basic visual and linguistic processing principles that guide consumers' attention and comprehension of information conveyed by brand names and/or logos. This attention and comprehension is done in the context of marketing and advertising activities. Thus, we must consider brand names and/or logos from the consumer's perspective to determine the impression made by these marketing elements.

19.   <u>The brand's overall market impression</u>: It is also important to consider the overall manner and context in which consumers encounter brands, including visual, aural, and textual information designed by the marketer. Each brand's overall market impression includes the impact of many elements (such as advertising, promotion, store atmosphere, logos, signage, fonts and colors), depending on the marketer's level and types of effort.

20.   Using a fundamental framework in marketing known as the "marketing mix" or "4P's analysis"[1], I will assess JIPC and IPC to examine the extent to which the resulting marketplace impressions are likely to overlap in consumer's minds. The greater the overlap across the marketing mix elements, the more likely consumers and potential consumers would be to assume that their offerings originate with the same or affiliated sources.

21.   My report will first discuss brand naming conventions and the manner in which consumers' process brand names and/or logos. I will then explain in detail the marketing mix elements and analysis, using illustrations and examples from JIPC and IPC. Finally, I will conclude with the importance of the JIPC and IPC brand names and the implications of any likelihood of confusion between them.

---

[1] For example, see Kotler and Keller, <u>Marketing Management</u>, 2006, Prentice Hall.

Expert Report of Dr. Bruce Isaacson
Case No. CV08-04310 MMM (PLAx)

## V.   CONSUMER PERCEPTION OF BRAND NAMING CONVENTIONS

22.   Assessing the likelihood that consumers will perceive the market impressions created by JIPC and IPC as originating from the same source or affiliated sources requires that we consider how consumers encounter and process conventions in brand naming.

23.   Many brand naming conventions arise from multiple brand offerings provided by a single company or affiliated companies. Examples include dual branding (such as CARL'S JR./GREEN BURRITO), sub-branding (such as BARILLA RESTAURANT CREATIONS), brand extensions (such as ESPN ZONE RESTAURANT), ingredient branding (such as T.G.I. FRIDAY'S JACK DANIEL'S GRILL), product branding (such as BURGER KING WHOPPER), endorsed branding (such as GENERAL MILLS CHEERIOS), and co-branding (such as D'ANGELO SANDWICH SHOPS AND PAPA GINO'S).

24.   Brand naming strategies aid consumers in inferring the relatedness of brands or offerings. Brand name relatedness is communicated through a variety of marketing efforts, including the use of common brand name elements and logos, similar trade dress and design, similar or related advertising, promotion of complementary usage, and proximate location[2]. Consumers are accustomed to inferring the relatedness of product offerings and the relatedness of sources of product offerings from the manner in which distinguishing marketing elements such as brand names are constructed.

25.   For example, in the Riverside, California area consumers can observe different hardware retailers operating under the names ACE HARDWARE, CROWN ACE HARDWARE, BAUMAN'S ACE HARDWARE, and WOODCREST ACE HARDWARE. They can also observe different real estate offices operating under the names DENNIS FRIEDMAN RE/MAX, HECTOR SANCHEZ RE/MAX ADVANTAGE, and RE/MAX ALL STARS REALTY. Applying their general knowledge of "how brand naming works," consumers understand that

---

[2] For example, see David A. Aaker and Erich Joachimsthaler (2000), "The Brand Relationship Spectrum: The Key to the Brand Architecture Challenge," California Management Review, 42 (Summer), 8–23. Also, see Raj Agopal and Romulo Sanchez (2004), "Conceptual Analysis of Brand Architecture and Relationships within Product Categories," Journal of Brand Management, 11 (February), 232–247.

1    these name variations indicate the same or affiliated sources (i.e., from the larger brands of ACE

2    HARDWARE and RE/MAX).

3    26.    In the restaurant category, possessive name forms (e.g., JOHN'S and AMERICA'S)

4    appear frequently in trademarks. In some cases, consumers are only likely to receive an

5    impression of proprietorship, such as when the additional portion of the mark is undifferentiating.

6    For example, JOHN'S RESTAURANT may convey a restaurant operated with a real or fictional

7    proprietor or source or owner of the restaurant. In other cases, consumers are likely to infer

8    proprietorship along with a sense of source identity for the offering, such as when the additional

9    portion of the mark provides differentiating source identity.  For example, JOHN'S

10   INCREDIBLE PIZZA CO. suggests to consumers that the source can be thought of as a joint or

11   integrated identity of JOHN'S and INCREDIBLE PIZZA CO.

12   27.    This creates at least several avenues for potential confusion when consumers encounter

13   both the JIPC and IPC marks. For example, a consumer who encounters AMERICA'S

14   INCREDIBLE PIZZA COMPANY (or INCREDIBLE PIZZA, INCREDIBLE PIZZA

15   COMPANY, or INCREDIBLE PIZZA.COM as prominently displayed on the sponsored No. 11

16   Race Team in the NASCAR Nationwide Series) in the marketplace may infer that a subsequently

17   encountered JOHN'S INCREDIBLE PIZZA CO. is a franchise or local operation of

18   AMERICA'S INCREDIBLE PIZZA COMPANY or INCREDIBLE PIZZA COMPANY.

19   Similarly, a consumer who initially encounters a JOHN'S INCREDIBLE PIZZA CO. location in

20   the marketplace might reasonably assume or infer that a subsequently encountered AMERICA'S

21   INCREDIBLE PIZZA COMPANY is a modification, extension, or evolution of "JOHN'S

22   INCREDIBLE PIZZA CO." Further, a consumer who is familiar with JOHN'S INCREDIBLE

23   PIZZA CO and who subsequently encounters the NASCAR sponsorship of INCREDIBLE

24   PIZZA COMPANY might reasonably infer the sponsor is affiliated with JOHN'S INCREDIBLE

25   PIZZA CO.

26   >>

27   >>

28   >>

- 7 -

## VI.   HOW CONSUMERS FORM BRAND NAME/LOGO IMPRESSIONS

28.     Consumers are inundated each day with marketing communications, brand names, brand information, and product images. For many years, researchers in marketing have used sophisticated techniques to examine the factors that determine where consumers focus their visual attention (these are called "fixation points") and how this attention shifts over time (these are called "gaze paths") when consumers are exposed to marketing stimuli such as advertisements, commercials, signage, warning labels, and logos.

29.     Marketers and advertisers use eye tracking technology, as well as other research, as a basis for understanding where consumers focus their attention in a variety of contexts, such as in response to website visits, print advertisements, TV commercials, outdoor billboards and signage, logos, etc.[3] The two most consistent findings in this research are as follows.  First, consumers typically place attention on the center of a stimulus regardless of the distribution of visual information associated with the stimulus.  This predisposition is often referred to as "center bias" or the "center of gravity effect".  Second is that attention is also directed by size and visual contrast[4]. Consumers make visual excursions from the center of a stimulus to process other information which may be relevant due to a connection to attention-grabbing factors, such as visual contrast, or an active goal, such as looking for specific nutrition information on a label. This means that consumers typically do not pay as much attention to tag lines as they pay to the words and text of the logo. Consumers also typically pay less attention to backgrounds, such as the pizza slice in IPC's logo, or the globe in JIPC's logo, as these elements do not carry as much salient information.[5] Based on these findings we can predict the impressions that consumers are

---

[3] For example, see Brasel, S. Adam and James Gips (2008), "Breaking Through Fast-Forwarding: Brand Information and Visual Attention," Journal of Marketing, 72 (6), 31-48.

[4] For example, see Tatler, B. W. (2007), "The Central Fixation Bias in Scene Viewing: Selecting an Optimal Viewing Position Independently of Motor Biases and Image Feature Distributions," Journal of Vision, 7 (14), 1-17.  Also see Vitu, F., Z. Kapoula, D. Lancelin, and F. Lavigne (2004), "Eye Movements in reading Isolated Words: Evidence for Strong Biases Towards the center of the Screen," Vision Research, 44, 321–338

[5] For example, see Pieters, Rik and Michel Wedel (2007), "Goal Control of Attention to Advertising: The Yarbus Implication," Journal of Consumer Research, 34 (2), 224-223,

Expert Report of Dr. Bruce Isaacson
Case No CV08-04310 MMM (PLAx)

1   likely to receive from exposure to a given brand name and/or logo, including those at issue in this

2   matter.

3   30.    The JIPC Mark:  Applying these concepts to the JIPC mark, it is likely that consumers

4   would receive two related impressions during comprehension.  One impression is from the center

5   portion of the mark containing the ribbon element with the color-contrasted letters which spell

6   "INCREDIBLE PIZZA CO.", and the other impression is from the somewhat larger and color-

7   contrasted lettering element that spells the possessive name "JOHN'S." The circular globe

8   element stands in the perceptual background of both the "INCREDIBLE PIZZA CO." and

9   "JOHN'S" elements. These impressions are perceptually integrated by their co-presentation and

10   arrangement within a single design and are conceptually integrated by the possessive form

11   "JOHN'S" which takes as its object "INCREDIBLE PIZZA CO."  In summary, the JIPC mark

12   makes two distinct but connected and integrated impressions in consumers' minds[6]

13   31.    The IPC Mark:  A similar analysis of the IPC mark indicates that center bias, color

14   contrast, and size converge to encourage consumers to extract a single element: "INCREDIBLE

15   PIZZA COMPANY." The letters used to spell "AMERICA'S" are in a relatively small font and

16   exhibit limited contrast against the background arch element. In addition to having low perceptual

17   attention-gathering, the AMERICA'S element is unlikely to contribute significant meaning or

18   distinctiveness to the AMERICA'S INCREDIBLE PIZZA COMPANY mark for reasons related

19   to naming principles in natural language. Specifically, researchers who study naming have

20   observed that geographic references in names are often candidates for "clipping", or shortening

21   by omission, in consumer perception and parlance. This phenomenon is especially likely when

22   the first portion of the name is a geographic reference and the remaining portion of the name is

23   distinctive enough to fulfill the naming function[7].  For example, consumers often refer to the LOS

24   ANGELES DODGERS as the DODGERS but do not refer to NEW YORK MAGAZINE as

25   MAGAZINE. Applying this principle to the IPC mark shows that the "AMERICA'S" portion of

26   _____

27   [6] I realize the logo has also sometimes been used without the ribbon element.

    [7] For example, see Carroll, John M (1983), "Nameheads," Cognitive Science, 7 (2), 121-153.

28

- 9 -

the mark AMERICA'S INCREDIBLE PIZZA COMPANY contributes little distinctiveness to the mark's impression. In fact, IPC uses "AMERICA'S" as only one geographic indicator of many in their brand name and logo. Instead of AMERICA's, they may substitute the name of the city in which the restaurant location operates as its geographic indicator, such as TULSA'S INCREDIBLE PIZZA, MEMPHIS' INCREDIBLE PIZZA, etc. In those and other city locations, the city name is substituted for AMERICA'S in much or all of their branding, such as website, literature, and signage.

## VII.   CREATION AND STRENGTH OF COGNITIVE ASSOCIATIONS BY JIPC AND IPC IN CONSUMERS' MINDS

32.   Associative network theory is a widely used and accepted model that describes how consumers encode brand names and brand information in memory.[8] In this model, mental concepts are represented as "nodes" (bits of information) and the type and strength of the cognitive associations between nodes is represented by relationships or "links". For example, nodes comprising a brand concept could include the brand name impressions, product category, attributes, images, and benefits. Associative network theory has been used by marketers for such activities as brand mapping, product positioning, and brand personality research and strategy.

33.   This model connects current exposure to a brand with long term memory and later recall. Links between nodes are developed through exposure to marketing communications, other consumers, and personal experience. Once formed, links and nodes comprising a consumer's representations remain in long-term memory, where they can be activated and the contents made available in a consumer's working memory. Activation of nodes in the network can result from encounters with external stimuli (such as marketing messages) or from activation spreading out from other linked nodes (such as the consumer thinking about a category or a product).

34.   The fact that activation spreads from active nodes to linked, inactive nodes provides a mechanism for explaining how certain aspects of a brand can be called to mind by separate but

---

[8] For example, see Anderson, John R. (1983), The Architecture of Cognition, Cambridge, MA: Harvard University Press. And also see Morrin, Maureen (1999), "The Impact of Brand Extensions on Parent Brand Memory Structures and Retrieval Processes," Journal of Marketing Research, 36 (4), 517-525.

Expert Report of Dr. Bruce Isaacson
Case No. CV08-04310 MMM (PLAx)

1   related aspects of the brand. For example, to the extent that the JIPC mark and brand involve the

2   distinct and identifying concept of "INCREDIBLE PIZZA CO.," the appearance of marketing

3   materials and images of a race car bearing a prominent sponsor logo spelling "INCREDIBLE

4   PIZZA" is highly likely to evoke the JIPC brand in the modes of relevant customers. The

5   likelihood of a bit of information being called to mind by the activation of another bit of

6   information depends on the strength of the link between the two, with a stronger linkage allowing

7   more activation to occur.

8   35.        The strength of links is determined in part by the number of times the link is traversed or

9   activated over time. Thus, the repetition of information that a consumer processes can serve to

10  strengthen the linkage between brand information elements.  Another important factor in

11  determining link strength is similarity. The similarity of concepts represented by nodes and

12  linkages is related to the category-based meanings shared by two concepts. Thus, to the extent

13  that JIPC has built a strong and recognizable brand and commercial presence, the previously-

14  mentioned race car with INCREDIBLE PIZZA lettering is all the more likely to evoke the JIPC

15  brand. Also, even when the frequency of link use and the relatedness of concepts are initially low,

16  links can still be established and strengthened by relating new information to information that is

17  already stored in memory.

18  36.        This is most likely when information is novel, incomplete, surprising, or interesting. In

19  such cases, more nodes will be activated, and the activation will be sustained and widespread.

20  Thus, there is a greater likelihood of finding and establishing a relationship as linkages are

21  strengthened. Accordingly, to the extent that IPC's marketing activities evoke the JIPC brand

22  through the use of shared and distinctive attributes (e.g., INCREDIBLE PIZZA) while also

23  introducing novel aspects (e.g., sponsoring race cars), it can be said that JIPC loses control of a

24  significant aspect of its brand meaning.

25  37.        A marketer works to create and strengthen these cognitive associations to a brand through

26  its strategic use of the marketing mix variables as targeted at a particular set of consumers. In the

27  second half of my report, I will explain and discuss the concepts of marketing mix and target

28  market and explain the types of association which JIPC is seeking to create and strengthen

- 11 -

1    through its marketing activities.

2

3    **I.      EXPLANATION OF TARGET MARKET AND THE MARKETING MIX TOOLS**

4          **A.      Target Market**

5    38.      A widely known fundamental framework in marketing is the "marketing mix," also

6    known as the 4P's[9]. The 4P's are: product, price, place, and promotion. Marketers use the 4P's in

7    conjunction with a specific target marketing of consumers. I will now briefly explain each of

8    these.

9    39.      The first concept I have considered is that of a "target market." Because sellers of goods

10   and services cannot satisfy every consumer's needs, they must concentrate their resources and

11   marketing efforts toward a specific group or groups of potential customers: these are called their

12   target markets. Once a target market has been identified, a seller then looks to satisfy the specific

13   needs of that target market by using a combination of four marketing activities commonly called

14   the "marketing mix."

15         **B.      Product**

16   40.      A product is a good or service offered to satisfy a consumer's or a business's needs. The

17   product has various characteristics, which can include such elements as appearance, functionality,

18   brand name, packaging, and customer service. In the case of IPC and JIPC, the product includes

19   food served as well as games, atmosphere, brand name, and other aspects of the restaurants.

20         **C.      Price**

21   41.      Price is what the seller charges for the buyer to purchase the product, typically in the form

22   of money spent to purchase an item or service. Price describes not only what the product costs to

23   buy, but also the manner and terms of payment and can also include such payment terms as

24   discounts and promotions.

25         **D.      Place**

26   42.      Place (also known as distribution) refers to how products are made available to

27

28   _____
[9] Philip Kotler and Kevin Keller, <u>Marketing Management</u>, 2006, 12th Edition, Prentice Hall.

- 12 -

Expert Report of Dr. Bruce Isaacson
Case No CV08-04310 MMM (PLAx)

1     consumers. The concept of place typically includes the location or the place of sale of the

2     product (for example, retail sales, direct marketing, etc.); distribution channel partners, such as

3     wholesalers and retailers; and target market coverage, which relates to how widely the product or

4     service is distributed within the target market. A product distributed in many locations within a

5     target market is said to be distributed widely, while a product distributed in few locations is said

6     to have limited or selective distribution.

7        **E.**     **Promotion**

8     43.     Promotion refers to how the chosen target markets are informed or educated about the

9     product. This concept typically includes advertising, selling, promotions, direct marketing, and

10     public relations. Often, the seller will focus promotions on their "unique selling proposition",

11     which includes those aspects of their product and service which serve to differentiate their

12     offering from competing products. A "unique selling proposition" is often used as the foundation

13     of an advertising campaign, and includes those items that make the seller's goods and services

14     appealing to customers. While an advertising execution is the specific creative manner in which

15     an advertisement portrays information, the unique selling proposition identifies a reason for the

16     customer to buy a product.

17     44.     Overall, marketers determine their marketing mix by managing the activities described by

18     4P's (product, price, place, and promotion) for each specific set of customers they want to attract

19     to purchase their product or service. A separate marketing mix may be crafted for each product

20     offering and/or for each target market.

21

22     **II.**     **APPLICATION AND ANALYSIS OF TARGET MARKET AND THE**

23        **MARKETING MIX TOOLS FOR JIPC AND IPC**

24     45.     In this matter, confusion among customers and potential customers can potentially have

25     several sources. A customer or potential customer may be confused when considering or actually

26     purchasing from JIPC, if the customer incorrectly believes that JIPC is the same company as, or

27     has an affiliation or connection to IPC. Alternatively, a customer or potential customer may be

28     confused when considering purchasing or actually purchasing from IPC if the customer

Expert Report of Dr. Bruce Isaacson
Case No. CV08-04310 MMM (PLAx)

1   incorrectly believes that IPC is the same company as, or has an affiliation or connection to JIPC.

2   This type of confusion may also arise if a consumer views a NASCAR event, sees the IPC

3   sponsored car with the words INCREDIBLE PIZZA, and incorrectly infers that JIPC is the same

4   company as, or has an affiliation or connection to, IPC.

5   46.    The larger the overlap or commonality among these key marketing activities across the

6   two restaurants and their offerings, the more likely it is that a customer or potential customer

7   would be confused as to the affiliation or connection of either restaurant.

8   47.    I will now provide an analysis of the target market, applying the marketing mix analysis to

9   JIPC and IPC offerings.

10          **A.    Target Market**

11   48.    Based on the evidence I have reviewed, JIPC and IPC seek to attract almost identical

12   types of customers to patronize their restaurants. JIPC's product offering is targeted at families

13   and individual consumers who are seeking a moderately priced restaurant and entertainment

14   experience. JIPC targets a variety of age ranges, by including a wide range of food items,

15   (including pizza, pasta, salads, and desserts), operating dining rooms with different themes,

16   offering themes and experiences appropriate for families and individuals, and providing various

17   types of entertainment (such as video games, miniature golf, bumper cars, and go-karts).

18   49.    IPC's product offering is also targeted quite broadly at families with children and

19   individuals who seek a moderately priced restaurant and entertainment experience. IPC targets a

20   variety of age ranges, by including a wide range of food items (including pizza, pasta, salads, and

21   desserts), operating dining rooms with different themes, offering themes and experiences

22   appropriate for families and individuals, and providing various types of entertainment and games.

23   50.    There is significant potential overlap between the target market profiles of customers and

24   potential customers of both IPC and JIPC. Historically, geography has limited that overlap in

25   practice. JIPC's chain includes eight restaurant locations in California. IPC's chain includes

26   fifteen restaurant locations in the United States, including eight in Texas, three in Missouri, two

27   in Oklahoma, with others in Tennessee and Louisiana.

28   51.    As of April 2009, IPC does not yet operate restaurants in California. However, as

- 14 -

1  indicated in court documents, IPC has an agreement as of 2008 with CJM Racing LLC to sponsor

2  nationally the No. 11 America's Incredible Pizza Company Racing Toyota and the No. 11 Race

3  Team on the Nascar Nationwide Series. The Nascar Nationwide Series has been broadcast on

4  television, radio and the Internet, and has broadcast advertisements promoting various events in

5  the California market of JIPC's restaurants.  This broadcasting of this sponsorship may have

6  already created potential confusion, as indicated in court documents and in the declaration of John

7  Parlet regarding an email received from John Wyson, dated June 25, 2008.

8  52.    For each individual who writes a letter or email asking a question or expressing

9  dissatisfaction, there many others who are also likely to have the same question or dissatisfaction

10 but who have not taken time to communicate.  Therefore, there may already be consumers, as

11 well as vendors and potential franchisees, of JIPC who could believe that JIPC is the same,

12 connected or affiliated with IPC.

13 53.    Based on court documents, IPC has initiated an effort to sell franchises in the California

14 market. Once IPC starts opening franchises in California, the target market of the two parties will

15 overlap substantially, and in fact be almost identical, and customers and potential customers of

16 each party's product likely to encounter both parties' products.

17 54.    Under conditions where IPC franchises start operating in California, it is likely that a

18 substantial number of JIPC customers and/or potential customers could believe that JIPC is the

19 same, connected or affiliated with IPC. In addition, it is also likely that a substantial number of

20 customers and/or potential customers of IPC could believe IPC is same, connected or affiliated

21 with JIPC.

22    **B.    Product**

23 55.    In this section, I will examine and analyze several key elements of the product and service

24 offering provided by both companies.

25 56.    Food: For restaurants, food is the core of what they offer, and typically the most

26 important aspect of their product and service offering.  It is the element that attracts customers to

27 the restaurant, and typically would be the first item considered by potential customers in deciding

28 whether to patronize that particular restaurant.  The two parties in this matter provide very similar

- 15 -

1   food to consumers.  They both operate chains of casual restaurants offering all-you-can-eat

2   buffets featuring pizza, pasta, salad and desserts.  Both focus their food items on pizza, and

3   include the term "pizza" in the name of their companies.  Both also include, within these

4   categories, a wide range of variety, offering many different types of pizza, different varieties of

5   pasta, salad bars, and a choice of desserts.

6   57.   Atmosphere: Atmosphere includes the aspects of a retailer's or location's premises that

7   contribute to its image as perceived by consumers. Aspects of atmosphere can include such

8   elements as decor, architecture and fixtures, layout, lighting, color scheme, noise level, scents,

9   wall coverings, staff demeanor and wardrobe, and special events. After food, atmosphere is an

10   important item considered by customers in selecting a restaurant.

11   58.   In terms of atmosphere, the offerings of the two companies are highly similar.  Both serve

12   their food in a variety of rooms that have themes or formats.  Both operate in the same building as

13   their restaurant, an entertainment complex, and the entertainment activities within that complex

14   have substantial overlap, including activities such as video games, redemption games, skee ball,

15   miniature golf, bumper cars, and go-karts.

16   59.   Brand:  Brand refers to both the name and the logo of a company, as well as the

17   recognition or image of that name within the target market.  Brands can include words, graphics,

18   and other elements.  A brand name can be thought of as the mental filing system for customers

19   and potential customers, because it indicates not only the source of certain goods, but also allows

20   the customer to retain in their mind the product attributes that the brand represents.

21   60.   There is substantial overlap among the names used by both companies to describe their

22   brand.  IPC markets itself under the name "Incredible Pizza Company", while JIPC markets itself

23   under "John's Incredible Pizza Co".  Both have slogans that invoke food and fun;  JIPC uses the

24   slogan "All You Can Eat Food & Fun" and "Experience the Incredible", while IPC uses "Great

25   Food, Fun, Family & Friends."  Both use the word "incredible" throughout their marketing and

26   advertising activities, using the word to describe the food, the gaming experience, and other

27   aspects of visiting their restaurant. For example, marketing materials for JIPC indicate that the

28   restaurant has "Incredible Party Packages", "Incredible Values", "Incredible Food", "Incredible

Expert Report of Dr. Bruce Isaacson
Case No. CV08-04310 MMM (PLAx)

1  Fun" and even "Incredible Seating". Similarly, marketing materials for IPC use the term

2  "incredible" in formats such as "Incredible Field Trip", "Incredible FUNdraising", and

3  "Incredible Edutainment."

4  61.    While the word "incredible" can be read as a superlative or modifier, it can also be

5  perceived by consumers as an unusual one in its manner and frequency of use, and the adoption

6  of this word so extensively by both companies provides another element where customers may be

7  confused as to whether the parties may be same company or, connected or affiliated. Both

8  companies also use names to describe some of their attractions which could draw similar

9  associations among customer or potential customers. For example, JIPC operates a "Speedway"

10  while IPC operates a golf course with a theme of "Route 66."

11  62.    Taking all these product-related factors together, the two products have similar product

12  offerings, atmosphere, and brand name. Consequently, if IPC enters JIPC's geographic market

13  area, and if it proceeds to support and manage its product offerings as it has in its other markets,

14  the IPC brand will gain increased awareness among a target market that has substantial overlap

15  with JIPC's. These factors increase the likelihood that a substantial number of customers and

16  potential customers of JIPC believe the two companies are the same, or connected or affiliated.

17  These factors also increase the likelihood that customers and potential customers of IPC believe

18  the two companies are the same, or connected or affiliated with JIPC.

19        **C.    Price**

20  63.    As described earlier, price is what the seller charges the buyer to purchase the product,

21  including related elements such as payment terms. The pricing for JIPC's product offerings and

22  IPC product offerings are very similar. Both companies operate moderately-priced dining

23  experiences, with average checks in the range of $8 to $12 per person.

24  64.    For both companies, the terms associated with these prices are similar, as both companies

25  provide all the food the customer wishes to eat in that visit, in a buffet-style setting, and also

26  include entertainment such as games. Both companies also offer specially-priced packages of

27  food and entertainment for events, including birthday parties, parties for sports teams, or

28  corporate events, and both hold these events in special facilities including dedicated rooms.

- 17 -

65.     Based on these factors, I conclude that two parties use similar pricing, including both similar price points for similar items and similar terms (both all-you-can-eat and also including some or all games).  Because of the substantial overlap in prices and terms, the offerings of both companies would be appealing to similar types of customers on similar types of occasions. Customers and potential customers thinking about a restaurant where they can obtain food such as pizza, pasta, and dessert in a buffet-style setting at inexpensive prices could potentially think of either company and the similarity would make it more difficult to distinguish between the two restaurants.  Consequently, the similar price points and terms increase the likelihood that customers and potential customers of the two parties will view the restaurants as the same and/or as connected or affiliated.

**D.    Place**

66.     As described earlier, Place includes the distribution and marketing channels through which the two parties deliver their products and services.  Based on my analysis, I find that the aspects of place are similar for both companies.  In this case, place includes the retail environment operated by each restaurant.  As described earlier, both restaurants operate large facilities, typically organized into different rooms, each with a specific theme or atmosphere. Some of those rooms are organized by age group, while others are organized by occasion (such as party or corporate event).   Both parties operate restaurants with large areas, in excess of 40,000 square feet, and offer both foods and games within that area.

67.     Regarding aspects of place such as the physical environment or advertising, I find that the aspects are similar between the parties, and that they will be reaching the same target market with these aspects. Therefore, the elements of place also increase the likelihood of confusion between customers and potential customers of both parties.

**E.    Promotion**

68.     As described earlier, Promotion includes the means by which the seller tells potential customers about its product and service offering.  The aspects of promotion for both companies are consistent with their positioning as moderately priced places for food and entertainment, targeting families, community groups, and individuals.

- 18 -

69.     Advertising is one of the most important elements of promotion, and I find that both parties have numerous similarities in their advertising activities. While both companies appear to use a variety of media to promote themselves to the relevant target markets, based on information and case documents for which I have had access, both companies appear to rely more heavily on referrals/word of mouth for advertising. Both firms also offer for sale branded apparel and accessories. Both also use marketing to schools, sports teams, and community associations to generate much business. For example, JIPC employs location marketing reps who help each restaurant unit make contacts to the local community. As described earlier, both companies also feature the word "incredible" throughout their advertising activities. Both parties also use the internet and have websites.

70.     Advertising includes not just the display of the company's message to the relevant consumers, but also the tone or look of the creative execution adopted by the company, both publicly as well as on other documents used within its restaurant, such as menus, signage, and other elements. The two parties have numerous similarities in the look and tone of their creative materials as both have "family-friendly" advertising, often with child-friendly themes and characters.

71.     Taken in its entirety, for the promotion element of the marketing mix, the manner in which the two companies are promoted to respective target customers is very similar. The unique selling propositions are substantially similar for both restaurant dining and experience, and the advertisements and promotions for the two chains are directed at very similar target audiences with similar needs. In addition, the advertising executions and appeals are also similar. This similarity in promotions will tend to increase the likelihood that customers and potential customers would be confused into thinking that the two restaurants are the same company and/or connected or affiliated[10].

>>

---

[10] In fact, based on court documents, it appears that some consumers are confused when they have interacted with the two companies through means such as their websites, believing they are interacting with IPC when they actually contacted JIPC.

Expert Report of Dr. Bruce Isaacson
Case No CV08-04310 MMM (PLAx)

### III.   THE CUSTOMER DECISION-MAKING PROCESS

72.   Consumers use different decision-making processes to buy different types of goods and services. For example, the purchase of a soft drink and a house are very different activities, each involving different amounts of money spent, risk to the buyer, locations for purchase, complexity of the item purchased, availability and similarity of goods offered in the marketplace, and length of time for shopping and purchase.

73.   The purchasing processes that consumers use vary in large part according to the level of consumer involvement in the purchase. Involvement refers to the amount of time and effort a buyer invests in the search, evaluation, and decision-making process. Goods for which consumers have low involvement are afforded relatively little time and effort in search and decision making prior to purchase. These types of goods are often items which are either inexpensive, or for which repetitive purchases over time have made consumers familiar with either the product or the method of purchasing the product.

74.   In many cases, the JIPC and IPC restaurant offerings could likely be considered low involvement types of purchases for consumers and prospective consumers. In general these products require a low level of consumer involvement and minimal need for any information search before purchase. For example, a consumer driving by either of their locations might see the signage and decide to stop in and eat, without requiring any further research other than observation of the exterior of the restaurant. In this type of purchasing situation, the JIPC or IPC product would be considered an impulse purchase: an unplanned or otherwise spontaneous purchase. The impulse is triggered from seeing the product itself or an advertisement for the product. Most consumers do not spend much time deliberating about impulse purchases. In an impulse purchase situation, consumers come upon a product while shopping or browsing, decide that the product may serve some purpose for them, and are willing to make a purchase of such a product on impulse in large part because of the product's low price. The low price means that purchase of the impulse product poses a low risk of loss to the consumer[11].

---

[11] While impulse purchases can sometimes extend to so-called "big ticket" items such as automobiles and home appliances, such impulse purchases of expensive items are much less common than impulse purchases of lower-priced items.

- 20 -

75.     I believe that the purchase behavior for the products and services offered by JIPC and IPC is very similar. JIPC's customers are engaged in either search or impulse behavior: these customers typically experience need recognition and are also exposed to the advertising or location signage. These customers will invest relatively little time and effort in making the purchase decision and will consider few alternatives. This type of impulse purchase behavior is largely driven by the low cost of the product and its easy availability at a nearby location. Because these customers could be making impulse purchases of JIPC's product offerings in reaction to seeing a JIPC location or a JIPC advertisement or promotion, if they are also exposed to IPC's product offerings or advertisements they could become confused as to the source, connection or affiliation of the parties' products.

76.     Therefore, analysis of the purchase behavior for customers and potential customers of JIPC and IPC suggest that purchase processes and patterns may increase the likelihood of confusion in this matter.

## IV.   THE IMPLICATIONS OF CONFUSION BETWEEN BRAND NAMES

77.     A brand name is a key determinant of the success of a product in the marketplace. One branding expert, David A. Aaker wrote in a well-known book entitled Managing Brand Equity[12] as follows: "The name is the basic indicator of the brand, the basis for both awareness and communication efforts. Often even more important is the fact that it can generate associations which serve to describe the brand - what it is and does. In other words, the name can actually form the essence of the brand concept."

78.     Any possible confusion between JIPC and IPC is likely to be very damaging to JIPC for several reasons. First, JIPC has enjoyed some marketplace success in its market of California. However, if IPC does enter or has already entered the California market, JIPC's image and brand equity may be affected by consumer perceptions of IPC, which means that JIPC could lose control of its own brand. That is, the brand equity of JIPC could be determined by the actions of

---

[12] Pages 187-197; Free Press, 1991.

Expert Report of Dr. Bruce Isaacson
Case No CV08-04310 MMM (PLAx)

1   another company and the reputation of its products.

2   79.    Second, to the extent that JIPC decides to revise its marketing or communications strategy

3   in the future, it may be unable to do so, because its "positioning" and consumer perception may

4   be tied to and influenced by marketing activities of IPC. Third, the impact of confusion is not

5   limited to consumers and potential consumers. For example, suppliers and/or investors could

6   become confused for the same reasoning and logic we have provided for consumer confusion.

7   This could be further damaging to JIPC and its ability to control its brand and identity.

8

9   **V.   CONCLUSIONS**

10   80.    In conclusion, my analysis shows that both companies have similar target customers, and

11   also use similar elements of the marketing mix to target those customers. Also, the purchase

12   behavior used by customers and potential customers for inexpensive family dining and

13   entertainment does not lead to careful discrimination across providers of these types of services.

14   81.    Consequently, my analysis suggests that a substantial percentage of customers are likely

15   to confuse IPC and JIPC, and believe that the two companies are either the same, or share a

16   connection or affiliation

17   82.    I further believe that such confusion, if it did exist, would be damaging to JIPC. In the

18   case of confusion, JIPC's brand would become subject to affiliations and associations which they

19   do not control. Further, in that case, the actions of IPC, another company, including the

20   reputation of that company's products and services, would can then potentially diminish or

21   change the image or equity of their brand in the mind of their target customers.

22   >>

23   >>

24   >>

25   >>

26   >>

27   >>

28   >>

1  I declare under penalty of perjury under the laws of the United States that the foregoing is true

2  and correct to the best of my belief.

3

4  Executed in Encino, California, on April 10, 2009.

5

6

7  Dr. Bruce R. Isaacson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**
Dr. Bruce Isaacson CV and Testimony Experience

**MMR** **Marylander Marketing Research**
**R e s e a r c h - B a s e d   C o n s u l t i n g**

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 • Phone (818) 464-2400 • Fax (818) 464-2399 • www.marylander.com

# DR. BRUCE R. ISAACSON, DBA, MBA

**QUALIFICATIONS**
- Expert in marketing, market research, branding, and strategy.
- Experience in research, consulting, and intellectual property matters.
- Doctorate and MBA, Harvard Business School; BS Engineering, Northwestern University Technological Institute.

## CURRENT OCCUPATION

***Marylander Marketing Research, Encino, CA***                    2005 to Present
**PRESIDENT**

MMR provides surveys, analysis, and consulting focused on understanding the attitudes and behaviors of customers and prospective customers.  MMR was founded more than 30 years ago and helps clients to attract and retain customers, manage and grow brands, launch and improve products, and support intellectual property litigation.

- **Manage research-based consulting firm**
  President of research firm, responsible for firm strategy, client projects, and overall business.

- **Manage clients and projects**
  Design studies, manage research, and present findings for clients in practice areas including consumer goods and services, restaurant/retail, litigation, technology, health care, and other industries.  Studies focus on topics in marketing, research, and strategy.  Regularly provide research, declarations, and expert witness services for intellectual property litigation.

- **Develop MMR's intellectual property**
  Develop and manage MMR's research and analysis capabilities.  Develop new products, serve as frequent speaker at conferences, seminars, and meetings on topics relating to marketing, research, and strategy.

## EDUCATION

- Doctor of Business Administration/Marketing, **Harvard Business School**, 1995.
- MBA with High Distinction, **Harvard Business School**, 1991.  Graduated in top 5% of class as a Baker Scholar.
- Bachelor of Science in Engineering with focus on Regional Development, **Northwestern University Technological Institute**, 1985.



## PRIOR PROFESSIONAL EXPERIENCE

*Fairview Company, Calabasas, CA*                                    2002 to 2004
**MANAGING DIRECTOR**

- **West Coast Practice Leader of Executive Development for Monitor Group.**
  Designed and managed marketing and strategy executive education programs for clients of an
  international consulting firm. Developed curriculum, served as lead faculty on programs for
  Fortune 100 clients in industries including consumer products, biotechnology and technology.

- **Consulted with clients in technology, software, and financial services.**
  Provided consulting services in marketing and strategy. Also provided services related to mergers
  and acquisitions – researching sectors, raising capital, and negotiating offers with target companies.

*Intuit/Digital Insight, Calabasas, CA*                                2001 to 2002
**SENIOR VICE PRESIDENT FOR PRODUCTS, MARKETING, AND ALLIANCES**

- **Managed business line for $130 million provider of outsourced banking services and software.**
  Directed marketing, strategy, alliances, mergers, acquisitions, resellers, and pricing for 9 business
  lines. Managed $29 million budget and staff of 40. Contributed to 38% revenue growth to $130
  million in 2002.

- **Transformed technical product group into revenue-focused organization.**
  Created and managed 7 cross-functional teams for key initiatives with $5 million in potential
  revenues. Developed programs for client base of 1,600 banks and credit unions.

- **Built product management and strategy functions.**
  Set priorities for $22 million R&D budget, pared down 370 projects to focus on high return
  categories. Directed $51 million acquisition and post-merger conversion of 150 new clients.

*Move, Inc. (NASDAQ:  MOVE)  Westlake Village, CA*                      1999 to 2001
**PRESIDENT, HOME SERVICES**

- **Founded home services division for $320 million software/services provider to real estate
  industry.**
  Directed business unit for new division as one of 5 division presidents reporting to firm President.

- **Started and managed division focused on the home improvement industry.**
  Created business plan, recruited team, developed products, launched marketing and sales programs.
  Negotiated alliances with National Association of Homebuilders, American Institute of Architects.
  Built services directory of 300,000 providers in 28 categories. Launched 3 product lines, grew to
  600 clients.

*PHH Corporation (NYSE: PHH), Mortgage Division, Mount Laurel, NJ*       1997 to 1999
**VICE PRESIDENT, MARKETING**

- **Directed marketing for $26 billion outsourced mortgage services division.**
  Company provided private label loans and loan servicing for customers and partners, including
  Merrill Lynch, Wells Fargo, USAA, Coldwell Banker, Century 21. Served on 14-member
  Executive Committee. Managed $14 million budget and 60 people in marketing, research, public
  relations, advertising, strategic planning, business development and e-commerce.

- **Created collateral for selling, processing, and closing loans distributed to 750,000 customers annually.**
  Redesigned sales materials used by 150-person sales force.  Created point-of-sale materials and placed in 1,600 real estate offices nationwide.  Negotiated co-marketing deals with software, real estate, financial service companies.

- **Built the company's first online platform to originate, close and service mortgages online.**
  Created co-branded system used by 1,400 partners to originate $700 million in mortgages in 2000.  Developed complete technology solution interfacing with 3 major legacy computer systems.  Integrated with over 2,000 sales and customer service reps.

*Boston Consulting Group, Chicago, IL*                                      1995 to 1997
CONSULTANT

- **Consulted in marketing, strategy and distribution for $1 billion international strategy consulting firm.**
  Designed and rolled out database marketing program including frequent shopper card for international supermarket chain.
  Developed global purchasing strategy across 14 business units and 8 plants for $3 billion consumer goods company.
  Evaluated market strategy for $800 million division of paper goods company.

*Harvard Business School, Cambridge, MA*                                    1991 to 1995
DEAN'S DOCTORAL FELLOW

- **Developed and implemented multi-year research project analyzing buyer-supplier alliances.**
  Authored 14 publications including best-selling case studies and articles in distribution, sales, supplier management, purchasing, branding, new products.  Taught in Babson College Executive MBA program.

*E&J Gallo Winery, Modesto, CA*                                             1990
MBA INTERN

- Summer intern at global winery.  Developed packaging strategy, distribution and retailer incentive programs for the wine cooler category.

*Long Wharf Trading Company, Danvers, MA*                                   1986 to 1989
PRESIDENT & CO-FOUNDER

- **Co-founded company manufacturing high quality sewn products for advertising premiums.**
  Directed 30 employees.  Clients included banks, universities, corporations, schools and museums.  Company was featured with full-page story in *Inc. Magazine* for innovative strategy.

*Parsons Corporation/Barton-Aschman Associates, Evanston, IL*              1985 to 1986
ASSOCIATE CONSULTANT

- **Conducted strategic and operations planning for public transportation systems at global construction and regional planning company.**
  Received *President's Award* for outstanding initiative and performance.

## HONORS, APPOINTMENTS, AFFILIATIONS

- Member, American Marketing Association (AMA)
- Member, Counsel of American Survey Research Organizations (CASRO)
- Member, International Trademark Association (INTA)
- Member, Marketing Research Association (MRA)

- Editorial Board, *Journal of Business-to-Business Marketing,* 1994 - present
- Policy Advisory Board, Joint Center for Housing Studies at Harvard University, 1999 - 2001
- Winner, Doctoral Dissertation, Institute for Study of Business Markets, Penn State, 1994
- George S. Dively Award for Innovative Research, Harvard Business School, 1993
- George F. Baker Scholar, Harvard Business School (top 5% of class), 1991
- Dean's Doctoral Fellowship, Harvard Business School, 1993 -1995

## SELECTED SPEAKING ENGAGEMENTS

Frequent speaker at industry conferences and client events on topics relating to marketing and strategy, including:

- "What Can We Learn from Customer Satisfaction Studies?" Real Trends Marketing & Technology Expo, September 2006.

- "Understanding Today's Customers and Making Tough Choices -- Lessons Learned From Starbucks," Western Foodservice & Hospitality Expo, August 2007.

- "Measuring Consumer Attitudes and Behaviors in Intellectual Property Litigation," Continuing Legal Education (CLE) seminar presented to audiences including:
  - Orange County Bar Association, November 2007.
  - Baker Botts, LLP, March, 2008.
  - Amster, Rothstein & Ebenstein LLP,  March, 2008.
  - Fulwider Patton, LLP, March, 2008.

- "Understanding Your Customer and Making Tough Strategic Choices," International Restaurant & Foodservice Show of New York, March, 2008.

- "The Death of the Focus Group: Non-Traditional Research to Create Deeper Customer Insight." Presentation to American Marketing Association Annual Marketing Research Conference, September, 2008.

## PUBLICATIONS

**Why Online Consumer Surveys Can Be a Smart Choice in Intellectual Property Cases** (with Dr. Jonathan Hibbard and Dr. Scott Swain).  Intellectual Property Law Newsletter of the American Bar Association, Intellectual Property Law Section, May 2008.

**Bose Corporation: The JIT II Program (A), (B), (C), and (D)** (with Professor Roy Shapiro).  Harvard Business School cases 9-694-001, -002, -003, and -004.

**Bose Corporation: The JIT II Program Teaching Note.**  Harvard Business School teaching note 5-695-017.

**Buyer-Supplier Relationships: Antecedents, Management and Consequences.**  Harvard Business School doctoral dissertation, 1996.

**Goodyear: The Aquatred Launch** (with Professor John Quelch).  Harvard Business School case 9-594-106. *Best seller.*

**Goodyear: The Aquatred Launch Teaching Note** (with Professor John Quelch).  Harvard Business School teaching note 5-595-016.

**Industrial Marketing** (with Professor V. Kasturi Rangan).  In *AMA Management Handbook, Third Edition,* edited by John J. Hampton.  New York: Amacom Books, 1994, pp. 2-101 to 2-108.

**Managing Buyer-Supplier Relationships.**  Preface to *JIT II: Revolution in Buying and Selling,* edited by Lance Dixon and Anne Millen Porter.  Newton, MA: Cahners Publications, Inc., 1994

**Philip Morris: Marlboro Friday (A) and (B).**  Harvard Business School case 9-596-001 and -002.

**Scope and Challenge of Business-to-Business Marketing** (with V. Kasturi Rangan).  Harvard Business School class note 9-594-125.

**Vistakon: 1 Day Acuvue Disposable Contact Lenses** (with Alvin J. Silk and Marie Bell).  Harvard Business School case 9-596-087.

**What is Industrial Marketing?** (with Professor V. Kasturi Rangan).  Harvard Business School class note 9-592-012.

**MMR** **Marylander Marketing Research**
*Research-Based Consulting*

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 · Phone (818) 464-2400 · www.marylander.com

### Dr. Bruce Isaacson
### Litigation Expert Witness Experience

#### January, 2009

Cases in which Dr. Bruce Isaacson has testified as an expert at trial, including written expert reports submitted to the court or by deposition in the past four years.

**Richard Dominguez et al v. UAL Corporation**
U.S. District Court, District of Columbia

**James and Mary Jordan et al v. The Scott Fetzer Company**
U.S. District Court, Middle District of Georgia

**Quicksilver, Inc. v. Tween Brands, Inc.**
U.S. District Court, Eastern District of Virginia

**Natural Balance Pet Foods v. Royal Canin USA**
U.S. District Court, Central District of California

**Tokidoki, LLC v. Fortune Dynamic Inc.**
U.S. District Court, Central District of California

**Luppen Holdings v. Pitney Bowes**
U.S. District Court, Central District of California

**American Healthcare Products, Inc. v. Great American Marketing, Inc. and Great American Manufacturing, Inc.**
U.S. District Court, Central District of California