# EXHIBIT 2

RONALD OINES (SBN #145016)
roines@rutan.com
RUTAN & TUCKER, LLC
611 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-1931
Telephone: (714) 641-5100

RANDOLPH C. FOSTER (OSB #784340)
rcfoster@stoel.com (to apply *pro hac vice*)
STEVEN E. KLEIN (OSB#051165)
seklein@stoel.com (to apply *pro hac vice*)
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone: (503) 224-3380

Attorneys for Plaintiff
JIPC Management, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

JIPC Management Inc

Plaintiff,

v.

Incredible Pizza Inc and Incredible Pizza Franchise Group Inc

Defendants.

**Case No. CV08-04310 MMM (PLAx)**

**EXPERT REPORT OF DR. BRUCE R. ISAACSON, D.B.A., M.B.A., RESPONDING TO THE REBUTTAL EXPERT REPORT OF DR. ITAMAR SIMONSON**

# I. OVERVIEW OF THIS EXPERT REPORT

1. Dr. Itamar Simonson has submitted a rebuttal expert report in the matter of JIPC Management, Inc. ("JIPC") v. Incredible Pizza Co., Inc., and Incredible Pizza Franchise Group, LLC (collectively, "IPC")[1]. Dr. Simonson's rebuttal expert report provides comments about the opinions I have expressed in my prior expert report on this matter[2].

2. This report responds to five specific opinions expressed by Dr. Simonson in his expert rebuttal report:

i. Dr. Simonson claims that I lack relevant expertise to provide my report. However he overlooks my extensive and relevant expertise and experience in the areas of consumer surveys, research design, consumer marketing, and the restaurant and food industry.

ii. Dr. Simonson claims that the literature I cite in this case is irrelevant. However, he inexplicably overlooks the extensive application of this literature by scholars wishing to understand how consumers form memories and interact and understand brands and brand names. Further, he ignores the extensive application of this literature to intellectual property related articles and litigation regarding concepts such as consumer confusion and secondary meaning.

iii. Dr. Simonson states that I equate low involvement with a low degrees of customer care. Dr. Simonson has oversimplified the concept of involvement and mischaracterized my report.

iv. Dr. Simonson provides his unsubstantiated personal opinion that the decision to select a family restaurant is a high involvement decision. Based on my extensive research with consumers in the restaurant industry, as well as my broader experience in marketing and related topics, I believe that the choice of a casual restaurant is typically a low involvement decision.

---

[1] Dr. Simonson's report is dated 4/23/09 and disclosed by attorneys from Holme Roberts & Owen LLP on April 24, 2009. This document references paragraph numbers in his report in parentheses.

[2] I submitted my expert report in this matter on April 10, 2009.

v. Dr. Simonson tries to claim that my opinions in this matter contradict my opinions in another recent matter, namely HVB vs The Coca-Cola Company[3]. However, that matter concerned different products, packaging, litigants, marketing activities, sales channels, and consumer buying behavior. Dr. Simonson neglects to mention that my opinions in that matter were stated in rebuttal to his expert report in that matter.

3. This report also responds to a series of statements made by Dr. Simonson regarding JIPC and IPC, in particular concerning the names by which consumers refer to JIPC. Dr. Simonson states in his expert rebuttal report that consumers refer to JIPC as "John's Incredible Pizza," or "John's" (paragraph 33). He provides a few, hand-picked examples found on the Internet where some consumers used one name and some used another yet he fails to specify which is most commonly used and fails to account for the context in which consumers are using the name.

4. In response to Dr. Simonson's statements about how consumers view the JIPC name, I undertook a detailed analysis of data gathered from customer comment cards, emails to JIPC, and online reviews of both chains. The analysis from these sources shows that:

i. The most common references to JIPC involve the words "Incredible Pizza," such as "John's Incredible Pizza Company," "John's Incredible Pizza," or related variants. Consumers also use "John's," or "John's Pizza," but most commonly use the words "Incredible Pizza" when describing JIPC.

ii. Consumers commonly associate the word "incredible" with JIPC in a host of other ways, to describe the service, food, and other aspects of the experience.

iii. Consumers typically refer to IPC as "Incredible Pizza Company" without any geographic modifier.

iv. Despite no geographic overlap, there is already evidence of actual marketplace confusion amongst JIPC customers and potential customers, as demonstrated by

[3] That case involves High Voltage Beverages, L.L.C. v. The Coca-Cola Company and also v Brand Name Management, Inc. and Owen Ryan as Counterclaim Defendants, and was filed in U.S. District Court, Western District of North Carolina.

emails received by JIPC.

5. These findings support my opinion that the phrase "Incredible Pizza" and the word "Incredible" are both closely associated with JIPC, and part of the brand identity of JIPC[4].

## II. COMPENSATION

6. As in the case of my expert report, I have been retained by Stoel Rives, LLP, attorneys for the plaintiffs in this litigation. My compensation in this matter is $450 per hour for consulting and expert services, plus expenses.

## III. DETAILED RESPONSE TO DR. SIMONSON'S CRITICISMS OF MY EXPERT REPORT

7. This section of my report addresses Dr. Simonson's mischaracterizations, errors, and flawed logic in his expert rebuttal report.

### A. Dr. Simonson claims that I lack relevant expertise

8. In his rebuttal, Dr. Simonson states that relying on consumer psychology principles requires expertise in consumer psychology (paragraph 16), and that one becomes an expert in consumer psychology by means of studying research questions, publishing articles in leading academic research journals, and teaching graduate and/or undergraduate courses on consumer psychology (paragraph 17). Dr. Simonson concludes that I am "lacking the necessary qualifications" to "play the role of a consumer psychologist" (paragraph 17).

9. Although Dr. Simonson repeatedly mentions "consumer psychology" and the need for my expertise in this area, he never defines what he means. Further, he lists a series of required qualifications that conveniently and narrowly match his own academic background.

---

4 It appears that Dr. Simonson felt the need for personal attacks. He states in his report that I chose to express opinions in areas that I know little about (paragraph 17), that I have no expertise relevant to this matter (paragraph 19), that my analysis is "simply irresponsible" (paragraph 19), that I make "baseless statements" (paragraph 25), that my opinions and analyses are unreliable (paragraph 30), that I exhibit "systematic bias" (paragraph 30), and that my opinion seems to be "largely determined by the position of the party on whose behalf" I submit a report (paragraph 24). Unlike Dr. Simonson, I will refrain from comments on motivations or character.

10. The courts and case history disagree with Dr. Simonson's simplistic view that any expert in this matter must have a background that matches Dr. Simonson's own academic expertise. Federal Rule of Evidence 702 requires that an expert witness have "specialized knowledge" in the area of his or her testimony. My CV clearly shows evidence of my specialized knowledge in fields that are major components of the issues in this litigation. In fact, my training and experience far exceed the requirement that, "'at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman....'"[5] They also provide background and expertise in relevant topics.

11. In my report, I claimed that I am expert in research, surveys, and marketing (paragraph 1), and further said that I have provided expertise to a variety of clients on topics such as "marketing, branding, and consumer behavior" (paragraph 7). I also mentioned that my firm and I both have particular experience and expertise with chain restaurants, which are a focus of my firm's activities and my personal experience and activities (paragraph 3).

12. My qualifications are reviewed in detail in my expert report. However, I briefly summarize them to correct Dr. Simonson's mischaracterizations. My career in marketing and research has spanned more than twenty years, during which time I have personally overseen and managed hundreds of consumer surveys and market research studies. Throughout my career, I have conducted research, published, and received awards on the topics of marketing, marketing research, and surveys. I worked at two global marketing consulting firms, and have run marketing departments at national companies. I regularly address law firms, bar associations, industry groups, trade associations, and clients on marketing, marketing research, and other related subjects.

13. My education includes a doctorate and MBA in marketing, both from Harvard Business School, where I received academic and research awards including Baker Scholar and Dean's Doctoral Fellow. My MBA and doctoral courses included extensive work in subjects such as

---

5 Opinion of the U.S. Court of Appeals, Third Circuit in Betterbox Communications Ltd. V BB Technologies, Inc.; Black Box Corporation, Appellants, No. 01-2356, 2002, p. 2, quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3rd Cir. 1998)

statistics, research methods, research design, marketing (including buyer behavior), sociology, communications, and finance.

14. I am the president of a firm that provides marketing consulting, consumer surveys, and other marketing research for clients. Nearly all of MMR's research projects help our clients to understand the attitudes, behaviors, and demographics of their customers and clients, topics that are highly relevant to this matter. I have published an article on the use of research in intellectual property litigation, and have conducted seminars at law firms and bar associations on the same topics.

15. Both under my direction and before I arrived, my firm has particular expertise and experience in the restaurant and retail industries. We regularly consult with a variety of restaurants, primarily focused on chain restaurants similar to JIPC and IPC. I have spoken at restaurant industry conferences, and regularly consult with restaurant industry clients on topics including pricing, strategy, and marketing. Dr. Simonson and I both have academic training, but his career has focused on writing academic articles, while I have selected a career working full-time with clients on research related to consumers and issues and topics related to marketing and strategy. The types of expertise we have developed may be different, but I believe that neither can be said to be irrelevant to this matter.

16. Finally, as noted on my CV, during the past four years, I have provided expert reports in a number of intellectual property cases. Many of these cases involved understanding how consumers viewed particular brands and the possibility of consumer confusion between brands. In every case, the courts found my credentials and expertise more than sufficient to provide an analysis and opinion on the matters under dispute.

**B. <u>Dr. Simonson claims that the literature I cite in this case is irrelevant.</u>**

17. Dr. Simonson claims that the literature I cite in this case has little, if anything, to do with my conclusions (paragraph 11) and that I rely "on a completely unrelated research" (paragraph 20). He points out that the Brasel and Gips 2008 article I cite was conducted in a context where consumers were viewing commercials recorded on digital video recorders, and claims that the

article has "nothing to do with the issues in the current litigation" (paragraph 20). He further claims that the article I cited published by Pieters and Wedel in 2007 is "completely unrelated" (paragraph 23), although he is never clear whether it is unrelated to other articles I cite or to this matter. Finally, he criticizes my use of associative network theory, which he claims "has nothing to do with confusion in this and most cases" (paragraph 26).

18. My expert report cited a total of seven articles relating to how consumers view and understand brands and process information and marketing communications. Although Dr. Simonson makes a series of blanket statements about the supposed irrelevance of this literature, he is only able to cite specifics about two of the articles.

19. Four of the articles I cited in my report (Pieters and Wedel, 2007; Brasel and Gips, 2008; Tatler, 2007; and Vitu, Kapoula, Lancelin, and Lavigne, 2004) are presented in my report as examples of an extensive literature relevant to how consumers process images. They all explore a topic called "center bias," whereby people tend to focus on the center of any visual stimulus they see. The examples I cite in my report are drawn from contexts as diverse as pictures and landscapes (Tatler), advertisements (Pieters and Wedel), words (Vitu, Kapoula, Lancelin, and Lavigne), and fast-forwarded images on screens (Brasel and Gips).

20. This effect is well documented over a large literature which extends decades. As Dr. Tatler states, "This central bias in fixation distributions was noted in the earliest studies of eye movements when viewing complex scenes… this central tendency is well documented." Pieters and Wedel conducted their research not just on advertisements, but on advertisements for food and cooking, which are particularly relevant to this matter.

21. This literature suggests that when consumers see a logo presenting a series of words, such as the logos used by JIPC and IPC, their initial inclination is to focus on the center of the logo. In this case, both parties share the words "Incredible Pizza Company" at the center of their logo.

22. Most puzzling to me is Dr. Simonson's assertion that associative network theory is unrelated to matters such as this. Associative network theory remains a predominant theory regarding how consumers form memories and associations, including those related to constructs such as products and brands. These memories and associations are crucial in how researchers

understand brand identity, brand confusion, secondary meaning and other concepts.

23. Researchers and authors have applied associative network theory extensively to brands, brand memories, and brand associations, which are the foundations of consumer confusion. Dr. Maureen Morrin, a well-known branding and consumer behavior researcher, states in a 1999 article in the *Journal of Marketing Research* (that I cited), "The strength of brand associations in memory is a key element of brand name awareness, which in turn is a critical component of brand equity… The predominant theory regarding the organization of information in long-term memory is associative network theory, which suggests that semantic information is stored in hierarchical networks containing nodes (or concepts) that are connected by links."[6] It is worthwhile to note that Dr. Morrin and others have applied this theory in intellectual property cases as experts.

24. Other articles confirm the central importance of associative network theory. For example, another scholar active in both consumer research and Lanham act litigation, Dr. Jacob Jacoby, has called associative network theory a "widely accepted theory," not new to Lanham Act proceedings, confirmed by advances in neurosciences over recent decades, which enables parties to "better understand the psychological processes that underlie acquired distinctiveness, confusion, dilution, and related legal concepts."[7] A recent article in *The Trademark Reporter* applies this theory directly to likelihood of confusion, discussing brands as "schemas" of nodes and links of associations to other nodes, with links created by advertising, word of mouth, or experience[8]. In a prior article, the same author provides a detailed schematic of the nodes and links that are the heart of associative network theory[9]. The theory is widely discussed in the academic literature as well, including in commonly-used textbooks on consumer behavior[10] and

---

[6] See "The Impact of Brand Extensions on Parent Brand Memory Structures and Retrieval Processes," by Maureen Morrin, cited in my expert report, page 518.

[7] Jacob Jacoby, "The Psychological Foundations of Trademark Law: Secondary Meaning, Acquired Distinctiveness, Genericism, Fame, Confusion, and Dilution." Working Paper #CLB-00-003, Stern School of Business, New York University, p. 5. See also Jacob Jacoby, "The Psychological Foundations of Trademark Law: Secondary Meaning, Genericism, Fame, Confusion, and Dilution.," *The Trademark Reporter*, 2001, Vol. 91, pp 1013 – 1071.

[8] Jerre B. Swann, "Likelihood of Confusion Studies and the Straightened Scope of Squirt," *The Trademark Reporter*, May-June 2008, Vol. 98.

[9] Jerre B. Swann, "An Interdisciplinary Approach to Brand Strength," *The Trademark Reporter*, July-August 2006, Vol. 96

[10] Hoyer and MacInnis, *Consumer Behavior,* Fifth Edition, South-Western, CENGAGE Learning, 2008. See, for

branding[11].

25. Thus, Dr. Simonson's assertion that associative network theory "has nothing to do with confusion" is a weak attempt to claim that only Dr Simonson's specific background allows him the ability to know how and where theories can be appropriately applied. Many other scholars, some of whom I have cited, have discussed the importance of associative network theory as it applies to branding and trademark matters.

### C. <u>Dr. Simonson equates involvement with "customer care" and no other attributes.</u>

26. Throughout his rebuttal expert report, Dr. Simonson mischaracterizes my conclusions about how consumers select casual restaurants such as those operated by JIPC and IPC. My report discusses whether a decision to purchase an item such as a meal or experience at a restaurant is low involvement or high involvement. At least four times in his rebuttal expert report, Dr. Simonson uses the concept of involvement in a manner that equates involvement with "customer care," The first instance is in paragraph 12, where he states that I believe that decisions to go to a family restaurant are "…characterized by low involvement (i.e., a low degree of customer care)."[12] There are others as well.

27. My expert report never used the phrase "customer care," only used the word "care" once, and never suggested that involvement can be simplified to "customer care," which is a concept Dr. Simonson brings to the discussion. My expert report relates involvement to concepts such as the time and effort a consumer spends during the process of search and decision making as well as the price of the goods and the degree of repeat purchase. As I stated, "Involvement refers to the amount of time and effort a buyer invests in the search, evaluation, and decision-making

---

example, pages 94-96.

[11] Kevin Lane Keller, *Strategic Brand Management Building, Measuring, and Managing Brand Equity*, Third Edition, Pearson Prentice Hall, 2008.

[12] Other examples include: "choosing the JIPC or IPC is a low involvement (i.e., a low degree of care) type of decision." (paragraph 28); "greater care and involvement" (paragraph 36); "a relatively high involvement decision in which consumers exercise a high degree of care" (paragraph 36)

process. Goods for which consumers have low involvement are afforded relatively little time and effort in search and decision making prior to purchase. These types of goods are often items which are either inexpensive, or for which repetitive purchases over time have made consumers familiar with either the product or the method of purchasing the product." (paragraph 73)

28. Interestingly, Dr. Simonson has adopted, in past writings, definitions that relate customer care to similar concepts, including the amount of risk for the consumer, the cost of the purchase, and the time spent researching alternatives. His expert report in the HVB vs. Coca-Cola matter described the purchase of a low involvement product as follows: "Given the limited cost and consequences in case one makes the wrong choice, most consumers are unlikely to spend a great deal of time researching or studying each option carefully before making a purchase."[13]

29. In my experience, involvement encompasses much more than how much a customer cares about a purchase decision. Low involvement decisions do not necessarily involve low amounts of customer care, and there may be instances where consumers make low involvement decisions but also care about the outcome of those decisions.

**D. <u>Dr. Simonson characterizes the decision to select a restaurant as high involvement.</u>**

30. Dr. Simonson states that because of the high degree of care, selecting a restaurant is a "high involvement decision" (paragraph 36), and he further claims that my opinion in the Coca-Cola matter characterizes soft drinks as "apparently a high involvement decision" (paragraphs 13 and 29). These are misstatements, and I believe they are connected with Dr. Simonson's equating "customer care" with involvement. To state the matter plainly, I do not believe that in most circumstances the choice of a restaurant or a soft drink is a high involvement decision. Automobiles, houses, and college education are common examples of high involvement decisions, and the decision to buy a soft drink or go to dinner is quite different and typically less complex. Dr. Simonson's assertion that soft drinks and restaurants are high involvement

[13] Quoted from Dr. Simonson's Expert Report dated March 12, 2009 in High Voltage v Coca-Cola Company, paragraph 15, page 6.

decisions defies common sense.

31. Finally, Dr Simonson concludes paragraph 36 by stating that "it is clearly a high involvement decision in which consumers exercise a high degree of care." While it may be personally "clear" to Dr. Simonson, based on my extensive research with consumers, restaurants and marketing, Dr. Simonson's personal opinion is not supported.

32. This does not mean that consumers do not care about low involvement decisions. Consumers can care about the outcome of a low involvement purchase, even a purchase that they make quickly. In my report rebutting Dr. Simonson's expert report in HVB v The Coca-Cola Company, [14] I cite an example described in *The Trademark Reporter* pointing out that the time taken to decide is not the same as attention paid to what is bought. That article refers to a hypothetical candy bar purchase where the consumer thinks, "I want a MILKY WAY DARK and nothing else, but even so I take very little time to decide on a candy bar."[15]

33. Over the past 4 years, my firm has conducted more than 32 research and consulting studies for chain restaurants; all but one of the clients involved were clients I brought to MMR. Those projects, and my past experience, provide a basis for my belief that consumers often make decisions about which restaurant to eat at relatively quickly (compared with how much they typically shop for an automobile or other high involvement product). They decide on attributes such as price, cuisine, location, and cleanliness. Although they may care very much about where they eat, they usually pick a restaurant based on interest in the type of food, or appeal of the building, without doing research beyond looking at a few online reviews. They sometimes try a new restaurant simply for the sake of variety and having a new experience. As this relates to likelihood of confusion, if they believe a restaurant shares a name with one they have heard of previously, they may select or avoid that establishment based on their associations with that restaurant, without conducting much or any additional research.

34. Thus, the decision to eat at a particular family restaurant is low involvement because it is

---

[14] My expert report in that matter is dated April 15, 2009.

[15] "Response to Survey Methodology Articles" by Mike Rappeport, *The Trademark Reporter*, May-June 2006, footnote 13, page 771.

often unplanned, spontaneous, or based on an impulse to try the restaurant without requiring additional research. As I state in paragraph 74 of my expert report, "For example, a consumer driving by either of their locations might see the signage and decide to stop in and eat, without requiring any further research other than observation of the exterior of the restaurant. In this type of purchasing situation, the JIPC or IPC product would be considered an impulse purchase: an unplanned or otherwise spontaneous purchase."

**E. <u>Dr. Simonson claims that my opinions in this matter contradict my conclusions in the matter of HVB v The Coca-Cola Company</u>.**

35. Dr. Simonson also claims that my report in this matter contradicts my opinion in the expert rebuttal report I filed in HVB v The Coca-Cola Company. He states in his rebuttal expert report filed in this matter that the contrast between my opinions in these two matters is "quite striking" (paragraph 13 and 29) and that this report contradicts the opinions I expressed in the other report (paragraph 30).

36. Dr Simonson fails to note that my opinions in the HVB matter were in rebuttal to his expert report. He further fails to note that his opinions in that case were in support of a finding of confusion. My opinions in that matter are entirely consistent with my opinions in this case, particularly in light of the significant factual differences between the two matters.

37. These matters are substantially different in several aspects. One matter involves restaurants selling food and entertainment from destination locations, while the other involves soft drinks sold in convenience stores among displays of other beverages. One matter involves products such as pizza that have no packaging. The other products are sold in bottles, where manufacturers make large investments in packaging, which is used as a branding element to identify the product for the consumer.

38. A consumer frequenting a pizza restaurant may go there monthly or even weekly, but is unlikely to go there daily, while beverages such as sodas may be consumed daily. Also, JIPC and IPC engage in some amount of advertising and marketing, but not nearly as much as Coca-Cola, the parent company of the Vault brand, which spends millions of dollars per year on brands such

as the ones involved in that matter.

39. Given these substantial differences between the two matters, there are obviously many bases for reaching different conclusions, other than the "systematic bias" Dr. Simonson alleges in paragraph 30.

40. Even given this, the only specific complaint I can find in his report that serves as the basis for his statements is that he believes in this matter I have characterized the goods as low involvement, while in HVB v The Coca-Company he mistakenly states that I characterized choice of a soft drink as "apparently a high involvement decision." (paragraph 29) I have discussed the issue of involvement in the previous section, pointing out that I have stated and believe that both soft drinks and casual restaurants are typically low involvement purchase decisions.

## IV. <u>DISCUSSION OF DR. SIMONSON'S ASSESSMENT REGARDING THE LIKELIHOOD OF CONFUSION BETWEEN JIPC AND IPC</u>

41. The last section of Dr. Simonson's expert rebuttal report analyzes the factors influencing the likelihood of confusion between the parties in the matter. He introduces this section by stating that he will limit his analysis "to a brief discussion of those aspects on which I have the necessary expertise" (paragraph 31). Dr. Simonson then presents a list of factors he intends to opine upon. Given his earlier comment about limiting his analysis, presumably these factors would be those that merit consideration given his expertise in consumer psychology and consumer confusion. However, his choice of discussion topics is much broader.

42. In paragraphs 31-41, he proceeds to offer a wide variety of personal opinions and statements about many items. He states an opinion regarding how consumers refer to JIPC (paragraph 33), the prominence of the word "JOHN'S" in the JIPC name within consumers' minds (paragraph 34), the prominence of JOHN'S in how consumers refer to JIPC (paragraph 34), the percentage of visitors that are repeat visitors and/or familiar with the chain (paragraph 35), whether destination restaurant food is purchased with a greater degree of care than a soft drink (paragraph 36), whether selecting a restaurant such as JIPC or IPC is a high involvement decision (paragraph 36), whether consumers can tell the difference when company names share

first parts (paragraph 39), whether consumers have visited both JIPC and IPC (paragraph 39), and whether there are significant differences between the look of JIPC and IPC locations (paragraph 41).

43. This array of opinions is broad in scope and unfounded in credible data. First, Dr. Simonson claims there are significant differences between JIPC and IPC in terms of how the restaurants look and what they offer to consumers (paragraph 41). As I discussed in my expert report, and as the court has already acknowledged in the August 8, 2008 Order Denying Plaintiff's Motion for Preliminary Injunction, the restaurants have multiple similarities, including the following:

a. Food: Both IPC and JIPC serve pizza, pasta, salads, soups, desserts and self-serve sodas in a buffet. They even serve similar types of items within those categories, such as pepperoni pizza or soft serve ice cream.

b. Entertainment: Both offer large entertainment complexes, including video and redemption games, bumper cars, miniature golf, and bowling.

c. Atmosphere: Customers in both chains can eat in rooms that have a variety of themes or formats, such as sports or family dining, and both offer rooms for private parties.

d. Target Customer and pricing: Both chains target families with children as one of their primary customer segments. Both price food in an all-you-can-eat format at an affordable price.

44. The similarities between these two chains are not by accident. It is my understanding that Rick Barsness, the owner of IPC, has been an acquaintance of John Parlet, the owner of JIPC for many years. It is my further understanding that Mr. Barsness, before and/or after opening IPC, obtained recipes from Mr. Parlet, toured at least three JIPC locations, and had numerous conversations with Mr. Parlet over many years. The many years of interaction between Mr. Barsness and Mr. Parlet may have contributed to the similarity of the food and experience between IPC and JIPC. It is interesting that Dr. Simonson, who (according to his CV) has provided expert testimony in more than 40 cases during the past four years, did not address

similarity of the goods when conducting his analysis of this matter, especially given the centrality of such similarity in any credible analysis of confusion.

45. A second deficiency in Dr. Simonson's analysis of the likelihood of confusion is that he uses apparently hand-picked examples from the internet to 'show' how consumers refer to JIPC. He describes a grand total of five restaurant reviews culled from the internet as the basis "which makes it possible to determine by what names consumers refer to JIPC." (paragraph 33). He states that consumers refer to JIPC as "John's Incredible Pizza" or "John's" (paragraph 33), while consumers refer to IPC as "Incredible Pizza Company" or "America's Incredible Pizza Company" (paragraph 34). He surmises, based on his personal opinion, that "John's" is the most prominent component of JIPC, visually, in consumers' minds, and in the manner in which they refer to JIPC (paragraph 34).

46. As Dr. Simonson, a scholar and expert in consumer psychology and consumer confusion matters is well aware, five hand-picked anecdotes located online do not provide the basis for drawing conclusions about how consumers refer to JIPC. To better understand how consumers refer to JIPC and IPC, and in response to the "analysis" provided by Dr. Simonson, I have conducted a detailed analysis that relies upon three sources of information:

i. Comment Cards: 420 comment cards filled out by JIPC customers in April, 2009 that refer to JIPC by any name or use the word "incredible."

ii. Emails: 805 electronic communications sent to JIPC between September 5, 2006 to May 8, 2009 that refer to JIPC by any name or use the word "incredible." The emails[16] are primarily from customers, but also come from other parties, such as suppliers.

iii. Online Restaurant Reviews: Reviews of JIPC and IPC, located online during May of 2009.

47. For this analysis, I started with every comment card and email available from JIPC as of May 8, 2009, which included 6232 emails and 8360 comment cards. I looked for emails and

[16] These electronic communications were sent to JIPC either directly from the sender's email program, or through a communications link on JIPC's website. In this report, I refer to all such communications as emails.

comment cards in which the customer or sender had provided comments relevant to three issues:

i. Any references that identified JIPC by any sort of name, such as John's, John's Pizza, John's Incredible Pizza, John's Incredible Pizza Company, Incredible Pizza, etc.

ii. Any other use of the word "incredible" to see whether or not this word is commonly associated with JIPC.

iii. Whether or not there was evidence of actual confusion, as demonstrated, for example, by consumers emailing JIPC to ask about JIPC units in a city where only IPC operates.

48. The attached exhibits provide copies of items that were probative in the above three issues. The comment cards are provided as Exhibit 1, emails as Exhibit 2, and online reviews as Exhibit 4. In all Exhibits, information personally identifying any party has been redacted, although the materials still show the actual comments and the date of the communication. The communication items were reviewed by me with the assistance of MMR staff, and each item selected was reviewed at least twice to make sure that it was coded and sorted correctly.

49. The results of the analysis of emails and comment cards are summarized in the table that follows.

>>

>>

>>

>>

>>

>>

>>

>>

>>

>>

**SUMMARY ANALYSIS OF NAME INFORMATION FROM COMMENT CARDS AND EMAILS**

| | Comment Cards | Emails |
|---|---|---|
| **Name for JIPC** | | |
| ▪ **John's Incredible Pizza, John's Incredible Pizza Company, JIPC, JIP, Incredible John's, etc.** | 50 | 372 |
| ▪ **John's or John's Pizza (no reference to Incredible)** | 41 | 359 |
| ▪ **Both John's and John's Incredible Pizza/JIP/JIPC** | 0 | 39 |
| ▪ **John's and the separate use of the word "incredible"** | 14 | 5 |
| ▪ **Incredible Pizza without John's** | 5 | 0 |
| **Any use of the word "incredible" without John's** | 310 | 22 |

50. As can be seen above, consumers across both commonly refer to JIPC as "John's Incredible Pizza," "John's Incredible Pizza Company" or a related variant that uses both "John's" and "Incredible Pizza." Although consumers use a variety of spellings[17], verbatim examples of this naming convention from the comment cards and emails are as follows:

- "Incredible place. This is not my first time here at Johns Incredible and I just enjoy the buffets and games here." (comment card 5371)
- "We love J.I.P.!" (comment card 5399)
- "I ♥ John's incredible Pizza" (comment card 5400)
- "I like the vibe at John's Incredible. The Employees are very helpful…" (comment card 5374)
- "I love John's incredible pizza. You should have an peanut butter chocolate and cinnamon pizza, I think everyone would like that." (comment card 5381)
- "I often come to John's Incredible and I am always satisfied with everything overall." (comment card 5383)

[17] In all cases, I reproduce comments as spelled and punctuated by consumers

- "The johns incredible is one of the best here you got a good service" (comment card 5398)
- "I had received some awards from John's Incredible at the beginning of the year…" (email 1367)
- "I love John's Incredible Pizza, I'm going there for my birthday it's the best. And the pizza is amazingly awesome". (email 1409)
- "Thanks John's Incredible Pizza Co. you truly are INCREDIBLE and you have a customer for life…" (email 1438)
- "I love John's incredible pizza it is fun for everyone in the family and the food is great too…" (email 1681)
- "…What is required to participate in the tour of John's Incredible?" (email 1492)

51. The next most common name used for JIPC is "John's" or "John's Pizza" without the term "Incredible" in the name. For example, from the comment cards and emails:

- "I love you John, I want more of your pizza" (comment card 5311)
- "We love John's" (comment card 5316)
- "Johns is the best" (comment card 5326)
- "I love Jhon's Pizza because the food is pretty good and I enjoy playing in the arcade. (comment card 5313)
- "This place is great. I will start to come with my family to Johns. I will tell my friends about this place. Thank you" (comment card 5320)
- "My grandchildren come from over Pacheco pass to visit me. The first thing they ask me, are we going to John's pizza! So here we are." (comment card 5324)
- "My visits here are always pleasant at Johns. Me & my boys will return." (comment card 5327)
- "My kids love coming to Johns and I love the service and friendly faces. Thank you!" (comment card 5328)
- "Would you please build a John's in the Palm Desert area? We love your theme and frequent you in Roseville with our grandchildren We live in La Quinta" (email1026)
- "…I Loved John's and so did my family! Thank You!" (email 1038)

- "We just moved to Washington from Fresno and WE MISS JOHN'S!...Have you ever considered opening in other states? We moved to a small town where we know a John's would be a hit!..." (email 1039)
- "Just wanted to let you know that I really enjoyed the peanut butter pizza last night. I visited John's for the first time last night for my nefew's birthday. I had never heard of putting peanut butter on pizza but I gave it a try and it was good." (email 1042)

52. Some consumers use both names to refer to JIPC. Many consumers use John's as a shorthand or abbreviation in the same communication in which they also use the term "John's Incredible Pizza Company." Examples from the comment cards and emails include:

- "My kids were used to going to John's Incredible Pizza once a month. Since being here in San Jose, I have not been able to locate a john's anywhere in the bay area..." (email 1769)
- "My girls and I love to eat at John's. They love the pizza and of course the games...We love Johns Incredible Pizza..." (email 1770)
- "Even though it says no franchise at this time I would love to open a John's Incredible in Las Vegas...I believe John's has a lot of potential in Las Vegas..." (email 1774)
- "i was just wondering if there was any way to check how many credits i have on my John's Card without having to go into John's Incredible Pizza" (email 1745)

53. Also, as can be seen below, consumers commonly associate the term "incredible" with JIPC. They use this term to describe the food, the service, and other aspects of the experience, and they use this term both in positive and negative contexts. Examples from the comment cards and emails are as follows:

- "Everything was incredible like always. Very clean too." (comment card 5002)
- "The food was incredible and the place was clean too." (comment card 5004)
- "The gentleman cleaning tables was extremely polite and helpful. Excellent experience!! Incredible!!" (comment card 5012)
- "The service and staff are incredible!!" (comment card 5025)
- "Very nice buffet. In fact I could say incredible." (comment card 5028)

- "I am a girl scout leader and looking for some inexpensive fun for my troop. I have ages 9-12. What can we do that is fun and reasonable? Please let us now as I have heard a lot of "Incredible" things about you." (email1780)
- "Wat's not to like about it when it's incredible." (email1790)
- "…Would it be possible to receive more incredible awards for the students and a few teacher rewards? These have been a big hit with our students. It's incredible." (email 1782)
- "I am a 7th grade English teacher in Wasco. I received 'You're Incredible!' certificates through the mail. I was wondering if I could get more?..." (email 1786)
- "I'd like to know how I can partner up with the Incredible Incentives Youth program…" (email 1787)

54. As mentioned earlier, Exhibit 4 provided examples drawn from online restaurant reviews showing how consumers refer to JIPC. I included as many reviews as I could locate in a reasonable search effort. An approximate count[18] found 22 instances in which consumers referred to JIPC as "John's Incredible Pizza," "John's Incredible Pizza Company," "JIP," or other terms that indicate that the consumer uses "Incredible" and "John's" in the name. There were also about 20 instances where consumers referred to JIPC as "John's," "John's Pizza," or similar terms that do not use "Incredible" in the name. Thus, the online consumer reviews suggest the same patterns for naming JIPC as found in the comment cards and emails.

55. The above analyses show that consumers commonly associate the term "incredible" with JIPC, and further, that they often refer to JIPC as "John's Incredible Pizza Company." They use this full name even in writing, where conventions to save writing or typing strokes (such as "fyi" to mean "for your information") abound. They even use this full name when the context is clear and an abbreviation might suffice. For example, if I refer to a sports team in Boston as "Boston," it may not be clear what team I am talking about, but in the context of a sports program discussing baseball scores, "Boston" might be understood to refer to the Red Sox. Similarly,

18 The references for all types of names of JIPC are highlighted or shaded in the exhibit.

consumers who have the option of using "John's" because the rest of the name is clear due to the context still often chose to use the longer name that involves the words "incredible" and "pizza."

56. I have completed a similar, although more abbreviated, analysis for IPC. Exhibit 3 shows consumers' restaurant reviews for IPC. I examined these reviews to see how consumers refer to IPC. In these reviews, I identified approximately 180 instances where consumers refer to IPC by name[19]. Of these references, approximately 110 were instances where consumers refer to IPC as simply, "Incredible Pizza Company," or some related variant. Only 70 were references where consumers refer to IPC as a name with a geographic modifier, such as "Tulsa's Incredible Pizza Company" or "Conroe's Incredible Pizza Co." This analysis shows that consumers are likely to refer to IPC, at least in online reviews, as "Incredible Pizza Company."

57. This relatively large dataset reflects a much fuller picture of how consumers express the name of JIPC. The data imply that another chain sharing the "Incredible Pizza Company" part of their name and operating in the same market as JIPC would be confusing for consumers, particularly when that other chain typically puts modifiers in front, such as "Tulsa's Incredible Pizza Company," so that "John's" might be seen as another modifier of a restaurant that is somehow connected or related.

58. The data also show evidence of actual confusion. Exhibit 5 provides examples of emails where consumers contacted JIPC about JIPC operations in locations where only IPC operates. For example,

- "I am currently working at the incredible pizza in Memphis Tennessee and I was just woundering if it was possible if I could transfer from there to here? (1000)
- "please send me some promotions for the week for the Missouri area." (1003)
- "you dont have texas location online." (1007)

59. Dr. Simonson has opined that consumers are likely to be able to tell apart JIPC and IPC despite the similarity in their names. In his expert report in the Coca-Cola matter, where he had been retained by a party alleging confusion, Dr. Simonson pointed out that confusion between a

[19] The references for all types of names of IPC are circled and/or underlined in the exhibit.

company and another brand is damaging because, in such cases, a company loses control of its own brand, so that company's brand equity becomes "largely determined by the actions of another company and the reputation of its products" (paragraph 55). According to Dr. Simonson, in those circumstances, a company may find itself unable to revise marketing or communications strategies, because the company's positioning and perception are tied to and influenced by the competitors' actions, and consumers may not be able to distinguish between the original brand and the knockoff brand (paragraph 55).

## V. CONCLUSIONS

60. The analysis provided in this report responds to a number of statements provided by Dr. Simonson in his rebuttal expert report. In addition, I have responded to Dr. Simonson's assessment of the names consumers use to refer to JIPC by providing evidence from customer comment cards, emails, and online restaurant reviews, that consumers commonly use the term "incredible" in association with JIPC, and that they often use the term "incredible" in the name they use to refer to JIPC. In addition, I have provided examples of actual confusion.

61. These findings support my opinion that the phrase "Incredible Pizza" and the word "Incredible" are both closely associated with JIPC, and part of the brand identity of JIPC. In my opinion, allowing another party to now associate those same words with another company, such as IPC, in overlapping geographies would increase marketplace confusion.

>>

>>

>>

>>

>>

>>

>>

>>

>>

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my belief.

Executed in Encino, California, on May 15, 2009.

Dr. Bruce R. Isaacson