# EXHIBIT A



7/4/09 N.Y. Times A1
2009 WLNR 12760221

New York Times (NY)
Copyright 2009 The New York Times Company

**July 4, 2009**

Section: A

For Banks, Wads of Cash and Loads of Trouble

ERIC LIPTON and ANDREW MARTIN

MACON, Ga.  H. Averett Walker used hot money to turn Security Bank from a sleepy Southern lender into a regional powerhouse. Darrell D. Pittard used hot money to jump-start his brand-new MagnetBank, allowing it to lend hundreds of millions of dollars even though it did not have a single drive-up window or even a customer with a checking account.

   It is a formula being replicated at banks across the United States.

   Rather than simply wooing local customers, they have turned to out-of-state brokers who deliver billions of dollars in bulk deposits, widely known as ''hot money,'' from investors nationwide. In fast-growing regions like this one in central Georgia, the money produced record bank profits and financed whole new communities, built at a phenomenal rate.

   But the hot money also came with a high cost. To lure the money from brokers, banks typically had to offer unusually high rates. That, in turn, often led them to make ever riskier loans, leaving them vulnerable when the economy collapsed. Magnet failed early this year and Security Bank is barely hanging on.

   Though few people have heard of it, hot money -- or brokered deposits, as it is also known in the industry -- is one of the primary factors in the accelerating wave of failures among small and regional banks nationwide. The estimated cost to the Federal Deposit Insurance Corporation over the last 18 months is $7.7 billion, and growing.

   Hot money has bedeviled regulators for three decades and they are starting to fight back, albeit tentatively, devising new restrictions to keep the practice from taking more banks down. But in one of the hidden lobbying battles in Washington this year, the banks are pushing hard to keep the money flowing.

   So far the banks are winning, and the hot money continues to fuel bank growth. The industry has even invented variants to get around the few rules that have been put in place by regulators.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Banks defend the use of brokered deposits as an important tool to bring in money to help communities grow. But even some industry executives acknowledge that certain banks became too dependent on the deposits, and that this abuse caused banks to fail. The consequences can be seen across the country.

The 79 banks that have failed in the United States over the last two years had an average load of brokered deposits four times the national norm, according to an analysis performed for The New York Times by Foresight Analytics, an industry research firm based in California. And a third of the failed banks, the analysis shows, had both an unusually high level of brokered deposits and an extremely high growth rate -- often a disastrous recipe for banks.

The data also shows that the problem isn't likely to go away. The 371 still-operating banks on Foresight's ''watch list'' as of March held brokered deposits that, on average, were twice the norm. Even this year, in the depth of the recession, a number of struggling banks have been piling up hot money in a desperate effort to survive.

It is the same mix -- rapid increases in hot money and heavy lending for risky real estate development -- that brought down many of the savings and loans in the late 1980s.

Warnings and Resistance

Regulators now acknowledge that they saw the warning signs during the most recent boom, but failed to take aggressive action. ''We went through this golden age of banking and I just think that everybody lost their compass,'' said Sheila C. Bair, the chairwoman of the Federal Deposit Insurance Corporation.

Their indifference has been costly. Even brokered deposits are insured, up to $250,000 for each customer account. But once a bank fails, these deposits become an albatross to the F.D.I.C., which often looks for a healthy bank to take over the failed bank. Most new owners refuse to accept the brokered money -- it doesn't bring branches or real customers -- forcing the F.D.I.C. to repay it. The fight over brokered deposits, though far less public than other struggles over the nation's regulatory system, is one of many in Washington that will help determine the shape of industries ravaged by the economic crisis.

To make their case, a delegation of nearly 50 Georgia bankers assembled at the F.D.I.C.'s headquarters in May to plead with regulators to ease restrictions on brokered deposits.

''It is a bullet to their head,'' Joe Brannen, president of the Georgia Bankers Association, recalled members of the group telling senior agency officials. ''This is insanity.''

Brokered deposits, industry players and regulators agree, are not inherently a bad thing. Many institutions have relied on brokered deposits for years without troubles. Without brokered deposits, small regional banks in fast-growing parts of the country would not have been able to keep up with the demand for construction loans.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The brokers receive much of the money from investment firms like Merrill Lynch, which are looking to park high-interest certificates of deposits they have sold to clients. Merrill customers get two things out of the arrangement: high returns on their investments and a haven because the money is placed in a bank insured by the F.D.I.C. One brokerage firm, Finance 500, in Irvine, Calif., started a hot money program in 1997 with seven bank customers. A decade later, it delivered $14 billion to more than 1,500 banks.

But the money is volatile. It can be easily shifted from one bank to another as brokers seek the highest interest rates. Thus the term hot money.

Some banks prosper by supplementing their accounts with these deposits, but try not to rely too much on them because the interest payments are high and the brokers can be fickle. ''It's simple, really,'' Michael Hobbs, the chief executive of First Commercial Bank in Missouri wrote to the F.D.I.C. late last year, in defending the industry's practices. ''If brokered deposits are managed accordingly, they provide a safe alternative funding source.''

But William M. Isaac, chairman of the F.D.I.C. from 1981 to 1985, said he became wary nearly three decades ago after watching the spectacular fall of Penn Square Bank of Oklahoma City, which had grown astronomically by gorging on brokered deposits. Alarmed by the practice, Mr. Isaac moved to eliminate F.D.I.C. insurance for most brokered deposits -- a rule that provoked an industry revolt and was ultimately overturned. Congress later made a similar attempt, but it too was defeated.

''I have a lot of scars on my back,'' Mr. Isaac said in an interview, recalling the fight over the rules. ''I don't have any doubt that tens of billions were lost in the S.& L. crisis because of brokered deposits. And we were on our way to shutting that practice down.''

By 1991, Congress prohibited weak banks from obtaining brokered deposits unless they were adequately capitalized. But because approximately 97 percent of the banks in the United States are considered ''well capitalized,'' the limit has little impact. Three years later, the F.D.I.C. watered down that rule by repealing the requirement that banks looking to grow rapidly with brokered deposits seek special permission from the agency.

The Frenzy in Georgia

The risks and rewards of brokered deposits played out visibly here in Georgia, where a red-hot real estate market in metropolitan Atlanta drove a lending frenzy that was heavily financed by hot money.

Mr. Pittard built MagnetBank solely on brokered deposits, eschewing even traditional branches. ''It was very simple,'' he said. ''It was clean.'' And the F.D.I.C. approved it.

The bank was chartered in Utah, but did muchof its lending in Georgia. When the real estate market here turned in 2007, many borrowers fell behind and Magnet began to crumble. Its failure in January 2009 cost the F.D.I.C. an estimated $129 million.

Magnet is the extreme example: 100 percent of its deposits were brokered. The story

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

of Security Bank is more typical of the risks.

For years it stayed out of the brokered deposit trade. Mr. Walker, its president and chief, who was known to everyone here in Macon as Rett, bragged to the newspaper about how much he valued local customers.

''The more accounts they have with you -- from a child's savings account to a safety deposit box -- the more loyal the customer is and less likely to leave,'' Mr. Walker said in 2001, the same year he dressed up in a tuxedo shirt and jacket, jeans and boots to cook up a quail dinner for employees at a branch that had met a sales goal.

But even as he spoke, suburban Atlanta was booming, and Security wanted to take advantage.

It bought small banks to ramp up its lending. But that did not satisfy its ambitions, government records show. So, despite Mr. Walker's faith in small depositors, Security called the brokers.

At the start of the decade, Security held just $693,000 in brokered deposits. By last year it had $798 million, or 33 percent of its overall deposit base.

It transformed the bank.

To attract the wholesalers, Security had to offer interest rates that, as of 2007, averaged 5.28 percent, or 20 percent higher than what local banking customers got.

To generate the profits to pay such rates, Security began concentrating its lending in the riskiest corners of the market: acquisition of raw land and construction of housing developments. These loans can bring higher profits from fees and higher interest rates. In 1999, construction lending was 8 percent of Security's loan portfolio. By 2007, it peaked at 53 percent, including prominent projects like converting 230 acres of a former plantation into an upscale new neighborhood called the Highlands.

For a while, the hot money strategy seemed to be working; Security's profits soared, as did its stock price. Then the economy went sour. Now Mr. Walker has been forced out of his job, and the bank acknowledges it is struggling to survive. It built itself a sprawling new headquarters here in Macon, but it is no longer putting its name atop the tower. Instead, it is trying to find someone to lease the empty space. The Highlands project, like many others it financed, sits unfinished.

Thomas D. Woodbery, the bank's senior vice president, defended the strategy as a ''proven and reliable'' way to get more money for loans. But he said the bank was now reducing its allowance on brokered deposits -- under orders from the F.D.I.C., which only in April placed heavy restrictions on Security by issuing a cease-and-desist order.

Through this hot-money explosion, the regulators largely watched from the sidelines, offering warnings at times, but declining to intervene forcefully, officials in Washington now acknowledge. The F.D.I.C. allowed many banks that lost their ''well capitalized'' status to keep taking brokered deposits, approving waivers for about 65 percent of the applicants over the last five years.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

''Don't get in the way, don't take away the punch bowl,'' Ms. Bair said, describing the approach taken by regulators, including her own agency.

Regulation Battles

At the Office of the Comptroller of the Currency, part of the Treasury Department, bank examiners in 2005 found that ANB Financial of Arkansas relied heavily on brokered deposits to fuel rapid growth, an audit shows. Yet the regulators did not take ''forceful action'' for two more years, the audit says, just before ANB was shut down.

At the Office of Thrift Supervision -- a Treasury agency that President Obama wants to eliminate -- regulators advised BankUnited of Coral Gables, Fla., to **backdate** financial records, allowing it to continue to lure brokered deposits, the department's inspector general reported in May 2009.

In recent years, even some brokers became concerned about the dependence on hot money that certain banks had developed, said Paul T. Clark, an industry lawyer in Washington. They shared those concerns with regulators at the F.D.I.C. last year, hoping to head off a crackdown. ''We looked at this and we were very nervous,'' he said. ''We are going to get blamed because these banks failed. It is not our fault. Where were the regulators?''

Looking back on the reluctance to slow the growth, Timothy W. Long, chief national bank examiner in the comptroller's office, asked: ''When do you tap on the brakes versus slamming on the brakes? It is a hard thing to do sometimes, particularly when management is pushing back hard.''

Late last year, the F.D.I.C. proposed a new rule. Banks that rely too heavily on brokered deposits to accelerate their growth will have to pay a higher insurance premium to help cover losses if they fail. The proposed limit was 10 percent brokered deposits and a growth rate of 20 percent over four years.

Just as it did in the early 1980s, industry opposition emerged almost overnight.

''Brokered' is not a 4-letter word!'' Dennis M. King, chief credit officer of North County Bank in Washington State, wrote in one of hundreds of letters the agency received condemning Ms. Bair's plan. ''They are especially important to community banks in our present economic environment.''

The banks won important concessions. The regulator relaxed the part of the rule that required higher premiums if banks grew too fast with brokered deposits, allowing a growth rate of up to 40 percent over four years. And it left open a loophole that lets banks -- even those considered unsound -- turn to a ''listing service,'' a source of hot money by another name. Instead of paying a broker, banks pay to subscribe to an electronic bulletin board of credit unions with money to park.

One listing service, QwickRate, based in Marietta, Ga., has just 18 employees crammed into a tiny second-floor office. But it delivered $1.6 billion in hot money to banks in May, up from $450 million last May. The growth is coming partly because banks on the edge of failure are coming to the service for a lifeline.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

   Bank regulators are just learning how popular these unregulated services have suddenly become -- and are already worried that they will be the next source of hot money abuses.

   Ms. Bair said she planned to ask Congress for greater powers to limit the role of hot money in banking -- be it brokered deposits, listing services or simply Internet sales by banks offering unusually high interest rates.

   ''We have seen the error of our ways,'' she said.

   PHOTOS: A BOOM'S LEFTOVERS Once flush with cash, Security Bank in Macon, Ga., built a sprawling new headquarters, in both photos above, and financed an upscale new neighborhood called the Highlands, below. As the bank struggles to survive, the office is empty and in need of a tenant, and the Highlands is unfinished. (PHOTOGRAPHS BY TAMI CHAPPELL FOR THE NEW YORK TIMES) (PG. A12)
CHARTS: The Rise of Brokered Deposits: The use of brokered deposits, in which banks pay brokers to bring in large chunks of money from investors who typically receive higher-than-average interest rates, has grown rapidly since 1999. Banks that have failed since September 2007 relied disproportionately on brokered deposits, grew faster than their peers and lent more to high-risk real estate projects. (Sources: Call Reports; F.D.I.C.; Foresight Analytics; Security Bank); Growth and Risk at One Georgia Bank: At Security Bank, based in Macon, Ga., brokered deposits jumped to one-third of all deposits by 2008, helping fuel rapid growth. At the same time, construction and land loans -- with potentially high reward but also high risk -- surged. (Source: Guilbert Gates for the New York Times) (PG. A12)

EDITION: Late Edition - Final

Word Count: 3089
7/4/09 NYT A1
END OF DOCUMENT



6/23/09 Boston Globe 1
2009 WLNR 11960101

Boston Globe (MA)
Copyright 2009 The Boston Globe

**June 23, 2009**

Section: Business

Broker aided Madoff, US says
Jaffe's profits called fraudulentSEC seeks return of investor money
Beth Healy
Globe Staff

Boston broker Robert M. Jaffe was a key source of fresh investor cash for Bernard L. Madoff, federal regulators alleged yesterday, steering $1 billion in client funds to the man who was conducting the biggest fraud in Wall Street history, and earning $150 million for himself in return

The Securities and Exchange Commission yesterday in a civil suit charged Jaffe, 65, and the Madoff-controlled brokerage he worked for, Cohmad Securities Corp., with fraud for "knowingly or recklessly" participating in Madoff's Ponzi scheme

For two decades, the SEC alleged, Jaffe and members of the Cohn family, which ran Cohmad, delivered a large portion of the money Madoff collected, peddled the Madoff mystique, and covered their tracks - leaving few records of the ties between the firms, on Madoff's orders

Jaffe's lawyer, Stanley S. Arkin, denied the charges in a statement, saying the complaint is "unfair, baseless in the law, and is inaccurate in its understanding of the facts and of Mr. Jaffe."
 The case marks the first time regulators have charged an outside firm with participating in Madoff's scheme. They are seeking the return of allegedly ill-gotten gains

How did Bob Jaffe become the billion-dollar man? B5
 The SEC charge delivers a blow to Jaffe, a member of a wealthy philanthropic family who has portrayed himself as an unwitting dupe in the Madoff affair. Known in social circles for his outgoing personality, dapper dress, and low golf handicap, Jaffe would offer access to the elite Madoff investment shop as his calling card. Indeed, many people didn't know he earned money for his referrals.

But according to the SEC, Jaffe earned more from Madoff than all of the other Cohmad employees combined, and in a highly irregular fashion: in the form of investment gains in his personal accounts at Madoff's firm

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Between 1996 and 2008, the Newton native  - who moved in wealthy circles from Weston
to Palm Beach, Fla.  - earned annual returns of up to 46 percent on Madoff investment
accounts, while the clients he charmed at charity galas and country clubs earned 12
percent to 18 percent, the SEC said. He withdrew $150 million in gains in that period,
according to the SEC

Moreover, Jaffe would often make requests to Madoff for his compensation, the SEC alleged,
"seeking a specific dollar amount of gains for a given period." A Madoff employee would
**backdate** trades at Jaffe's request, according to the complaint, and essentially fabricate
transactions as cover for payments to him

Arkin, Jaffe's lawyer, said he received no advance warning about the complaint from
regulators, and that the case "smacks of impulsiveness and efforts at
self-justification."
 Also charged was Madoff's friend Maurice "Sonny" J. Cohn, 78, and Cohn's daughter, Marcia
B. Cohn, 49, Cohmad's chief operating officer. Madoff and the elder Cohn started the
firm in 1985, combining portions of their last names to make the name Cohmad.

Jaffe and the Cohns have repeatedly denied they knew Madoff was stealing clients' money,
instead of investing it. But the SEC complaint, filed in US District Court in New York,
said they either knew or should have known Madoff was breaking the law.

Regulators described Cohmad as "integrated and indistinguishable" from Madoff's firm,
a "stealth sales force" sharing the same Manhattan offices. Madoff paid commissions of
nearly $100 million to Cohmad employees, accounting for 90 percent of Cohmad's revenue

In a separate complaint yesterday, the SEC charged a California investment adviser,
Stanley Chais, with fraud for sending $900 million to Madoff on behalf of his customers
and charging them $250 million in fees

"These Madoff solicitors collectively received several hundred million dollars in fees
over the past few decades while Madoff ruined the finances of countless investors," James
Clarkson, acting director of the SEC's New York office, said in a statement about Jaffe,
the Cohns, and Chais

A lawyer for the Cohns, Steven Paradise, said his clients would challenge the charges.
"Efforts to accuse Cohmad, Maurice or Marcia Cohn of fraud or complicity in any of the
acts of Bernard Madoff are simply not based on any facts or evidence that we have seen.
Our clients remain as shocked as anyone by the revelations of Mr. Madoff's fraud," he
said

Chais's attorney, Eugene Licker, told the Associated Press that Chais "is solely a
victim."
 Also yesterday, Irving Picard, the court-appointed trustee in the Madoff bankruptcy
case, sued Jaffe and the Cohmad principals, seeking to recoup their earnings from the
scandal to reimburse victims. He alleged Cohmad provided 20 percent of Madoff's client
funds and "had little other business or purpose, apart from steering customers" to Madoff

Jaffe and his lawyers have been fighting requests from Massachusetts Secretary of State

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

William F. Galvin for information on his Cohmad activities. It was Galvin's office that
first revealed that Madoff's wife, Ruth, in the weeks before her husband's arrest,
withdrew $15.5 million from an account she kept at Cohmad

The two complaints paint Jaffe as a person with a special relationship with Madoff. Jaffe
served as a personal reference for Madoff when he sought entrance to the tony Palm Beach
Country Club, according to Picard's complaint. And Madoff specifically sought out Jaffe
to run the small Cohmad office in Boston's Back Bay, the SEC said, because he was the
son-in-law of one of his longtime clients, Carl Shapiro

"He'd been known as the guy who can get you in," said Ross B. Intelisano, a New York
lawyer representing a number of Madoff victims, including some who were introduced by
Jaffe. Speaking about the SEC allegations that Jaffe received higher returns than his
clients, Intelisano said it appears Jaffe should have known Madoff was acting improperly.
"You have to know there's no way you could get those returns year after year," he said

SEC lawyers appear to have drawn the same conclusion: that Jaffe should have recognized
the higher investment returns he received from Madoff as a tip-off that something was
amiss

But Brenda Sharton, a lawyer at Goodwin Procter in Boston, said this kind of detail shows
the regulators' case is circumstantial. Prosecuting Jaffe and the Cohns, she said, "will
come down to proving what they knew when."
 And if Jaffe knew, who else in his circle knew? His father-in-law, Carl Shapiro, is
a former dress merchant who was one of Madoff's first investors and is said to have thought
of Madoff as a son. Investing with Madoff, Shapiro, 96, parlayed proceeds from the 1971
sale of his business into a fortune exceeding $1 billion, say people who know him. But
as of Dec. 11, after Madoff confessed to defrauding investors of at least $50 billion,
the Shapiro family said they, like others, were victims

The Carl & Ruth Shapiro Family Foundation, major contributor to Boston institutions,
lost nearly half its assets, or about $145 million, in the Madoff scandal, they have
said. And Shapiro had invested another $250 million, at Madoff's request, in the weeks
before his scheme collapsed. Shapiro is believed to have had other funds with Madoff,
as well, bringing his losses over $400 million. Jaffe is married to one of Shapiro's
daughters, Ellen Shapiro Jaffe

Picard has been pursuing Madoff's large, longtime investors for "clawbacks," money they
supposedly reaped from false investment gains that belongs to other clients. Picard has
not said whether he is pursuing a clawback claim against the Shapiros

Beth Healy can be reached at bhealy@globe.com.

Word Count: 1501
6/23/09 BOSTONG 1
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



6/18/09 L.A. Times 1
2009 WLNR 11613151

Los Angeles Times
Copyright 2009 Los Angeles Times

**June 18, 2009**

Section: Business

THE FINANCIAL CRISIS
U.S. agency is blamed in Downey fall

E. Scott Reckard

A federal thrift regulator bungled its oversight of Downey Savings & Loan, allowing the Newport Beach thrift to pile on billions of dollars in high-risk mortgages and eventually collapse, according to a government report.

The regulators from the beleaguered Office of Thrift Supervision also botched their oversight of Pomona-based PFF Bank & Trust, which collapsed along with Downey last fall, according to reports issued this week by the U.S. Treasury Department's inspector general.

The Obama administration proposed Wednesday that the OTS, which has long been criticized as weak and ineffectual, be abolished. As part of his overhaul of financial regulation, Obama recommended that savings and loans, which have been principally mortgage lenders, answer to the same regulators as full-service commercial banks that specialize in a range of loans to businesses as well as consumers.

"We've seen that structural deficiencies allow some companies to shop for the regulator of their choice," Obama said. "And that's why, as part of these reforms, we will dismantle the Office of Thrift Supervision and close loopholes that have allowed important institutions to cherry-pick among banking rules."

This week's reports are only the latest critical looks at failed thrifts supervised by the OTS. After the Federal Deposit Insurance Corp. spent $10.7 billion to back deposits at Pasadena's failed IndyMac Bank, the inspector general said in February that OTS examiners ignored repeated warning signs of trouble with exotic mortgages and allowed the thrift to **backdate** a cash infusion to make it seem stronger.

The Downey failure attracted special attention because it was a major purveyor of one of the riskiest types of home loans: the pay-option adjustable-rate mortgage, which allowed borrowers to pay so little that their loan balances went up instead of down.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

These option ARMs, often written without checking borrowers' earnings or assets, emerged as a major contributor to the nation's foreclosure crisis.

The inspector general said Downey's problems stemmed not only from issuing option ARM loans and subprime mortgages to people with bad credit but also from having inadequate systems to monitor risk and a high turnover among managers. Downey's executives frequently failed to respond to recommendations from the OTS, the report said.

The final straw was the bursting of California's housing bubble. Downey had counted on borrowers' being able to refinance adjustable-rate loans before the payments shot higher. But as borrowers' home values sank far below the amount of their mortgages, they were unable to do so and defaulted in higher numbers.

So many of the loans went sour that by November 2008, when Downey was taken over by regulators, the bank had lost $548 million in just nine months. OTS officials closed PFF the same day.

It was clear by 2002 that Downey was heavily involved in high-risk loans, according to the Treasury report, and examiners began warning Downey's management that year of potential problems.

Yet despite the warnings, "OTS examiners did not require Downey to limit concentrations in higher-risk loan products," the report said.

"We believe that in light of the OTS's repeated expressions of concern and management's unresponsiveness to those concerns, OTS should have been more forceful, at least by 2005, to limit such concentrations," the report said.

Even after Downey, operated by parent Downey Financial Corp., was downgraded in the confidential regulatory ratings from a strong institution to an average one in 2006, the OTS took only an informal enforcement action against the thrift. The agency's guidelines required a formal enforcement action, the report said.

OTS spokesman William Ruberry said Wednesday that the agency, after conducting its own internal review, agreed with the inspector general's report on Downey. The report found that the OTS' enforcement was strong in some respects and that the agency "appropriately used its authority to address Downey's capital levels," Ruberry said in an e-mailed statement.

U.S. Bancorp acquired Downey and PFF in November in a deal brokered by the FDIC, which said Downey's collapse would cost the deposit insurance fund about $1.4 billion and PFF's failure an additional $729 million.

Several large OTS-supervised thrifts, including Washington Mutual Inc., IndyMac and Downey, failed after suffering large losses on option ARMs and other risky loans.

The portfolios of two other major option ARM lenders overseen by OTS, Golden West Financial Corp. of Oakland and Countrywide Financial Corp. of Calabasas, also have racked up huge losses.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Countrywide, which switched from a more stringent banking regulator to the OTS in 2007 by becoming a thrift, is now part of Bank of America Corp. Golden West, parent of World Savings, was bought by Wachovia Corp., which failed and was taken over by Wells Fargo & Co.

--

scott.reckard@latimes.com

EDITION: Home Edition

Word Count: 982
6/18/09 LATIMES 1
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/18/09 L.A. Times (Bus. Sec.) (Pg. Unavail. Online)
2009 WLNR 11606272

Los Angeles Times
Copyright 2009 Los Angeles Times

**June 18, 2009**

Report: Thrift Regulator Failed in Oversight of Downey, Others

E. Scott Reckard

A federal thrift regulator bungled its oversight of Downey Savings & Loan over six years, allowing the Newport Beach, Calif., thrift to pile on billions of dollars in high-risk mortgages and eventually collapse, according to a report from the U.S. Treasury Department's inspector general.

The regulators from the embattled Office of Thrift Supervision also botched their oversight of Pomona, Calif.-based PFF Bank & Trust, which collapsed along with Downey last fall, according to reports issued by the inspector general this week.

The Obama administration proposed on Wednesday that the OTS, which has long been criticized as weak and ineffectual, be abolished. As part of its overhaul of financial regulation, Obama is recommending that savings and loans, which have been principally mortgage lenders, answer to the same regulators as full-service commercial banks that specialize in a range of loans to businesses and consumers.

"We've seen that structural deficiencies allow some companies to shop for the regulator of their choice," Obama said. "And that's why, as part of these reforms, we will dismantle the Office of Thrift Supervision and close loopholes that have allowed important institutions to cherry pick among banking rules."

This week's reports are the latest critical looks at failed thrifts supervised by the OTS. After the Federal Deposit Insurance Corp. spent $10.7 billion to back deposits at failed IndyMac Bank of Pasadena, Calif., the inspector general said that OTS examiners ignored repeated warning signs with exotic mortgages and allowed the thrift to **backdate** a cash infusion to make it seem stronger.

The Downey failure attracted special attention because it was a major purveyor of one of the riskiest types of home loans: the pay option adjustable mortgage, which allowed borrowers to pay so little that their loan balances went up instead of down. These loans, often written without checking borrowers' earnings and assets, have emerged as a major contributor to the U.S. foreclosure crisis.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The inspector general said Downey's problems stemmed not only from option ARMs and subprime mortgages but also from inadequate systems to monitor risk and high turnover of managers. Downey's executives frequently failed to respond to OTS recommendations, the report said.

The final straw was the bursting of California's housing bubble. Downey had counted on borrowers being able to refinance adjustable-rate loans before the payments spiked, but as borrowers' home values sank far below the amount of their mortgages, they were unable to do so and defaulted in higher numbers.

So many of the loans went sour that by November 2008, when Downey was taken over by regulators, it had lost $548 million in nine months. PFF was closed by OTS officials the same day.

It was clear by 2002 that Downey was heavily involved in high-risk loans, according to the Treasury report, and examiners began warning Downey management that year of potential problems.

Despite the warnings, "OTS examiners did not require Downey to limit concentrations in higher-risk loan products," the 71-page inspector general report said.

"We believe that in light of the OTS's repeated expressions of concern and management's unresponsiveness to those concerns, OTS should have been more forceful, at least by 2005, to limit such concentrations," the report said.

 (Optional add end)<

Even after Downey, operated by parent Downey Financial Corp., was downgraded in the confidential regulatory ratings from a strong institution to average in 2006, the OTS took only an informal enforcement action against the thrift. The agency's guidelines required a formal enforcement action, the report said.

OTS spokesman William Ruberry said Wednesday that the agency, after conducting an internal review, agreed with the inspector general report on Downey. The report found that the OTS enforcement was strong in some respects and "appropriately used its authority to address Downey's capital levels," Ruberry said in an e-mailed statement.

U.S. Bancorp acquired Downey and PFF Bank in November in a deal brokered by the FDIC, which said Downey's collapse would cost the deposit-insurance fund about $1.4 billion and PFF's failure another $729 million.

A series of large OTS-supervised thrifts, including Washington Mutual Inc., failed after suffering large losses on option ARMs and other risky loans.

The portfolios of two other major option ARM lenders overseen by OTS, Golden West Financial Corp. of Oakland, Calif., and Countrywide Financial Corp. of Calabasas, Calif., also have racked up huge losses and have been swallowed by other companies.

Countrywide, which switched from more stringent banking regulator to the OTS in 2007 by becoming a thrift, is now part of Bank of America Corp.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Golden West, parent of World Savings, was purchased by Wachovia Corp., which failed and was taken over by Wells Fargo & Co.

bc-downey

Word Count: 978
6/18/09 LAT-BUS (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/13/09 Orange County (Cal.) Reg. (Pg. Unavail. Online)
2009 WLNR 11383096

Orange County Register, The (CA)
Copyright 2009 ProQuest Information and Learning Company; All Rights Reserved.

**June 13, 2009**

Section: BUSINESS

Judge tosses former wife's legal bid for Nicholas fortune ; Stacey Nicholas contends billionaire is an unfit trustee after his indictments.

JOHN GITTELSOHN

A probate court judge threw out a lawsuit by the ex-wife of Henry T. Nicholas III to gain full control of their joint trust, rejecting her argument that the billionaire was an unfit trustee because he has been indicted for drug dealing and securities fraud.

"It's over for good," Richard Howell, an attorney for Henry Nicholas, said of the trust dispute. "We've said all along that this is a publicity stunt aimed to smear Dr. Nicholas in the press with ridiculous and false accusations."

Robert Sacks, the attorney for Stacey Nicholas, gave a different interpretation of the ruling, saying that the judge did not preclude his client from filing a complaint in a different venue, such as family court.

"It's not over for good," Sacks said. "We're considering our options. It was a procedural ruling and had nothing to do with the merits of the case."

Stacey Nicholas of Laguna Hills filed her original complaint last November, citing criminal charges against her ex-husband and additionally alleging he threatened to have her "whacked," harassed her by having men in gorilla masks stalk her and left her on the verge of insolvency by squandering millions of dollars.

A probate court judge tossed out the original complaint in March, but allowed Stacey Nicholas to refile. The revised version left out the most sensational allegations, but could not overcome the objections of Judge Mary Fingal Schulte, who ruled from the bench that she was dismissing the lawsuit "without leave to amend," according to Howell.

Henry Nicholas, a Newport Coast tech tycoon whose fortune was an estimated $1.3 billion by Forbes magazine, has pleaded not guilty to 25 criminal counts that he distributed illegal drugs and conspired to illegally **backdate** $2.2 billion in employee stock options as head of Broadcom Corp., an Irvine company that makes communications semiconductors.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

His trial in the backdating case is scheduled to start next February to be followed by a separate trial on the drug charges.

Henry and Stacey Nicholas separated in 2002 and divorced in 2008. In April, a family court judge granted the ex-spouses joint custody of their three children.

In her filing, Stacey Nicholas estimated the joint trust was worth $600 million. The balance of the family fortune is in Broadcom stock.

714-796-7969 or jgittels@ocregister.com

Word Count: 462
6/13/09 OCREG (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/12/09 L.A. Times 2
2009 WLNR 11261016

Los Angeles Times
Copyright 2009 Los Angeles Times

**June 12, 2009**

Section: Business

Ex-wife of Broadcom co-founder loses court bid

Stuart Pfeifer

The former wife of beleaguered Broadcom Corp. co-founder Henry T. Nicholas III has lost an attempt to limit his control of the family's fortune.

Orange County Superior Court Judge Mary Fingal Schulte ruled Thursday that Probate Court was not the proper venue for Stacey Nicholas to seek to have her former husband removed as co-trustee of the family's trust, which she estimated to be worth $600 million.

Attorneys for Henry Nicholas had contended that the action should have been filed in family court, where the couple's divorce is being heard.

In November, Stacey Nicholas filed a petition in probate court accusing Henry Nicholas of squandering $60 million on misguided investments and personal indulgences, including $1 million she said he spent on private detectives who tailed her, once wearing gorilla masks to conceal their identities.

She said his spending had left her so cash poor she couldn't pay a tax bill.

She also accused Henry Nicholas of threatening to physically harm her, once whispering in her ear that he would have her "whacked."

Nicholas, in turn, accused his former wife of filling her petition with "outrageous falsehoods" in an attempt to damage his reputation.

The couple's wealth stems from the success of Broadcom, an Irvine manufacturer of computer chips used in such products as Apple's iPhone.

An attorney for Henry Nicholas said Schulte's decision was welcome news.

"It has always been our view that this petition was filed for improper purposes, as a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

publicity stunt to smear Dr. Nicholas with false accusations," said Richard Howell, a partner with the Costa Mesa office of Rutan & Tucker.

"The court has rejected her petition across the board," Howell said.

Robert Sacks, an attorney for Stacey Nicholas, could not be reached.

Henry Nicholas is awaiting criminal prosecution under two federal indictments, one that alleges he provided illegal narcotics to friends and business associates and another that alleges he conspired to **backdate** stock options as secret rewards to employees without disclosing the arrangement to investors.

Nicholas contends he is innocent of any wrongdoing.

--

stuart.pfeifer@latimes.com

EDITION: Home Edition

Word Count: 427
6/12/09 LATIMES 2
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/12/09 L.A. Times (Bus. Sec.) (Pg. Unavail. Online)
2009 WLNR 11235402

Los Angeles Times
Copyright 2009 Los Angeles Times

**June 12, 2009**

Nicholas' Ex-Wife Loses Bid to Oust Him as Co-Trustee of Fortune

Stuart Pfeifer

The ex-wife of beleaguered Broadcom Corp. co-founder Henry T. Nicholas III has lost an attempt to limit his control of the family's fortune.

Orange County Superior Court Judge Mary Fingal Schulte ruled Thursday that probate court was not the proper venue for Stacey Nicholas to seek to have her ex-husband removed as co-trustee of the family's trust, which she estimated to be worth $600 million.

Attorneys for Henry Nicholas had contended that the action should have been filed in family court, where the couple's divorce is being heard.

In November, Stacey Nicholas filed a petition in probate court accusing Henry Nicholas of squandering $60 million on misguided investments and personal indulgences, including $1 million she said he spent on private detectives who tailed her, once wearing gorilla masks to conceal their identities. She said his spending had left her so cash poor she couldn't pay a tax bill.

She also accused Henry Nicholas of threatening to harm her physically, once whispering in her ear that he would have her "whacked."

Nicholas, in turn, accused his ex-wife of filling her petition with "outrageous falsehoods" in an attempt to damage his reputation.

The couple's wealth stems for the success of Broadcom, an Irvine, Calif.-based man-ufacturer of computer chips used in such products as Apple's iPhone.

An attorney for Henry Nicholas said Thursday that Judge Schulte's decision was welcome news.

"It has always been our view that this petition was filed for improper purposes, as a publicity stunt to smear Dr. Nicholas with false accusations," said attorney Richard Howell, a partner with the Costa Mesa, Calif., office of Rutan & Tucker. "The court has rejected her petition across the board."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Robert Sacks, an attorney for Stacey Nicholas, could not be reached.

Henry Nicholas is awaiting criminal prosecution under two federal indictments, one that alleges he provided illegal narcotics to friends and business associates and another that alleges he conspired to **backdate** stock options as secret rewards to employees without disclosing the arrangement to investors.

Nicholas contends that he is innocent of any wrongdoing.

bc-nicholas

Word Count: 430
6/12/09 LAT-BUS (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/9/09 AP Alert - CA 21:04:27

AP Alert - California
Copyright 2009 The Associated Press. All rights reserved. This material may not be
published, broadcast, rewritten or redistributed.

**June 9, 2009**

Broadcom willing to reassess Emulex bid price
DEBORAH YAO
AP Business Writer

Broadcom Corp. could reassess the price of its unsolicited takeover of Emulex Corp.,
which had called its $764 million offer as inadequate, if given nonpublic information
to justify a new bid, according to a regulatory filing made Tuesday.

In the latest salvo in a bitter takeover attempt, Broadcom Chief Executive Scott McGregor
said the company's $9.25-per-share offer for Emulex was based on publicly available
information.

"If Emulex can justify a valuation that is not ascertainable from public information,
we would consider it," he wrote in an e-mail to Emulex CEO James McCluney that was
disclosed in a filing with the Securities and Exchange Commission.

McCluney had called Broadcom's bid "opportunistic," saying the company knew Emulex has
won yet-unannounced design contracts with manufacturers, beating Broadcom and other
rivals.

"As you know, these design wins are kept confidential at our customers' request and do
not typically begin contributing revenue for several quarters," McCluney wrote in an
e-mail. "You are uniquely aware of the future value we have secured and how well positioned
we are to unseat you on many other platforms in the near future."

McGregor called McCluney last Friday, seeking to reopen talks. McCluney sent a follow-up
e-mail, saying Broadcom sought nonpublic information that was "highly competitive and
sensitive" _ including customer plan details, design wins and financial plans.

Emulex has said that it won 12 new design contracts for converged network adapters and
expects fiscal 2012 revenue to climb to over $600 million. But Broadcom countered that
it needed access to private information to verify these claims.

On April 21, Broadcom launched a buyout offer for Emulex, saying its $9.25-per-share
bid represented a 40 percent premium to Emulex's stock price in the prior trading day.
Emulex rejected the offer as too low, and Executive Chairman Paul Folino said Broadcom

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

wanted to take advantage of stock prices depressed by the nation's financial meltdown.

Both companies do business in the enterprise network market. Enterprise network equipment moves corporate data and communications between computers, servers, mainframes and storage systems. There are two technologies for moving data in this market, fibre channel, which Emulex dominates, and Ethernet, which is Broadcom's area. But technology has emerged to combine the two, called Fibre Channel over Ethernet, or FCoE, which costs less to deploy.

Emulex and partner ServerEngines are in FCoE, but not Broadcom. In a twist, the co-founder of ServerEngines, Raju Vegesna, was a former Broadcom executive who was publicly fired, the regulatory filing said. Broadcom later settled with Vegesna and other executives.

Separately, Broadcom co-founder Henry Nicholas III faces drug charges and allegations that he conspired to **backdate** $2.2 billion in employee stock options. He pleaded not guilty.

Broadcom first approached Emulex for a possible acquisition in December 2008, through a phone call between McGregor and Folino. In January, Emulex restated its corporate bylaws to require 66.67 percent shareholder approval for any amendments. It also adopted a new "poison pill" provision designed to make hostile takeovers more expensive to accomplish. These bylaw changes would later become the subject of litigation between the two companies.

A formal offer for Emulex was sent in writing in April. Emulex's board rejected the offer in May. Broadcom then decided to take the offer directly to shareholders.

Shares of Costa Mesa, Calif.-based Emulex were down 2 cents to close Tuesday at $10.58 while Broadcom, based in Irvine, Calif., rose $1.43, or 5.5 percent, to finish at $27.25.

Word Count: 735
6/9/09 APALERTCA 21:04:27
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



6/9/09 AP DataStream 21:04:30

AP DataStream
Copyright 2009 The Associated Press. All rights reserved. This material may not be
published, broadcast, rewritten or redistributed.

**June 9, 2009**

Broadcom willing to reassess Emulex bid price
DEBORAH YAO
AP Business Writer

Broadcom Corp. could reassess the price of its unsolicited takeover of Emulex Corp.,
which had called its $764 million offer as inadequate, if given nonpublic information
to justify a new bid, according to a regulatory filing made Tuesday.

In the latest salvo in a bitter takeover attempt, Broadcom Chief Executive Scott McGregor
said the company's $9.25-per-share offer for Emulex was based on publicly available
information.

"If Emulex can justify a valuation that is not ascertainable from public information,
we would consider it," he wrote in an e-mail to Emulex CEO James McCluney that was
disclosed in a filing with the Securities and Exchange Commission.

McCluney had called Broadcom's bid "opportunistic," saying the company knew Emulex has
won yet-unannounced design contracts with manufacturers, beating Broadcom and other
rivals.

"As you know, these design wins are kept confidential at our customers' request and do
not typically begin contributing revenue for several quarters," McCluney wrote in an
e-mail. "You are uniquely aware of the future value we have secured and how well positioned
we are to unseat you on many other platforms in the near future."

McGregor called McCluney last Friday, seeking to reopen talks. McCluney sent a follow-up
e-mail, saying Broadcom sought nonpublic information that was "highly competitive and
sensitive" _ including customer plan details, design wins and financial plans.

Emulex has said that it won 12 new design contracts for converged network adapters and
expects fiscal 2012 revenue to climb to over $600 million. But Broadcom countered that
it needed access to private information to verify these claims.

On April 21, Broadcom launched a buyout offer for Emulex, saying its $9.25-per-share
bid represented a 40 percent premium to Emulex's stock price in the prior trading day.
Emulex rejected the offer as too low, and Executive Chairman Paul Folino said Broadcom

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

wanted to take advantage of stock prices depressed by the nation's financial meltdown.

Both companies do business in the enterprise network market. Enterprise network equipment moves corporate data and communications between computers, servers, mainframes and storage systems. There are two technologies for moving data in this market, fibre channel, which Emulex dominates, and Ethernet, which is Broadcom's area. But technology has emerged to combine the two, called Fibre Channel over Ethernet, or FCoE, which costs less to deploy.

Emulex and partner ServerEngines are in FCoE, but not Broadcom. In a twist, the co-founder of ServerEngines, Raju Vegesna, was a former Broadcom executive who was publicly fired, the regulatory filing said. Broadcom later settled with Vegesna and other executives.

Separately, Broadcom co-founder Henry Nicholas III faces drug charges and allegations that he conspired to **backdate** $2.2 billion in employee stock options. He pleaded not guilty.

Broadcom first approached Emulex for a possible acquisition in December 2008, through a phone call between McGregor and Folino. In January, Emulex restated its corporate bylaws to require 66.67 percent shareholder approval for any amendments. It also adopted a new "poison pill" provision designed to make hostile takeovers more expensive to accomplish. These bylaw changes would later become the subject of litigation between the two companies.

A formal offer for Emulex was sent in writing in April. Emulex's board rejected the offer in May. Broadcom then decided to take the offer directly to shareholders.

Shares of Costa Mesa, Calif.-based Emulex were down 2 cents to close Tuesday at $10.58 while Broadcom, based in Irvine, Calif., rose $1.43, or 5.5 percent, to finish at $27.25.

Word Count: 735
6/9/09 APDATASTREAM 21:04:30
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/9/09 Associated Press (AP) Newswires 21:04:27

AP Online
Copyright 2009 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

**June 9, 2009**

Broadcom willing to reassess Emulex bid price
DEBORAH YAO
AP Business Writer

Broadcom Corp. could reassess the price of its unsolicited takeover of Emulex Corp., which had called its $764 million offer as inadequate, if given nonpublic information to justify a new bid, according to a regulatory filing made Tuesday.

In the latest salvo in a bitter takeover attempt, Broadcom Chief Executive Scott McGregor said the company's $9.25-per-share offer for Emulex was based on publicly available information.

"If Emulex can justify a valuation that is not ascertainable from public information, we would consider it," he wrote in an e-mail to Emulex CEO James McCluney that was disclosed in a filing with the Securities and Exchange Commission.

McCluney had called Broadcom's bid "opportunistic," saying the company knew Emulex has won yet-unannounced design contracts with manufacturers, beating Broadcom and other rivals.

"As you know, these design wins are kept confidential at our customers' request and do not typically begin contributing revenue for several quarters," McCluney wrote in an e-mail. "You are uniquely aware of the future value we have secured and how well positioned we are to unseat you on many other platforms in the near future."

McGregor called McCluney last Friday, seeking to reopen talks. McCluney sent a follow-up e-mail, saying Broadcom sought nonpublic information that was "highly competitive and sensitive" _ including customer plan details, design wins and financial plans.

Emulex has said that it won 12 new design contracts for converged network adapters and expects fiscal 2012 revenue to climb to over $600 million. But Broadcom countered that it needed access to private information to verify these claims.

On April 21, Broadcom launched a buyout offer for Emulex, saying its $9.25-per-share bid represented a 40 percent premium to Emulex's stock price in the prior trading day. Emulex rejected the offer as too low, and Executive Chairman Paul Folino said Broadcom

wanted to take advantage of stock prices depressed by the nation's financial meltdown.

Both companies do business in the enterprise network market. Enterprise network equipment moves corporate data and communications between computers, servers, mainframes and storage systems. There are two technologies for moving data in this market, fibre channel, which Emulex dominates, and Ethernet, which is Broadcom's area. But technology has emerged to combine the two, called Fibre Channel over Ethernet, or FCoE, which costs less to deploy.

Emulex and partner ServerEngines are in FCoE, but not Broadcom. In a twist, the co-founder of ServerEngines, Raju Vegesna, was a former Broadcom executive who was publicly fired, the regulatory filing said. Broadcom later settled with Vegesna and other executives.

Separately, Broadcom co-founder Henry Nicholas III faces drug charges and allegations that he conspired to **backdate** $2.2 billion in employee stock options. He pleaded not guilty.

Broadcom first approached Emulex for a possible acquisition in December 2008, through a phone call between McGregor and Folino. In January, Emulex restated its corporate bylaws to require 66.67 percent shareholder approval for any amendments. It also adopted a new "poison pill" provision designed to make hostile takeovers more expensive to accomplish. These bylaw changes would later become the subject of litigation between the two companies.

A formal offer for Emulex was sent in writing in April. Emulex's board rejected the offer in May. Broadcom then decided to take the offer directly to shareholders.

Shares of Costa Mesa, Calif.-based Emulex were down 2 cents to close Tuesday at $10.58 while Broadcom, based in Irvine, Calif., rose $1.43, or 5.5 percent, to finish at $27.25.

Word Count: 735
6/9/09 APWIRES 21:04:27
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/5/09 AP Alert - CA 19:07:37

                              AP Alert - California
       Copyright 2009 The Associated Press. All rights reserved. This material may not be
                    published, broadcast, rewritten or redistributed.

                                  **June 5, 2009**

                       Broadcom co-founder aims to clear name

SANTA ANA, Calif._Broadcom co-founder Henry Nicholas III is speaking out in hopes of
clearing his name after federal prosecutors accused the billionaire of throwing drug
parties and slipping ecstasy into the drinks of business associates.

Nicholas told The Orange County Register in an interview published Friday that there
was no so-called secret lair beneath the mansion where he lived except a room his children
used for band practice.

"Enough is enough," he told the newspaper. "There have been some pretty preposterous
allegations made about me which have been reported in the media. While we have, can and
will demonstrate that these allegations are false, what I have found is that if you don't
respond, the stories are going to keep snowballing."

Nicholas has pleaded not guilty to drug charges and to conspiring to **backdate** $2.2 billion
in employee stock options while at the helm of the Irvine-based computer chip company.

Prosecutors have accused Nicholas of keeping a warehouse where he stashed and distributed
cocaine, methamphetamine and ecstasy. They say he also hired prostitutes and escorts
for himself, his employees and customers.

In the interview, Nicholas declined to discuss prosecutors' allegations that he built
a replica of the underground room at a warehouse near his home or surveillance video
that prosecutors say show him doing drugs in Las Vegas.

Nicholas' attorney James Brosnahan said the drug allegations would not stand in court
because witnesses made them in the pursuit of money.

Two earlier civil lawsuits filed against Nicholas by a personal assistant and con-
struction crew accused him of drug use and hiring prostitutes.

Nicholas is scheduled for trial next year.

___

                    © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Information from: The Orange County Register, http://www.ocregister.com

Word Count: 354
6/5/09 APALERTCA 19:07:37
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/5/09 AP DataStream 19:49:09


                            AP DataStream
    Copyright 2009 The Associated Press. All rights reserved. This material may not be
                    published, broadcast, rewritten or redistributed.

                            **June 5, 2009**

                   Broadcom co-founder aims to clear name

SANTA ANA, Calif._Broadcom co-founder Henry Nicholas III is speaking out in hopes of
clearing his name after federal prosecutors accused the billionaire of throwing drug
parties and slipping ecstasy into the drinks of business associates.

Nicholas told The Orange County Register in an interview published Friday that there
was no so-called secret lair beneath the mansion where he lived, except a room his children
used for band practice.

"Enough is enough," he told the newspaper. "There have been some pretty preposterous
allegations made about me which have been reported in the media. While we have, can and
will demonstrate that these allegations are false, what I have found is that if you don't
respond, the stories are going to keep snowballing."

Nicholas has pleaded not guilty to drug charges and to conspiring to **backdate** $2.2 billion
in employee stock options while at the helm of the Irvine-based computer chip company.

Prosecutors have accused Nicholas of keeping a warehouse where he stashed and distributed
cocaine, methamphetamine and ecstasy. They say he also hired prostitutes and escorts
for himself, his employees and customers.

Nicholas' attorney James Brosnahan said the drug allegations would not stand in court
because witnesses made them in the pursuit of money.

A trial is scheduled for next year.

Two earlier civil lawsuits filed against Nicholas by a personal assistant and con-
struction crew accused him of drug use and hiring prostitutes.

___

Information from: The Orange County Register, http://www.ocregister.com

Word Count: 307
6/5/09 APDATASTREAM 19:49:09

                    © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/5/09 AP DataStream 19:48:44

                              AP DataStream
  Copyright 2009 The Associated Press. All rights reserved. This material may not be
                published, broadcast, rewritten or redistributed.

                              **June 5, 2009**

                    Broadcom co-founder aims to clear name

SANTA ANA, Calif._Broadcom co-founder Henry Nicholas III is speaking out in hopes of
clearing his name after federal prosecutors accused the billionaire of throwing drug
parties and slipping ecstasy into the drinks of business associates.

Nicholas told The Orange County Register in an interview published Friday that there
was no so-called secret lair beneath the mansion where he lived, except a room his children
used for band practice.

"Enough is enough," he told the newspaper. "There have been some pretty preposterous
allegations made about me which have been reported in the media. While we have, can and
will demonstrate that these allegations are false, what I have found is that if you don't
respond, the stories are going to keep snowballing."

Nicholas has pleaded not guilty to drug charges and to conspiring to **backdate** $2.2 billion
in employee stock options while at the helm of the Irvine-based computer chip company.

Prosecutors have accused Nicholas of keeping a warehouse where he stashed and distributed
cocaine, methamphetamine and ecstasy. They say he also hired prostitutes and escorts
for himself, his employees and customers.

Nicholas' attorney James Brosnahan said the drug allegations would not stand in court
because witnesses made them in the pursuit of money.

A trial is scheduled for next year.

Two earlier civil lawsuits filed against Nicholas by a personal assistant and con-
struction crew accused him of drug use and hiring prostitutes.

___

Information from: The Orange County Register, http://www.ocregister.com

Word Count: 307
6/5/09 APDATASTREAM 19:48:44

               © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/5/09 AP Online Reg. - US 19:48:51

                              AP Online Regional - US
      Copyright 2009 The Associated Press. All rights reserved. This material may not be
                    published, broadcast, rewritten or redistributed.

                                   **June 5, 2009**

                        Broadcom co-founder aims to clear name

SANTA ANA, Calif._Broadcom co-founder Henry Nicholas III is speaking out in hopes of
clearing his name after federal prosecutors accused the billionaire of throwing drug
parties and slipping ecstasy into the drinks of business associates.

Nicholas told The Orange County Register in an interview published Friday that there
was no so-called secret lair beneath the mansion where he lived, except a room his children
used for band practice.

"Enough is enough," he told the newspaper. "There have been some pretty preposterous
allegations made about me which have been reported in the media. While we have, can and
will demonstrate that these allegations are false, what I have found is that if you don't
respond, the stories are going to keep snowballing."

Nicholas has pleaded not guilty to drug charges and to conspiring to **backdate** $2.2 billion
in employee stock options while at the helm of the Irvine-based computer chip company.

Prosecutors have accused Nicholas of keeping a warehouse where he stashed and distributed
cocaine, methamphetamine and ecstasy. They say he also hired prostitutes and escorts
for himself, his employees and customers.

Nicholas' attorney James Brosnahan said the drug allegations would not stand in court
because witnesses made them in the pursuit of money.

A trial is scheduled for next year.

Two earlier civil lawsuits filed against Nicholas by a personal assistant and con-
struction crew accused him of drug use and hiring prostitutes.

___

Information from: The Orange County Register, http://www.ocregister.com

Word Count: 307
6/5/09 APONLINEUS 19:48:51

                  © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


6/1/09 Investment News 34
2009 WLNR 10803586

Investment News
Copyright 2009 Crain Communications Inc.

**June 1, 2009**

Volume 13; Issue 22

ADVISERS GIVE SUGGESTIONS FOR THE POST-MADOFF ERA
Diligently following specific steps can provide relief

The following edited transcript is from "Surviving an SEC audit after Madoff," an InvestmentNews webcast held May 19. Editor Jim Pavia and deputy editor Evan Cooper were the moderators.

InvestmentNews: They say that there are three things that are givens in the investment business -- death, taxes and audits. Our goal today is to make sure that audits are a little bit easier to deal with, especially after the recent securities scandals. To start, each of our panelists will fill in our listeners on who they are and why they are here.

Mr. Hermening: Unlike our other planning panelists, I am a fee-based adviser [at Hermening Financial Group LLC in Wausau, Wis.], which is a combination of fee- and commission-based income. I am registered with a broker-dealer, First Allied Securities [Inc.] in San Diego. But I also have an independent SEC-registered [investment advisory] firm. Prior to that, for about two years, we were licensed only with our state. We manage assets inside of what traditionally would be known as wrap-type programs and accounts, as well as fee-based consulting.

Mr. Kautt: I'm president and chairman and chief investment officer of The Monitor Group [Inc. in McLean, Va.] We have a fee-only RIA, not to be confused with fee-based or fee-offset. We are subject only to Securities and Exchange Commission audits, and we were audited in late 2006. We do not fall under the purview of either [the Financial Industry Regulatory Authority Inc. of New York and Washington] or any other regulatory agency other than the SEC. And because of this, some of our comments may not apply to those who are registered representatives or to broker-dealer affiliates. We have been in business as a registered investment advisory firm since 1991, with full discretion over all of the assets we manage -- and were at the time of the audit at about $450 million.

Mr. Marshall: I'm a [New York-based] partner in the investment management and securities enforcement group at Ropes & Gray [LLP of Boston], and in that capacity, I counsel many registered entities, investment advisers, investment companies and broker-dealers on inspection and enforcement issues. Probably my greatest credential for being on this panel is that I worked for the SEC for many years and for about five years ran the SEC

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

inspection program for investment companies and investment advisers in the New York region, which is about half of the total national inspection program. So I've seen it from the SEC side.

InvestmentNews: We received several phone calls prior to this webcast asking questions about what we were going to cover, which is unprecedented. So we know audits are a hot button and that the advisers really are clamoring for information. Can you take a few minutes to walk us through how someone prepares for an SEC audit?

Mr. Hermening: We have a relationship with an independent-consulting firm that has managed to provide us with insight and direction on a consultancy basis, which would include everything from preparation of a compliance manual to development of procedures and forms. We work very closely with our consulting firm, and they have managed to assist us in the process of the detailed preparation for each of the specific requests that were in the SEC audit letter. The audit letter arrived about two weeks before they wanted to show up on-site, which gave us some time to prepare in gathering data, documents and files. They wanted most everything prepared on a digital basis and sent down to them on flash drives and other hardware. They still spent a full four days in our office when we had our initial SEC audit last year.

InvestmentNews: How specific were the SEC requests? What were they looking for exactly?

Mr. Hermening: They wanted to make sure that we had, for example, the proper investment adviser agreements per client, that all of the documents were correctly and sufficiently completed. They wanted to see each account in which an individual investment advisory client had indicated they wanted to be in our growth strategy or growth and income strategy, and that their monies were appropriately invested. They asked for a lot of information that didn't apply to our firm, such as [initial public offerings]. Our firm doesn't deal in initial public offerings. But we have limited discretion to manage an investment advisory client's portfolio. They wanted performance information, detailed asset holdings and to be able to confirm every trade for the year in the data that we provided to them.

InvestmentNews: Kevin [Hermening] said he got the letter about two weeks prior. Was that the same time you got your letter?

Mr. Kautt: It was about two weeks prior, but I told them that I had a previous commitment.

It was interesting because we got a letter from the SEC's Philadelphia office. I was in Washington, but interestingly enough, the SEC Washington office didn't send anybody; they had to bring a team in from Philly. But we got right back to them and said, "Sure, we would love to see you. And when do you want to come in?" And they said, "Here's the date we're coming." And I said, "Great, I'll be in Las Vegas."

I'm the chief compliance officer, but our director of compliance would be here. And we have a guy who is also our director of operations, who I work with closely on our entire compliance program.

Some of the listeners may be thinking that you are literally bolted down to a chair while they are there. And in fact, I was not physically present in the office for our SEC audit for the four days they were here. However, I was available by telephone. I was in a business

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

conference out of town -- yes, it really was in Las Vegas -- and that was fine, as long as they can interview you, and you have the data prepared in an orderly fashion. And yes, they want it all electronically. We prepared it on a burnt DVD, which is the same as a flash drive, and it was fine. They had a list of about 20 pages, and we checked off the items -- again, as a fee-only adviser, there are many things that we do not deal with, as Kevin [Hermening] was saying. So we ended up checking off what we could provide them. We put the package together, we prepared the conference room for them, and we were ready when they walked in the door.

InvestmentNews: What happens after the SEC asks questions and you provide answers on a disk?

Mr. Hermening: In my case, I literally was only in our conference room during the four days for a little less than one hour. But I had two of my staff -- my chief compliance officer and our trader, the manager of our RIA -- sitting in quite often during the meetings. We had two auditors out of Chicago. One I believe was a [certified public accountant], the other I think was also a CPA as well as an attorney, and they had both of their laptops opened the entire time, and they went through all of the data, pretty much everything that we had sent to them. They wanted additional documentation for things that they had questions about, and they were reviewing everything from advertising materials, to fee structures, to reporting, to billing.

InvestmentNews: Rick [Marshall], how do you prepare the people you're consulting?

Mr. Marshall: I have a six-step program: plan, control, advocate, speed, truth, confidentiality. Let's start with planning. What we are talking about here is what happens before you get that letter, before the examiners show up. It is the most important work you do to get ready, because once they come in and they are working through the information, if you have problems, you are going to have to deal with the problems. What you do before you ever get that letter is critical. So you build a good system of compliance.

You want to know what kind of tests the SEC actually does when they come in to do their inspection. Most of them are now on the SEC website. Go to sec.gov and go to "Compliance" for the [CCOutreach] programs, and you can go back to 2008, 2007, 2006. They call them forensic tests. Do the tests yourself. Do them now before they ever come in. If the tests show problems, then you address those problems and fix them. Build a good system of compliance. Do the kind of testing the SEC has told you they are going to do when they come in.

Record keeping is another part of planning. What does the SEC do when they come in and conduct an inspection? They ask for the required records. They look at the required records. If you don't have the required records, that's a violation in and of itself. So one thing that many, many registrants think is less important -- record keeping -- is actually very important to get through an SEC inspection well.

And then you can do some periodical mock SEC exams. There are companies that do this; I do this. You come in, you do a little practice. My experience is, a lot of the inspections begin with interviews. There are some standard interviews they do, for example, on the culture of compliance or on your risk assessment. Those are things that are very good to prepare for, and they help you to run a good system of compliance.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The second step is control. This is from the moment they come in the door. This is a big deal. An SEC inspection is a very important interaction with the government. I say control the process. How do you do that? Designate a person who is your control person in charge of the inspection. All requests for information from the SEC, Finra, whoever, go to that control person. They read them. If they are ambiguous, they get clarification. If they are burdensome or ridiculously broad, they push back and try to get them narrowed. And then all of the information that goes back out to the regulator goes through that control person who makes sure, number one, that it is responsive, and number two, that they keep a record of what they have given. It's very important to keep a record, because if there are problems later on, you have to know what you gave the regulators.

The third step is to advocate your case. What does that mean? It means you make your good points to the regulators. If the regulators are looking at something and you've got a good story to tell, put your case forward. If they found a mistake, if you made a mistake, there are always some mitigating factors you can come forward with. You found it and fixed it before they arrived. You are going to address it, it was inadvertent, no one was injured. Whatever it may be, put forward that advocacy. Nowadays, when the deficiency letter, which is the product of the inspection, becomes so well-known and so important to people, it is very important that you put that advocacy forward as aggressively as possible and at as early a date as possible. Always ask for an exit interview, because that gives you a chance to find out what they are worried about before they write it up in the deficiency letter. If they have a mistake, correct the mistake right away -- jump on it. If they have got you, if it is a good point, put your mitigating facts forward in a very aggressive way.

Fourth: speed. Get them out of there. There are two reasons for this. First, my theory is, the longer they stay, the more likely it is they are going to get irritated and annoyed, and look at your stuff more closely and find violations. They have also said -- and this has now become a priority, post-Madoff -- that they are looking to sanction registrants for delaying the inspection. The statute says that the SEC has a right to get the records within a reasonably prompt period of time. That is not well-defined, but you don't want to be the test case. Don't drag the process out; commit the resources to make sure you get them the documents, get them the copies, give them what they want.

The fifth step is truth -- two points here. If you lie to the government or you produce a false document, you have committed a felony. You have made a bad problem 100 times worse. Scrupulous honesty is necessary in every document you give, every oral re-presentation you make. If you don't know, say you don't know. If you didn't prepare some kind of compliance checklist, don't create it and **backdate** it. There are enforcement cases where people were sanctioned for that. You would be surprised how easy it is for the regulators to find that.

Not quite as extreme as the first point, but important in the planning process is to make sure you have monitored all of the promises you have made to the regulators in the past and do an inventory. Make sure you have kept those promises.

The final step is confidentiality. There is an onerous statute, the Freedom of Information Act, which permits any citizen to go to the government, the SEC or Finra and get files about you, subject to certain exemptions. There is a very simple process in which you can write a letter to the SEC at the beginning of the inspection, or a letter to Finra,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

requesting confidential treatment of the information you produce. That gives you the right, if someone makes that Freedom of Information Act request, to get notice so you can make sure all of your rights to keep that information confidential are preserved. A lot of confidential stuff -- how much you pay people, investment strategies, who your clients are -- is going to be turned over during the inspection, and there is nothing you can do about it. The worst thing in the world is to have a competitor or a disgruntled former employee get their hands on that and use it to your disadvantage. So preserve confidentiality.

InvestmentNews: Tell us what has changed since the Bernie Madoff scandal. What is the SEC looking for in particular that is different now than in the past?

Mr. Marshall: There are a couple of things that have changed. The first one, which has been widely publicized, is that the regulator is reviewing third-party custodial records to verify assets. So if you have your assets custodied, the SEC is going to get verification. They are going to be looking at your reconciliations with the custodial records and focusing very much on making sure that the assets are there, preserved. I would also say that they have become much more suspicious of representations that are made by a registrant. There was a time when they might have just taken your word for it. Now they are going to want to verify it, and they are going to want to verify it not just by looking at your records but by looking at third-party records. And so they might go to clients. If you say you have disclosed something to clients, they might go to them to make sure the disclosure has been made. If you say that a trade was done in a certain way, they might go to the broker to verify that it was in fact how the trade was done. So I would say that greater suspicion about the representations that have been made is certainly part of the process.

Mr. Kautt: I would like to build on a couple of things that Rick [Marshall] said. I think it's critical to build your compliance program and plan on being audited rather than be surprised by an audit letter. We have been audited many times during our 16 years, but in fact we did not employ an outside consultant. We felt that we didn't want to use a boilerplate compliance book or manual. We thought that could be problematic and cost us money. So we looked at the five key risk areas that we thought our firm had, and built our compliance programs around that, so that when, not if, the SEC showed up, we knew that we were absolutely as tight as a drum, both from a compliance standpoint and from a record-keeping standpoint in anything that might be a risky area. And to build on what was said about Madoff, there were really four areas where Madoff made off with the money.

One was custody, the second was proprietary products, the third was performance reporting with his infamous old computer, and the fourth was trading. So in upgrading our compliance program, we took two key risk areas where we could be sensitive -- custody and performance reporting. We didn't change the protocols, but we added those to our key risk areas and changed our documentation. As Rick [Marshall] said, the SEC wants to see the documentation. And you better have it or stand by for news in the evening.

InvestmentNews: One of the questions from our listeners is directed to Kevin Hermening: "Whom did you use as a consultant, and who are some of the consultants out there that are popular among advisers?"

Mr. Hermening: Our firm uses National Compliance Services [Inc.] -- NCS -- in Delray Beach, Fla. Regarding the conversation about the SEC now going to custodians to confirm

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

assets, about two hours ago, I received an e-mail -- as did our chief compliance officer -- from our consulting firm indicating that yesterday, the SEC posted on their website the actual letter that will go to advisory clients to confirm their account balances. So it really shouldn't cause us concern, as it is standard practice amongst SEC examiners. But that is their job to keep us informed of important or relevant regulatory issues.

InvestmentNews: Did you tell your clients that the SEC may come calling soon?

Mr. Hermening: The SEC just posted the letter to the website. It's from May 18. So they now have this document -- SEC Form 1662 -- which requests a response from the client within 10 days of receiving the letter. It asks for the type of account -- I suppose that means whether it is an [individual retirement account] or a joint account or whatever -- the account number, the last deposit date, the last withdrawal date and the total balance.

So presumably, the clients would look at their monthly statements for that data or call the firms. Everything that we do is necessarily and deliberately at arm's length. We don't custody assets in our firm. We are with the major wirehouses, which is where most of our assets are. And it is our responsibility to keep on top of these things. It's just that we have chosen not to log on to the SEC website every day or every couple of days to keep tabs on this ourselves, which is why we hired an outside firm.

InvestmentNews: We have written about how advisers are concerned that if a customer gets a notice from the SEC they might infer that the SEC has concerns about the adviser. Have you communicated to your clients that this is part of the normal course of affairs?

Mr. Kautt: We try to communicate [with] our clients between 20 and 30 times a year, which could be anything from a phone call to a meeting or a letter. We sent a letter immediately after the Madoff story broke, and told clients the risk areas and why they were not at risk. After our audit, we told them we had one.  And if you go to the front page of our website, you can click on something that says, "SEC Articles," which discusses the audits.

We felt that it was important to let our clients know what the government was about to do to intervene in their lives, and we let them know as fast as we could. And because of the letter that Kevin [Hermening] cited, we will probably write yet another letter. We know that the SEC had absolutely no  power to make any of our clients do anything. They can't, because they aren't regulated by the SEC. But we will tell them, "You may get this letter -- it's a good thing. If you get it, please respond."

Mr. Hermening: We will be doing the same thing. I actually delayed a marketing piece to personalize that portion of it.

InvestmentNews: Here's a question from one of the listeners: "Do you include invoices for asset under management fees with quarterly reports? And if so, does that satisfy the requirements to deliver the invoice before debiting?"

Mr. Kautt: We invoice our clients on a forward basis every quarter, so that meets one requirement, which is not to charge fees more than six months in advance. They receive a "paid" invoice, if you will, because we pull the money right out of the account. It also specifies what the assets under management are, and that absolutely meets the SEC examination requirements.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. Hermening: Our firm bills or invoices quarterly in arrears. We also send out quarterly invoices along with account statements. Clients have already received their statements generally around the same time or they see them from Pershing [LLC of Jersey City, N.J.] or the other custodians, and we send our RIA documents out to them, our performance reports. We do comparative performance reports, or compare to the Dow [Jones Industrial Average] and the Nasdaq [Composite Index]. It's just what we do in our firm. And the SEC reviewed all of those documents.

As we all know, they don't really approve them. They certainly would disapprove if they needed to, but they basically just review them. And if they have a problem, then they would certainly, I'm sure, take issue with it.

I also have a registration that brings me under the compliance rules related to Finra, as well as the broker-dealer's policies and procedures, which in some cases are more stringent than the regulators'.

Our broker-dealer's compliance department has all of our data, documents and copies of all of our files, as well as for each individual client. It is an extra set of eyes, but since they also have compliance and regulatory responsibilities, it makes sense that they would need to receive those as well.

Mr. Marshall: The SEC put out a release in 2000 on electronic delivery of documents, basically saying there are three requirements. The first is notice, which is really consent. The client has to agree that they will accept electronic delivery. The second is access, which now is pretty simple, and it was in 2000, but it has to be delivered in a form that the client can access or open. And third is evidence of delivery, which means that the regulated entity has to keep some kind of record to show that they sent the document electronically. So you can certainly deliver documents electronically, but the mantra is notice, access and evidence of delivery.

InvestmentNews: Do auditors review e-mails or do they just ask you to outline your e-mail compliance policy and processes?

Mr. Marshall: "Always," is the simple answer. I cannot remember an inspection in recent years when they did not make some kind of request for e-mails. They have gotten more reasonable in terms of the scope of the request. They were asking for all e-mails of everyone over multiyear periods. Now they tend to be more selective both in terms of the people that they ask -- they try to narrow that down -- and the time periods. But I have not heard of an inspection in recent years where they have not requested e-mails and reviewed them in connection with the inspection.

InvestmentNews: What do they look for in the e-mails?

Mr. Marshall: They would always look for things like fraud and misappropriation, but, for example, if they were looking for something to do with your proxy-voting policies, they will put in proxy and voting, and they will use the Concordance search engine to search. The SEC uses Concordance, which is a search engine, and that is public knowledge. You can buy Concordance and put in search terms. And they put in search terms depending upon what they are looking for. You can do the same thing. You can buy Concordance and search your e-mails.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

InvestmentNews: We have a question about SEC procedures from one of our listeners: "How long do I have to wait for a response letter after an audit? What is the normal course of action?" The listener was audited in October and has not yet heard from the SEC. This person contacted the SEC but was told the agency is working on highly important issues.

Mr. Marshall: Well, that sounds ominous. They should get back in touch with the SEC and find out what these issues are.  The answer is that the fieldwork portion of the inspection, which is where the examiners are actually in your offices looking at documents and talking to people, is only part of the process. Once they finish the fieldwork, they prepare work papers and have senior people review them. They analyze the data and sometimes request additional information. The SEC has said that they will send a notice -- when the inspection is completed -- if they have found no violations. My experience is that inspections can stay open for a very long time. I would say to the person who posed the question that that kind of feedback from the SEC suggests that they are very troubled by something, and I would be proactive with the SEC in trying to figure out what they are worried about, and try to address it through aggressive advocacy.

Mr. Kautt: Luckily, we were pre-Madoff, and there were no high and important issues inside or outside the SEC. I am wondering if some of those issues might have been internal to the SEC about the time the Madoff story broke. But in any case, we had our exam in the fall, and we did not complete the final letter until February. So it was about four months.

InvestmentNews: Does the SEC want to see marketing plans, and if so, are they subject to the audit?

Mr. Kautt: Absolutely. We have a relatively sophisticated marketing materials and a director of marketing who was interviewed by the SEC. He was one of the three key people interviewed, in addition to our director of operations and our vice president of planning. But they didn't spend much time with the director of business development. They wanted to see all of the marketing materials. And they considered any communication sent to clients on a regular basis as falling in that category. We sent generic returns for our overall corporate portfolio, as well as specific reports that were individually prepared for each client. So they said, "Golly, this is marketing material." You must fully disclose on the back how you derive that. So they actually spent probably half of a day looking at every communication or type of communication that we sent to clients and prospective clients. But I will tell you that they only looked at about three e-mails on one client.

InvestmentNews: When the SEC auditors are at the office, what happens? Do you make people available to them as they request it?

Mr. Kautt: As Rick [Marshall] mentioned, the interview and the audit is very tightly controlled. The auditors were put in a conference room and given power, the Internet, a telephone and coffee, tea, water, the whole bit. They had one guided tour through our office. If they wanted to speak with someone, we had them  speak to that person in the presence of our director of compliance. Before the SEC showed up, we had a team briefing, kind of like a pre-game discussion about being honest, being direct, answering the question and only the question. And if you couldn't answer it, say, "I don't know; I will find out and get back to you."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

InvestmentNews: Great advice.  Kevin [Hermening], would you like to address the marketing question?

Mr. Hermening: I agree with everything Glenn [Kautt] said, and would add that in the 18-page pre-audit letter, there was a section with roughly 10 questions related to performance advertising and marketing. Because our firm doesn't advertise its performance figures, most of those questions did not apply to us.

Word Count: 5401
6/1/09 INVNWS 34
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


5/26/09 Wichita Eagle (Kan.) b6
2009 WLNR 9931859

Wichita Eagle (KS)
Copyright 2009 The Wichita Eagle

**May 26, 2009**

Section: b

Guerrero activated

ANAHEIM, Calif. --The Los Angeles Angels activated slugger Vladimir Guerrero from the
disabled list on Monday and optioned outfielder Reggie Willits to Triple-A Salt Lake.

Guerrero, who possesses one of the strongest throwing arms in the game, has yet to play
right field this season because of a torn pectoral muscle on the right side of his chest.
He first felt discomfort after making a throw during an exhibition game April 2 at Dodger
Stadium.

The 2004 AL MVP served as a designated hitter in eight games before he was sidelined,
going 8 for 32 with a homer and three RBIs. Guerrero was the DH again Monday night in
his first game since April 15, batting third in the opener of a three-game series against
the Chicago White Sox.

Bruney headed to DL

ARLINGTON, Texas -- New York Yankees reliever Brian Bruney is headed back to the disabled
list because of a recurring right elbow strain.

Bruney, who pitched only once since being activated last Tuesday from the DL, played
catch Monday before the Yankees' 11-1 victory over the Texas Rangers. The right-hander
said his arm doesn't feel right.

Reyes decision near

NEW YORK -- The short-handed Mets likely will decide on Friday whether to put shortstop
Jose Reyes on the disabled list.

Reyes hasn't played since Wednesday after hurting his right calf at Los Angeles, an injury
that kept him out of seven games on a 10-game trip. He tested his legs before Monday
night's series opener against Washington but didn't run hard.

"It's not ready yet to go full speed," Reyes said.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

He hopes to return when the leg feels about 80-85 percent. If he isn't ready by Friday, the Mets would put him on the DL and **backdate** the move.

## Mauer sits

MINNEAPOLIS -- The temptation to leave Joe Mauer in the lineup every day has never been greater for Minnesota manager Ron Gardenhire, with the reigning AL batting champion getting a hit nearly every other at-bat and averaging a home run every eight at-bats.

But overusing the two-time All-Star catcher is not a risk worth taking for the Twins. He was supposed to have a full day off Monday but still found his way into the lineup as a pinch-hitter and homered against Boston Red Sox closer Jonathan Papelbon in the ninth inning.

## Maddon signs extension

ST. PETERSBURG, Fla. --Joe Maddon wasn't looking to leave, and Tampa Bay had no intention of letting him go.

The Rays rewarded their manager for leading them to last season's World Series, announcing a three-year contract extension Monday that runs through 2012.

"This is where I belong. This is where I want to be," Maddon said during a conference call.

## Hurler may need surgery

CLEVELAND -- Right-hander Anthony Reyes may need season-ending surgery on his right elbow.

An MRI on Reyes' elbow by team physician Dr. Mark Schickendantz revealed an inflamed ulnar nerve.

"We feel it will be beneficial for him to have surgery," Indians head athletic trainer Lonnie Soloff said Monday. "But Anthony will seek a second opinion in Los Angeles later this week from Dr. Lewis Yocum."

Soloff said recovery time from a procedure to transpose the ulnar nerve typically is four to six months.

## Posada nears rehab games

TAMPA, Fla. --New York Yankees catcher Jorge Posada could play in an extended spring training game this week.

Posada, sidelined since straining his right hamstring while sliding during a May 4 game against Boston, took batting practice, threw and participated in a running program on Monday.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Maybe Wednesday or Thursday," Posada said after working out at the Yankees' minor league complex. "It's now a matter of getting into baseball shape."

Outfielder Xavier Nady (right elbow ligament), catcher Jose Molina (strained left quadriceps) and third baseman Cody Ransom (right quadriceps) worked out with Posada. All three also took part in the running session.

Struggling Ortiz on bench

MINNEAPOLIS -- David Ortiz's possible drop in the Red Sox lineup has been delayed.

Boston's struggling designated hitter was on the bench Monday at Minnesota, with Twins left-hander Francisco Liriano on the mound. Manager Terry Francona said before the game he wanted as many right-handed hitters in the batting order as possible.

Francona said Ortiz is healthy and described his slump as "normal hitters' woes."

EDITION: main

Word Count: 841
5/26/09 WCHTEAG b6
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


5/18/09 Sacramento Bus. J. (Pg. Unavail. Online)
2009 WLNR 9462489

Sacramento Business Journal
Copyright 2009 American City Business Journals

**May 18, 2009**

Monster settles SEC allegations, pays $2.5M fine

Monster Worldwide, the online employment search company, agreed on Monday to settle charges it was involved in a multi-year scam to secretly **backdate** stock options granted to thousands of its officers, directors and employees.

According to a complaint filed in New York federal court by the Securities and Exchange Commission, between 1997 and 2007, Monster defrauded investors "by granting backdated, undisclosed 'in-the-money' stock options while failing to record required non-cash charges for option-related compensation expenses."

"Monster misled investors by failing to report hundreds of millions of dollars of expenses. Backdating stock options made the company look like it had more money than it really did," said James Clarkson, acting regional director of the SEC's New York regional office.

Monster neither admitted nor denied the allegations. Four former executives, including its CEO and COO, were previously charged. The company operates under new management.

EDITION: sacramento

Word Count: 194
5/18/09 BUSJSACRAMENT (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


5/15/09 AP Alert - CA 21:00:02

                              AP Alert - California
          Copyright 2009 The Associated Press. All rights reserved. This material may not be
                     published, broadcast, rewritten or redistributed.

                                  **May 15, 2009**

                    Former KB Home executive settles with SEC

LOS ANGELES_The former head of human resources at KB Home Inc. has agreed to pay more
than $540,000 to settle civil charges that he schemed to **backdate** stock options to
make them more valuable.

Gary A. Ray did not admit or deny allegations by the Securities and Exchange Commission
that he improperly backdated the homebuilder's annual stock option grants. The dates
often coincided with dates of low closing prices for the homebuilder's stock, which
allowed Ray to get a higher return when the options were actually exercised, an SEC
complaint said.

Ray received backdated awards amounting to 380,000 shares of KB Home's stock and received
more than $480,000 in profits from exercising many of these options, the SEC said.

Ray has agreed to pay $540,651.58, and a $50,000 civil penalty. He is also barred from
serving as an officer or director of a public company for five years.

"Mr. Ray is pleased to get these issues behind him," his lawyer, Mark Beck, said Friday.

In February, Ray pleaded guilty to conspiring to obstruct justice by causing KB Home
to file a false report on its option-granting practices in a bid to avert an SEC probe.
He is awaiting sentencing.

Former KB Home Chief Executive Bruce Karatz pleaded not guilty in March to charges related
to the stock option backdating scheme. Karatz agreed in September to pay $7.2 million
to settle civil charges in the case.

Word Count: 275
5/15/09 APALERTCA 21:00:02
END OF DOCUMENT

                     © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



5/15/09 AP DataStream 21:00:29

AP DataStream
Copyright 2009 The Associated Press. All rights reserved. This material may not be
published, broadcast, rewritten or redistributed.

**May 15, 2009**

Former KB Home executive settles with SEC

LOS ANGELES_The former head of human resources at KB Home Inc. has agreed to pay more
than $540,000 to settle civil charges that he schemed to **backdate** stock options to
make them more valuable.

Gary A. Ray did not admit or deny allegations by the Securities and Exchange Commission
that he improperly backdated the homebuilder's annual stock option grants. The dates
often coincided with dates of low closing prices for the homebuilder's stock, which
allowed Ray to get a higher return when the options were actually exercised, an SEC
complaint said.

Ray received backdated awards amounting to 380,000 shares of KB Home's stock and received
more than $480,000 in profits from exercising many of these options, the SEC said.

Ray has agreed to pay $540,651.58, and a $50,000 civil penalty. He is also barred from
serving as an officer or director of a public company for five years.

"Mr. Ray is pleased to get these issues behind him," his lawyer, Mark Beck, said Friday.

In February, Ray pleaded guilty to conspiring to obstruct justice by causing KB Home
to file a false report on its option-granting practices in a bid to avert an SEC probe.
He is awaiting sentencing.

Former KB Home Chief Executive Bruce Karatz pleaded not guilty in March to charges related
to the stock option backdating scheme. Karatz agreed in September to pay $7.2 million
to settle civil charges in the case.

Word Count: 275
5/15/09 APDATASTREAM 21:00:29
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



5/15/09 SEC News Dig. (Pg. Unavail. Online)
2009 WLNR 9312716

SEC News Digest
Copyright 2009 Federal Information & News Dispatch, Inc.

**May 15, 2009**

News Digest
ENFORCEMENT PROCEEDINGS - SEC Charges Home Builder's Former Human Resources Executive
with Stock Options Backdating

SECURITIES AND EXCHANGE COMMISSION

The Securities and Exchange Commission yesterday filed settled civil fraud charges
against Gary A. Ray, the former vice president of human resources of Los Angeles
homebuilder KB Home, Inc., for his participation in a multi-year scheme to **backdate**
stock options to himself and other KB Home officers and employees.

The SEC's complaint alleges that Ray used hindsight to pick advantageous grant dates
for KB Home's annual stock option grants in order to enrich himself and others at KB
Home. On many occasions, the grant dates coincided with dates of low monthly closing
prices for the company's common stock. The SEC's complaint further alleges that Ray
continued to use hindsight for stock option grant dates even after the Sarbanes-Oxley
Act of 2002 imposed stricter reporting requirements. The complaint alleges that, because
of the backdating scheme, KB Home filed proxy statements with the SEC that inaccurately
stated that KB Home granted options at market value on the date of the grant. In addition,
the complaint alleges that, by concealing his knowledge about stock option backdating
at KB Home, Ray contributed to KB Home's filing of a false and misleading quarterly report
with the SEC in 2006. Ray received backdated annual stock option awards amounting to
380,000 shares of KB Home stock and profited more than $480,000 from exercising many
of these options.

Ray agreed to settle the Commission's charges without admitting or denying the al-
legations in the complaint. Under the settlement, Ray consented to the entry of an order
that (i) permanently enjoins him from future violations of Sections 10(b), 13(b)(5),
and 16(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5, 13b2-1,
and 16a-3 thereunder, and aiding and abetting violations of Sections 13(a), 13(b)(2)(A),
13(b)(2)(B), and 14(a) of the Exchange Act and Rules 12b-20, 13a-13, and 14a-9 thereunder;
(ii) requires him to pay $540,651.58 in disgorgement and interest and a civil penalty
of $50,000; and (iii) bars him from serving as an officer or director of a public company
for five years. [SEC v. Gary A. Ray, Civil Action No. CV 09-3430 R (CTx) USDC, C.D. Cal.]
(LR-21039; AAE Rel. 2969)

Word Count: 444

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

5/15/09 SECNWSD (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



5/4/09 eMediaMillWorks Pol. Transcripts 13:35:00

eMediaMillWorks Political Transcripts
Copyright 2009 CQ Transcriptions, LLC

**May 4, 2009**

REP. LYNN WOOLSEY HOLDS A HEARING ON OSHA'S ENHANCED ENFORCEMENT PROGRAM

HOUSE COMMITTEE ON EDUCATION AND LABOR, SUBCOMMITTEE ON     WORKFORCE PRO-
TECTIONS HOLDS A HEARING ON OSHA'S ENHANCED        ENFORCEMENT PROGRAM

APRIL 30, 2009

SPEAKERS:             REP. LYNN WOOLSEY,
D-CALIF.,                    CHAIRWOMAN             REP. DONALD M. PAYNE,
D-N.J.          REP. CAROL SHEA-PORTER, D-N.H.                REP. TIMOTHY H.
BISHOP, D-N.Y.          REP. PHIL HARE, D-ILL.            DEL. GREGORIO
"KILILI" CAMACHO SABLAN,                    I-NORTHERN MARIANA
IS.          REP. RAUL M. GRIJALVA, D-ARIZ.            REP. GEORGE MILLER,
D-CALIF.          EX OFFICIO

REP. TOM PRICE, R-GA.                    RANKING MEM-
BER          REP. JOE WILSON, R-S.C.,          REP. PETER HOEKSTRA,
R-MICH.          REP. JOHN KLINE, R-MINN.          REP. HOWARD P. "BUCK"
MCKEON, R-CALIF.                    EX OFFICIO

WITNESSES:             JORDAN BARAB,            ACTING AS-
SISTANT SECRETARY,          OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

ERIC FRUMIN,          DIRECTOR OF HEALTH AND SAFE-
TY,             CHANGE TO WIN

ELLIOT LEWIS,             ASSISTANT INSPECTOR GENERAL FOR AU-
DITS,          LABOR DEPARTMENT

JESUS ROJAS,             STEPSON OF RAUL FIGUEROA

JASON SCHWARTZ,          PARTNER,          GIBSON, DUNN &
CRUTCHER LLP

[*]     WOOLSEY:  A quorum is present.  The hearing of the Subcommittee on
Workforce Protection will come to order.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

        I am going to present my opening statements and then yield to the ranking member,
Mr. Price.

        Thank you all for being here.

        One year ago, almost to this very day, our subcommittee held a hearing on
strengthening OSHA enforcement of multi-state employers. Our issue today, our subject
today, relates to that directly.  Because today, as part of the Workers Memorial Day
commemoration, the subcommittee is exchanging and examining OSHA's enhanced enforcement
program, or EEP.

        This is a program that OSHA unveiled in 2003 to deal with large employers that
are indifferent to the health and safety of their employees and employers who have
multi-properties and multi-states and are not in just one area, in other words.     The
FEP (sic) was initiated in response to a widespread investigation by the New York Times
and "Frontline" that exposed the horrendous working conditions at McWane.  McWane is
the biggest cast iron water and sewer pipe manufacturer in the world.  From 1995-2003,
at least nine workers were killed, and 4,600 workers were injured at McWane facilities
across the country.

        McWane had received over 400 citations, but it had only received one criminal
conviction, and that was in 2002.  At that time, McWane paid a fine.  Several years later,
McWane was found guilty of several work and safety and environmental criminal vi-
olations.  And just this last week some of its officials were sentenced to substantial
prison time.

        Had an EEP -- an Enhanced Enforcement Program -- been in place at an earlier date,
many McWane workers could have been saved from death or serious injury.

        Currently, under the EEP -- did I say FEP? -- if OSHA has reason to target a
recalcitrant employer for the program, it is permitted to conduct enhanced enforcement
activities, such as follow-up inspections and inspections of related worksites.  It also
can insist that a company hire a health and safety consultant to develop a health and
safety program or apply the terms of any settlement that it reaches with the employer
on a company-wide basis.

        After six years of operation, it's clear that EEP's original design is flawed,
and that OSHA under the Bush Administration didn't implement the program as intended.

        The Office of Inspector General -- the OIG -- has conducted an audit of the program
and has come up with some startling results. They include the fact that in 97 of the
cases that the audit sampled, OSHA did not comply fully with the requirements of the
program.  These omissions were not trivial.  They held very serious consequences.

        Jesus Rojas, who is here with us today as a witness, will testify as to just how
devastating these mistakes can be.  He is the stepson of Raul Figueroa, who was killed
in January 2008 while working as a mechanic for Waste Management, Inc. at one of the
company's facilities in Broward County, Florida.

        Mr. Rojas, I am so sorry for your loss.  And I think you are very brave to be here

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

today.  Your stepfather died a gruesome and senseless death, when he was crushed by that hydraulic arm of a garbage truck -- something that we believe could have been prevented.

Now, Waste Management, Inc. is a large company with multi-state facilities.  We all know that.  It has a history of OSHA violations. In fact, before Mr. Figueroa died, another worker had suffered a similar fate at a different facility in Florida.

And Waste Management was one of the 32 employers the inspector general found that should have been targeted for the EEP, but it hadn't been.      If the company had been properly monitored under the EEP, would Mr. Figueroa be with us today?  That is a sobering question and a sobering thought and one that deserves our full attention, which is why we are conducting this hearing.  We need to know why the program isn't working and what we can do to fix or revamp it.

I'm very pleased to welcome all of our witnesses, including acting assistant secretary for OSHA, Jordan Barab, who we have all worked with -- who I'm going to call "secretary" until this gets all settled, because I'm not going to say "acting assistant secretary." OK?  I'm going to say "Secretary Barab" -- who, until very recently, as I said, was on this side of the table.

Mr. Secretary, we know that both you and Secretary Solis share a deep commitment to worker health and safety, and so we're looking forward to hearing from you about the agency's suggestions -- be they legislative or administrative -- so that we can target larger employers who are indifferent to their employees and do it appropriately.

Now I'd like to yield to Ranking Member Price.

PRICE:  Thank you, Madam Chair. And I want to thank you for holding this hearing and for inviting the panel members.

I want to thank them, the distinguished panel members, for appearing today.  And we appreciate the time that all of you have taken.

And, Mr. Rojas, we do extend our deepest sympathy to you in the loss that your family has suffered.

We meet today to examine OSHA's efforts on workplace safety.  In particular, we're looking at one policy initiative:  the Enhanced Enforcement Program.  We look forward to hearing from both the inspector general and OSHA itself on their views about whether this program should be continued, or modified, or expanded, or eliminated.

But speaking more broadly, as we examine OSHA's efforts with respect to workplace safety, I think it's important that we ask ourselves some questions.  How do we, or how should we, evaluate whether our workplace safety laws are effective?  Is it the number of citations that are issued?  The amount of fines that are collected by regulators?  The number of lawsuits filed?

The best way to evaluate the effectiveness of our workplace health and safety laws should be to examine objective evidence, certain numbers.  They show whether we're making progress in reducing workplace illnesses and injuries.  When we look at those numbers,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the trends over the past number of years are actually encouraging.

Earlier this week, we heard at a similar hearing on workplace safety that when OSHA works cooperatively with businesses, particularly small ones, there's been significant and measurable progress. For example, in 2007 the Bureau of Labor Statistics reports that the number of deaths on the job fell to less than 4 for every 100,000 workers -- the lowest rate on record. The Bureau also says that in 2007, non-fatal injuries and illnesses were down by 4 percent, or 122 cases for every 10,000 workers.

Figures from OSHA tell a similar story. These numbers show that since 2001, workplace deaths have declined 14 percent, and the injuries and illnesses have dropped 21 percent.

Now, any -- any -- is too many. There's no acceptable level of workplace injury or illness. But it's important that as we evaluate the effectiveness of our laws that we do so with the goal of improving and building upon those that are actually working rather than reversing course for politics for an ideological agenda.

I hope that as we move forward in assessing our workplace safety regime that we keep that principle in mind.

With that, Madam Chairman, I look forward to the testimony and working with you on this very important issue.

WOOLSEY: Thank you, Mr. Price.

Without objection, all members will have 14 days to submit additional materials for the hearing record.

Now, I'd like to introduce our very distinguished panel of witnesses here with us today. We will have two panels. The first panel is seated. The second panel will be Secretary Bar -- I'm sorry, I said that wrong Jordan. But I never have called you by your last name. That's my problem.

So, welcome, all of our witnesses.

Just before I introduce you, know what our lighting system is all about. You have five minutes for your testimony. And so a green light will go on when you begin speaking. And when the orange light comes on, you have one minute remaining.

And we have the same amount of time. So it isn't like we aren't under the same restrictions. We are. But after the one minute, then a red light comes on. So we're hoping by the time you're into the orange light you're starting to tie up and bring your thoughts to conclusion.

If there are some thoughts that you haven't gotten out, get them out during question and answers if you can. If not, finish your thought for sure. The floor doesn't open up. You don't disappear.

So now I want to introduce our witnesses. And our witnesses will speak in the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

order that they're seated and how they will be introduced.

Mr. Elliot Lewis joined the U.S. Department of Labor in 1991, now serves as the assistant inspector general for audit, Office of Inspector General, U.S. Department of Labor.  Prior to this, he served as the deputy assistant inspector general for audit.    He received his B.S. at the University of South Carolina in 1978. He is a certified public accountant in the state of South Carolina, a member of the American Institute of Certified Public Accountants.

Mr. Jesus Rojas is the stepson of Raul Figueroa, a mechanic at Waste Management who was the victim of a gruesome accident which resulted in his stepdad's death.  Since the accident, Jesus has spoken out about the need for employees (sic) to be held accountable for such accidents.  He received an associate degree in homeland security from Everest University and is currently working at Comcast.

Mr. Jason Schwartz is a partner in the Washington, D.C., office of Gibson, Dunn & Crutcher and a member of the firm's Labor and Employment Practice Group and its litigation department.  His practice includes the full range of labor and employment matters, including ERISA, the Occupational Safety and Health Act.

And Mr. Schwartz earned his J.D. from the Georgetown University Law Center, received a B.A. degree in international affairs from the George Washington University.

Mr. Eric Frumin serves as the health and safety coordinator for Change to Win.  Mr. Frumin served as chair of the Labor Advisory Committee on OSHA Statistics to the U.S. Bureau of Labor Statistics from 1983-2003.  He received his B.A. from the State University of New York in 1979 and his master's degree from New York University in 1981.

I welcome all four of you.

And we will begin with you, Mr. Lewis.

LEWIS:  Madam Chair and members of the subcommittee...

WOOLSEY:  And you need to turn on your microphone, or either put it closer to you.

LEWIS:  OK.

Madam Chair and members of the subcommittee, I appreciate the opportunity to discuss the Office of Inspector General's audit of OSHA's Enhanced Enforcement Program.  I will summarize my statement and ask for my full statement to be entered in the record.

As you know, Madam Chair, the purpose of the Enhanced Enforcement Program is to identify high-risk employers and target their worksites with increased enforcement action.  I will focus my testimony on our recent report that assessed whether establishments were properly identified, whether follow-up inspections were conducted, and whether OSHA's January 2008 directive had an adverse impact on the program.

Madam Chair, our overall conclusion was that OSHA did not always properly identify

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

establishments and conduct enhanced enforcement inspections.  Specifically, for 97 percent of EEP qualifying cases that we sampled, OSHA did not comply with at least one of the following four requirements:  designating enhanced enforcement cases, inspections of related worksites, enhanced follow-up inspections and enhanced settlement provisions.

First, OSHA did not properly designate 53 percent of sampled cases.  As a result, the worksites were not subject to the full range of enhanced enforcement actions, and 24 employers had 33 subsequent fatalities.

Second, we found that OSHA did not generally inspect related worksites for 80 percent of the cases, and 34 of these employers had 47 subsequent fatalities at other worksites.  Related worksites inspections were to be used to determine whether compliance was a company-wide problem.

OSHA either did not commit necessary resources or lacked information on other worksites needed to perform the inspections. Inspections may have deterred and abated hazards at worksites where 47 subsequent fatalities occurred.

Third, we found that OSHA did not conduct proper worksite follow- up on 146 of 282 cases.  And there were five subsequent fatalities at the same worksites.  Enhanced enforcement requirements state that a follow-up inspection must be conducted to assess not only whether cited violations were abated but also whether the employer was committing similar violations.

Fourth, OSHA generally did not utilize enhanced settlement provisions to better ensure future compliance with the OSHA act.  OSHA did not include enhanced settlement provisions in 153 of 188 cases with settlement agreements.

Finally, OSHA did not have specific criteria for issuing National Office Alert Memorandum on employers with worksites across regions or states.  This occurred because OSHA did not place appropriate emphasis on compliance, commit necessary resources or provide clear policy guidance.

Our sample included 22 employers with worksites across states or regions that had multiple facilities and/or cases.  OSHA issued Alert Memoranda on only five of these employers, and the alerts were not issued until after the majority of fatalities had occurred.

Our audit also examined whether OSHA's January 2008 directive had an adverse impact on the Enhanced Enforcement Program.  The 2008 criteria resulted in significantly fewer eligible cases.  But despite this drop in the workload, OSHA still did not focus on qualifying employers with company-wide safety and health violations and issues.

OSHA has not placed the appropriate management emphasis and resources on this program to ensure its effectiveness.  While we cannot conclude that enhanced enforcement would prevent subsequent fatalities, full and proper application of the program may have deterred and abated hazards at worksites for a total of 45 employers where 58 subsequent fatalities occurred.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

We made six recommendations including that OSHA's assistant secretary form a task force to make recommendations to improve the efficiency and effectiveness of the program, revise its 2008 directive, provide specific criteria for issuing alert memorandum, and assuring that enhanced settlement provisions are used.

Madam Chair, this concludes my statement.  I would like to thank you for the opportunity to share the OIG's findings on this important issue.  I'm happy to respond to any questions you or other subcommittee members may have.

WOOLSEY:  Thank you.

Mr. Rojas?

ROJAS:  Chairwoman Woolsey, Representative Price, members of the committee, thank you for inviting me here today to talk about accountability for work safety.

My name is Jesus Rojas.  I live in West Palm Beach, Florida.  I'm the stepson of Raul Figueroa, who was a mechanic at Waste Management.

WOOLSEY:  Can you put that a little bit closer?

ROJAS:  Yes.  Better?

WOOLSEY:  That's way better.

ROJAS:  On January 3rd, 2008, my stepfather died in a gruesome accident at Waste Management's facility in North Broward, Florida.

The company told me and my family what happened.  They said a hydraulic arm on a truck malfunctioned and pinned my stepfather against the cab. His body was severed.

But that is not the whole story.  Companies like Waste Management need to be held accountable for workers' deaths that could have been prevented.

After my stepfather's death, my family and I spoke with his co- workers. We learned other disturbing details.  We learned that my stepfather began working on the truck, a front loader, at around 5:30 a.m.  He was told the hydraulic arms on the truck were not working.

My stepfather was very safety conscious.  And to make sure the repair job was done safe, he went to his supervisor and asked for a ladder.  He was told there was no ladder, or that the ladder was broken.

Later, he went back to the supervisor and asked for a second mechanic to help with the repairs.  Having a ladder or a second person was necessary for safety reasons.  But he was told they didn't have a second person to help him.

The supervisors are also supposed to check on the mechanics every half hour to make sure that things are OK.  But that didn't happen in the case of my stepfa-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ther.  Instead, at around 8:30 or 9:00, his coworker came by and saw my stepfather.  The coworker pulled the alarm, and the supervisors came to the scene.

Instead of cutting the line that powered the hydraulic arms, the supervisors started pulling at my stepfather to free his body.  As a result, we will never know for sure what happened because the accident scene was compromised.

We also learned that a ladder was pictured in the photos of the accident scene.  Since my stepfather's coworkers told us that he wasn't able to get a ladder for the repair job, we believe supervisors placed the ladder near the truck after the accident.

For some time before his death, my stepfather complained about safety problems at the facility.  He complained about the long hours he and his coworkers had to work.  Often they didn't have adequate help when they needed it.

He complained that the company didn't provide the proper parts for the trucks.  He said they were forced to patch the trucks but weren't given parts they needed to repair them properly and make them safe.

My stepfather heard that the less money the company spent on parts, the more bonus money the managers received.  My stepfather was repeatedly told by his supervisors, "You need to get the truck out on the roads."  They said they didn't care how they fixed them.

After the accident, we found out that company officials backdated the service records on the truck my stepfather was working on when he was killed.  My brother-in-law spoke to the person assigned to do the backdating of records.

Companies need to keep up-to-date safety records, and they need to be punished for backdating safety records.  We can't just rely on the company's word when it comes to safety.

Waste Management did get fined in the case of my stepfather.  I'm not sure about the specific violations.  OSHA told us that they investigated the accident and cited the company for two different safety violations.  I believe that the fine was between $9,000 and $10,000.

Thankfully, my mother did receive money from my stepfather's life insurance, which she used to pay off her home.  However, after the accident, my mother had to stop attending English classes and began working two jobs to make ends meet.

She still works two jobs, one at a Publix Supermarket and the other as a janitor at night.  Because my mom had to discontinue studying English, she cannot work as a medical assistant, which is the profession she has a degree in.

My stepfather left behind my mother, me, 27-year-old sister.  He also left two daughters in Cuba and a grandson there who will never meet his grandfather.

Companies like Waste Management should not be allowed to cut corners and compromise safety.  They need to provide enough staff to make sure workers are safe on the job.  They

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

need to be punished when they **backdate** safety records to cover up flaws in their safety procedures.

A lot of people know that Dr. Martin Luther King Jr. was killed in Memphis in 1968.  What they don't know is that Dr. King traveled to Memphis to support striking sanitation workers.  They were striking because two sanitation workers were killed on the job.

Forty years after Dr. King was assassinated is time enough to hold companies accountable for practices that kill and injure workers.

Thank you for your time.

WOOLSEY:  Thank you.

Mr. Schwartz?

(OFF-MIKE)

Can't hear you.

SCHWARTZ:  Thank you.

WOOLSEY:  Thank you.

SCHWARTZ:  Thank you, Madam Chairwoman, Ranking Member Price and members of the committee.

I'm pleased to appear today on behalf of the U.S. Chamber of Commerce.  The Chamber supports the conclusion of the Inspector General that the Enhanced Enforcement Program is a good idea that serves OSHA's purpose of improving workplace safety and focusing its resources where they can target the highest risk workplaces and worst offenders.

Let me make four points about the program, as the committee and the agency considers it on behalf of the Chamber.

Number one, we agree with the inspector general that there is a need to examine the program criteria to ensure that it really is focusing on the most recalcitrant employers and the highest-risk workplaces.

We think that objective criteria are needed that focus on workplaces where repeat or willful violations relate to fatalities like Mr. Rojas's stepfather's or that relate to serious injuries that occur in the workplace.

We also think it ought to focus on workplaces where the employers are not abating violations that they've been advised of.

And we also think that it needs to focus on workplaces where there are high risks that have not been identified by prior citation history, because as we all know, there

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

are many workplaces out there that have not been subject to OSHA's inspection pro-
grams.  And looking at that as the sole pool of workplaces from which you draw we don't
think is a very effective mechanism.          We agree that a task force should be created
to define those criteria.  And we think that it may make sense to do that on a trial
basis as those criteria are refined.  And we think all the stakeholders, including
employers, ought to be involved in that effort to define those criteria where those
resources are going to be focused.

    We think that's critical because there are 7.2 million workplaces in the United
States.  At its current rate, OSHA is inspecting one- half of 1 percent of those
workplaces.  Even magnifying those resources by multiple factors will never reach out
to any significant percentage of those workplaces.

    So you've got to figure out a way to leverage those resources to get at the worst,
highest-risk offenders and to use outreach and education with others in order to expand
OSHA's influence and improve safety.

    Second point I'd like to make is with respect to the resources committed to this
program.  We agree with the inspector general's conclusion that there are not enough
resources committed to the program.  And that may very well have led to the various issues
that the inspector general identified where OSHA was not able to follow up to the degree
that the program called for.

    We think more resources ought to be committed to it.  OSHA's response to the
inspector general was to indicate that the EEP was only 1 percent of the agency's
enforcement program.  We think that the agency and, Madam Chairwoman, this committee
ought to focus on where the other 99 percent is going and whether, in fact, it's an
effective use of resources.

    For example, OSHA's principle programmed inspection program is called
Site-Specific Targeting.  That program selects employers based on injury and illness
data for wall-to-wall inspections.  It results, many times, in selecting employers who
are very conscientious at reporting sprains and strains throughout their workplace, not
the type of high-profile, high-risk workplaces that need this kind of attention.

    This point is demonstrated in my testimony.  If you see, we've done a comparison
of the number of citations issued to SST-inspected workplaces versus the number of
citations issued to Voluntary Protection Program workplaces, those that are showcased
by OSHA as the best of the best.  The bottom line is the numbers are not materially
different.

    So SST is not focusing in the right area.  And we think OSHA needs to take a good
hard look at that in the context of this task force.

    Number three, we concur with the inspector general that creative enforcement and
settlement tools are appropriate.

    For example, we strongly believe that where you find a condition that's likely
to be repeated in other worksites that OSHA ought to focus on those other worksites as
well, so we can get the most health and safety benefit out of the inspection program
and out of the settlement results.  And we think that needs to be looked at on a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

case-by-case basis to see what methods are appropriate in each instance.

        Let me conclude with one final observation.  The inspector general is very careful
to indicate that he can't conclude that any particular fatality resulted from a lapse
in the Enhanced Enforcement Program.  I think, though, the tone of the report certainly
suggests that many fatalities did result.  And we think that that's an unfair cha-
racterization.

        There are very many hardworking men and women at the Occupational Safety and Health
Administration who have worked to prevent those kinds of incidents.  And I think that
the conclusion without evidence that following up on this program in certain instances
would've prevented them is an unwarranted one and is an unfortunate inference from the
report.

        I thank you for your time.  And I'd just suggest that preventing those kinds of
injuries and illnesses ought to be our focus as we go forward in expanding and improving
this program.

        Thank you, Mr. Schwartz.

        Mr. Frumin?

        FRUMIN:  Can you hear me OK?

        Good morning, Chairman Woolsey, Ranking Member Price, members of the subcom-
mittee.  Thank you for the opportunity to testify today.

        On behalf of Change to Win, we greatly appreciate your leadership and interest
in the serious problems confronting OSHA's enforcement program.  These shortcomings
endanger workers' lives, and the Congress has the power to help.

        Today we hear the testimony of Jesus Rojas.  A year ago, you heard the testimony
of Emmanuel Torres Gomez, whose father Eleazar died at the Cintas Corporation on the
job in 2005.

        The conditions that Mr. Rojas has described are truly intolerable.  If indeed Waste
Management managers misled inspectors about the working conditions, they may well have
committed the same felony interference in a federal investigation that just sent several
McWane managers to prison for 3-5 years.

        Last April, we testified before a Senate subcommittee about patterns of violations
at large companies like Waste Management and Cintas.  Today I regret to report that a
continuing pattern of violations at large corporations continues where they're ignoring
or avoiding their obligations to assure a safe workplace.

        For instance, Cintas has finally acknowledged that they had 65 facilities around
the country that lacked the basic guarding equipment.  ShawnLee has accumulated ad-
ditional willful and repeat violations on construction sites for fall protection
hazards.  The manager and owners of the Agriprocessors plant in Iowa has been charged
with major immigration, child labor and financial crimes.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The top manager and dozens of supervisors at the notorious House of Raeford chicken plant in Greenville, South Carolina, has been indicted for violation of immigration-related labor violations, and federal investigators also found repeated cases of children working in House of Raeford's chicken plants. And, finally, Waste Management itself has incurred more serious lockout violations since Mr. Figueroa's death.

The enforcement program, the EEP, was specifically established to deal with these flagrant repeated offenders. However, it's far too limited.

Before discussing it in detail, we should look at two examples of the serious limitations in OSHA's overall enforcement program apart from those within the EEP. Some individual employers -- in fact, some entire industries -- have such disregard for their obligations that even the EEP is not enough.

Since the huge 2005 explosion at the B.P. plant in Texas City, one supervisor and two contract workers have died in that facility, and two more contract workers died at B.P.'s plant in Cherry Hill (sic), Washington. Clearly, B.P. indicates that the EEP is not enough.

Likewise, the continuing high death toll in the oil and gas drilling industry, which has one of the highest fatality rates in the country, demonstrates that flagrant and repeated violators persist at the level of entire industries as a whole. Not surprisingly, several drilling companies appear repeatedly on the IG's list of companies with repeat fatalities after EEP inspections. Wyoming, a major site for this industry, has the highest fatality rate in the country.

This industry requires more than just EEP designation. It requires a national or a regional emphasis program, a very strong one. And in addition, OSHA should get on with issuing its industry-specific standards that it's been considering for 10 years.

Now, let's look at the EEP itself. At the outset, the EEP was at best a weak response to the notorious McWane cases. It relied heavily on fatalities to trigger more enforcement.

Even after the changes in 2008, it still lacks the proper focus on multiple severe workplace violations. And, as has been pointed out, OSHA's inspectors have indicated that they view the program as not catching the bad actors.

The IG's investigation, therefore, was a very welcome review. But because it was limited to the scope of the EEP program, it's limited in terms of the kind of guidance that it can offer for where we can go from here.

We need a systemic, holistic examination of the entire OSHA enforcement program designed in the era of giant corporations to find violations everywhere, not just at individual facilities.

We need a new enforcement regime that has stronger criminal sanctions, cutting-edge enforcement capability and investigation capability, more national alerts, corporate reporting requirements to facilitate detection of serious problems, and additional

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

resources. And we salute you for introducing the Protecting America's Workers Act.

Finally, OSHA must...

WOOLSEY: You're forgiven.

FRUMIN: ... OSHA must enhance responsible corporate performance. The act created the principle that employers are primarily responsible for safety on the job, not the government. And we believe that's an opportunity that must be pursued as well.

Americans voted for real change in the last election. We believe that the Protecting America's Workers Act and Secretary Solis are committed to giving us that. And we're happy to work with you and the department on that change.

Thank you very much.

WOOLSEY: Thank you, Mr. Frumin.

Mr. Lewis, I understand that OSHA has actually taken your recommendation seriously, and they've begun to form a task force to put some of your -- if not all, but some of your recommendations into place based on your audit.

What additional resources do you think OSHA -- and I'm going to ask this of you, too, Mr. Secretary, so -- will OSHA need in order to fulfill your recommendations?

LEWIS: Madam Chair, we did not specifically study OSHA's resources and what would be needed. We can't say how many would be needed to address this.

And it could also be a matter of the allocation or the utilization of the resources, not necessarily the total resources but how they're utilized. But we did not spe-cifically look at what would be the resources required to do this.

WOOLSEY: Did you look at any cause of why since 2003, when EEP put into place, why there had been no follow-up and review and...

LEWIS: What we heard -- when the auditors were out doing the work, we did hear from folks in the field that resources were a problem.

There were not enough resources to do all the things that OSHA was attempting to do. That's why I say it could be a matter of, you know, prioritization and allocation of resources as well as total resources.

WOOLSEY: OK. Thank you.

Mr. Rojas, you testified that your stepfather had complained about safety problems at his job. Did they have a formal complaint system? Did they have a safety com-mittee? And how did Waste Management respond to his complaints? Or concerns -- it might not even be a complaint.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ROJAS:  As far as I know, they had no specific committee within Waste Management to focus on those complaints.  As I said, it was our belief -- or was his belief -- that the less money they spent on parts, the more bonuses the managers would get.

So they really -- the complaints were among the workers.  And they could complain till they turned blue, but nothing ever changed.

WOOLSEY:  Was this an assumption the workers, or had they ever seen anything in writing that said, "Dear Manager, Don't spend money on parts so you can have a bonus," in so many words?

ROJAS:  Well, no, no one is ever going to say, "I'm not going to spend this much money on parts for you to fix the truck so I can get a bonus," and "The less money that the company spends on certain assets, the more bonus that the manager gets." Because it would look as if they are managing their people in a correct way, when...

WOOLSEY:  And so it was like the practice, the actions they took or didn't take, actually, set in place...

ROJAS:  Exactly.

WOOLSEY:  ... what you...

ROJAS:  I mean, no one -- I don't think anyone would be...

WOOLSEY:  ... the expectations.

ROJAS:  I don't think anyone would step out and say, "Yeah, I'm not going to give you this part because I want my bonus."

WOOLSEY:  But you saw that -- but your stepfather saw that in practice.

ROJAS:  Yes.  Yes, on a daily basis.

WOOLSEY:  OK.  Thank you so much.

Mr. Frumin, certainly the employer bears the ultimate responsibility for an accident.  We actually get witnesses here that tell us it's the employee's fault when they fall in a drying vat at Cintas.  And they really believe it.

Even if the employee does something that they shouldn't do, and an accident or an illness occurs, who is the ultimate responsible entity in that?  I mean, well, let me ask a different way, because I know the answer I want.  Isn't it the employer's ultimate responsibility?        FRUMIN:  The OSHA act clearly places the overwhelming burden on the employer.

Now, we'd be naive to say that there are no situations in which the employee bears a substantial responsibility for some violation. And, in fact, the courts have recognized there is an employee misconduct offense.  But it's a very narrow defense,...

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

WOOLSEY:  Yes.

FRUMIN:  ... one that employers typically try to ignore when they blame work-ers.  And we've seen case after case.

The case of Mr. Torres Gomez is a sad but notorious one, where managers knew fully well about exactly how dangerous the situation was.  They knew it for years.  And they took little or no action to protect workers who were under tremendous pressure -- pressure in the ways that Mr. Rojas has just described.

So the employers have the responsibility.  And it's unfortunate -- it's worse than unfortunate -- when managers, even CEOs, will blame workers rather than accepting their own responsibility.  That's why we encourage you to keep tabs on those companies and let them know you expect them to be responsible.

WOOLSEY:  Thank you very much.

Mr. Price?

PRICE:  Thank you, Madam Chair.

I again want to thank the witnesses for their testimony.

And, Mr. Rojas, again for your commitment to improving workplace safety, and our sympathy to you for your loss.

Mr. Lewis, in reviewing the report, it appears to be that the criteria for an EEP qualifying case continues to be confusing and muddled.  Would you describe what constitutes a qualifying case -- an EEP qualifying case?

LEWIS:  Well, under the current requirement that came into effect in '08, there can be a number of ways you can qualify.

One is that you've had a fatality inspection with one or more willful or repeated violation related to a death.  You have fatality inspection with one or more serious violation related to a death, and the employer had an OSHA history of similar in-kind violations within the last three years; a fatality inspection with one or more serious violation related to a death, and the employer had another fatality within the last three years.

PRICE:  Now, you're going through a very specific list.  And I appreciate that.  Is that to say that there is no confusion about what ought to be a qualifying case?

LEWIS:  I agree.  I think it is confusing.

We found that there is perhaps some confusion over what counts for the histo-ry.  It's confusing to me in terms of the fatalities.  We have a problem with fatalities

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

that are in state-planned states versus federal-planned states that do or don't count towards this employer now being classified for enhanced enforcement.

PRICE:  So greater focus on that criteria might be helpful?

LEWIS:  Yes.  Yes.  I think greater focus on the criteria, clarity on that, would be a big help.

PRICE:  Thank you.

Mr. Schwartz, I was interested in some of the statistics that you cited -- that .5 percent, half of 1 percent, of workplace sites are reviewed by OSHA.  Is that right?  Or...

SCHWARTZ:  That's correct, Mr. Price.

In the last year's inspection data that we have, there were almost 40,000 worksites that were inspected out of 7.2 million across the country -- inspected by federal OSHA.

PRICE:  And, clearly, we can't review all of the worksites.

SCHWARTZ:  That's right.

PRICE:  You alluded to the fact that we may not be focusing on the worst of-fenders.  Would you expand on that?

SCHWARTZ:  Absolutely.

Mr. Price, the idea is that OSHA is spending the vast majority of its enforcement resources on the Site-Specific Targeting program. That program selects employers based upon their self-reported injury and illness rates.  And what it tends to do is focus on employers who are overly conscientiousness in reporting minor sprains and strains in the workplace.

The reason that I know that that is the case, and that the SST program is not in fact targeting the worst offenders, is because if you look at the citations that are produced -- the citable violations that result after one of those wall-to-wall in-spections -- and you compare it to the number of violations that are cited when OSHA inspects one of its showcase Voluntary Protection Program workplaces, there's no material difference.

So we know that these SST resources are being misdirected.  And, frankly, the EEP resources ought to be increased, as I think pretty much every witness on this panel has indicated.  There ought to be a focus on the worst of the worst, and there ought to be an objective look at who those employers really are so that they can be identified and the resources deployed appropriately.

PRICE:  Your sense about focusing on the worst of the worst, which sounds like it makes a whole lot of sense and ought to be the direction in which we head in order to truly decrease workplace injuries and deaths:  Is there a specific way in which one

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ought to proceed to have OSHA do that in terms of their criteria?

SCHWARTZ:  Here's what I would recommend, Mr. Price.  I think there are a number of approaches that you can take.

First, I think you need to start with a working group that includes all the stakeholders who have got the knowledge of this to try to figure it out.

I think one area you can focus on are the repeat and the willful violations that relate to a death or a serious workplace injury.

I think another area you can focus on is the employers that fail to abate after they've been cited for a violation.

And then I think you also need to focus on the larger pool of employers who are not already captive in the OSHA inspection system but who truly may be the ones posing the highest risk.

I mean, the problem with the current program is it tends to propagate on it-self.  It's looking to the people who have been inspected -- who, as I said, are largely compliant employers with low- gravity injuries and illnesses -- and it doesn't look to anybody that hasn't been looked at before.

PRICE:  Thank you.

WOOLSEY:  Mr. Hare?

HARE:  Thank you, Madam Chair.

This is the second hearing that we've had about workplace safety. And the other day we had a woman here who testified that she lost her son.  A lumber company modified a piece of equipment, and basically her son's shirt got caught in it, and it strangled him to death.

We've heard about Cintas, the death where the company initially tried to tell the family that the man committed suicide.  And when that didn't work, they said that he basically wasn't smart enough to operate the equipment.  And then finally, I guess they decided they were going to back off those two completely dumb remarks.

Today, Mr. Rojas comes and talks about his stepfather and what happens.

I believe that the vast majority of the companies in this country want to do the right thing.   But we have got companies like Cintas, like the company that your stepfather worked for, like the lumber company.

And we have got to do something to make sure that these folks -- in Cintas's case, the $2.8 million fine.  They paid a fine, and they just whistle as they leave.        And as you said, Mr. Frumin, they still haven't cleaned up their act.  And they're not going to.  Because it's cheaper for them to pay the fine, evidently, than it is to keep people from dying.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

You know, one of the charts that was held up the other day said accidents are going down.  But yet the very woman who testified about her son said that not too long after his death, a young man had his leg literally torn off and that the company didn't have to report it.

So the charts -- my charts -- are the pictures of the workers who have been killed and maimed.  And we've got to put an end to this.

And what I would like to know from maybe anybody on the panel -- Mr. Rojas, I want to ask you first, I'm sorry.  What kind of a fine did you say was levied on the company for your stepfather's death?

ROJAS:  I don't know the specific fine that it was.  I do know there were two different fines for safety totaling between $9,000 and $10,0000.

HARE:  $9,000?

ROJAS:  Yes.

HARE:  So they were willfully negligent in the death of your stepfather, and it cost them a whopping $9,000?

ROJAS:  Correct.

HARE:  And you said that your mother got enough from his life insurance to be able to pay off her house?

ROJAS:  That's correct.

HARE:  Did the company do anything to help your family?  Did they come over?  Did they send anybody over to try to help, you know, you and your family, your mother, with any other additional things and walk them through the process?

ROJAS:  At the beginning, when everything happened, the company did send some representatives out to her home.

They sent a flower arrangement to the funeral.  And I think they put up I believe it was $9,000 for the funeral arrangements.  That's about it.

HARE:  And do you know if they've made any changes at that company since, to make it safer?

ROJAS:  I know there have been meetings in the mornings.  Serious changes, I don't believe there have been, no.

HARE:  That's not surprising.

Mr. Frumin, what do we do with companies that just literally think that the law

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

or the fine is just OK and continue to operate, like Cintas and these companies? What do we do to take those companies, and not -- look, and I'm not saying we go after the people that are doing what they're supposed to be doing every day.

But I'm talking about -- isn't there a moral obligation we have to allow workers to be able to go to work and come home safe with their families? So what do we do with companies like Cintas and other companies -- this lumber company, the company that Mr. Rojas's stepfather worked at -- that just don't seem to care?

FRUMIN: Well, accountability is a very critical aspect of this entire issue. And right now the required amount of accountability within American companies on health and safety is pretty low.

At the individual establishment level, OSHA does inspections, and either finds violations or not. And Mr. Schwartz has talked about some of the variation there.

But how about above the level of the company, the people who tell the managers what to do, who set the performance goals, who push the production requirements, who create the pressures that Mr. Rojas has talked about?

HARE: You think people ought to go to jail?

FRUMIN: When CEOs...

HARE: I do. I'm just wondering if you'd agree with that.

FRUMIN: When CEOs ignore their responsibility, they don't hold people ac-countable, as was the situation at McWane and we believe at Cintas then, they ought to face those same penalties. The PAWA would do that.

But we've got to create a system in this country where corporate structures are enforced on health and safety, not just on profits.

HARE: Thank you, Madam Chair.

WOOLSEY: And now, Mr. McKeon, the ranking member of the Education and Labor Committee?

MCKEON: Thank you, Madam Chair.

Mr. Lewis, I want to be sure the record is clear with respect to OSHA's role in reviewing its Enhanced Enforcement Program.

It was suggested earlier that the agency decided to constitute a task force only in response to the IG's audit and report. But isn't it true that in fact the agency had decided on its own in 2008 to review the EEP and had planned to convene a task force to consider changes but held off on that task force pending completion of the IG's report.

LEWIS: Correct. That is our understanding with OSHA that they were starting to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

look at this at the time we announced our audit.

MCKEON:  OK.  I just wanted to make that clarification in the record.

WOOLSEY:  Thank you.

MCKEON:  This is really a serious subject.  I think when we're talking about worker safety, workers that have very serious accidents, have injuries such as Mr. Hare noted, or death, this is something I think that we're all very, very concerned about.

And I think we have to be overly careful that we don't politicize this issue, that we are careful about how we attack companies that are involved.  I think the overall purpose of OSHA is to protect people in the workplace.  And when we have -- I think it's been suggested earlier that the overwhelming majority of all companies have this same concern.

There are some bad actors.  We know that.  And it seems to me that, as has been stated in your testimonies, those are the companies that we should be going after.

The idea of going in and -- I think, as Mr. Schwartz suggested in his testimony, that the companies that are trying to do well and make these reports, and then they're the ones that are followed up and visited.  And perhaps OSHA then can say, "Well, look at the job we're doing," but not going after the companies that have repeated offenses.

And I think, some way, that would be the best thing that we could be doing is going after companies that have shown a disregard for when OSHA has come in, or for the safety of their employees.  And when they have one offense after another, those are the things that seems like we should be really talking about.

I know something came up in the testimony yesterday.  And I wasn't here, but I heard about the testimony.  And I was a little bit upset because I know the gentleman from Illinois is my good friend, and probably I think went a little bit overboard, and then mentioned Cintas again today.

I met with some of the people from Cintas yesterday.  And they're going to put a statement into the record that will clarify what happened, the incident that was referred to.  And I think from what has been said -- and even from what you said today, Mr. Hare -- that would indicate that the company has little regard for their employees.

There was a serious tragic accident where an employee lost his life.  And they have made a great deal of change in their operation to prevent that from further happening.  And I think that is the result that we should be looking for.  And I think that we could all agree to that.

And if something comes of OSHA's looking into this and going after this Enhanced Enforcement Program, seems to me that that would be a very beneficial way to move forward.

Do you agree with me on that?  Is that something that you would feel would be a good improvement on this program?  Anybody?        FRUMIN:  Mr. McKeon, I would agree with you that a very thoughtful, well-informed targeting program is necessary to make sure

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

that OSHA finds out who the bad actors are.

And right now, that system doesn't exist.  That information system doesn't exist.

OSHA is operating at a very archaic information system.  We have very sophisticated information systems in companies in corporate structures today that OSHA has little or no access to.

And Mr. Hare's legislation would help remedy that, but it would go part of the way.

I would differ with you, though, that the outcome at Cintas is something that we could applaud because...

MCKEON:  Did I say applaud?

FRUMIN:  Well, you said that was an example of something we would approve of, or  -- you described it in a beneficial way.

MCKEON:  What I said was that the company had made extensive changes to preclude that type of an accident happening in the future.

FRUMIN:  And if they had actually been caught by surprise in that incident, one could salute their quick reaction in that way.

Unfortunately, senior corporate officers knew years in advance that that very hazard was a problem in the company, and they virtually predicted that it would happen.

Well, where was the deterrence to remind them that they had to act on that knowledge?  There was no deterrence.  We don't have that ability now to stop companies from ignoring problems like Cintas...

MCKEON:  I guess probably rather than focusing on it, I look at --

Madam Chair, he went a little long on his answer.  I'd like to hear Mr. Schwartz...

WOOLSEY:  Well, no, I'm sorry, Mr. McKeon.  But we can go back around if you'd like after we go through this series.

MCKEON:  Maybe then when it comes back around I will not be here.

But maybe, Mr. Price, if you could give Mr. Schwartz...

WOOLSEY:  OK.  Thank you.

MCKEON:  ... a chance to respond to that, I'd appreciate.

WOOLSEY:  Mr. Payne?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

MCKEON:   Thank you.        WOOLSEY:   Thank you.

PAYNE:   Thank you, very much.

And thank you, Madam Chair, for calling this important hearing and to stay on the whole issue of occupational safety.

As we've seen in the past several years, the safety of employees continued to decline.  A number of deaths last year, two years ago -- window washers in New York, several deaths in the course of several months.  It's just that the safety of the employed has been compromised.

I just would like to ask Mr. Frumin -- and I appreciate you attending the hearing in Linden, where we had the Cintas case where two employees unfortunately lost their lives, and -- was it one or two? -- but that they were blamed for the death.  And the company was initially very insensitive to the situation.

But I wonder, Mr. Frumin, in the Cintas case, it is my understanding that the company agreed to pay a substantial fine but that its citations were downgraded to unclassified.

And so can you tell us the significance of an unclassified citation, particularly if another worker is killed or seriously injured at a Cintas facility?

FRUMIN:   Thank you, Mr. Payne.

Unclassified violations have become, unfortunately, pretty popular in a larger number of high-visibility settlements.  And what they do is make it difficult for OSHA to consider the severity of that violation in future cases.

We know, for instance, that further action against the company might require a willful violation.  And yet if it's unclassified, well, then there's no willful vi-olation.

So it creates a difficulty in proceeding aggressively with those same compa-nies.  And I think that's one of the reasons the companies work so very hard to secure them in their settlement negotiations.

PAYNE:   Also, there was a inspector general's -- I don't know if anyone mentioned it; I've been in and out -- report, assessment.  And I wonder if you agree with the inspector general's assessment that the 2008 revisions were detrimental to the pro-gram.  And if not, could you please explain why, Mr. Frumin?

FRUMIN:   Well, the 2008 changes were actually quite good in some ways because it relieved some of the pressure on the inspectors to find fatalities as a basis for going forward.  And it also allowed the program to focus on larger employers with multiple sites.

The prior program was finding fatalities and finding them, in many cases, at individual sites in the construction industry and others.  So a program which is designed

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to look at multiple sites and create a deterrence and stop companies from creating the same violation over and over again should focus on multi-site companies.

But having said that, it's still an incomplete program.  And we've called today for a comprehensive review of it.  We're glad to hear that the Labor Department is, in fact, undergoing such a review.

And I think the limitations that the government was operating under in 2008 were such that they were never going to be able to fix it properly.  The time to fix it is now.

PAYNE:  Have any of you found whether the new administration has been able to increase -- I don't know, I guess, Mr. Lewis, you must be representative of the government.  Have there been an increase in employment, or is it just the first 100 days a little bit too soon to have an assessment of what's going on in OSHA?

We did see a sort of a lessening during the past eight years, it appeared to me, of even weakening in NLRB and OSHA reform.

Oh, my time's up.  So, quickly, I guess the question is have you seen the new administration move into the area of this OSHA yet?

LEWIS:  All right.  Simply because -- I don't know the answer to that, simply because OSHA has not responded to us yet to the final audit report.  It will be the end of March before we hear their response to the final recommendations we had.  So they may very well be moving on that, and I'm just not aware of it.

WOOLSEY:  Thank you.

Ms. Shea-Porter?

SHEA-PORTER:  Thank you.

Mr. Rojas, I'm sorry about what happened.  And I will tell you that this is the second time this week I heard about flowers coming. And it's incredibly disturbing.

And I will say that the hearing that we had the other day said that actually it has gotten so bad that if you really want to make a company pay for the damage that they've done, you should look at the EPA rules because they're tougher than the OSHA rules for loss of human life.  And that is just astounding.  That has to change.

I had one question, Mr. Lewis, and that had to do with OSHA not following up on the majority of cases.  What, if anything, can we do to make sure the company eliminates the hazards.  I mean, how do you know if they've eliminated the hazards, and if they're now in compliance, if they don't have the follow-up?

LEWIS:  Well, I think that's exactly the point.  Without the follow-up, you don't know, if you haven't verified that things have been corrected.

SHEA-PORTER:  OK.  So that's exactly...

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

LEWIS:  Yes.        SHEA-PORTER:  ... the crux of the problem here, that they can go another round, and another round, because we can't and don't follow up.

LEWIS:  Right.

SHEA-PORTER:  Thank you.

And at this point, I'd like to yield the remainder of my time to Congressman Hare.

HARE:  I thank my friend from New Hampshire.

I have tremendous respect for the ranking member.  But I feel compelled to respond.  He said he was disappointed in what I had to say the other day regarding Cintas, and he met with the executives of Cintas.

Let me just say for the record, Madam Chair, we met with the workers from Cintas.  And if the companies calls cleaning up their act of 46 violations that they've been cited for for the very same thing that killed this man, I would have to say that I would thoroughly disagree with the ranking member.  When 15 states that Cintas currently has plans in have not been -- this problem has not been addressed as we sit here today.

When the workers came and testified here at this very hearing, the Cintas executives that met with McKeon were invited, but they went on the company picnic.  They sent their legal counsel to sit and take very good notes in the back row.

The bottom line here, this is a company that has been fined -- you know, I didn't make the numbers up -- $2.8 million.  And the treatment of the family of this worker, to me, is reprehensible.

Now, they haven't met with me at my office.  I'd be happy to have them come in.  But I've got a feeling I'm not going to get a phone call from them.

But I think they owe an explanation.  And I would be more than willing to sit down and ask them why -- 46 worth of violations.  They are branded as one of the single biggest violators of worker safety in the nation.

So they can crow all they want to about how they're protecting their workers. But one of the workers told me -- and then I will yield back my time to my friend -- that they were told on this conveyor belt if it got stuck to jump up and down on it until it became unstuck. And if they didn't do it, they'd be looking for another job.

The fact of the matter is, if that's corporate responsibility, then I don't know what the real definition of that is.

But I would just say, Mr. Frumin, in our second go-around, I'm anxious to hear your result.  But, again, I say this for the record because we had an opportunity to meet with these people.  Facts are facts, and I'm glad that they took the time to meet with the ranking member, who I consider a friend.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

But I could not be in stronger disagreement with him on whether or not this company has in fact made an effort to clean up their act. I'm still waiting for the other 15 states.

More importantly, I'm waiting for word that one of the workers is going to be harmed again at one of these places for their haven't done it. And when they're fined, you can just bet the bank that these guys are going to go right along their merry little way, pay the fine, and wait for another person to be harmed.

And I thank my friend for yielding.

WOOLSEY: Mr. Bishop?

BISHOP: Thank you, Madam Chair. I'm sorry I've arrived late.

Let me just stay on the Cintas issue that Mr. Hare was just speaking about. We had a series of hearings last year with respect to Cintas. And it became clear as a result of those hearings that they knew years earlier about the severe danger to their workers that was presented by some of their workplace conditions.

And it was in fact those dangers that eventually killed Eleazar Gomez, and it did trigger an EEP investigation. But to date, Cintas has done really very little to fix the problems.

Isn't this the kind -- there was a case in New York that was identical to the case in Oklahoma. The case in Oklahoma was addressed in some measure, but there was no addressing the situation in New York.

And shouldn't we have a mechanism that would allow the existence of a condition in one component of a company that when there is a complaint filed about that condition in a particular site that there also would be an investigation of other sites and the remediation of that condition in other sites, not just in the site that created a tragedy?

Mr. Lewis, I'll put this question to you.

LEWIS: Yes. And that's one of the points that we brought out in our report: first identifying that and making it known to nationwide, and doing the inspections, particularly in the related worksites. So, yes, you're exactly correct in that.

BISHOP: It just seems so painfully obvious that we must have a mechanism that addresses problems that exist throughout a corporate structure.

Mr. Frumin, did you want to comment?

FRUMIN: The case in New York is instructive, because even though it dealt with many of the same hazards that eventually killed Mr. Torres Gomez in Oklahoma, it would not have been considered an EEP case. It was a serious violation, and unfortunately at the time the Labor Department was not, OSHA was not, aware of the extent of that hazard

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

throughout the company.  They only became aware of it, I believe, after the fatality.

So your point about individual incidents triggering a broad look is very well taken.  And if the company had acted on its knowledge, if OSHA had been provided with the information and asked them to act broadly, Cintas might have done what its competitors were already doing.  It's not like they were being asked to do anything different than the rest of the industry.

Their competitors were already installing this equipment.  And, you know, we wouldn't have had millions of dollars in penalties and legal fees and hearings on it.  People would've been protected.

So we need that kind of trigger, and we need it at a lower level than the EEP program currently provides.

BISHOP:  Thank you very much.

Madam Chair, I yield back.

WOOLSEY:  Thank you very much.

Thank you, panel.  You were wonderful.

We're going to bring our secretary up now.  And hopefully before we vote, we can hear him and not interrupt everything so badly.

Mr. Secretary, I don't have to explain the lighting system to you.  But welcome.

Jordan Barab is the acting assistant secretary for the Occupational Health and Safety (sic) Administration.  He served most recently as a senior policy adviser for the Education and Labor Committee.  We were really fortunate to have his expertise.

Jordan was the special assistant to the assistant director of labor for OSHA from 1998-2001 and directed the Safety and Health Program for the American Federation of State, County and Municipal Employees from '82 to '98.  He graduated Claremont McKenna College in California and received a master's degree in international relations from the Johns Hopkins University.  Welcome.

BARAB:  Thank you, Madam Chairman.

Madam Chairman, Mr. Price, members of the subcommittee, before I begin, I just want to say a few words to Mr. Rojas.

First, I'm very sorry for your loss.  The type of conditions that you describe in your stepfather's workplace, the attitude of putting speed in production before safety and not listening to the health and safety concerns workers raise -- these are the type of things that this administration will not tolerate.

We are not only sending a strong message to employers who cut corners on safety,

but because OSHA can't be everywhere all the time, we also need to work much harder to make sure that workers have the tools they need to ensure that their workplaces are safe and that OSHA is there to make sure that that happens.

I want to thank you for coming here today.

Madam Chairman, thank you very much for this opportunity to discuss the Occupational Safety and Health Administration's Enhanced Enforcement Program and to respond to the concerns expressed by the Department of Labor's Office of Inspector General in it March 31st report.

President Obama and Secretary of Labor Hilda Solis have both publicly expressed their desire that OSHA be more vigorous in protecting the nation's workers. OSHA employs some of the most dedicated and hardest working employees in the federal government, and under the leadership of Secretary Solis, they are inspired and eager to do their jobs of protecting the American workforce. I intend to help lead this agency in achieving that goal.

Despite the brevity of my tenure at OSHA, I have had time to fully review and analyze the OIG's report. I do agree with the recommendations in the report, and both agency staff and I share the concerns of the report.

Properly identifying employers who should be subject to EEP is essential. Similarly, it is not acceptable to fail to follow through with inspections or enhanced settlement agreements with employers that OSHA has placed on the EEP.

OSHA's targeted inspection efforts consist primarily of a Site- Specific Targeting system that focuses on establishments with high injury and illness rates and both Local and National Emphasis Programs. The Enhanced Enforcement Program was designed to supplement to these programs and to focus enforcement efforts on recalcitrant employers.

The EEP was initiated in September 2003 to help OSHA focus its resources on those employers who were indifferent to their obligations under the OSH Act, concentrating limited enforcement assets on employers who not only failed to meet their obligations under the OSH Act but who also appeared unlikely to decide on their own to improve working conditions at their workplaces.

OSHA had discovered that a number of employers continued to expose workers to very serious dangers even after having received OSHA citations for worker exposure to hazards that caused serious injuries and fatalities. Such was in the case at McWane facilities as reported the New York Times and "Frontline" in 2003.

In 2008, the EEP was amended in response to OSHA staff concerns that the program was not consistently accomplishing its purpose to focus on recalcitrant employers. However, it soon became clear that additional program modifications would be needed to better direct resources and that more stringent follow-up inspection criteria needed to be added to the program.

OSHA staff began revisions in March of 2008 and was in the process of developing those revisions prior to the OIG evaluation.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Obviously, in order for the EEP to be effective, OSHA area, regional, and national offices must accurately identify which employers are in need of enhanced enforcement and then apply its enhanced enforcement tools to these recalcitrant employers. The OIG report pointed out that this has not always occurred.

I assure you that OSHA is already hard at work rectifying the weaknesses in the OIG report. The agency has established a task force to revise the EEP which will design a new program, which we are preliminarily renaming the Severe Violators Inspection Program, which will be a comprehensive revision of the existing EEP.

Although the details are still being worked out, the new program will ensure that recalcitrant employers not meeting their obligations under the OSH Act are targeted for additional enforcement action, and will focus more on large companies and less on small businesses.

Some changes under consideration for the program include mandatory -- not recommended -- follow-up inspections, more inspections of other establishments of an identified company, and additional enhanced settlement provisions. The new program will include a more intensive examination of the employer's history for systemic problems that would trigger additional mandatory inspections.

And the new program would undergo continual review, and improvements will be made while deficiencies are identified. I believe that this new program will address each of the six OIG recommendations.

I want to emphasize that while the OIG report identified serious problems within the EEP, the EEP process also made OSHA more aware of criminal violations. Referrals of potentially criminal willful violations to the Department of Justice for prosecution increased from six per year from 1993-2003 to 12 cases in fiscal year 2008.

Although the EEP is an important component of OSHA's overall compliance strategy, it is not the only enforcement tool that we utilize, nor is it the main tool that OSHA utilizes. OSHA's main inspection strategy focuses primarily on its LEPs and NEPs, as well as the Site-Specific Targeting Program for the vast majority of its enforcement work.

Currently there are NEPs focusing on the hazards of combustible dust, amputations, lead, shipbreaking, crystalline silica, and trenching and excavation. We are also finalizing the NEP program on flavoring chemicals.

Thank you, Madam Chairman. And I'd be glad to answer any questions.

WOOLSEY: Thank you.

As you heard, the bells are ringing. What we would like to do, so you don't have to sit around here for an hour while we're voting -- we have a whole series of votes. We're going to go three minutes each -- and just the three of us, I guess, are here.

So thank you. I think we did the wrong thing. We should've had you first. I

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

thought you'd be the -- you are the cleanup batter.  But I would've preferred to have everybody here when you were speaking. So next time, you'll be first.

All right.  So, we have the report.  OSHA penalties are too low. And the report tells us what we didn't do on EEP.   But what are we going to do about making these penalties serious enough -- and not just in funding penalties -- so we have penalties that mean something to the CEOs where we hold corporate officers accountable, and multi- sited facilities and employers accountable?  I think you know what I'm asking.

BARAB:  Yes, that's a good question, Madam Chairman.

As you know, to a certain extent OSHA penalties are prescribed by the law.  The maximum OSHA penalties are set by the law, and were last set in 1990.  It's been quite a while since they've been raised.

Within the law, however, we do have some discretion about where our penalties are.  And I think there's a general consensus within OSHA, and certainly outside OSHA, that we need to take another look at our penalties.

And I have set up a task force since I've been there to take another look at OSHA's penalties, look at some of the reductions that we make in our penalties, and try to improve that process and raise those penalties to where they're a realistic deterrent to employers.

WOOLSEY:  And when you talk about reductions, we were talking about what happened with Waste Management with the gentleman before, on the last panel, his stepfather -- that penalty of $9,000-$10,000 was reduced to $6,300.  Right?

BARAB:  That's right.  It was reduced, I believe, by the review commission.

WOOLSEY:  Right.  So you're going to put some...

BARAB:  Yes.  I mean, there's no doubt that, I think, many OSHA penalties are too low.  And, again, we're taking a look at that, and we're going to try to see what we can do, again, within the parameters of the law.

We do note, however, that there's been quite a bit of criticism out there about OSHA penalties, as well as the introduction of the Protecting America's Workers Act, and we are busily analyzing that bill.  And we hope to have a position on that very soon.

WOOLSEY:  So, very quickly, on multi-sited, multi-state employer sites, is OSHA doing anything to make sure that if it happens in one place, then that employer has to look at all of the facilities?

BARAB:  Yes.  That is the main focus of the EEP program, and certainly our new program.  Again, we did set up a task force.  We're busily looking at that.

And we will have the new program finalized soon.  And that is the major emphasis...

WOOLSEY:  Good.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

BARAB:  ... on the program, to make sure that we go to all other workplaces and look for similar hazards in those workplaces.

WOOLSEY:  Thank you so much.

Mr. Price?

PRICE:  Thank you, Madam Chair.

You now know what it's like to be on the clock, so, when the red light comes.  I want to thank you for your testimony and thank you for your service and future service with OSHA.

One watching this hearing might get the sense that things were going absolutely in the wrong direction all across this nation as it relates to workplace safety.  And I think it's important to point out, as you did, that there are remarkably dedicated workers at OSHA.

And something, actually, is moving in the right direction.  I showed this the other day at our hearing:  workplace fatalities from 1994-2006 down from 5.3 per 100,000 to 3.9 per 100,000.  Certainly, 3.9 is too high, but something is moving in the right direction.

By the same token, workplace injury and illness rates -- this chart is from 1990 through 2006, and obviously the trend is significantly moving in the right direction.

I ask that to ask you:  What's the best measure of progress in all of this?  We've talked about numbers of citations, dollar fines, all those kind of things.  What, in your opinion, is the best measure for how we should objectively evaluate whether or not we are making progress?

BARAB:  Well, clearly, if we have accurate statistics on both workplace fatalities and injuries and illnesses, those would be good indicators.

I believe the fatality statistics are quite accurate because they are based on a census.  This committee, actually the full committee, held a hearing last year and the staff produced a report that revealed quite a bit of -- quite a few studies and opinion out there in the world, in both inside and outside OSHA, that the injury and illness statistics particularly are not accurate, and in fact some studies that OSHA may be actually only counting about one-third of injuries and illnesses.

We received some money from Congress in this year's budget, and we are setting up a task force, again, to look at the accuracy of those statistics, working with BLS and working with NIOSH on that so that we have more accurate statistics.     We also know that because of the shift in industry from manufacturing to service that we're going to see a natural decline in fatalities as well as injuries and illnesses.

The problem is, Mr. Price, that when you look at the individual cases there are still far, far too many cases of workplace fatalities, injury and illnesses that could

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

clearly be prevented.  Far too many fatalities still, far too many injuries and illnesses overall, and that's what we're really focusing on.

PRICE:  And the Severe Violators Program will hopefully get us in that direction, because all of us wants to find the outliers and make certain that we're concentrating on those folks as well.

I thank you for your testimony.

WOOLSEY:  Mr. Bishop?

BISHOP:  Thank you, Madam Chair.

And thank you, Mr. Secretary.

We had a hearing earlier this week in which a witness testified that because OSHA penalties are only misdemeanors, it is unlikely that the Department of Justice will prosecute those cases.  Do you agree with that assessment?

BARAB:  That's what I'm told, yes.

BISHOP:  OK.

And are there ways, if the OSHA infractions remain misdemeanors, if that remains our construct, are there ways that OSHA can try to work with the DOJ to increase the number of referrals and prosecutions, or is the better way to make the transgressions be felonies as opposed to misdemeanors?

BARAB:  Well, again, we are reading the Protecting America's Workers Act, and we understand that's where you're going on that bill. And we are analyzing that right now and will have an opinion for it.

But there's no doubt in anybody's mind that the fact that the worst penalty is a misdemeanor has raised a lot of problems in terms of making OSHA citations, OSHA penalties, a realistic deterrent to employers' cutting corners, especially where fatalities or serious injuries occur.

BISHOP:  OK.

One more question:  If we were to move in the direction of making the behavior potentially criminal behavior, do you believe that the current cast of OSHA inspectors has the expertise to develop cases for criminal referral?

BARAB:  We're working with the Justice Department on increasing the expertise of OSHA inspectors to follow up on potential criminal cases.

Clearly, if the law is changed and we happen to get a lot more criminal cases and the scope is expanded, we'll need to do additional training, and OSHA inspectors will need additional skills.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

BISHOP:  OK.  Thank you very much.

I yield back, Madam Chair.

WOOLSEY:  Thank you.

Today we've examined one in particular of OSHA's programs, the EEP, and we've highlighted some real flaws.

I am totally confident that OSHA, under the watchful eyes of the secretary of labor, Hilda Solis, and her assistant secretary will do all that it can do to make large companies -- in fact, all companies -- accountable for the safety and health of their employees.

We've got a lot of work to do.  But we in Congress, on both sides of the aisle, are ready to do our part.

And I thank you very much, all of the witnesses, and you in particular, Mr. Secretary, for sitting here and then getting such a short shrift.  Thank you very much.

So with that, as previously ordered, members will have 14 days to submit additional materials for the hearing record.  Any member who wishes to submit follow-up questions in writing to the witnesses should coordinate with majority staff within 14 days.

And without objection, this hearing is adjourned.

END

Word Count: 15619
5/4/09 EMEDIAPT 13:35:00
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


4/30/09 CQ Cap. Transcripts (Pg. Unavail. Online)
2009 WLNR 8450631

CQ Capital Transcripts
Copyright 2009 Voxant

**April 30, 2009**

REP. LYNN WOOLSEY HOLDS A HEARING ON OSHA'S ENHANCED ENFORCEMENT PROGRAM - Part 1

xfdtr HOUSE-HRG-OSHA-ENFORCE sked

TRANSCRIPT

April 30, 2009

COMMITTEE HEARING

REP. LYNN WOOLSEY

CHAIRWOMAN

HOUSE COMMITTEE ON EDUCATION AND LABOR, SUBCOMMITTEE ON WORKFORCE

PROTECTIONS

WASHINGTON, D.C.

REP. LYNN WOOLSEY HOLDS A HEARING ON OSHA'S ENHANCED ENFORCEMENT

PROGRAM - Part 1CQ Transcriptions, LLC

1255 22nd Street N.W.

Washington, D.C. 20037

Transcript/Programming: Tel. 301-731-1728

Sales: Tel. 202-419-8500  ext 599

sales@cq.com

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

www.cq.com

Copyright 2009 CQ Transcriptions, LLC   All materials herein are protected by United
States copyright law

and may not be reproduced, distributed, transmitted, displayed,

published or broadcast without the prior written permission of

CQ Transcriptions. You may not alter or remove any trademark,

copyright or other notice from copies of the content.

HOUSE COMMITTEE ON EDUCATION AND LABOR, SUBCOMMITTEE ON

WORKFORCE PROTECTIONS HOLDS A HEARING ON OSHA'S ENHANCED

ENFORCEMENT PROGRAM

APRIL 30, 2009

SPEAKERS:

REP. LYNN WOOLSEY, D-CALIF.,

CHAIRWOMAN

REP. DONALD M. PAYNE, D-N.J.

REP. CAROL SHEA-PORTER, D-N.H.

REP. TIMOTHY H. BISHOP, D-N.Y.

REP. PHIL HARE, D-ILL.

DEL. GREGORIO  KILILI  CAMACHO SABLAN,

I-NORTHERN MARIANA IS.

REP. RAUL M. GRIJALVA, D-ARIZ.

REP. GEORGE MILLER, D-CALIF.

EX OFFICIO

REP. TOM PRICE, R-GA.

RANKING MEMBER

REP. JOE WILSON, R-S.C.,

REP. PETER HOEKSTRA, R-MICH.

REP. JOHN KLINE, R-MINN.

REP. HOWARD P.  BUCK  MCKEON, R-CALIF.

EX OFFICIO

WITNESSES:

JORDAN BARAB,

ACTING ASSISTANT SECRETARY,

OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

ERIC FRUMIN,

DIRECTOR OF HEALTH AND SAFETY,

CHANGE TO WIN

ELLIOT LEWIS,

ASSISTANT INSPECTOR GENERAL FOR AUDITS,

LABOR DEPARTMENT

JESUS ROJAS,

STEPSON OF RAUL FIGUEROA

JASON SCHWARTZ,

PARTNER,

GIBSON, DUNN   CRUTCHER LLP

WOOLSEY:  A quorum is present.  The hearing of the Subcommittee on Workforce Protection will come to order.

I am going to present my opening statements and then yield to the ranking member, Mr. Price.

Thank you all for being here.

One year ago, almost to this very day, our subcommittee held a hearing on strengthening OSHA enforcement of multi-state employers. Our issue today, our subject today, relates to that directly.  Because today, as part of the Workers Memorial Day commemoration, the subcommittee is exchanging and examining OSHA's enhanced enforcement program, or EEP.

This is a program that OSHA unveiled in 2003 to deal with large employers that are indifferent to the health and safety of their employees and employers who have multi-properties and multi-states and are not in just one area, in other words.

The FEP (sic) was initiated in response to a widespread investigation by the New York Times and  Frontline  that exposed the horrendous working conditions at McWane.  McWane is the biggest cast iron water and sewer pipe manufacturer in the world.  From 1995-2003, at least nine workers were killed, and 4,600 workers were injured at McWane facilities across the country.

McWane had received over 400 citations, but it had only received one criminal conviction, and that was in 2002.  At that time, McWane paid a fine.  Several years later, McWane was found guilty of several work and safety and environmental criminal violations.  And just this last week some of its officials were sentenced to substantial prison time.

Had an EEP -- an Enhanced Enforcement Program -- been in place at an earlier date, many McWane workers could have been saved from death or serious injury.

Currently, under the EEP -- did I say FEP? -- if OSHA has reason to target a recalcitrant employer for the program, it is permitted to conduct enhanced enforcement activities, such as follow-up inspections and inspections of related worksites.  It also can insist that a company hire a health and safety consultant to develop a health and safety program or apply the terms of any settlement that it reaches with the employer on a company-wide basis.

After six years of operation, it's clear that EEP's original design is flawed, and that OSHA under the Bush Administration didn't implement the program as intended.

The Office of Inspector General -- the OIG -- has conducted an audit of the program and has come up with some startling results. They include the fact that in 97 of the cases that the audit sampled, OSHA did not comply fully with the requirements of the program. These omissions were not trivial.  They held very serious consequences.

Jesus Rojas, who is here with us today as a witness, will testify as to just how devastating these mistakes can be.  He is the stepson of Raul Figueroa, who was killed in January 2008 while working as a mechanic for Waste Management, Inc. at one of the company's facilities in Broward County, Florida.

Mr. Rojas, I am so sorry for your loss.  And I think you are very brave to be here today. Your stepfather died a gruesome and senseless death, when he was crushed by that hydraulic arm of a garbage truck -- something that we believe could have been prevented.

Now, Waste Management, Inc. is a large company with multi-state facilities.  We all know

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

that.  It has a history of OSHA violations. In fact, before Mr. Figueroa died, another worker had suffered a similar fate at a different facility in Florida.

And Waste Management was one of the 32 employers the inspector general found that should have been targeted for the EEP, but it hadn't been.

If the company had been properly monitored under the EEP, would Mr. Figueroa be with us today?  That is a sobering question and a sobering thought and one that deserves our full attention, which is why we are conducting this hearing.  We need to know why the program isn't working and what we can do to fix or revamp it.

I'm very pleased to welcome all of our witnesses, including acting assistant secretary for OSHA, Jordan Barab, who we have all worked with -- who I'm going to call  secretary until this gets all settled, because I'm not going to say  acting assistant secretary. OK?  I'm going to say  Secretary Barab  -- who, until very recently, as I said, was on this side of the table.

Mr. Secretary, we know that both you and Secretary Solis share a deep commitment to worker health and safety, and so we're looking forward to hearing from you about the agency's suggestions -- be they legislative or administrative -- so that we can target larger employers who are indifferent to their employees and do it appropriately.

Now I'd like to yield to Ranking Member Price.

PRICE:  Thank you, Madam Chair. And I want to thank you for holding this hearing and for inviting the panel members.

I want to thank them, the distinguished panel members, for appearing today.  And we appreciate the time that all of you have taken.

And, Mr. Rojas, we do extend our deepest sympathy to you in the loss that your family has suffered.

We meet today to examine OSHA's efforts on workplace safety.  In particular, we're looking at one policy initiative:  the Enhanced Enforcement Program.  We look forward to hearing from both the inspector general and OSHA itself on their views about whether this program should be continued, or modified, or expanded, or eliminated.

But speaking more broadly, as we examine OSHA's efforts with respect to workplace safety, I think it's important that we ask ourselves some questions.  How do we, or how should we, evaluate whether our workplace safety laws are effective?  Is it the number of citations that are issued?  The amount of fines that are collected by regulators?  The number of lawsuits filed?

The best way to evaluate the effectiveness of our workplace health and safety laws should be to examine objective evidence, certain numbers.  They show whether we're making progress in reducing workplace illnesses and injuries.  When we look at those numbers, the trends over the past number of years are actually encouraging.

Earlier this week, we heard at a similar hearing on workplace safety that when OSHA works

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

cooperatively with businesses, particularly small ones, there's been significant and measurable progress. For example, in 2007 the Bureau of Labor Statistics reports that the number of deaths on the job fell to less than 4 for every 100,000 workers -- the lowest rate on record. The Bureau also says that in 2007, non-fatal injuries and illnesses were down by 4 percent, or 122 cases for every 10,000 workers.

Figures from OSHA tell a similar story. These numbers show that since 2001, workplace deaths have declined 14 percent, and the injuries and illnesses have dropped 21 percent.

Now, any -- any -- is too many. There's no acceptable level of workplace injury or illness. But it's important that as we evaluate the effectiveness of our laws that we do so with the goal of improving and building upon those that are actually working rather than reversing course for politics for an ideological agenda.

I hope that as we move forward in assessing our workplace safety regime that we keep that principle in mind.

With that, Madam Chairman, I look forward to the testimony and working with you on this very important issue.

WOOLSEY: Thank you, Mr. Price.

Without objection, all members will have 14 days to submit additional materials for the hearing record.

Now, I'd like to introduce our very distinguished panel of witnesses here with us today. We will have two panels. The first panel is seated. The second panel will be Secretary Bar -- I'm sorry, I said that wrong Jordan. But I never have called you by your last name. That's my problem.

So, welcome, all of our witnesses.

Just before I introduce you, know what our lighting system is all about. You have five minutes for your testimony. And so a green light will go on when you begin speaking. And when the orange light comes on, you have one minute remaining.

And we have the same amount of time. So it isn't like we aren't under the same re-strictions. We are. But after the one minute, then a red light comes on. So we're hoping by the time you're into the orange light you're starting to tie up and bring your thoughts to conclusion.

If there are some thoughts that you haven't gotten out, get them out during question and answers if you can. If not, finish your thought for sure. The floor doesn't open up. You don't disappear.

So now I want to introduce our witnesses. And our witnesses will speak in the order that they're seated and how they will be introduced.

Mr. Elliot Lewis joined the U.S. Department of Labor in 1991, now serves as the assistant inspector general for audit, Office of Inspector General, U.S. Department of Labor. Prior

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to this, he served as the deputy assistant inspector general for audit.

He received his B.S. at the University of South Carolina in 1978. He is a certified public accountant in the state of South Carolina, a member of the American Institute of Certified Public Accountants.

Mr. Jesus Rojas is the stepson of Raul Figueroa, a mechanic at Waste Management who was the victim of a gruesome accident which resulted in his stepdad's death.  Since the accident, Jesus has spoken out about the need for employees (sic) to be held accountable for such accidents.  He received an associate degree in homeland security from Everest University and is currently working at Comcast.

Mr. Jason Schwartz is a partner in the Washington, D.C., office of Gibson, Dunn   Crutcher and a member of the firm's Labor and Employment Practice Group and its litigation department.  His practice includes the full range of labor and employment matters, including ERISA, the Occupational Safety and Health Act.

And Mr. Schwartz earned his J.D. from the Georgetown University Law Center, received a B.A. degree in international affairs from the George Washington University.

Mr. Eric Frumin serves as the health and safety coordinator for Change to Win.  Mr. Frumin served as chair of the Labor Advisory Committee on OSHA Statistics to the U.S. Bureau of Labor Statistics from 1983-2003.  He received his B.A. from the State University of New York in 1979 and his master's degree from New York University in 1981.

I welcome all four of you.

And we will begin with you, Mr. Lewis.

LEWIS:  Madam Chair and members of the subcommittee...

WOOLSEY:  And you need to turn on your microphone, or either put it closer to you.

LEWIS:  OK.

Madam Chair and members of the subcommittee, I appreciate the opportunity to discuss the Office of Inspector General's audit of OSHA's Enhanced Enforcement Program.  I will summarize my statement and ask for my full statement to be entered in the record.

As you know, Madam Chair, the purpose of the Enhanced Enforcement Program is to identify high-risk employers and target their worksites with increased enforcement action.  I will focus my testimony on our recent report that assessed whether establishments were properly identified, whether follow-up inspections were conducted, and whether OSHA's January 2008 directive had an adverse impact on the program.

Madam Chair, our overall conclusion was that OSHA did not always properly identify establishments and conduct enhanced enforcement inspections.  Specifically, for 97 percent of EEP qualifying cases that we sampled, OSHA did not comply with at least one of the following four requirements: designating enhanced enforcement cases, inspections of related worksites, enhanced follow-up inspections and enhanced settlement provisions.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

First, OSHA did not properly designate 53 percent of sampled cases. As a result, the worksites were not subject to the full range of enhanced enforcement actions, and 24 employers had 33 subsequent fatalities.

Second, we found that OSHA did not generally inspect related worksites for 80 percent of the cases, and 34 of these employers had 47 subsequent fatalities at other worksites. Related worksites inspections were to be used to determine whether compliance was a company-wide problem.

OSHA either did not commit necessary resources or lacked information on other worksites needed to perform the inspections. Inspections may have deterred and abated hazards at worksites where 47 subsequent fatalities occurred.

Third, we found that OSHA did not conduct proper worksite follow- up on 146 of 282 cases. And there were five subsequent fatalities at the same worksites. Enhanced enforcement requirements state that a follow-up inspection must be conducted to assess not only whether cited violations were abated but also whether the employer was committing similar violations.

Fourth, OSHA generally did not utilize enhanced settlement provisions to better ensure future compliance with the OSHA act. OSHA did not include enhanced settlement provisions in 153 of 188 cases with settlement agreements.

Finally, OSHA did not have specific criteria for issuing National Office Alert Memorandum on employers with worksites across regions or states. This occurred because OSHA did not place appropriate emphasis on compliance, commit necessary resources or provide clear policy guidance.

Our sample included 22 employers with worksites across states or regions that had multiple facilities and/or cases. OSHA issued Alert Memoranda on only five of these employers, and the alerts were not issued until after the majority of fatalities had occurred.

Our audit also examined whether OSHA's January 2008 directive had an adverse impact on the Enhanced Enforcement Program. The 2008 criteria resulted in significantly fewer eligible cases. But despite this drop in the workload, OSHA still did not focus on qualifying employers with company-wide safety and health violations and issues.

OSHA has not placed the appropriate management emphasis and resources on this program to ensure its effectiveness. While we cannot conclude that enhanced enforcement would prevent subsequent fatalities, full and proper application of the program may have deterred and abated hazards at worksites for a total of 45 employers where 58 subsequent fatalities occurred.

We made six recommendations including that OSHA's assistant secretary form a task force to make recommendations to improve the efficiency and effectiveness of the program, revise its 2008 directive, provide specific criteria for issuing alert memorandum, and assuring that enhanced settlement provisions are used.

Madam Chair, this concludes my statement. I would like to thank you for the opportunity

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to share the OIG's findings on this important issue.  I'm happy to respond to any questions you or other subcommittee members may have.

WOOLSEY:  Thank you.

Mr. Rojas?

ROJAS:  Chairwoman Woolsey, Representative Price, members of the committee, thank you for inviting me here today to talk about accountability for work safety.

My name is Jesus Rojas.  I live in West Palm Beach, Florida.  I'm the stepson of Raul Figueroa, who was a mechanic at Waste Management.

WOOLSEY:  Can you put that a little bit closer?

ROJAS:  Yes.  Better?

WOOLSEY:  That's way better.

ROJAS:  On January 3rd, 2008, my stepfather died in a gruesome accident at Waste Management's facility in North Broward, Florida.

The company told me and my family what happened.  They said a hydraulic arm on a truck malfunctioned and pinned my stepfather against the cab. His body was severed.

But that is not the whole story.  Companies like Waste Management need to be held accountable for workers' deaths that could have been prevented.

After my stepfather's death, my family and I spoke with his co- workers. We learned other disturbing details.  We learned that my stepfather began working on the truck, a front loader, at around 5:30 a.m.  He was told the hydraulic arms on the truck were not working.

My stepfather was very safety conscious.  And to make sure the repair job was done safe, he went to his supervisor and asked for a ladder.  He was told there was no ladder, or that the ladder was broken.

Later, he went back to the supervisor and asked for a second mechanic to help with the repairs.  Having a ladder or a second person was necessary for safety reasons.  But he was told they didn't have a second person to help him.

The supervisors are also supposed to check on the mechanics every half hour to make sure that things are OK.  But that didn't happen in the case of my stepfather.  Instead, at around 8:30 or 9:00, his coworker came by and saw my stepfather.  The coworker pulled the alarm, and the supervisors came to the scene.

Instead of cutting the line that powered the hydraulic arms, the supervisors started pulling at my stepfather to free his body.  As a result, we will never know for sure what happened because the accident scene was compromised.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

We also learned that a ladder was pictured in the photos of the accident scene. Since my stepfather's coworkers told us that he wasn't able to get a ladder for the repair job, we believe supervisors placed the ladder near the truck after the accident.

For some time before his death, my stepfather complained about safety problems at the facility. He complained about the long hours he and his coworkers had to work. Often they didn't have adequate help when they needed it.

He complained that the company didn't provide the proper parts for the trucks. He said they were forced to patch the trucks but weren't given parts they needed to repair them properly and make them safe.

My stepfather heard that the less money the company spent on parts, the more bonus money the managers received. My stepfather was repeatedly told by his supervisors, You need to get the truck out on the roads. They said they didn't care how they fixed them.

After the accident, we found out that company officials backdated the service records on the truck my stepfather was working on when he was killed. My brother-in-law spoke to the person assigned to do the backdating of records.

Companies need to keep up-to-date safety records, and they need to be punished for backdating safety records. We can't just rely on the company's word when it comes to safety.

Waste Management did get fined in the case of my stepfather. I'm not sure about the specific violations. OSHA told us that they investigated the accident and cited the company for two different safety violations. I believe that the fine was between $9,000 and $10,000.

Thankfully, my mother did receive money from my stepfather's life insurance, which she used to pay off her home. However, after the accident, my mother had to stop attending English classes and began working two jobs to make ends meet.

She still works two jobs, one at a Publix Supermarket and the other as a janitor at night. Because my mom had to discontinue studying English, she cannot work as a medical assistant, which is the profession she has a degree in.

My stepfather left behind my mother, me, 27-year-old sister. He also left two daughters in Cuba and a grandson there who will never meet his grandfather.

Companies like Waste Management should not be allowed to cut corners and compromise safety. They need to provide enough staff to make sure workers are safe on the job. They need to be punished when they **backdate** safety records to cover up flaws in their safety procedures.

A lot of people know that Dr. Martin Luther King Jr. was killed in Memphis in 1968. What they don't know is that Dr. King traveled to Memphis to support striking sanitation workers. They were striking because two sanitation workers were killed on the job.

Forty years after Dr. King was assassinated is time enough to hold companies accountable

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

for practices that kill and injure workers.

Thank you for your time.

WOOLSEY:  Thank you.

Mr. Schwartz?

(OFF-MIKE)

Can't hear you.

SCHWARTZ:  Thank you.

WOOLSEY:  Thank you.

SCHWARTZ: Thank you, Madam Chairwoman, Ranking Member Price and members of the committee.

I'm pleased to appear today on behalf of the U.S. Chamber of Commerce.  The Chamber supports the conclusion of the Inspector General that the Enhanced Enforcement Program is a good idea that serves OSHA's purpose of improving workplace safety and focusing its resources where they can target the highest risk workplaces and worst offenders.

Let me make four points about the program, as the committee and the agency considers it on behalf of the Chamber.

Number one, we agree with the inspector general that there is a need to examine the program criteria to ensure that it really is focusing on the most recalcitrant employers and the highest-risk workplaces.

We think that objective criteria are needed that focus on workplaces where repeat or willful violations relate to fatalities like Mr. Rojas's stepfather's or that relate to serious injuries that occur in the workplace.

We also think it ought to focus on workplaces where the employers are not abating violations that they've been advised of.

And we also think that it needs to focus on workplaces where there are high risks that have not been identified by prior citation history, because as we all know, there are many workplaces out there that have not been subject to OSHA's inspection programs.  And looking at that as the sole pool of workplaces from which you draw we don't think is a very effective mechanism.

We agree that a task force should be created to define those criteria.  And we think that it may make sense to do that on a trial basis as those criteria are refined.  And we think all the stakeholders, including employers, ought to be involved in that effort to define those criteria where those resources are going to be focused.

We think that's critical because there are 7.2 million workplaces in the United States.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

At its current rate, OSHA is inspecting one- half of 1 percent of those workplaces. Even magnifying those resources by multiple factors will never reach out to any significant percentage of those workplaces.

So you've got to figure out a way to leverage those resources to get at the worst, highest-risk offenders and to use outreach and education with others in order to expand OSHA's influence and improve safety.

Second point I'd like to make is with respect to the resources committed to this program. We agree with the inspector general's conclusion that there are not enough resources committed to the program. And that may very well have led to the various issues that the inspector general identified where OSHA was not able to follow up to the degree that the program called for.

We think more resources ought to be committed to it. OSHA's response to the inspector general was to indicate that the EEP was only 1 percent of the agency's enforcement program. We think that the agency and, Madam Chairwoman, this committee ought to focus on where the other 99 percent is going and whether, in fact, it's an effective use of resources.

For example, OSHA's principle programmed inspection program is called Site-Specific Targeting. That program selects employers based on injury and illness data for wall-to-wall inspections. It results, many times, in selecting employers who are very conscientious at reporting sprains and strains throughout their workplace, not the type of high-profile, high-risk workplaces that need this kind of attention.

This point is demonstrated in my testimony. If you see, we've done a comparison of the number of citations issued to SST-inspected workplaces versus the number of citations issued to Voluntary Protection Program workplaces, those that are showcased by OSHA as the best of the best. The bottom line is the numbers are not materially different.

So SST is not focusing in the right area. And we think OSHA needs to take a good hard look at that in the context of this task force.

Number three, we concur with the inspector general that creative enforcement and settlement tools are appropriate.

For example, we strongly believe that where you find a condition that's likely to be repeated in other worksites that OSHA ought to focus on those other worksites as well, so we can get the most health and safety benefit out of the inspection program and out of the settlement results. And we think that needs to be looked at on a case-by-case basis to see what methods are appropriate in each instance.

Let me conclude with one final observation. The inspector general is very careful to indicate that he can't conclude that any particular fatality resulted from a lapse in the Enhanced Enforcement Program. I think, though, the tone of the report certainly suggests that many fatalities did result. And we think that that's an unfair cha- racterization.

There are very many hardworking men and women at the Occupational Safety and Health

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Administration who have worked to prevent those kinds of incidents.  And I think that the conclusion without evidence that following up on this program in certain instances would've prevented them is an unwarranted one and is an unfortunate inference from the report.

I thank you for your time.  And I'd just suggest that preventing those kinds of injuries and illnesses ought to be our focus as we go forward in expanding and improving this program.

Thank you, Mr. Schwartz.

Word Count: 5281
4/30/09 FDCHCAPTRPTS (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


4/7/09 Orange County (Cal.) Reg. (Pg. Unavail. Online)
2009 WLNR 6537791

                    Orange County Register, The (CA)
     Copyright 2009 ProQuest Information and Learning Company; All Rights Reserved.

                              **April 7, 2009**

                            Section: NEWS

         Judge rules Broadcom lawyers guilty of ethical misconduct

                    JOHN GITTELSOHN Register blogger

The federal judge in a criminal case alleging executives at Broadcom schemed to **backdate**
$2.2 billion in employee stock options said in a ruling released last week that he must
suppress evidence because of ethical misconduct by Broadcom's attorneys.

The ruling, dated April 1, by U.S. District Court Judge Cormac J. Carney says lawyers
with Irell & Manella violated the attorney- client relationship by giving federal
investigators notes from interviews with Broadcom's former chief financial officer who
was not told that his statements could be used against him. The Irell attorneys in-
terviewed the CFO after news reports that Broadcom executives had manipulated the timing
of stock options to increase their potential value to employees.

William Ruehle, the former CFO, has pleaded not guilty to 21 counts of conspiracy to
commit securities and accounting fraud. His trial is scheduled to begin in October.

For more on this story and other business news, go to ocregister.com/ocbiz.

Word Count: 196
4/7/09 OCREG (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


4/4/09 AP Alert - CA 03:58:11

AP Alert - California
Copyright 2009 The Associated Press. All rights reserved. This material may not be
published, broadcast, rewritten or redistributed.

**April 4, 2009**

Judge blasts law firm for alleged misconduct

SANTA ANA, Calif._The prestigious law firm of Irell & Manella has been referred to the
State Bar for potential discipline by a federal judge who condemned it for ethical
misconduct in the Broadcom Corp. stock fraud litigation.

In a blistering opinion issued earlier this week and reported in The Daily Journal on
Friday, U.S. District Judge Cormac J. Carney ruled that the firm had violated the bar's
conduct rules by taking on clients with adverse interests to each other. The clients
included Irvine-based Broadcom and its former chief financial officer, William J. Ruehle,
who is charged with conspiring to **backdate** employee stock options.

The judge wrote that Irell should have obtained Ruehle's written consent before
disclosing the substance of one of its interviews with him to federal prosecutors.

The judge wrote that the firm's misconduct "has compromised the rights of Mr. Ruehle,
the integrity of the legal profession and the fair administration of justice."

The decision was preceded by a three-day evidentiary hearing in which Irell claimed it
warned Ruehle that they could disclose anything he told them to outside parties.

Carney called the warning "misplaced."

"In effect, Irell was interrogating one client to benefit another," the judge wrote.

Carney has also ruled that Ruehle's disclosures given by Irell to prosecutors cannot
be used at his trial later this year. Prosecutors have filed a notice of their intent
to appeal the decision.

Irell, which no longer represents Ruehle, issued a statement Thursday challenging
Carney's findings and predicting the company would be exonerated by the State Bar.

"The disclosures ... were proper and were made pursuant to the instructions of the company
and its management," the firm said.

Irell spokesman Charles Sipkins said Ruehle testified at the hearing that he knew Irell

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

lawyers had been instructed by Broadcom to "give all factual information" to the company's auditing firm Ernst & Young.

Andrew Stolper, an assistant U.S. attorney, declined comment to the Daily Journal. Ruehle's lawyer, Richard Marmaro did not immediately return a message left Friday by The Associated Press.

Broadcom co-founder Henry T. Nicholas III and Ruehle have pleaded not guilty to charges of conspiring to commit accounting and securities fraud.

----

Information from: Daily Journal

Word Count: 463
4/4/09 APALERTCA 03:58:11
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



4/4/09 AP Alert - NV 03:58:21

                          AP Alert - Nevada
  Copyright 2009 The Associated Press. All rights reserved. This material may not be
                 published, broadcast, rewritten or redistributed.

                              **April 4, 2009**

                  Judge blasts law firm for alleged misconduct

SANTA ANA, Calif._The prestigious law firm of Irell & Manella has been referred to the
State Bar for potential discipline by a federal judge who condemned it for ethical
misconduct in the Broadcom Corp. stock fraud litigation.

In a blistering opinion issued earlier this week and reported in The Daily Journal on
Friday, U.S. District Judge Cormac J. Carney ruled that the firm had violated the bar's
conduct rules by taking on clients with adverse interests to each other. The clients
included Irvine-based Broadcom and its former chief financial officer, William J. Ruehle,
who is charged with conspiring to **backdate** employee stock options.

The judge wrote that Irell should have obtained Ruehle's written consent before
disclosing the substance of one of its interviews with him to federal prosecutors.

The judge wrote that the firm's misconduct "has compromised the rights of Mr. Ruehle,
the integrity of the legal profession and the fair administration of justice."

The decision was preceded by a three-day evidentiary hearing in which Irell claimed it
warned Ruehle that they could disclose anything he told them to outside parties.

Carney called the warning "misplaced."

"In effect, Irell was interrogating one client to benefit another," the judge wrote.

Carney has also ruled that Ruehle's disclosures given by Irell to prosecutors cannot
be used at his trial later this year. Prosecutors have filed a notice of their intent
to appeal the decision.

Irell, which no longer represents Ruehle, issued a statement Thursday challenging
Carney's findings and predicting the company would be exonerated by the State Bar.

"The disclosures ... were proper and were made pursuant to the instructions of the company
and its management," the firm said.

Irell spokesman Charles Sipkins said Ruehle testified at the hearing that he knew Irell

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

lawyers had been instructed by Broadcom to "give all factual information" to the company's auditing firm Ernst & Young.

Andrew Stolper, an assistant U.S. attorney, declined comment to the Daily Journal. Ruehle's lawyer, Richard Marmaro did not immediately return a message left Friday by The Associated Press.

Broadcom co-founder Henry T. Nicholas III and Ruehle have pleaded not guilty to charges of conspiring to commit accounting and securities fraud.

___

Information from: Daily Journal

Word Count: 463
4/4/09 APALERTNV 03:58:21
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


4/1/09 AP Alert - CA 01:43:10

AP Alert - California
Copyright 2009 The Associated Press. All rights reserved. This material may not be
published, broadcast, rewritten or redistributed.

**April 1, 2009**

Judge rejects suit filed by Broadcom founder's ex

SANTA ANA, Calif._A bid by the ex-wife of Broadcom Corp. co-founder Henry T. Nicholas
III to get control of the family fortune has been rejected by a probate judge in Orange
County.

Stacey Nicholas' lawsuit alleged that her billionaire ex-husband threatened to have her
"whacked" after their divorce and misspent $61 million of their joint $600 million trust.

Superior Court Judge Leonard Baumgarten's ruling did not contain an explanation. However,
the ex-wife's attorney, Robert Sacks, said Tuesday the judge rejected the claim on
technical grounds, so he plans to amend the petition.

Henry Nicholas' attorney, Richard Howell, says the lawsuit was a "bogus action" based
on false claims.

In a separate federal case, Henry Nicholas has pleaded not guilty to charges of drug
use and conspiring to **backdate** $2.2 billion of employee stock options.

___

Information from: The Orange County Register, http://www.ocregister.com

Word Count: 183
4/1/09 APALERTCA 01:43:10
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

3/31/09 L.A. Times 2
2009 WLNR 6006565

Los Angeles Times
Copyright 2009 Los Angeles Times

**March 31, 2009**

Section: Business

Karatz enters plea in stock case
KB Home's former CEO pleads not guilty to backdating options that netted him more than
$7 million.

Stuart Pfeifer

Former KB Home Chief Executive Bruce Karatz pleaded not guilty in federal court Monday
to charges that he secretly backdated stock options to enrich himself, then concealed
the scheme from regulators and investors.

Karatz, 63, entered the plea during a brief court appearance before U.S. District
Magistrate Judge Jeffrey W. Johnson in Los Angeles. Johnson scheduled a trial date for
May 19.

Karatz, who declined to comment after the hearing, could face a maximum sentence of 415
years in prison if convicted on all 20 felony charges. Regulators say Karatz personally
netted more than $7 million from the backdating of options at Westwood-based KB Home.
He served as chairman and chief executive from 1986 to 2006, when he resigned under fire.

He is one of just six executives nationwide to face criminal charges in the
stock-option-manipulation scandal and one of the few accused of backdating options to
enrich himself.

Free on $750,000 bond secured by his Bel-Air mansion, Karatz appeared in court with
attorney John Keker of the San Francisco law firm of Keker & Van Nest. Keker declined
to comment after the hearing.

According to an indictment returned earlier this month, Karatz first tried to get KB
Home to give him stock options valued at $1, ensuring a huge profit, in 1998.

When the company balked, the indictment says, he worked closely with former KB human
resources executive Gary Ray to **backdate** options repeatedly from 1999 to 2006.

Karatz then concealed the backdating from KB Home's board of directors, its compensation

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

committee, its shareholders and the SEC, according to the indictment.

Ray was charged separately from Karatz. He pleaded guilty in February to conspiring with Karatz to thwart an SEC investigation. Now he is cooperating with prosecutors.

Stock options typically are granted to employees with an exercise price tied to the date of the grant. Companies can legally **backdate** stock options, making them more valuable, but they must account for them properly, pay taxes accordingly and report the backdating to shareholders.

KB Home did not disclose the backdating until nearly a decade after it began, authorities said. The company had to adjust its financial statements by $70 million when the backdating of options held by Karatz and other shareholders was finally disclosed in 2008.

--

stuart.pfeifer@latimes.com

PHOTO: DEFENDANT: Bruce Karatz leaves federal court in Los Angeles with fiancee Lilly Tartikoff after his arraignment.

PHOTOGRAPHER:Gina Ferazzi Los Angeles Times

EDITION: Home Edition

Word Count: 500
3/31/09 LATIMES 2
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


3/31/09 L.A. Times (Bus. Sec.) (Pg. Unavail. Online)
2009 WLNR 5975939

Los Angeles Times
Copyright 2009 Los Angeles Times

**March 31, 2009**

Former KB Home CEO Bruce Karatz Pleads Not Guilty

Stuart Pfeifer

LOS ANGELES -- Former KB Home Chief Executive Bruce Karatz pleaded not guilty in federal court Monday to charges that he secretly backdated stock options to enrich himself and then concealed the scheme from regulators and investors.

Karatz, 63, entered the plea during a brief court appearance before U.S. District Magistrate Judge Jeffrey W. Johnson here. Johnson scheduled trial for May 19.

Karatz, who declined to comment after the hearing, could face a maximum sentence of 415 years in prison if convicted on all 20 felony charges. Regulators say Karatz personally netted more than $7 million from the backdating of options at Los Angeles-based KB Home. He served as chairman and chief executive from 1986 to 2006, when he resigned under fire.

He is one of just six executives nationwide to face criminal charges in the stock-option-manipulation scandal and one of the few accused of backdating options to enrich himself.

Free on $750,000 bond secured by his Bel-Air mansion, Karatz appeared in court with attorney John Keker of the San Francisco law firm of Keker & Van Nest. Keker declined to comment after the hearing.

 (Optional add end)<

According to an indictment returned earlier this month, Karatz first tried to get KB Home to give him stock options valued at $1, ensuring a huge profit, in 1998. When the company balked, the indictment says, he worked closely with former KB human-resources executive Gary Ray to **backdate** options repeatedly from 1999 to 2006.

Karatz then concealed the backdating from KB Home's board of directors, its compensation committee, its shareholders and the Securities and Exchange Commission, according to the indictment. Ray was charged separately from Karatz. He pleaded guilty in February to conspiring with Karatz to thwart an SEC investigation. Now he is cooperating with prosecutors.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Stock options typically are granted to employees with an exercise price tied to the date of the grant. Companies can legally **backdate** stock options, making them more valuable, but they must account for them properly, pay taxes accordingly and report the backdating to shareholders.

KB Home did not disclose the backdating until nearly a decade after it began, authorities said. The company had to adjust its financial statements by $70 million when the backdating of options held by Karatz and other shareholders was disclosed in 2008.

bc-karatz

Word Count: 473
3/31/09 LAT-BUS (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


3/27/09 L.A. Times 4
2009 WLNR 5764603

Los Angeles Times
Copyright 2009 Los Angeles Times

**March 27, 2009**

Section: Business

Acting director of S&L regulator is named
John Bowman will run the Office of Thrift Supervision while its chief, the subject of
an inquiry, is on leave.

Appointment

U.S. Treasury Secretary Timothy F. Geithner named John E. Bowman acting director of the
Office of Thrift Supervision, which regulates the savings and loan industry.

Scott M. Polakoff, formerly acting director, is on leave, pending a review by the Treasury
Department of the OTS' actions last year "related to post-period capital contributions,"
the agency said Thursday in an e-mailed statement. Bowman was deputy director and chief
counsel at the OTS.

Former OTS director John Reich told Geithner in January that the agency let IndyMac Bank
**backdate** a capital injection that helped the lender avoid regulatory restrictions.

The agency found four other cases of lenders failing to follow reporting policies, Reich
wrote to Geithner and four U.S. lawmakers. Reich stepped down as OTS director Feb. 27,
before his term ended.

Five OTS-regulated lenders failed last year, including Pasadena-based IndyMac and
Seattle-based Washington Mutual Inc., the largest U.S. bank failure. The number of
"problem thrifts" rose to 26 at the end of 2008 from 11 a year earlier, according to
the agency's fourth-quarter report.

EDITION: Home Edition

Word Count: 223
3/27/09 LATIMES 4
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


3/26/09 US Fed. News (Pg. Unavail. Online)
2009 WLNR 5704784

                         US Federal News
             Copyright 2009 US Fed News (HT Syndication)

                          **March 26, 2009**

INFORMATION ISSUED BY U.S. ATTORNEY'S OFFICE FOR THE CENTRAL DISTRICT OF CALIFORNIA ON
        MARCH 5: FORMER CEO OF KB HOME CHARGED WITH SECURITIES FRAUD...

INFORMATION ISSUED BY U.S. ATTORNEY'S OFFICE FOR THE CENTRAL DISTRICT OF CALIFORNIA ON
MARCH 5: FORMER CEO OF KB HOME CHARGED WITH SECURITIES FRAUD IN CONNECTION WITH
STOCK-OPTION BACKDATING SCHEME

LOS ANGELES, March 5 -- The U.S. Department of Justice's U.S. Attorney's office for the
Central District of California issued the following press release:

A former CEO and chairman of the board of KB Home was named today in a 20-count indictment
that charges him in a scheme to defraud KB and its shareholders by awarding himself and
other KB executives millions of dollars in undisclosed stock-based compensation in
connection with the backdating of stock options over a seven-year period.

Bruce E. Karatz, 63, of Bel Air Estates, was charged with seven counts of mail fraud,
five counts of wire, three counts of securities fraud, four counts of making false
statements in reports filed with the Securities and Exchange Commission, and one count
of lying to KB's accountants.

This scheme alleged in the indictment involves Karatz's use of hindsight pricing to
inflate the value of stock options granted to him and other KB executives, as well as
Karatz's ongoing concealment of this practice from KB's board of directors, Compensation
Committee and shareholders. Furthermore, the indictment alleges, when an internal
investigation into stock-option backdating was initiated at KB in May 2006, Karatz
falsely denied his orchestration of the stock-option backdating scheme and caused a false
report of KB's historical option-granting practices to be submitted to KB's Audit
Committee and outside auditor, which impeded the timely and accurate disclosure of this
matter in filings with the Securities and Exchange Commission.

In a related case, a former senior vice president of KB and head of Human Resources,
Gary A. Ray, pleaded guilty on February 6 to conspiring with Karatz to obstruct justice.
By pleading guilty, Ray admitted that he and Karatz collaborated in causing a false and
misleading report on KB's historical option-granting practices to be submitted to KB's
Audit Committee and other KB managers for the purpose of warding off a contemplated SEC
probe into backdating at KB (see:
http://www.usdoj.gov/usao/cac/pressroom/pr2008/154.html).

              © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

According to the indictment returned this afternoon by a federal grand jury in Los
Angeles, Karatz engaged in a fraudulent scheme to disguise and conceal from KB and its
shareholders the nature and value of stock-based compensation KB was actually awarding
to Karatz and other KB executives through its stock-option granting practices. Karatz
allegedly caused below-market exercise prices to be selected for stock options granted
to him and other KB executives by using hindsight to **backdate** the grant date of these
options to the date with the lowest price point for KB's stock.

In furtherance of the scheme, the indictment alleges, Karatz concealed his use of
hindsight pricing from KB's board of directors, Compensation Committee and shareholders.
In various public filings made by KB, Karatz made it appear that KB's option grants were
made "as of" the date that had been selected. Karatz allegedly caused false statements
to issued that claimed that all employee stock options granted under KB's compensation
plans had an exercise price equal to the fair market value of KB's stock on the date
of the grant. This representation created the false impression that KB was granting
at-the-money stock options to KB executives, for which the recording of a compensation
expense was not required, when in fact KB was granting discounted, in-the-money stock
options, a large portion of which were awarded to Karatz himself.

As a result of these fraudulent practices, Karatz caused KB to grant millions of
backdated, in-the-money options to himself and to other KB executives without publicly
reporting the compensation and without taking the required compensation expense on KB's
financial statements. As a result, the indictment alleges, Karatz was able to mi-
sappropriate millions of dollars in KB's funds when he exercised his options, while
maintaining the pretense that these gains were solely the result of the appreciation
of the market value of KB's stock.

After KB commenced an internal investigation into its option-granting practice in May
2006, Karatz continued to conceal that he had backdated KB's stock option grants during
the preceding seven years. Among other things, Karatz caused a false and misleading
internal report to be presented to KB's Audit Committee and outside auditors that
represented there was "no evidence of the backdating of options or other manipulation
by management." KB's Audit Committee and other members of KB's management relied on this
false and misleading internal report in deciding to file KB's Form-10Q for the three
month period ending May 31, 2006, without disclosing any irregularities in KB's past
option-granting practices.

After KB discovered irregularities in its reporting, KB was unable to timely file its
third quarter 10Q in October 2006. When KB ultimately filed its 2006 3rd quarter Form-10Q
and its 2006 Form-10K in February 2007, the company was forced to recognize, for the
first time, more than $36 million in additional stock-based compensation expenses and
a total increase of more than $70 million in accrued liabilities arising from adjustments
required to address the backdated stock options.

Karatz is expected to make his initial court appearance on March 26 in federal court
in Los Angeles. If convicted of all the charges, Karatz faces a statutory maximum sentence
of 415 years in federal prison. An indictment contains allegations that a defendant has
committed a crime. Every defendant is presumed innocent until and unless proven guilty.

"Top executives of publicly traded companies have a duty to adhere to all the rules imposed

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

on them by company directors and members of the public who invest their hard-earned money," said United States Attorney Thomas P. O'Brien. "Mr. Karatz allegedly broke the rules, and then lied about it, to line his pockets and then to conceal his windfall from his company and the trading public. Efforts to manipulate a company's compensation process, and then to impede the oversight function of the SEC, seriously compromise the integrity of our entire system."

This case was investigated by the Federal Bureau of Investigation.For more information please contact: Sarabjit Jagirdar, Email:- htsyndication@hindustantimes.com.

Word Count: 1294
3/26/09 USFEDNEWS (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


3/23/09 SEC News Dig. (Pg. Unavail. Online)
2009 WLNR 5477464

SEC News Digest
Copyright 2009 Federal Information & News Dispatch, Inc.

**March 23, 2009**

News Digest
ENFORCEMENT PROCEEDINGS - Sharlene Abrams, Former Chief Financial Officer of Mercury
Interactive, LLC, to be Permanently Enjoined and to Pay Civil Penalties and Disgorgement
for Stock Option Backdating and Other Fraudulent Conduct; Abrams Also to be Barred from
Serving as an Officer and Director of a Public Company

SECURITIES AND EXCHANGE COMMISSION

The Securities and Exchange Commission today settled civil fraud charges against Sharlene
Abrams, a former Chief Financial Officer of Mercury Interactive, LLC, arising from an
alleged scheme to **backdate** stock option grants and from other alleged misconduct.

On May 31, 2007, the Commission charged Abrams and three other former senior Mercury
officers with perpetrating a fraudulent and deceptive scheme from 1997 to 2005 to award
themselves and other Mercury employees undisclosed, secret compensation by backdating
stock option grants and failing to record hundreds of millions of dollars of compensation
expense. The Commission's complaint alleges that during this period certain of these
executives, including Abrams, backdated stock option exercises, made fraudulent
disclosures concerning Mercury's "backlog" of sales revenues to manage its reported
earnings, and structured fraudulent loans for option exercises by overseas employees
to avoid recording expenses.

Without admitting or denying the allegations in the Commission's complaint, Abrams
consented to the entry of a final judgment permanently enjoining her from violating and/or
aiding and abetting violations of the antifraud, financial reporting, record-keeping,
internal controls, false statements to auditors, securities ownership reporting and
proxy provisions of the federal securities laws, and barring her from serving as an
officer or director of a public company. Abrams will pay $2,287,914 in disgorgement,
of which $1,498,822 represents the "in-the-money" benefit from her exercise of backdated
option grants, and a $425,000 civil penalty. Under the terms of the settlement, Abrams'
disgorgement of her "in-the-money" benefit--$1,498,822--would be deemed satisfied by
her previous voluntary payment of that amount to Mercury. The settlement is subject to
the approval of the United States District Court for the Northern District of California.

As part of the settlement, and following the entry of the proposed final judgment, Abrams,
without admitting or denying the Commission's findings, has consented to the entry of
Commission order, pursuant to Rule 102(e)(3) of the Commission's Rules of Practice,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

suspending her from appearing or practicing before the Commission as an accountant.

The Commission previously filed settled charges in this matter against Mercury and three former outside directors of Mercury. On May 31, 2007, the Commission filed civil fraud charges against Mercury based on the stock option backdating scheme and other fraudulent conduct noted above. Mercury, which was acquired by Hewlett-Packard Company on Nov. 8, 2006, after the alleged misconduct, settled the matter by agreeing to pay a $28 million penalty and to be permanently enjoined. See Litigation Release No. 20136 (May 31, 2007). On September 17, 2008, the Commission filed settled charges against three former outside directors of Mercury alleging that they recklessly approved backdated stock option grants and reviewed and signed public filings that contained materially false and misleading disclosures about the company's stock option grants and company expenses. The outside directors settled the matter by consenting to permanent injunctions and the payment by each director of a $100,000 penalty. See Litigation Release No. 20724 (Sept. 17, 2008). Mercury and the outside directors settled the charges without admitting or denying the allegations in the Commission's complaint.

The Commission's litigation against the other senior Mercury officers is continuing. [SEC v. Mercury Interactive, LLC (f/k/a Mercury Interactive Corporation), Amnon Landan, Sharlene Abrams, Douglas Smith, and Susan Skaer , Case No. 07-2822 (RS). (N.D. Cal.)] (LR-20964; AAE Rel. 2953)

Word Count: 753
3/23/09 SECNWSD (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


3/13/09 CFO Mag. for Senior Fin. Executives 6
2009 WLNR 5477665

CFO Magazine
Copyright 2009 CFO

**March 13, 2009**

Section: CFO 13 Mar 2009

SEC Nails Down Backdating, Fraud Cases

Allegations are settled that Quest Software wrongly granted millions of stock options, and that MedQuist boosted results with billing tricks that it hid from investors and auditors.

Stock-option backdating is back in the news, with Quest Software, a midcap provider of point-of-sale systems, settling civil charges by the Securities and Exchange Commission. The SEC also settled a fraud case against MedQuist Inc., a small-cap medical-transcription company.

The SEC charged that Quest, executive chairman Vincent Smith, former CFO John Laskey, and former controller and principal accounting officer Kevin Brooks improperly granted undisclosed in-the-money stock options to executives and employees by backdating millions of options from 1999 through 2002.

The software firm restated $113.6 million of its operating income in September 2007 as a result of the alleged misconduct. The company and the three individuals settled the SEC allegations without admitting or denying them. The executives also agreed to pay more than $300,000 combined.

"Today's action reinforces that the commission will hold companies and executives accountable for engaging in misconduct that deceives investors," said Rosalind Tyson, director of the SEC's Los Angeles office.

According to the complaint, Quest failed to accurately describe its stock-option practices in its public filings and failed to properly account for the backdated options in its financial statements. This resulted in false and misleading disclosures in regulatory filings from 1999 through 2005.

Quest also was accused of backdating 28 separate grants involving more than 11 million shares of common stock. The company's failure to properly record compensation expenses in connection with the backdated options caused operating income to be overstated by 4 percent to 963.1 percent and its operating loss to be understated by 26.12 percent

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to 154 percent from 1999 through 2005, according to the regulator.

The SEC also alleged that Smith and Laskey approved a policy by which Quest would pool stock-option grants each month and **backdate** the grants to coincide with the lowest stock price of the month. According to the complaint, although he knew about the use of hindsight to date option grants, Brooks failed to ensure the accuracy of Quest's financial statements and disclosures.

Smith, Laskey, and Brooks also took steps to prevent Quest's independent auditors from discovering the backdating, including the use of false written consents from Quest's board of directors, the SEC claimed.

Smith, Brooks, and Laskey will pay civil penalties of $150,000, $60,000, and $50,000, respectively. Brooks also agreed to disgorge $34,775, representing half of the in-the-money value of backdated options he had exercised -- he already paid back the other half to the company -- and prejudgment interest of $5,808.29. He is suspended for five years from appearing or practicing as an accountant before the SEC.

In the other case, the SEC settled a civil injunctive action against MedQuist and a former company executive over alleged securities fraud and other violations.

The commission's complaint alleged that, from 1999 to 2004, MedQuist claimed in SEC filings, press releases, and earnings calls that its strong financial performance was due to its disciplined and conservative business practices. Yet at the same time, it systematically and secretly inflated customer bills to increase revenues and profit margins, according to the charges.

Without admitting or denying the allegations, MedQuist agreed to be permanently enjoined from violating federal securities laws. Company president and chief operating officer John Donohoe, also without an admittance or denial, agreed to a $75,000 civil penalty and a five-year officer and director bar.

The commission alleged that Donohoe, among other things, knew the company was increasing its bills to meet revenue and margin targets, and that he and others misled shareholders and other public investors about the source of MedQuist's success.

In a separate complaint, the SEC charged MedQuist's ex-CFO Brian Kearns and ex-controller Bruce Van Fossen with participating in the fraudulent scheme.

The two allegedly knew company offices were not calculating bills in accordance with customer contracts, but rather were secretly manipulating the number of transcribed lines charged to customers in order to increase revenues and profit margins. Neither Kearns nor Van Fossen took steps to stop the scheme, the SEC asserted.

"Both knew that customers and employees complained of billing fraud, but neither investigated the accuracy of the company's line counts," the commission claimed.

The complaint further alleged that Kearns and Van Fossen made false statements to auditors designed to conceal the billing complaints and the scheme itself.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

SOURCE: CFO

EDITION: CFO

Word Count: 965
3/13/09 CFOE 6
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


3/13/09 M2 Presswire 00:00:00

                              M2 PRESSWIRE
                   Copyright 2009 M2 Communications Ltd.

                              **March 13, 2009**

US SEC: SEC Charges Quest Software and Three Executives for Stock Option Backdating

 RDATE:12032009

 Washington, D.C -- The Securities and Exchange Commission today charged  Aliso Viejo,
Calif.-based software manufacturer Quest Software, Inc.  and three current or former
officers for stock option backdating.

 The SEC's complaint alleges that Quest, its executive chairman Vincent Smith, its former
chief financial officer John Laskey, and former  controller and principal accounting
officer Kevin Brooks improperly  granted undisclosed in-the-money stock options to
executives and  employees by backdating millions of options from 1999 through 2002. As
a result of this misconduct, Quest reported a $113.6 million restatement of its operating
income in September 2007. Quest has agreed  to settle the SEC's charges, and the three
executives have agreed to  pay more than $300,000 combined to settle the allegations
against them.

 "Today's action reinforces that the Commission will hold companies and  executives
accountable for engaging in misconduct that deceives  investors," said Rosalind R. Tyson,
Director of the SEC's Los Angeles  Regional Office. "By participating in the backdating
scheme, these  executives ignored their responsibilities as Quest's primary financial
gatekeepers."

 According to the SEC's complaint, filed in federal court in Santa Ana,  Calif., Quest
failed to accurately describe its stock option practices  in its public filings and failed
to properly account for the backdated  options in its financial statements. This resulted
in false and  misleading disclosures to Quest's shareholders in filings with the SEC
from 1999 through 2005.

 The SEC further alleges that Quest backdated 28 separate grants  involving more than
11 million shares of common stock. Quest's failure  to properly record compensation
expenses in connection with the  backdated options resulted in the overstatement of
Quest's operating  income by 4 percent to 963.1 percent and the understatement of its
operating loss by 26.12 percent to 154 percent from 1999 through 2005.

 Specifically, the SEC's complaint alleges that Smith and Laskey  approved a policy by
which Quest would pool stock option grants each  month and **backdate** the grants to coincide
with the lowest stock price  of the month. The complaint alleges that the backdated grant

                   © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

dates bore no relation to when the grant was actually approved, resulting in artificially low exercise prices for the stock options. According to the complaint, although he knew about the use of hindsight to date stock option grants, Brooks failed to ensure the accuracy of Quest's financial statements and disclosures. The complaint also alleges that Smith, Laskey, and Brooks took steps to prevent Quest's independent auditors from discovering the backdating, including the use of false written consents by Quest's board of directors.

All defendants have agreed to settle the SEC's charges without admitting or denying the allegations in the SEC's complaint.

Quest consented to the entry of an order permanently enjoining it from violating certain antifraud provisions, as well as the record-keeping, financial reporting, internal controls, and proxy provisions of the federal securities laws.

Smith consented to the entry of an order permanently enjoining him from violating or aiding and abetting violations of certain antifraud provisions, as well as the record-keeping, financial reporting, internal controls, proxy, false statements to auditors, Sarbanes-Oxley certification, and securities ownership reporting provisions of the federal securities laws. Smith also agreed to pay a $150,000 penalty.

Laskey and Brooks each consented to the entry of orders permanently enjoining them from violating or aiding and abetting violations of certain antifraud provisions, as well as the record-keeping, financial reporting, internal controls, false statements to auditors, and securities ownership reporting provisions of the federal securities laws. Brooks and Laskey agreed to pay penalties of $60,000 and $50,000 respectively. Brooks also agreed to pay disgorgement of $34,775, representing half of the in-the-money value of backdated options he had exercised (the other half was previously repaid to the company), and prejudgment interest of $5,808.29. In addition, Brooks, a certified public accountant, agreed to a five-year suspension from appearing or practicing as an accountant before the SEC.

All settlements are subject to approval by the court.

CONTACT: Andrew G. Petillon, Associate Regional Director, SEC's Los Angeles Regional Office Tel: +1 323 965 3214 Finola Halloran Manvelian, Assistant Regional Director, SEC's Los Angeles Regional Office Tel: +1 323 965 3980 John M. McCoy III, Regional Trial Counsel, SEC's Los Angeles Regional Office Tel: +1 323 965 4561 WWW: http://www.sec.gov/news/press/2009/2009-57.htm

((M2 Communications Ltd disclaims all liability for information provided within M2 PressWIRE. Data supplied by named party/parties. Further information on M2 PressWIRE can be obtained at http://www.presswire.net on the world wide web. Inquiries to info@m2.com)).

Word Count: 1003
3/13/09 M2PW 00:00:00
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


3/13/09 SEC News Dig. (Pg. Unavail. Online)
2009 WLNR 4831943

SEC News Digest
Copyright 2009 Federal Information & News Dispatch, Inc.

**March 13, 2009**

News Digest
ENFORCEMENT PROCEEDINGS - SEC Charges Quest Software and Three Executives With Stock
Option Backdating

SECURITIES AND EXCHANGE COMMISSION

The Securities and Exchange Commission today charged Quest Software, Inc., an Aliso
Viejo, California-based software manufacturer, and three current or former officers for
stock option backdating.

The SEC's complaint alleges that Quest, its executive chairman Vincent Smith, its former
chief financial officer John Laskey, and former controller and principal accounting
officer Kevin Brooks, improperly granted undisclosed in-the-money stock options to
executives and employees by backdating millions of options from 1999 through 2002. As
a result of this misconduct, in September 2007, Quest reported a $113.6 million
restatement of its operating income.

According to the SEC's complaint, filed in federal court in Santa Ana, California, Quest
failed to accurately describe its stock option practices in its public filings and failed
to properly account for the backdated options in its financial statements, resulting
in false and misleading disclosures to Quest's shareholders in filings with the SEC from
1999 through 2005.

The complaint further alleges that Quest backdated 28 separate grants involving over
11 million shares of common stock. Quest's failure to properly record compensation
expenses in connection with the backdated options resulted in the overstatement of
Quest's operating income by 4 percent to 963.1 percent, and the understatement of its
operating loss by 26.12 percent to 154 percent from 1999 through 2005.

Specifically, the SEC's complaint alleges that Smith and Laskey approved a policy by
which Quest would pool stock option grants each month and **backdate** the grants to coincide
with the lowest stock price of the month. The complaint alleges that the backdated grant
dates bore no relation to when the grant was actually approved, resulting in artificially
low exercise prices for the stock options. According to the complaint, although he knew
about the use of hindsight to date stock option grants, Brooks failed to ensure the
accuracy of Quest's financial statements and disclosures. The complaint also alleges
that Smith, Laskey, and Brooks took steps to prevent Quest's independent auditors from

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

discovering the backdating, including the use of false written consents by Quest's board of directors.

All defendants have agreed to settle this matter, without admitting or denying the allegations in the SEC's complaint, on the following terms:

Quest consented to an order permanently enjoining it from violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 (Securities Act) and Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Securities Exchange Act of 1934 (Exchange Act) and Rules 12b-20, 13a-1, 13a-13, and 14a-9 thereunder. Smith consented to an order permanently enjoining him from violating Sections 17(a)(2) and 17(a)(3) of the Securities Act, and Sections 13(b)(5), 14(a), and 16(a) of the Exchange Act and Rules 13a-14, 13b2-1, 13b2-2, 14a-9, and 16a-3 thereunder, and from aiding and abetting Quest's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder. Smith also agreed to pay a $150,000 civil penalty.

Laskey and Brooks, a certified public accountant, consented to orders permanently enjoining them from violating Sections 17(a)(2) and 17(a)(3) of the Securities Act, and Sections 13(b)(5) and 16(a) of the Exchange Act and Rules 13b2-1, 13b2-2, and 16a-3 thereunder, and from aiding and abetting Quest's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder. Laskey and Brooks agreed to pay civil penalties of $50,000 and $60,000 respectively. Brooks also agreed to pay disgorgement of $34,775, representing half of the in-the-money value of backdated options he had exercised (the other half had previously been repaid to the company), and prejudgment interest of $5,808.29. In addition, Brooks agreed to a five-year suspension from appearing or practicing as an accountant before the SEC. All settlements in the civil injunctive action are subject to the approval of the United States District for the Central District of California. [SEC v. Quest Software, Inc., Vincent C. Smith, John J. Laskey, and Kevin E. Brooks, United States District Court for the Central District of California, Civil Action No. SACV 09-0315 (AG)] (LR-20950; AAE Rel. 2949)

Word Count: 881
3/13/09 SECNWSD (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



3/13/09 US Fed. News (Pg. Unavail. Online)
2009 WLNR 4818453

                              US Federal News
                  Copyright 2009 US Fed News (HT Syndication)

                             **March 13, 2009**

      SEC CHARGES QUEST SOFTWARE, THREE EXECUTIVES FOR STOCK OPTION BACKDATING

WASHINGTON, March 12 -- The Securities & Exchange Commission issued the following press
release:

The Securities and Exchange Commission today charged Aliso Viejo, Calif.-based software
manufacturer Quest Software, Inc. and three current or former officers for stock option
backdating.

The SEC's complaint alleges that Quest, its executive chairman Vincent Smith, its former
chief financial officer John Laskey, and former controller and principal accounting
officer Kevin Brooks improperly granted undisclosed in-the-money stock options to
executives and employees by backdating millions of options from 1999 through 2002. As
a result of this misconduct, Quest reported a $113.6 million restatement of its operating
income in September 2007. Quest has agreed to settle the SEC's charges, and the three
executives have agreed to pay more than $300,000 combined to settle the allegations
against them.

"Today's action reinforces that the Commission will hold companies and executives
accountable for engaging in misconduct that deceives investors," said Rosalind R. Tyson,
Director of the SEC's Los Angeles Regional Office. "By participating in the backdating
scheme, these executives ignored their responsibilities as Quest's primary financial
gatekeepers."

According to the SEC's complaint, filed in federal court in Santa Ana, Calif., Quest
failed to accurately describe its stock option practices in its public filings and failed
to properly account for the backdated options in its financial statements. This resulted
in false and misleading disclosures to Quest's shareholders in filings with the SEC from
1999 through 2005.

The SEC further alleges that Quest backdated 28 separate grants involving more than 11
million shares of common stock. Quest's failure to properly record compensation expenses
in connection with the backdated options resulted in the overstatement of Quest's
operating income by 4 percent to 963.1 percent and the understatement of its operating
loss by 26.12 percent to 154 percent from 1999 through 2005.

Specifically, the SEC's complaint alleges that Smith and Laskey approved a policy by

              © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

which Quest would pool stock option grants each month and **backdate** the grants to coincide with the lowest stock price of the month. The complaint alleges that the backdated grant dates bore no relation to when the grant was actually approved, resulting in artificially low exercise prices for the stock options. According to the complaint, although he knew about the use of hindsight to date stock option grants, Brooks failed to ensure the accuracy of Quest's financial statements and disclosures. The complaint also alleges that Smith, Laskey, and Brooks took steps to prevent Quest's independent auditors from discovering the backdating, including the use of false written consents by Quest's board of directors.

All defendants have agreed to settle the SEC's charges without admitting or denying the allegations in the SEC's complaint.

Quest consented to the entry of an order permanently enjoining it from violating certain antifraud provisions, as well as the record-keeping, financial reporting, internal controls, and proxy provisions of the federal securities laws.

Smith consented to the entry of an order permanently enjoining him from violating or aiding and abetting violations of certain antifraud provisions, as well as the record-keeping, financial reporting, internal controls, proxy, false statements to auditors, Sarbanes-Oxley certification, and securities ownership reporting provisions of the federal securities laws. Smith also agreed to pay a $150,000 penalty.

Laskey and Brooks each consented to the entry of orders permanently enjoining them from violating or aiding and abetting violations of certain antifraud provisions, as well as the record-keeping, financial reporting, internal controls, false statements to auditors, and securities ownership reporting provisions of the federal securities laws. Brooks and Laskey agreed to pay penalties of $60,000 and $50,000 respectively. Brooks also agreed to pay disgorgement of $34,775, representing half of the in-the-money value of backdated options he had exercised (the other half was previously repaid to the company), and prejudgment interest of $5,808.29. In addition, Brooks, a certified public accountant, agreed to a five-year suspension from appearing or practicing as an ac-countant before the SEC.

All settlements are subject to approval by the court.For more information please contact: Sarabjit Jagirdar, Email:- htsyndication@hindustantimes.com.

Word Count: 908
3/13/09 USFEDNEWS (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



3/6/09 L.A. Times 1
2009 WLNR 4321752

Los Angeles Times
Copyright 2009 Los Angeles Times

**March 6, 2009**

Section: Main News

Ex-CEO of KB Home accused of stock fraud

William Heisel

Bruce Karatz, who rode the housing boom to become one of the highest-paid executives in the country, was indicted by a federal grand jury Thursday on charges of manipulating stock options -- becoming one of the few executives to face criminal charges in the nation's options backdating scandal.

Karatz, 63, served as chairman and chief executive of Westwood-based KB Home from 1986 to 2006, when he resigned under fire. Over a three-year period ending in 2005, Karatz garnered more than $232 million in compensation.

"This investigation painted a picture of avarice and dishonesty at its core," said Salvador Hernandez, who heads the FBI office in Los Angeles.

Karatz's lawyer said his client did nothing wrong and was being unfairly prosecuted.

"We are disappointed that during this economic collapse the government chooses to waste its resources on backdated options, an issue that has long ago been fixed at KB Home and generally in the corporate world," attorney John Keker said in a prepared statement.

Karatz, who has already been forced to pay $20 million to the company and the federal government in connection with the case, faces up to 415 years in prison if convicted on all 20 counts of the indictment, which includes charges of fraud and making false statements.

The indictment said Karatz orchestrated the backdating of stock options from 1999 to 2006. Stock options typically are granted to employees with an exercise price tied to the date of the grant. Companies can legally **backdate** stock options to a date when the stock price was lower -- insuring an immediate paper gain -- but they must account for it properly, pay taxes accordingly and report the backdating to shareholders.

In the KB Home case, the backdating was not disclosed until nearly a decade after it

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

began. The company was forced to adjust its financial statements by $70 million when the backdating of options held by Karatz and other shareholders was finally disclosed in 2008.

In Karatz's case, the backdating made his stock options worth $1.63 to $4.56 more per share, according to the indictment -- a fact that should have been disclosed to other shareholders, it said.

The indictment does not say exactly how much Karatz gained as a result, but KB Home required Karatz to pay back $13 million in backdating gains when he left the company in 2006. And the SEC agreed to a settlement of $7.2 million with Karatz in 2008 to cover what it reckoned were his gains.

Karatz has long been a target of shareholder activists and labor unions, who accused him of taking more than his fair share of company profit. In 2005, the year before he stepped down, Karatz had take-home pay of $6.3 million, but he received an additional $150 million, mostly from exercising stock options.

"For the whole backdating scandal, he was one of the biggest poster CEOs," said Patrick McGurn, a special counsel for New York-based Risk Metrics Group who specializes in executive compensation. "He had to hand back more of his gains than almost anyone else."

The indictment accuses Karatz of concealing the practice from KB's board of directors and compensation committee as well as from shareholders.

It alleges that when KB undertook an internal investigation into the stock-option grants in May 2006, Karatz falsely denied his orchestration of the backdating scheme and caused a false report of KB's options practices to be submitted to the company's auditors, resulting in improper disclosures in filings with the Securities and Exchange Commission.

The SEC and other agencies have investigated more than 250 companies for backdating improprieties since 2005, and there have been some large settlements. In December 2007, United Healthcare CEO William W. McGuire agreed to pay $458 million to settle a civil case with the SEC over backdating.

The KB Home case produced one of only a handful of criminal indictments under which executives might lose more than money.

The case also stands apart because of how much Karatz himself allegedly benefited. In most of the backdating cases, including the case of Broadcom founders Henry T. Nicholas III and Henry Samueli, the companies and executives are accused of using backdating to attract and keep employees.

"Companies can say they were using these options to equalize the pay among employees who entered at different times," said Michael Lemmon, a University of Utah finance professor who has studied backdating. "It becomes a much harder story to sell when you have the CEO benefiting personally."

Karatz's resignation in November 2006 surprised Wall Street analysts who had watched him, since he took over as CEO in 1986, expand the company from its Los Angeles roots

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

into one of the country's largest home builders.

KB Home grew rapidly during the recent housing boom. From 1995 to 2005 the company's revenues rose 576%. In 2005, he helped strike a partnership with Martha Stewart to create a line of Stewart-branded homes. KB Home was named one of America's most admired companies by Fortune magazine in 2006.

But the crash of the housing market, the collapse of the mortgage lending industry and the subsequent economic crisis have changed public sentiment dramatically.

The company's stock, which topped $80 a share three years ago, closed Thursday at $8.14, down 19 cents.

Attorneys who advise companies on executive pay said prosecutors could benefit from a growing backlash against corporate excesses.

"Home builders are not popular right now because of the economic crisis we're in, and now you throw in a top executive making a lot of money at the expense of shareholders," said Andrew Stoltmann, a Chicago lawyer for plaintiffs in investor lawsuits. "That will not play well in front of a jury."

The prosecution in this case also will have the aid of a key insider. A former senior vice president of KB, human relations chief Gary A. Ray, pleaded guilty Feb. 6 to conspiring with Karatz to obstruct justice. Ray has been cooperating with prosecutors.

--

william.heisel@latimes.com

--

Times staff writer E. Scott Reckard and Times researcher Scott Wilson contributed to this report.

PHOTO: INDICTED: Former KB Home CEO Bruce Karatz faces up to 415 years in prison if convicted on all 20 counts.

PHOTOGRAPHER:Mike Segar Reuters

EDITION: Home Edition

Word Count: 1244
3/6/09 LATIMES 1
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


3/6/09 L.A. Times (Bus. Sec.) (Pg. Unavail. Online)
2009 WLNR 4277795

Los Angeles Times
Copyright 2009 Los Angeles Times

**March 6, 2009**

KB Home's Karatz Is Indicted

William Heisel

LOS ANGELES -- Bruce Karatz, who once ranked among the highest-paid corporate executives in the United States, was indicted by a federal grand jury Thursday on charges that he masterminded a scheme to falsify the grant dates of stock options to boost their value to himself and other executives of KB Home.

The case is a rare show of force by the Justice Department in the stock options scandal that has touched more than 250 companies and forced dozens of resignations, but has led to just a handful of criminal cases.

"This investigation painted a picture of avarice and dishonesty at its core," said Salvador Hernandez, who heads the FBI office in Los Angeles. "The FBI is committed to devoting resources to the continuing crisis involving corporate figures who abdicate their responsibility in order to enrich themselves."

Karatz, 63, of Bel Air Estates, served as chairman and chief executive of Westwood-based KB Home from 1986 to 2006, when he resigned under fire. Over a three-year period ending in 2005, Karatz garnered more than $232 million in compensation as the company's profits soared during the housing boom.

Karatz's attorney said his client did nothing wrong and was being unfairly prosecuted.

"We are disappointed that during this economic collapse the government chooses to waste its resources on backdated options, an issue that has long ago been fixed at KB Home and generally in the corporate world," attorney John Keker said in a statement. "But since they made that choice, we will show a jury that Bruce Karatz, who as CEO helped create 5,000 jobs and oversaw significant company growth, acted appropriately."

Karatz, who has already been forced to pay $20 million to the company and the federal government in connection with the case, faces up to 415 years in prison if convicted on all 20 counts in the indictment, including charges of fraud and making false statements.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The grand jury indictment said Karatz orchestrated the back-dating of stock options from 1999 to 2006. Stock options typically are granted to employees with an exercise price tied to the date of the grant. Companies can legally **backdate** stock options to a date when the stock price was lower -- insuring an immediate paper gain --  but they have to account for it properly, pay taxes accordingly and report the backdating to shareholders.

In the KB Home case, the backdating was not disclosed until nearly a decade after it began. The company was forced to adjust its financial statements by $70 million when the backdating of options held by Karatz and other company shareholders was finally disclosed in 2008.

In Karatz's case, the back-dating made his stock options worth between $1.5 and $3 more per share, according to the indictment -- a fact it said should have been disclosed to other shareholders.

The indictment does not says exactly how much Karatz gained as a result, but KB Home required Karatz to pay back $13 million in backdating gains when he left the company in 2006. And the SEC agreed to settlement of $7.2 million with Karatz in 2008 to cover what it thought were his gains.

Karatz has long been a target for shareholder activists and labor unions who accused him of taking more than his fair share of company profits. In 2005, the year before he stepped down, Karatz had a take-home pay of $6.3 million, but he earned an additional $150 million mostly from the exercising of stock options.

"For the whole backdating scandal, he was one of the biggest poster CEOs," said Patrick McGurn, a special counsel for New York-based Risk Metrics Group who specializes in executive compensation. "He had to hand back more of his gains than almost anyone else."

The indictment accused Karatz of concealing the practice from KB's board of directors and compensation committee as well as from shareholders.

It alleged that when KB undertook an internal investigation into the stock-option grants in May 2006, Karatz falsely denied his orchestration of the backdating scheme and caused a false report of KB's options practices to be submitted to the company's auditors, resulting in improper disclosures in filings with the Securities and Exchange Commission.

The SEC and other agencies have investigated more than 250 companies for backdating improprieties since 2005, and there have been some large settlements. In December 2007, United Healthcare CEO William W. McGuire agreed to pay $458 million to settle a civil case with the SEC over backdating.

The KB Home case is one of only a handful of criminal indictments in which executives might lose more than money.

The case also stands apart because of how much Karatz himself benefited. In most of the backdating cases, including the case of the Broadcom founders Henry Nicholas and Henry Samueli, the companies and executives are accused of using backdating to attract and keep employees.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Companies can say they were using these options to equalize the pay among employees who entered at different times," said Michael Lemmon, a University of Utah finance professor who has studied backdating. "It becomes a much harder story to sell when you have the CEO benefiting personally."

Karatz's resignation in November 2006 surprised Wall Street analysts who had watched him, since taking over as CEO in 1986, expand the company from its Los Angeles roots into one of the country's largest home builders.

KB Home rode the 1990s housing boom to great heights. Between 1995 and 2005, the company's revenues rose by 576 percent. In 2005, he helped strike a partnership with Martha Stewart to create a line of Stewart-branded homes. KB Home was named one of "America's Most Admired Companies" by Fortune magazine in 2006.

But the crash of the housing market, the collapse of the mortgage lending industry and the subsequent economic crisis have changed public sentiment dramatically.

The company's stock, which topped $80 a share three years ago, closed Thursday at $8.14, down 19 cents.

 Times staff writer E. Scott Reckard and researcher Scott Wilson contributed to this report.<

bc-kbhome

Word Count: 1204
3/6/09 LAT-BUS (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


3/6/09 San Jose Mercury News 2E
2009 WLNR 4369799

San Jose Mercury News (CA)
Copyright 2009 San Jose Mercury News

**March 6, 2009**

Section: Business

BROADCOM RESTRICTIONS EASED

A federal judge has agreed to allow indicted Broadcom co-founder Henry T. Nicholas to travel throughout the country while awaiting trial on securities and drug charges. Under the order issued Monday by U.S. Magistrate Arthur Nakazato, Nicholas is required to obtain approval from court officials before leaving Southern California and must consent to random drug tests. Nicholas is scheduled to stand trial next Feb. 9 on charges that he conspired to **backdate** stock options for the chip maker's employees. He is also accused in a separate indictment of providing drugs to friends and business associates.

EDITION: Valley Final

Word Count: 121
3/6/09 SJMERCN 2E
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



3/6/09 Seattle Post-Intelligencer A1
2009 WLNR 4397334

Seattle Post-Intelligencer (WA)

Copyright 2009 Seattle Post-Intelligencer (http://seattlep-i.com).  All rights re-
served.  Reproduced with permission of the Seattle Post-Intelligencer.

**March 6, 2009**

Section: News

CRIME NO BARRIER FOR LOAN SELLERS
LAW REQUIRING BACKGROUND CHECKS TOO LATE FOR MANY HOMEOWNERS

ERIC NALDER P-I investigative reporter

Numerous convicts - including embezzlers, robbers, meth dealers and rapists - sold
mortgage loans to unsuspecting homeowners in Washington in recent years while state
lawmakers and members of Congress debated and tabled requirements for licensing and
background checks, records show.

Ronald Bernard Cox Sr. was among them. The convicted felon sold mortgages for as long
as eight years, freely admitting in an interview that he sold loans even while on work
release for felony theft in 2003. The Federal Way man, who says many of his customers
were higher-risk, lower-income subprime borrowers, is among a handful of sellers named
in an ongoing state investigation of one of the mortgage companies he worked for.

Roswitha Martha McKinney sold mortgages for only two years. But during that time she
bilked two mortgage company owners, a co-worker and a close friend out of a total of
$78,000 using bogus checks, according to police and court and state records. Although
McKinney stole from friends and associates rather than customers, she and other convicted
check forgers, as well as identity thieves and extortionists, had ready access to bank
statements, accounts and other such information.

Criminals who were barred from the mortgage business in other states continued to sell
loans to Washington borrowers. Garrett Sytsma of Kennewick violated numerous licensing
rules in Oregon, losing his license there in a 2003 suspension made permanent in 2004,
then gave a mortgage broker a bad check for his own home purchase. He pled guilty to
a gross misdemeanor in Oregon in 2005.

That crime ultimately led to the loss of Sytsma's license in Washington state, but only
because the Washington Legislature finally agreed to require licensing and background
checks for mortgage originators in 2007, although employees of federally chartered banks
and consumer lending companies weren't included.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Seattle P-I examined the histories of loan sellers, taking advantage of records made available for the first time because of the new requirement.

A total of 299 loan originators with criminal records applied for licenses in 2007 when licensing and criminal background checks were first required. They applied even though they knew their fingerprints would be checked by law enforcement and that all felonies and gross misdemeanors involving dishonesty within the previous seven years would disqualify them.

Half of them - 149 - were denied licenses because of their convictions, and the other half kept their licenses because their convictions were more than seven years old. But that's only temporary, because if the Legislature enacts a proposed law to conform with a new federal law, they, too, will be prohibited from renewing their licenses at the end of 2009. Hundreds, perhaps thousands, of other loan originators with criminal records probably didn't apply. Although the mortgage industry was booming before licensing, and thousands of loan originators were being hired, the industry had collapsed by the time licensing was imposed.

"The whole mortgage industry was out of control," said Ted Naff, who until recently was the designated broker at Abacus Mortgage, one of the largest mortgage brokers in the Seattle area.

The fight against requirements for state background checks and licensing was led by lobbyists for the powerful mortgage banking industry. One reason: The nation's federally chartered banks have long fought against any type of state regulation of their industry, preferring federal oversight. At the same time, state-chartered mortgage lenders didn't want an added layer of regulation that was not imposed on their federally regulated competitors.

But state-licensed mortgage brokers - the street-level vendors of loans - came out in favor of state licensing of their loan originators as a way of improving the reputation of their increasingly tainted industry.

Even today, many other states don't require licensing or background checks, though a federal law passed last year by Congress will soon require all of them to impose licensing and backgrounding of loan originators.

Naff, whose brokerage company employed at least a dozen criminals among hundreds of others, said though he was unaware of some of the criminal records, he knowingly kept a few ex-convicts on his work force because they did a good job and followed the rules better than others.

Among them was Ryan David Bishop, 35, who pleaded guilty in 2001 in federal court in Spokane to a scheme in which he and others sold drugs and distributed counterfeit $100 bills. Naff said Bishop "turned the corner" and the state showed unusual leniency, allowing him to re-enter the mortgage business the next year. However, the new federal law will likely ban him. Bishop said he did well in the mortgage industry, "my last chance as an adult to succeed in anything," and now he is in a Spokane partnership that is advising others how to get out of debt.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The chaos that reigned throughout the mortgage industry between 2002 and 2007 fomented lawlessness even among those without criminal records, Naff said. He fired hundreds of loan originators each year, criminals and noncriminals, because many of them violated rules and laws. But they simply went to work elsewhere unscathed, he said, because it was too easy to get commission-only jobs during the hot lending market, and there was nothing preventing it.

Deborah Bortner, director of consumer services for the state Department of Financial Institutions, said she has heard that criminals and others banned more recently from state-licensed institutions sometimes went to work for consumer loan companies where there is no state licensing of loan originators.

Records at the DFI show the largest companies such as Naff's had as many as 700 loan originators at a time, all on commission, originating more than a half-billion dollars in loans annually just at his company.

The root causes of the mortgage meltdown were relatively low interest rates, escalating property values and a gusher of credit that flowed from Wall Street. Exempted from liability by Congress, Wall Street investment firms sold record volumes of toxic mortgages to investors in packages known as mortgage-backed securities. That increased eightfold the money available for high-risk lending in just a half-decade. Lending institutions invented dozens of new products to accommodate the gusher that hit a trillion dollars. One product offered extravagant loans to borrowers with practically no proof of income. Mortgage brokers hired loan originators to distribute the low-hanging fruit to home seekers.

"I think we are all at fault," said Naff, who now works for Axia Financial. "From the borrowers to Wall Street, all of us, we were all guilty of greed."

Naff said he became so alarmed at the blatant law violations he witnessed three years ago, he asked a priest who was a friend whether he should quit the business. The priest suggested he stay and try to reform it from within. But Naff found it an impossible task.

"The lack of regulation made it hard for an individual, conscientious mortgage broker to enforce as many standards as we would like," said Naff, whose former company, Abacus, came through a state examination cleanly. "Loan originators would simply go to someone who had no standards, or lower standards."

Naff said he made less than a third of the income of some of his more successful loan originators.

The churn in the mortgage industry became an opportunity for Cox.

Cox, 44, had been caught stealing thousands of dollars from a Seattle fencing company, court records show, when he said he was hired by Home Capital Funding of Tukwila to sell mortgages. State records show that was about eight years ago.

The mortgage business was a refuge for him, he said, an easy place to get a job.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

"I knew some girl that used to process loans that got me into it," Cox recalled. " 'I can get you a job where I work,' she said. 'Want to be inside? Come talk to my boss.' "

When Home Capital Funding hired him, his previous employer had caught him stealing but he had not yet been convicted, King County Sheriff's Office records show.

Cox pled guilty to first-degree theft in June 2003 in an Alford plea, refusing to admit responsibility but admitting the evidence against him was overwhelming. He had stolen $23,700 from the fencing company, according to a Sheriff's Office affidavit. He confessed to police that he regularly changed records at the Statewide Rent-a-Fence Office in South Seattle so he would get more money for installing and uninstalling chain-link fences at construction sites, according to the affidavit. Cox said in an interview that his mortgage company boss reacted to his guilty plea by asking him how much time he needed to take off, but he said he was able to sell loans anyway during the brief work release he was required to serve under the plea agreement in July 2003.

His plea deal wasn't his first break. A sharp-eyed record keeper first caught him falsifying payment claims in 1999, but Statewide Rent-a-Fence allowed him to continue work so he could reimburse the company. He kept stealing "to pay back what he owed," according to a court affidavit. When finally arrested in March 2002, he had a stranger's missing credit card in his pocket, though he explained he found it at a gas pump, the Sheriff's Office reported.

Previous criminal convictions included misdemeanor car prowling, in Renton District Court in 1996, and misdemeanor possession of stolen property, in Kent Municipal Court in 1995, according to court records. Cox declined to discuss his misdeeds.

Cox continued to originate loans for Home Capital Funding for two years after his guilty plea, then left for a better mortgage-selling job in 2005, according to his license application.

Last June, after a state investigation, Home Capital Funding repaid borrowers $134,000, and paid a state fine of $30,000 and an investigations fee of $1,380, according to a Department of Financial Institutions consent order. A DFI audit stated the company had been selling mortgages containing unauthorized fees, failing to provide mandatory disclosures and making "false representations" to borrowers, according to DFI records. The investigation was limited to loans originated during a period starting in October 2005, after Cox left the company. Bortner said they are no longer operating in Washington, but are licensed in California.

Cox said he joined his new company, A+ Mortgage, in May 2005 because a recruiter was "hounding me and hounding me." He said A+ also charged him $100 less for loan processing fees. Cox said he informed A+ of his conviction, but it didn't seem to matter given the fact he was paid by commission.

"They got half of what I made, why wouldn't they hire you?" Cox said. "What have they got to lose?"

Greg Nick, president of A+, didn't dispute the possibility that one of his supervisors might have known about Cox's record when he was hired. He said his company did background

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

checks. But Nick said he personally "wasn't aware of the full impact of his troubles" or he wouldn't have hired Cox. Home Capital Funding officials didn't respond to messages.

Nick said he shut down A+ Mortgage in March and now is working as a branch manager for another firm, Sound Mortgage, out of the same Tukwila building. Nick said he owns the building. A+ was a large mortgage brokerage house, employing hundreds of originators on commission, and generating upward of $600 million in loans a year, according to DFI documents. Size, Nick said, was one reason his company had a dozen criminals apply for licenses under the company name.

A+ is under state investigation for unfair and deceptive loan practices, and the inspector general of the U.S. Department of Housing and Urban Development has recommended the company repay more than $185,000 for bogus fees and charges, according to HUD records.

The state Department of Financial Institutions said in July that it plans to revoke the company's license, prevent Nick from operating as a state-licensed mortgage broker for five years, impose a $250,000 fine and require $150,000 in restitution to borrowers because of an audit of its lending spanning August 2005 through September 2007.

Charges by the state regulator include that borrowers' income was inflated, signatures were falsified, fees were inflated over initial disclosures, fees paid to lending sources weren't disclosed, and variable rates and interest rate increases weren't properly disclosed. A+ is appealing the proposed sanction. Nick said the complaints involved a tiny percentage of loans. He and his attorney, John Bley, declined to discuss the details.

"I'd really love to tell you my side of the story," he said, but expressed fear his statements could be used against him.

Cox is one of only a handful of individual loan originators cited by name in the complaint against A+. He continued to process a mortgage transaction after his license was denied by the state, which was a law violation, records show. State regulators also accused him of asking the couple that was borrowing the money to **backdate** documents, apparently to conceal the fact he was placing the loan after his ban, records show. He also was accused of failing to properly disclose loan terms to the couple, according to the records.

Cox said he believed it was unfair for the state to invoke a licensing requirement after he was allowed to work in the industry for so long without one - a sort of bait and switch.

"Really, I feel that law should have been there from day one. How about that?" he remarked with irony, during a telephone interview from a Hawaiian vacation.

Cox acknowledged that he tried to mislead the state when he filed his online application for a loan originator license in November 2006. The state ruled, in fact, that he was deceptive in his answers. His answer when asked whether he'd ever been convicted of a crime was: "Possession of stolen property back in 2000. I was given something I had no idea was stolen. But honestly I don't remember if it was a felony or misdemeanor."

Asked why he wrote that, he said: "Why not?"

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

"You can actually apply with an excuse," he said, meaning that the form allows an applicant to explain any convictions.

The state ran his fingerprints and got his record. They denied him a license until 2013, though a new federal law may ban him forever. He appealed the state ban, but an administrative law judge rejected his appeal on summary judgment.

Cox, who lives in a luxurious 3,500- square-foot home in Federal Way, assessed at $570,000, said during his career he placed more than a hundred home loans. He estimated he made $65,000 a year before the state refused him a license in 2007, a figure that could not be verified. At least half of the loans he sold were to high-risk, lower-income borrowers, Cox said, adding that "wealthy people don't come to folks like us."

"Incredible," said Bill Bardon, his former employer and president of Statewide Rent-A-Fence. "And then you wonder why everyone is having so much trouble right now with mortgages."
 OVERSIGHT

More than 13,000 loan originators worked in the state during the height of the boom, a number cut to 4,400 under licensing and the mortgage bust.

The state polices them as well as brokers and lending institutions with only 11 investigators, many of them lawyers, and two supervisors.

Two investigators handled the task in 2002.

P-I reporter Eric Nalder can be reached at 206-448-8011 or ericnalder@seattlepi.com.

News researcher Marsha Milroy contributed to this report.

CASE STUDIES

Here are samples of the loan originators who turned out to have criminal records when they applied for state licensing. Licensing became a requirement in 2007.

EXAMPLE 1.; CHECK FRAUD

Roswitha Martha McKinney, 62, Auburn

Evergreen Pacific Services, Home Loan Express

Notable: Three recent felonies involving theft or check fraud. Two previous convictions.

Criminal cases: Pleaded guilty to felony first-degree theft in Pierce County Superior Court, December 2005. Pleaded guilty to felony unlawful issuance of checks in Pierce County Superior Court, October 2007. Pleaded guilty to unlawful issuance of checks in King County Superior Court, January 2008. By her own admission, she also went to prison in California in 1976 for felony possession of cocaine with intent to sell, and she was convicted of first-degree theft in Oregon in 1989 for writing a bad check.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Details: Sold mortgages for at least two years.

Wrote a bad check for $3,100 in 2007 to cover a personal loan from the owner of Park Place Mortgage. Added an extra $100 as a "gesture of thanks" but the check was written on a closed account. She later paid her back.

Wrote a bad check for $70,000 in 2006 to longtime friend from whom she borrowed numerous times. Told her to wait to cash it and when the woman visited the bank she found out it was a closed account.

Stole $5,150 in 2004 from the two partners at Home Loan Express in Fircrest by taking a check from the business, altering it and cashing it.

Linda Howe-Bristow, one of her bad-check victims, said: "I don't think people who are irresponsible with their own money should be allowed to deal with other people's money."

"She is a good con artist," said another victim who did not want her name used.

Her comment: McKinney initially said in an interview: "I don't think I ever did anything I shouldn't have." When asked to clarify, in light of her convictions, she said: "What I mean is, I don't think I ever took advantage of my clients."

"There's lots of opportunity" to commit fraud in the mortgage business, she said, but she said she did not do so. McKinney blamed her two recent check fraud victims for cashing checks prematurely, but court record shows otherwise. Regarding her theft from Home Loan Express, she said: "I am totally guilty. I made a mistake. I screwed up."

Source: Court records, police reports, Department of Financial Institutions records, interviews with victims and McKinney.

EXAMPLE 2: IDENTITY THEFT AND FORGERY

David Brian Capelli, 35

Trusted Home Mortgage, Evergreen MoneySource

Notable: Identity theft and forgery

Criminal cases: Capelli admitted he obtained a man's social security number and used the man's identity to finance a car. He was convicted in Michigan's 6th Circuit Court of two felonies, obtaining personal information without permission and false pretenses on Feb. 11, 2005. Previously convicted of felony forgery in Ohio on May 12, 1998.

Details: Capelli falsely stated in his application for a Washington loan originator license that he had never been convicted of a felony. He obtained a license in February 2007 before the state discovered his Michigan conviction and ordered him to stop working in May 2007. His license was revoked in July 2007.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

"I'm glad, or at least I hope, he's out of the business," said Russ Shulman, owner of Trusted Home Mortgage, who said he terminated Capelli in February 2007 after a lender discovered that credit scores were changed on a borrower's credit report. He learned months later from the state about Capelli's criminal record. His company's background check didn't reveal the conviction.

Comments: Capelli said he did not tell his employers about his convictions, "just knowing they wouldn't go for it." He said concerns about his working in the mortgage industry with a criminal record were "understandable," especially since they involved identity theft. But he added: "I think everyone has made some mistakes here and there." He said he rarely sold subprime loans, and was frequently commended by his customers.

Source: Court, police and DFI records, and interviews.

EXAMPLE 3: BAD BILLS AND DRUG DEALING

Ryan David Bishop, 35

Abacus Mortgage and Gem Mortgage

Notable: Passed counterfeit bills and dealt methamphetamine and cocaine.

Criminal case: Pleaded guilty then convicted in U.S. District Court in Spokane on May 21, 2001, of felony conspiracy to pass counterfeit currency and distribute meth and cocaine.

Details: Sold drugs to a confidential federal informant and later admitted spending numerous counterfeit $100 bills in stores in Seattle and Bellevue. DFI would have allowed him to apply for a license again after the end of this year, but a new federal law might prevent that.

His comments: "I just was young and made a mistake. I was trying to make an easy dollar." After four years in prison, he has been clean since and was endorsed as an honest mortgage seller by his former broker at Abacus.

EXAMPLE 4: FIRST-DEGREE ROBBERY

Kenny Hoyoon Cho, 28, Federal Way

Western States Mortgage Corp.

Notables: Former member of Rolling 90's Crips gang. Getaway driver in drive-by shooting, also convicted of first-degree robbery in another case.

Criminal cases: Convicted of rendering criminal assistance in King County Superior Court in 1999 as driver in drive-by shooting; pleaded guilty to three counts of first-degree robbery, one count of attempted first-degree robbery and delivery of marijuana in June 2000, also in King County.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Details: Was driving a car with gang members when one of them shot a man. Cho appealed, but the appeals court judge noted he was driving a car with a teenager he had recruited into the gang. In the robbery case, Cho was with two other men who accosted three women and a man in an apartment and robbed them of cash and credit cards. Court records show the man recognized Cho as the man who held a gun to his head. They were once schoolmates. Cho didn't tell the state about his convictions when he applied for a license, records show.

Troy Bowers, formerly with Western States Mortgage, said records show Cho didn't stay long enough with the company to originate any loans. He said he "seemed like a nice kid, not a hoodlum or anything like that."

Comment: Cho could not be reached for comment.

Sources: Police reports, records from King County Superior Court and Washington Court of Appeals, DFI records.

EXAMPLE 5: CHECK FRAUD

Garrett John Sytsma, 39, Kennewick

Kelly Mortgage and Realty Inc., Citiwide Mortgage, All Seasons Mortgage, Prestige Mortgage

Notables: Banned from mortgage business in Oregon but continued working in Washington.

Criminal case: Pleaded guilty in 2005 in Deschutes County Circuit Court (Oregon) to negotiating a bad check, after being charged initially, also, with felony theft of services.

Details: Oregon's Department of Consumer and Business Services suspended Sytsma's mortgage loan originator license for five years in 2003 for numerous violations and then revoked it in 2004 when he didn't follow the terms of the suspension. In his criminal case, he gave a mortgage broker an $8,400 check in 2004 for assistance in financing his Sisters, Ore., home; it bounced, and after claiming he would cover it, he told the broker "he did not have the money and 'good luck' collecting anything," according to the Deschutes County Sheriff's Office. He falsely stated to the Washington Department of Financial Institutions on his license application that his felony charge was dropped because "the DA realized it was a mistake." It was a plea bargain.

Comments: Sytsma said both problems, the Oregon banning of his license and the criminal case, resulted from misunderstandings and officials who were out to get him. He said he was "railroaded" by Oregon regulators because he was "very entrepreneurial." Now a dairy farmer, he said, "I'm blacklisted from an industry I was good at."

"We were out to get him because he violated our laws," said William Hansen, chief investigator for Oregon's Division of Finance and Corporate Securities. "He was supposed to clean up his act and he didn't. He could not follow the law. We gave him several opportunities."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Source: Court records, Sheriff's Office reports, Oregon Department of Consumer and
Business Services Reports, Washington Department of Financial Institutions records and
interviews.

EXAMPLE 6: FINANCIAL CRIMES

Jamia Shurlese Thomas, 36

A+ Mortgage

Notable: Two convictions for financial crimes.

Criminal case: Pleaded no contest to felony theft of rental property and to gross
misdemeanor attempted forgery in June 2001.

Details: Rental company demanded pay for dinette set and entertainment center, but after
six months letter returned undeliverable. Used best friend's name and personal in-
formation to rent four apartments without paying rent or utility bills.

Her comments: Thomas talked to the Seattle P-I about her conduct, and then retracted
her statements.

Source: Police, court and DFI records.

EXAMPLE 7: VEHICLE THEFT

Tracey Cornel Holmes, 42

Choice Investment Group, Inc.

Notable: Multiple vehicle theft.

Criminal case: Pleaded guilty to trafficking in stolen property and nine counts of
possession of stolen property, both felonies, in 2003.

Details: When Pierce County sheriff's deputies raided Holmes' property in Graham, the
tow truck driver had 46 vehicles, including nine identified as stolen that were valued
at well over $100,000. Two were flatbed tow trucks and two cars had been broken down
for parts that were sold over the Internet. Holmes' application for a loan originator
license stated that he had previously worked for "Four Horsemen Towing" in Graham.

Comment: Holmes could not be reached for comment.

EXAMPLE 8: SECOND-DEGREE THEFT

Joseph Alan Hacker, 25

A+ Mortgage

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Notable: Stole from employer's safe.

Criminal case: Pleaded guilty to attempted second-degree theft, a gross misdemeanor, in April 2004, after originally charged with felony first-degree theft.

Details: After losing money at a Renton casino, he took an estimated $2,600 from the safe at Willows Run Golf Course where he worked, threw checks and receipts out of the window and lied to police when confronted until a bank bag was found in his car. Claimed to state that he had been charged but not convicted of the crime.

His comments: Said he was in a crisis with a girlfriend and needed the money, that he thought his criminal record had been expunged and that this episode is now irrelevant. "By the end of 2007, I was out of the mortgage business," he said. "I got out of the mortgage business because I couldn't pay my mortgage."

Source: Police, court, DFI records and interview with Hacker.

EXAMPLE 9: BATTERY, THEFT, DRUGS

Douglas Dodd, 46

Access Mortgage

Notable: Says the information the state has published about him in public records is inaccurate, but won't specify what is wrong with the data.

Criminal cases: FBI fingerprint check revealed he pled no contest to battery, Lawrenceville, Ga., 2002; convicted of theft, Lawrenceville, 1999; convicted of felony false imprisonment and aggravated battery, Lawrenceville, 1996; guilty of sale of cocaine, 1993; Pleaded guilty to felony selling cocaine, Gwinnett County, Ga., 1991. Also listed convictions in California. Details: Dodd did not inform DFI about the vast majority of the listed convictions when he applied online for a license. Dodd's license application indicated he sold mortgages for five years in Seattle, Tacoma, Tukwila and Burien. He denied working that long, or for the companies listed on his application, other than Access Mortgage.

Comment: Dodd stated at one point he didn't fill out the application himself. He wouldn't clarify what he meant by that. At one point he stated he did not live in Georgia, though the court records indicate otherwise. The state obtained his fingerprints during the application process and submitted them for an FBI fingerprint search. The records that came back were under his name.

At one point in the interview he said, "the only thing I have is a bad record," but he would not answer follow-up questions about that record.

Patrick Woods, designated broker at Access Mortgage in Seattle, said Dodd was a "super sweet guy. Big smile. Very unassuming. He was a good salesperson." But Woods said Dodd did not tell Woods about his criminal record when he worked as a loan originator for him.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Sources: Court, police and DFI records, and interviews.

EDITION: Final

Word Count: 5574
3/6/09 STLPI A1
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



3/5/09 AP Alert - CA 13:40:27

                          AP Alert - California
          Copyright 2009 The Associated Press. All rights reserved. This material may not be
                   published, broadcast, rewritten or redistributed.

                              **March 5, 2009**


                  Judge: Broadcom co-founder may travel freely

LOS ANGELES_A federal judge has agreed to allow indicted Broadcom Corp. co-founder Henry
T. Nicholas to travel throughout the country while awaiting trial on criminal charges.

Before U.S. Magistrate Judge Arthur Nakazato's ruling Monday, Nicholas could leave his
Orange County home only for certain activities, including employment and medical and
mental health treatment.

Nicholas is required to obtain approval from court officials before leaving Southern
California and must consent to random drug tests.

He is scheduled to stand trial Feb. 9, 2010 on charges that he conspired to **backdate**
stock options for the chip maker's employees.

He is also accused in a separate indictment of providing narcotics and prostitutes to
friends and business associates.

Nicholas remains free on $3.3-million bail.


___


Information from: Los Angeles Times, http://www.latimes.com

Word Count: 172
3/5/09 APALERTCA 13:40:27
END OF DOCUMENT


              © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


3/5/09 AP Alert - CA 20:31:50

AP Alert - California
Copyright 2009 The Associated Press. All rights reserved. This material may not be
published, broadcast, rewritten or redistributed.

**March 5, 2009**

Judge: Broadcom co-founder may travel in US

SANTA ANA, Calif._A federal judge has agreed to allow indicted Broadcom Corp. co-founder
Henry T. Nicholas to travel throughout the country while awaiting trial on securities
and drug charges.

Under the order issued Monday by U.S. Magistrate Arthur Nakazato, Nicholas is required
to obtain approval from court officials before leaving Southern California and must
consent to random drug tests.

Last June, Nakazato set Nicholas' bail at $3.3 million and ordered random weapons searches
and drug tests by the government, home detention, electronic monitoring and the disabling
of Nicholas' two private planes.

Nicholas attorney James D. Riddet said he was pleased with the latest ruling by Na-
kazato.   "Because of Dr. Nicholas exemplary behavior since he was released on bail
conditions, he has been routinely granted considerable freedom to move about to various
locations in and out" of much of Southern California, Riddet said.   Nicholas is
scheduled to stand trial next Feb. 9 on charges that he conspired to **backdate** stock options
for the chip maker's employees.

He is also accused in a separate indictment of providing drugs to friends and business
associates.

Word Count: 233
3/5/09 APALERTCA 20:31:50
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



3/2/09 L.A. Times (Bus. Sec.) (Pg. Unavail. Online)
2009 WLNR 4012477

Los Angeles Times
Copyright 2009 Los Angeles Times

**March 2, 2009**

Red Flags at IndyMac Went Unheeded

William Heisel

After selling her home in Orange County, Calif., Cheryl Hodgson parked an escrow check
for about $360,000 with IndyMac Bancorp.

Less than a month later, the Pasadena, Calif.-based thrift was seized by the federal
government -- and Hodgson lost $130,000.

"I looked around at the interest rates and saw that IndyMac was offering a really good
rate," Hodgson said. "You would think someone at the bank could have explained to me
that I was putting in money well above the insurance limit."Although accounts at the
time were insured only up to $100,000, Hodgson ended up recovering $230,000 because the
Federal Deposit Insurance Corp. covered half of uninsured deposits. Still, she was among
an estimated 10,000 depositors who lost $270 million in deposits when IndyMac collapsed
under the weight of mortgage loan defaults.

These losses might have been prevented had federal regulators done their jobs in
overseeing IndyMac, a government report this week determined.

The report from the Treasury Department's Inspector General excoriated the Office of
Thrift Supervision for ignoring warning signs that IndyMac's loan portfolio was
quicksand, costing the Federal Deposit Insurance Corp. $10.7 billion.

The report casts a shadow over both the OTS and its director, John M. Reich, who stepped
down Friday.

"John Reich's reign was catastrophic to the OTS, the FDIC and the uninsured depositors
in particular," said Richard Newsom, a retired FDIC and California state bank examiner,
referring to the failures of IndyMac, Washington Mutual Bank and other institutions.Reich
declined to comment for this article. OTS officials said that Reich, after taking office
in 2005, increased the number of bank examiners and worked hard to make sure that
struggling thrifts recovered their footing and stayed in business.

The Los Angeles Times found that those efforts were too little too late in the case of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

IndyMac.

-- OTS officials became concerned about IndyMac's strength in early 2007, said Timothy T. Ward, OTS deputy director for examinations, supervision and consumer protection. He said officials moved up a scheduled bank exam for IndyMac, but even so that review did not begin until January 2008.

-- IndyMac's top managers tried to secure OTS approval of another questionable accounting maneuver in the company's final months, according to company e-mails, before persuading the agency to allow it to **backdate** a capital infusion, a move that is now the subject of a federal investigation.

-- The OTS ignored concerns from the FDIC that the bank was using recklessly high interest rates to lure in new deposits to cover its losses, interviews and documents show.

IndyMac prospered during the real-estate boom, which fueled demand for its so-called alt-A mortgages, which it granted to borrowers with clean credit but with little or no documentation of their income. They would then sell those loans to other banks or investors through bundled securities.

As the real-estate market collapsed, however, IndyMac was stuck with loans it couldn't sell.

"The secondary market for mortgage-backed securities had dried up," said Ward, the deputy OTS examinations director.

Ward said the review the agency conducted in January 2008 resulted in a downgrade of IndyMac's status, putting it one step away from being labeled a "troubled institution."

At the same time, the OTS allowed IndyMac to make a major change in its books that kept it from becoming insolvent. Instead of continuing to carry more than $10 billion in loans that no investors would buy, it moved those loans to its "held for investment" portfolio.

Had it been forced to acknowledge that these loans were never going to be profitable, it would have had to report that its losses were eight times larger than its operating capital.

"No honest regulator would permit a bank to cover that up, but OTS had become complicit with IndyMac," said William Black, a law professor at the University of Missouri-Kansas City and a former OTS attorney.

By the end of March 2008, more than half of all the bank's money was coming from loans it was getting from the federal government and short-term, high-interest deposits from middlemen called "brokered deposits."

The brokered deposits were so crucial to IndyMac staying in business that the bank fought hard to keep them coming. In order to meet the threshold that allowed it to continue receiving brokered deposits, it lobbied OTS to receive a waiver allowing it to remove certain costs associated with reverse mortgages from its books.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

"I believe we have a lot of levers to pull and we will be a survivor of this period, but it is not guaranteed -- nothing in life is," IndyMac CEO Michael W. Perry wrote in an e-mail to employees on April 17, 2008. "I strongly believe that ... it is in the FDIC's strong financial interest to work with us."

That same month, rating agency Standard & Poor's downgraded IndyMac's securitized mortgages and, at that point, the bank should have been declared short of cash, the inspector general said. On May 6, FDIC told OTS regional managers that IndyMac was close to failing and needed new money -- quickly.

"FDIC was very concerned," its spokesman, Andrew Gray, said. "And our analysis led us to a conclusion that IndyMac needed between $1 (billion) and $3 billion in additional capital to survive."

On May 9, IndyMac managers made this pitch to Darrell Dochow, head of the thrift agency's western region: let IndyMac accept an $18 million deposit from its holding corporation that day but book it as if it occurred before the end of the first quarter.

The reason? The $18 million was the difference between IndyMac being what the FDIC termed "well capitalized" or "adequately capitalized," the latter being a barrier to both brokered deposits and to high-interest retail deposits.

Dochow agreed to IndyMac's proposal. The bank stayed "well capitalized" and was allowed to continue bringing in deposits for two more months.

In a Jan. 30, 2009, letter to Treasury Secretary Timothy Geithner, Reich said IndyMac's independent auditors and the FDIC knew about the backdating plan and "raised no ob-jections."

FDIC officials countered that the agency had asked OTS about the late deposit and were told that IndyMac had a "note receivable," essentially a promise for the $18 million that had been given to it prior to March 31, 2008.

"That turned out to be misinformation," Gray said.

An IndyMac spokesman declined to comment. IndyMac, meanwhile, went fishing for more deposits. It's rate on a one-year certificate of deposit went from 2.35 percent in March to 4.05 percent in July. The average at the time was 2.45 percent. Shortly before being seized, it was offering a 4.1 percent yield for a six-month CD.

Those rates alarmed the FDIC.

"We became concerned that the bank was paying interest rates which appeared to exceed the limitations prescribed in FDIC regulations applying to banks that were less than well capitalized," Gray said.

OTS, in its role as the lead examiner, could have stopped the bank from offering those high rates.

Yet IndyMac was allowed to bring in at least $90 million in new uninsured deposits right

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

before it collapsed.

Amid criticism of its performance, the Treasury Department proposed eliminating the Office of Thrift Supervision last year.

Any decision on that now would rest with President Barack Obama, who has called for stepped- up regulation of the financial-services industry.

bc-indymac (TPN)

Word Count: 1483
3/2/09 LAT-BUS (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


2/28/09 L.A. Times 1
2009 WLNR 3899468

Los Angeles Times
Copyright 2009 Los Angeles Times

**February 28, 2009**

Section: Business

BANKING
IndyMac's shuffle ran over depositors

William Heisel

After selling her Orange County home, Cheryl Hodgson parked an escrow check for about $360,000 with IndyMac Bancorp.

Less than a month later, the Pasadena-based thrift was seized by the federal government -- and Hodgson lost $130,000.

"I looked around at the interest rates and saw that IndyMac was offering a really good rate," Hodgson said. "You would think someone at the bank could have explained to me that I was putting in money well above the insurance limit."

Although accounts at the time were insured only up to $100,000, Hodgson ended up recovering $230,000 because the Federal Deposit Insurance Corp. covered half of uninsured deposits.

Still, she was among an estimated 10,000 depositors who lost $270 million in deposits when IndyMac collapsed under the weight of mortgage loan defaults.

These losses might have been prevented had federal regulators done their jobs in overseeing IndyMac, a government report this week determined.

The report from the Treasury Department's inspector general excoriated the Office of Thrift Supervision for ignoring warning signs that IndyMac's loan portfolio was quicksand, costing the Federal Deposit Insurance Corp. $10.7 billion.

The report casts a shadow over both the OTS and its director, John M. Reich, who stepped down Friday.

"John Reich's reign was catastrophic to the OTS, the FDIC and the uninsured depositors in particular," said Richard Newsom, a retired FDIC and California state bank examiner,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

referring to the failures of IndyMac, Washington Mutual Bank and other institutions. Reich declined to comment for this story. OTS officials said that Reich, after taking office in 2005, increased the number of bank examiners and worked hard to make sure that struggling thrifts recovered their footing and stayed in business.

The Times found that those efforts were too little, too late in the case of IndyMac.

* OTS officials became concerned about IndyMac's strength in early 2007, said Timothy T. Ward, OTS Deputy Director for Examinations, Supervision and Consumer Protection. He said officials moved up a scheduled bank exam for IndyMac, but the review did not begin until January 2008.

* IndyMac's top managers tried to secure OTS approval of another questionable accounting maneuver in the company's final months, according to company e-mails, before persuading the agency to allow it to **backdate** a capital infusion, a move that is now the subject of a federal investigation.

* The OTS ignored concerns from the FDIC that the bank was using recklessly high interest rates to lure in new deposits to cover its losses, interviews and documents show.

IndyMac prospered during the real estate boom, which fueled demand for its so-called alt-A mortgages, loans that it granted to borrowers with clean credit but with little or no documentation of their income. It would then sell those loans to other banks or investors through bundled securities.

As the real estate market collapsed, however, IndyMac was stuck with loans it couldn't sell.

"The secondary market for mortgage-backed securities had dried up," said Ward.

Ward said the review the agency conducted in January 2008 resulted in a downgrade of IndyMac's status, putting it one step away from being labeled a "troubled institution."

At the same time, the OTS allowed IndyMac to make a major change in its books that kept it from insolvency.

Instead of continuing to carry more than $10 billion in loans that no investors would buy, it moved those loans to its "held for investment" portfolio.

Had it been forced to acknowledge that these loans were never going to be profitable, it would have had to report that its losses were more than six times larger than its operating capital.

"No honest regulator would permit a bank to cover that up, but OTS had become complicit with IndyMac," said William Black, a law professor at the University of Missouri at Kansas City and a former OTS attorney.

By the end of March 2008, more than half of all the bank's money was coming from loans it was getting from the federal government and short-term, high-interest deposits from middlemen called "brokered deposits."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The brokered deposits were so crucial to IndyMac staying in business that the bank fought hard to keep them coming.

In order to meet the threshold that allowed it to continue receiving brokered deposits, it lobbied the OTS to receive a waiver allowing it to remove certain costs associated with reverse mortgages from its books.

"I believe we have a lot of levers to pull and we will be a survivor of this period, but it is not guaranteed -- nothing in life is," IndyMac CEO Michael W. Perry wrote in an e-mail to employees on April 17, 2008. "I strongly believe that we retain our positive regulatory relationship with the OTS and it is in the FDIC's strong financial interest to work with us."

That same month, rating agency Standard & Poor's downgraded IndyMac's securitized mortgages and, at that point, the bank should have been declared short of cash, the inspector general said.

On May 6, the FDIC told OTS regional managers that IndyMac was close to failing and needed new money -- quickly.

"FDIC was very concerned," its spokesman Andrew Gray said. "And our analysis led us to a conclusion that IndyMac needed between $1 [billion] and $3 billion in additional capital to survive."

On May 9, IndyMac managers made this pitch to Darrell Dochow, the head of the thrift agency's western region: Let IndyMac accept an $18-million deposit from its holding corporation that day but book it as if it had occurred before the end of the first quarter.

In doing so, IndyMac would meet an important FDIC threshold and be allowed to accept more brokered deposits and high-interest retail deposits

Dochow agreed to IndyMac's proposal. The bank stayed "well capitalized" and was allowed to continue bringing in deposits for another two months.

In a Jan. 30 letter to Treasury Secretary Timothy F. Geithner, Reich said that IndyMac's independent auditors and the FDIC also knew about the backdating plan and "raised no objections."

FDIC officials countered that the agency had asked OTS about the late deposit and was told that IndyMac had a "note receivable," essentially a promise for the $18 million that had been given to it prior to March 31, 2008.

"That turned out to be misinformation," Gray said.

An IndyMac spokesman declined to comment.IndyMac, meanwhile, went fishing for more deposits. Its rate on a one-year certificate of deposit went from 2.35% in May to 4.05% in July. The average at the time was 2.45%. Shortly before being seized, it was offering 4.1% yield for a six-month CD.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Those rates alarmed the FDIC.

"We became concerned that the bank was paying interest rates which appeared to exceed
the limitations prescribed in FDIC regulations applying to banks that were less than
well capitalized," Gray said.

OTS, in its role as the lead examiner, could have stopped the bank from offering those
high rates.

But IndyMac was allowed to bring in at least $90 million in new uninsured deposits from
people like Hodgson, right before it collapsed.

--

william.heisel@latimes.com

PHOTO: SOBERING ACCOUNT: Laguna Woods seniors hear Cheryl Hodgson describe how IndyMac
Bank's collapse cost her $130,000, part of $270 million in lost IndyMac deposits that
stronger federal oversight could have prevented, a report says.

PHOTOGRAPHER:Christine Cotter Los Angeles Times

PHOTO: DEPOSITOR: Hodgson said IndyMac Bank's high interest rates drew her in.

PHOTOGRAPHER:Christine Cotter Los Angeles Times

EDITION: Home Edition

Word Count: 1496
2/28/09 LATIMES 1
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


2/5/09 L.A. Times 1
2009 WLNR 2258527

Los Angeles Times
Copyright 2009 Los Angeles Times

**February 5, 2009**

Section: Main News

Executive Pay cap is far from airtight

Walter Hamilton

WASHINGTON AND NEW YORK Infographic

President Obama moved Wednesday to rein in the pay of executives whose companies get
taxpayer bailout money -- putting a $500,000 cap on annual compensation, limiting "golden
parachutes" to departing bigwigs and requiring corporate boards to adopt policies on
luxury expenditures such as lavish entertainment and parties.

Corporate watchdogs applauded the intent of the new measures, but compensation experts
cautioned that abundant loopholes -- and crafty lawyers -- could undermine any lasting
effect.

"You're pitting a group of government bureaucrats against compensation consultants and
lawyers who are paid lots of money, and they're pretty damn smart," said Graef Crystal,
a former executive compensation consultant who has written six books on the subject.
"It's a lot easier to find ways around things like this than it is to invent them in
the first place."

Under the new rules, companies that receive "exceptional financial recovery assistance"
-- large bailouts like those given to Citigroup Inc. and American International Group
Inc. -- would not be allowed to pay senior executives more than $500,000 in total annual
compensation.

Obama's action was triggered by disclosures that Wall Street firms paid out almost $20
billion in bonuses last year, even as they were seeking or taking public money intended
to spur the economy, and in spite of a flagging economy.

Over the last two decades, however, Wall Street and the rest of corporate America have
skirted a series of rules that sought to rein in executive compensation. An attempt in
1993 to deal with such compensation is a textbook example.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

With the country struggling economically, President Clinton signed a law limiting a company's ability to deduct more than $1 million in salary for top executives from their taxes.

It's widely believed to have backfired. Companies shifted to stock options, leading to an explosion in executive compensation through the rest of the 1990s and setting the stage for scandals over attempts to **backdate** the options to make them even more valuable.

Thanks to lucrative options and a strong stock market, the typical chief executive was earning 525 times the pay of the average U.S. worker by 2000, according to one recent study. The gap has narrowed in recent years, the study found, but CEOs still on average earn 344 times the salaries of average workers.

"Over the past 15 years there have been a number of efforts to put some sort of restriction on executive pay, both through legislation and through shareholder activism, and yet we see CEO pay continuing to rise," said Sarah Anderson, an executive-pay expert at the Institute for Policy Studies in Washington. "Wall Street has the best, shrewdest lawyers in the world looking to maintain these outrageous pay levels."

In 1984, for example, Congress sought to limit excessive severance packages, known as golden parachutes. Lawmakers changed the tax code so that any payment more than 2.99 times an executive's annual salary was hit with a 20% excise tax.

But most companies were only providing severance of one year's salary to their executives. Companies interpreted the new tax rules to mean that anything up to three times the salary was permissible, and severance packages rose to that level.

Many companies also responded by simply paying the executives' taxes -- a practice known appropriately enough as a "gross up."

Just as in the past, there are ways around Obama's rules.

First, they apply only to companies that receive government bailout money in the future. For companies that don't receive "exceptional financial recovery assistance" -- such as the outsize bailouts that went to AIG and Citigroup -- the restrictions on executive pay would be waived if the company discloses the compensation and allows a nonbinding shareholder vote.

Companies that don't have the restrictions waived still could pay an unlimited amount in restricted stock and other incentives. The incentives can be cashed in after the company has paid the government back, but also if the government decides after an undetermined period that the company has shown it is meeting its repayment obligations. The Treasury website did not detail what constitutes "exceptional" aid.

Also, while executive salaries are capped, there are no limits on the scores of mid-level Wall Streeters such as bond traders or investment bankers who typically pocket million-dollar bonuses.

"It's a move in the right direction, but it doesn't have enough teeth and on some items doesn't go deep enough," said Brian Foley, a pay expert in White Plains, N.Y. "It's

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

important not to be too intrusive, but particularly with companies that have gotten exceptional assistance, the rules ought to be truly tough."

Some critics of Obama's plan said restricting executive pay would dissuade the most talented people from working at the companies most in need of help, or dissuade companies from seeking necessary government aid.

Steve Bartlett, president of the Financial Services Roundtable, which represents large financial institutions, called Obama's restrictions "a measured response" but warned they still could cause problems.

"Political decisions like this often have unintended consequences that could hamper the economic recovery," he said. "Healthy banks will begin to stray away from using [Troubled Asset Relief Program] capital."

Crystal warned of another potential consequence: a desperate desire by banks that need government assistance to get out from under the compensation restrictions.

"It's an incentive to find a way to pay the government back -- however you get there," he said. "It could encourage bad behavior."

But others said people on Wall Street had more pressing demands than worrying about their gargantuan pay.

"It would be nice if they applied their brilliant minds to not getting us into this mess in the first place [rather than in] finding ways to not limit executive compensation," said Paul Hodgson, a pay expert at Corporate Library, a corporate-governance research firm.

--

jim.puzzanghera@latimes.com

cparsons@tribune.com

walter.hamilton@latimes.com

GRAPHIC: CEO salaries

CREDIT:Los Angeles Times

EDITION: Home Edition

Word Count: 1231
2/5/09 LATIMES 1
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


2/5/09 L.A. Times (Bus. Sec.) (Pg. Unavail. Online)
2009 WLNR 2236721

Los Angeles Times
Copyright 2009 Los Angeles Times

**February 5, 2009**

Good in Theory, but Beware the Loopholes

Jim Puzzanghera, Christi Parsons and Walter Hamilton

WASHINGTON -- President Barack Obama moved Wednesday to rein in the pay of executives whose companies receive taxpayer bailout money -- putting a $500,000 cap on annual compensation, limiting "golden parachutes" to departing bigwigs and requiring corporate boards to adopt policies on luxury expenditures such as lavish entertainment and parties.

Corporate watchdogs applauded the intent of the new measures, but compensation experts cautioned that abundant loopholes -- and crafty lawyers -- could undermine any lasting effect.

"You're pitting a group of government bureaucrats against compensation consultants and lawyers who are paid lots of money, and they're pretty damn smart," said Graef Crystal, a former executive-compensation consultant who has written six books on the subject. "It's a lot easier to find ways around things like this than it is to invent them in the first place."

Under the new rules, companies that receive "exceptional financial recovery assistance" -- large bailouts like those given to Citigroup and American International Group -- would not be allowed to pay senior executives more than $500,000 in total annual compensation.

Obama's action was triggered by disclosures that Wall Street companies paid out almost $20 billion in bonuses last year, even as they were seeking or taking public money intended to spur the economy.

Over the past two decades, Wall Street and the rest of corporate America have skirted a series of rules that sought to rein in executive compensation. An attempt to deal with executive compensation in 1993 offers a textbook example.

With the country struggling economically, President Bill Clinton signed a law limiting companies' ability to deduct more than $1 million in salary for top executives from their taxes.

It's widely believed to have backfired.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Companies shifted to stock options, leading to an explosion in executive compensation through the rest of the 1990s and setting the stage for scandals involving attempts to **backdate** options to make them more valuable.

Thanks to lucrative options and a strong stock market, the typical chief executive was earning 525 times the pay of the average American worker by 2000, according to one recent study. The gap has narrowed in recent years, the study found, but CEOs still on average earn 344 times the salary of the average worker.

"Over the past 15 years there have been a number of efforts to put some sort of restriction on executive pay, both through legislation and through shareholder activism, and yet we see CEO pay continuing to rise," said Sarah Anderson, an executive-pay expert at the Institute for Policy Studies, in Washington. "Wall Street has the best, shrewdest lawyers in the world looking to maintain these outrageous pay levels."

In 1984, Congress sought to limit excessive severance packages, known as golden parachutes. Lawmakers changed the tax code so that any payment more than 2.99 times an executive's annual salary was hit with a 20 percent excise tax.

But most companies at the time were providing a severance of only one year's salary to their executives. Companies interpreted the new tax rules to mean that anything up to three times the salary was permissible, and severance packages rose to that level.

Many companies also responded by simply paying the executives' taxes -- a practice known as a "gross up."

Just as in the past, there are ways around Obama's restrictions.

First, they apply only to companies that receive government bailout money in the future. For companies that don't receive "exceptional financial recovery assistance" -- like the outsize bailouts that went to AIG and Citigroup -- the executive-pay restrictions would be waived if the company discloses the compensation and allows a nonbinding shareholder vote.

Companies that don't have the restrictions waived still could pay an unlimited amount in restricted stock and other incentives. The incentives can be cashed in after the company has paid the government back, but also if the government determines after an undetermined period that the company has shown it is meeting its repayment obligations.

Also, although executive salaries are capped, there are no limits on the scores of mid-level Wall Streeters such as bond traders and investment bankers who typically pocket million-dollar bonuses.

"It's a move in the right direction, but it doesn't have enough teeth and on some items doesn't go deep enough," said Brian Foley, a pay expert in White Plains, N.Y. "It's important not to be too intrusive, but, particularly with companies that have gotten exceptional assistance, the rules ought to be truly tough."

Some critics of Obama's plan said restricting executive pay would dissuade the most

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

talented people from working at the companies most in need of help, or would dissuade companies from seeking necessary government aid.

Steve Bartlett, president of the Financial Services Roundtable, which represents large financial institutions, called Obama's restrictions "a measured response" but warned that they still could cause problems.

"Political decisions like this often have unintended consequences that could hamper the economic recovery," he said. "Healthy banks will begin to stray away from using TARP capital."

Crystal warned of another potential consequence: a desperate desire by banks that need government assistance to get out from under the compensation restrictions.

"It's an incentive to find a way to pay the government back -- however you get there," he said. "It could encourage bad behavior."

But others said Wall Streeters had more pressing demands than worrying about their gargantuan pay.

"It would be nice if they applied their brilliant minds to not getting us into this mess in the first place (rather than in) finding ways to not limit executive compensation," said Paul Hodgson, a pay expert at The Corporate Library, a corporate-governance research firm.

Parsons, of Tribune Co.'s Washington bureau, and Times staff writer Puzzanghera reported from Washington; Times staff writer Hamilton reported from New York.

bc-execpay-assess

Word Count: 1213
2/5/09 LAT-BUS (No Page)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



1/31/09 L.A. Times 2
2009 WLNR 1861190

Los Angeles Times
Copyright 2009 Los Angeles Times

**January 31, 2009**

Section: Business

4 more thrifts backdated assets
Regulators say they let S&Ls besides IndyMac improperly include later capital infusions
in financial reports.

E. Scott Reckard

Federal regulators said Friday that they had allowed four thrifts besides failed IndyMac
Bank to improperly     **backdate**    infusions of capital.

In a letter to Treasury Secretary Timothy F. Geithner, John Reich, the director of the
Office of Thrift Supervision, did not identify the four S&Ls. The thrift regulator is
an arm of the Treasury Department.

The Times reported Dec. 23 that Treasury investigators had found that Darrel W. Dochow,
the agency's Western regional director, improperly allowed IndyMac to include extra
capital, a bank's cushion against losses, in its report for the first quarter of 2008,
months before the Pasadena mortgage lender failed.

Dochow has been suspended pending an inquiry.

A timeline with Reich's letter says IndyMac's parent, IndyMac Bancorp, provided $18
million in extra capital May 9, more than a month after the first quarter ended.

But with Dochow's approval, and no objection from IndyMac's auditors, the thrift recorded
the money as capital as of March 31, the timeline says.

The move allowed IndyMac to report that it was "well capitalized" at the end of the first
quarter, meaning it was financially strong enough to stay in business.

IndyMac, which suffered heavy losses on risky mortgages made during the housing bubble,
was seized in July. Its failure is expected to cost the federal deposit insurance fund
as much as $9.4 billion.

--

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

scott.reckard@latimes.com

EDITION: Home Edition

Word Count: 279
1/31/09 LATIMES 2
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



1/29/09 San Diego Union-Trib. EZ
2009 WLNR 1871201

UNION-TRIBUNE
Copyright 2009 San Diego Union-Tribune

**January 29, 2009**

Section: ZONE

Title: SHORT TAKES

NEWS IN BRIEF

Clinic gets grant to buy ultrasound

LA MESA:

A Spring Valley clinic that serves uninsured and low-income patients has received an $84,916 grant for new ultrasound equipment.

The grant awarded last week to Family Health Centers of San Diego from the Grossmont Healthcare District will provide equipment to be used to monitor the pregnancies of more than 1,300 women a year, the district said.

The grant will also be used for a program that helps low-income residents overcome barriers to obtaining health care. Family Health Centers of San Diego is a nonprofit clinic organization with 28 locations throughout San Diego County.

--A.K.

Imaging system is donated to college

EL CAJON:

A $65,000 ultrasound imaging system has been donated to Grossmont College, which officials say will assist in the instruction of students in the college's cardiovascular technology program.

The system was donated by Biosound Esaote of Indianapolis, an ultrasound technology company.

The college's cardiovascular technology program was founded in 1972 and has about 1,750

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

graduates. It was the first to be accredited in the nation, and is one of three such programs in the state.

   --A.K.

   Trial postponed in teacher's suit

DEHESA:

 The trial has been postponed in a lawsuit that accuses a charter school of retaliating against a former teacher because she did not go along with a plan to falsify records.

 Elizabeth Roach in a 2007 lawsuit claims that she lost her job as a teacher at Dehesa Charter School because she refused to **backdate** records to inflate attendance and generate additional state funding.

 The school has denied any wrongdoing.

 Roach's attorney said the trial needs to be rescheduled because of a family emergency. It had been set to start Monday.

 --L.S.

 Staff writers Anne Krueger and Leonel Sanchez contributed to this report.

EDITION: EAST

Word Count: 361
1/29/09 SDUT EZ
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/26/09 AP Alert - CA 21:01:50

                         AP Alert - California
   Copyright 2009 The Associated Press. All rights reserved. This material may not be
                 published, broadcast, rewritten or redistributed.

                            **January 26, 2009**

                   Broadcom co-founder to be tried separately

SANTA ANA, Calif._The financial fraud trial of Broadcom billionaire Henry T. Nicholas
III will be delayed until the case of his co-defendant concludes.

U.S. District Court Judge Cormac J. Carney says in a ruling Monday he wants the trial
of former chief financial officer William Ruehle to begin by July 21. The ruling also
grants a motion by Nicholas to be tried separately.

Nicholas co-founded the tech company that makes telecommunications chips.

Both men pleaded not guilty to 21 felony counts of alleged accounting and securities
fraud. Authorities accuse them of conspiring to **backdate** employee stock options.

Word Count: 122
1/26/09 APALERTCA 21:01:50
END OF DOCUMENT

                © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/24/09 San Diego Union-Trib. EZ
2009 WLNR 1622599

                              UNION-TRIBUNE
                  Copyright 2009 San Diego Union-Tribune

                            **January 24, 2009**

                            Section: ZONE

                  Teacher files suit against school
                  She claims she was fired in retribution

                      Leonel Sanchez, STAFF WRITER

  DEHESA -- A former Dehesa Charter School teacher, in a lawsuit that was scheduled to
go to trial in San Diego this week, claims school officials retaliated against her because
she refused to go along with a plan to falsify records to get more state funding.

  The school is a home-school program with some staff members who oversee independent
study plans.

  Elizabeth Roach has accused school officials of ordering teachers in February 2006 to
**backdate** records a few weeks to inflate attendance and generate $75,000 in additional
state funding. State funding for schools is based largely on attendance.

  Roach said teachers were given "specific instructions on how to falsify the documents
so that they would not be discovered by auditors."

  She said she refused to participate and later received a negative evaluation. Roach
was not rehired for the next school year, according to the 2007 lawsuit. She is seeking
$225,000 in damages.

  The school, through its attorney, denies any wrongdoing and said the case was politically
motivated.

  John Marcin, who represents Dehesa Charter School, said Roach submitted documents with
incorrect dates and refused to change them. He said she and her husband, Derrick Roach,
created a controversy to get back at the school.

  Derrick Roach was president of the school's board at the time. Elizabeth Roach said
she complained to her husband after she refused to **backdate** independent study agreements,
which are supposed to be signed by parents, students and teachers before instruction
begins.


               © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

 The couple protested and later lost their positions. Derrick Roach, a private in-
vestigator who ran unsuccessfully last year for the 79th Assembly District, was voted
off the board, according to the lawsuit.

 "Her husband and her were upset that he had been asked to resign as a board director,"
Marcin said.

 A trial was scheduled to start Thursday morning before Superior Court Judge Charles
Hayes. Instead, Hayes gave the two sides time to discuss the possibility of a settlement.

 The Dehesa School District near El Cajon sponsors the charter school but has limited
oversight and is not a defendant in the case. The charter school has its main office
in Escondido and draws students from San Diego, Orange and Riverside counties.

EDITION: EAST

Word Count: 444
1/24/09 SDUT EZ
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/23/09 L.A. Times 5
2009 WLNR 1332284

Los Angeles Times
Copyright 2009 Los Angeles Times

**January 23, 2009**

Section: Business

Nicholas accuses ex-wife of 'outrageous falsehoods'

E. Scott Reckard

Accusing his ex-wife of character assassination, Broadcom Corp. founder Henry T. Nicholas III said her attempt to oust him as co-trustee of their family holdings was filled with "outrageous falsehoods," including misrepresenting herself as unable to meet her expenses when she had spent more than $100 million in the last two years.

Stacey Nicholas' attorney, Adam Streisand, said he had not seen the filing in Orange County Superior Court and declined to comment.

In a filing in probate court Nov. 26, Stacey Nicholas said her ex-husband should be removed as a trustee for allegedly squandering $60 million from their fortune on personal indulgences, having her tailed by detectives wearing gorilla masks and threatening her life.

In his response, filed Wednesday, Henry Nicholas asked the court's probate division in Orange to reject her requests.

He argued that the proper venue for any such motion was divorce court, where the Nicholases have waged bitter battles over custody and assets and where the files have been sealed. Stacey Nicholas' intent was to generate news coverage -- an aim accomplished in headlines saying Henry Nicholas wanted to have her "whacked" -- and not to fight a legitimate legal battle, the filing contended.

As for the alleged misrepresentations in Stacey Nicholas' filings, the ex-husband said "just one example" was her portrayal of herself "as financially destitute and unable to meet her expenses."

An attorney for Henry Nicholas, Emilio F. Gonzalez, said in a statement that his client "has consistently put the interests of his children first in this dispute, attempting to keep details which could be embarrassing to his former wife and hurtful to his children out of the public eye."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Nicholas' wealth stems from the success of Broadcom, the Irvine-based designer of computer chips used for communications, which he co-founded with Henry Samueli, owner of hockey's Anaheim Ducks.

Nicholas faces prosecution on separate federal indictments alleging conspiracies to distribute drugs and to **backdate** billions of dollars in stock options as secret rewards for employees. He has pleaded not guilty in both cases.

Samueli has pleaded guilty to lying to securities regulators about his role in the options award but will not be sentenced until after the backdating trial is concluded.

--

scott.reckard@latimes.com

PHOTO: Broadcom co-founder Henry Nicholas III is facing prosecution on separate drug and securities charges.

PHOTOGRAPHER:Richard Hartog Los Angeles Times

EDITION: Home Edition

Word Count: 497
1/23/09 LATIMES 5
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/19/09 Can. Stockwatch 19:18:00

Canada StockWatch
Copyright 2009 Canjex Publishing Ltd.

**January 19, 2009**

*SEC SEC target Mrakuzic denies wrongdoing
Ex-Vancouver broker defends fraud charges

SEC target Darko Mrakuzic, a former Vancouver broker, denies any wrongdoing in the alleged
Global Development & Environmental Resources Inc. pump-and-dump. He claims he relied
on a lawyer's opinion when he converted a note into free-trading shares.

U.S. Securities and Exchange Commission (:*SEC) Monday January 19 2009 - Street Wire

Also U.S. Securities and Exchange Commission (:*SEC) Street Wire Also Global Development
& Environmental Resources (:GDVE) Street Wire

by Mike Caswell

Former Vancouver broker Darko Mrakuzic has filed his answer to allegations that he
participated in the pump-and-dump of Global Development & Environmental Resources Inc.,
a pink sheets company. He denies any wrongdoing, and says he relied on opinions provided
by the company's lawyer and transfer agent.

The U.S. Securities and Exchange Commission alleged that Mr. Mrakuzic fraudulently
acquired 2.7 million shares of Global Development. It said he did this by having the
company **backdate** a promissory note by two years, which allowed him to convert the note
into free-trading shares. He then sold those shares for $1.2-million as others promoted
the stock, the SEC claimed. (All figures are in U.S. dollars.) In his answer, Mr. Mrakuzic
says that he relied on advice provided by the company's lawyer and transfer agent that
the shares "were issued properly, without restrictive legend, in a transaction exempt
from registration under the federal securities laws."

The SEC's complaint

The SEC filed civil fraud charges against Mr. Mrakuzic and others on May 22, 2008, in
U.S. District Court for the Middle District of Florida. The other defendants were Michigan
resident Anthony Cimini Sr., California securities lawyer Carmine Bua, Las Vegas
residents Philip Pritchard and Pietro Cimino, and Florida resident Dante Panella.

The scheme began in June, 2005, when Mr. Mrakuzic allegedly arranged for his company,
Quantumvest Holdings Ltd., to receive a promissory note purportedly showing that it was

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

owed money by Global Development's predecessor. "Importantly, the draft Note was backdated by more than two years to December 2002, and included a provision granting the Noteholder the option to convert the debt into shares of Old Mission's stock," the complaint read. Global Development's lawyer, Mr. Bua, then authored a legal opinion allowing the note to be converted into 2.7 million unrestricted shares of the company, the SEC claims. He did this "despite a multitude of red flags pointing to a fraudulent scheme to evade the registration requirements," according to the SEC. These included a note agreement signed by somebody who was not a director or officer of the company on the date the agreement was signed.

The SEC claimed that Mr. Mrakuzic transferred half the stock to Mr. Panella. The two men then allegedly made $1.2-million and $1.1-million dumping the company, as it issued misleading news releases that boosted the price from $1.79 to $5.15. The SEC claims Mr. Pritchard, the company's chief executive officer, wrote a news release on Aug. 1, 2005, claiming that the company had more than $67-million in current projects, and that defence contracting firm Halliburton had bought its products.

At the same time, Mr. Panella allegedly arranged for a newsletter called The Grip to tout the stock. The SEC said The Grip published an article on Aug. 1, 2005, that falsely stated that Global Development had booked $67-million in sales, and it predicted the stock would go to $20. The SEC said the false news had "an immediate and substantial impact on the market demand for Global's stock." On the first day of trading, the company closed at $1.80. "Within three weeks, the price increased to $5.15 per share and daily trading volume peaked at more than 900,000 shares," the SEC said.

In addition to the pump-and-dump allegations, the SEC alleged that the company misappropriated investor money. According to the complaint, Global Development raised $2.1-million privately in July, 2005, telling investors that it had a $67-million contract backlog. The work included one contract worth $28-million with a company called Atlantic Land. The SEC said Global Development did not disclose that Atlantic Land was in fact owned by Mr. Cimino, who was also Global Development's president. The company allegedly said it would use investor money for salaries, equipment purchases, rent and other expenses. Instead, Mr. Pritchard and Mr. Cimino used the money to buy themselves residential properties, including a condominium at the Palms Casino in Las Vegas, the SEC claimed. They also used $1-million to pay for high-end Mercedes vehicles, according to the complaint.

The SEC sought penny stock bans, disgorgement of profits and appropriate civil penalties. It acknowledged the assistance of the B.C. Securities Commission in filing the case.

Mrakuzic's answer

Mr. Mrakuzic filed his answer to the complaint on Dec. 16, 2008. Most of the document provides bare denials of the allegations. He admits that his company, Quantumvest, sold shares of Global Development through a Canadian brokerage, and that he relied on an opinion prepared by Mr. Bua that said the shares could be traded. "Mrakuzic was a foreseeable third-party beneficiary of the legal opinion authored by Defendant Bua, an experienced securities law attorney, and Mrakuzic was entitled to rely upon that legal opinion," the answer reads. He also says that Quantumvest legitimately purchased a convertible debt security from a noteholder in a private sale. He later converted that security into the tradeable shares. Mr. Mrakuzic asks that the court "find in his favour

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

and that Plaintiff will take nothing on its claims."

IDA fined Mrakuzic

The SEC case is not the first time a regulator has made allegations against Mr. Mrakuzic. Between 1990 and 2000, he worked at Wolverton Securities Ltd. and Pacific International Securities Inc. He was fired by PI for allowing a client to circumvent a debt, and later fined $30,000 (Canadian) by the Investment Dealers Association for the same transaction.

PI first disciplined him in January, 1999, after he executed 30 undeclared short sales in a client's account, including four stocks he sold short contrary to direct instructions from his supervisor. PI made him donate $2,500 (Canadian) to charity after it discovered the sales.

One year later, PI discovered that he had helped a client circumvent a debt owed to the brokerage. The client had wanted to transfer shares to PI and have Mr. Mrakuzic sell them, but the client's account had a debit of $61,449 (Canadian). To get around this, Mr. Mrakuzic allowed the client to deposit the shares in the account of Mr. Mrakuzic's father. He then sold the stock from the account and sent the proceeds to the U.S.

PI fired him when it found out what he did, and the IDA eventually investigated the case as well. On Feb. 3, 2004, he agreed to pay $30,000 (Canadian) to settle the case and to a one-year ban from working in the brokerage industry. According to BCSC records, he has not worked at a Vancouver brokerage since.

Word Count: 1409
1/19/09 CANSTCKWTH 19:18:00
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/19/09 Can. Stockwatch 19:18:00

Canada StockWatch
Copyright 2009 Canjex Publishing Ltd.

**January 19, 2009**

*SEC SEC target Mrakuzic denies wrongdoing
Ex-Vancouver broker defends fraud charges

SEC target Darko Mrakuzic, a former Vancouver broker, denies any wrongdoing in the alleged Global Development & Environmental Resources Inc. pump-and-dump. He claims he relied on a lawyer's opinion when he converted a note into free-trading shares.

U.S. Securities and Exchange Commission (:*SEC) Monday January 19 2009 - Street Wire

See U.S. Securities and Exchange Commission (:*SEC) Street Wire

by Mike Caswell

Former Vancouver broker Darko Mrakuzic has filed his answer to allegations that he participated in the pump-and-dump of Global Development & Environmental Resources Inc., a pink sheets company. He denies any wrongdoing, and says he relied on opinions provided by the company's lawyer and transfer agent.

The U.S. Securities and Exchange Commission alleged that Mr. Mrakuzic fraudulently acquired 2.7 million shares of Global Development. It said he did this by having the company **backdate** a promissory note by two years, which allowed him to convert the note into free-trading shares. He then sold those shares for $1.2-million as others promoted the stock, the SEC claimed. (All figures are in U.S. dollars.) In his answer, Mr. Mrakuzic says that he relied on advice provided by the company's lawyer and transfer agent that the shares "were issued properly, without restrictive legend, in a transaction exempt from registration under the federal securities laws."

The SEC's complaint

The SEC filed civil fraud charges against Mr. Mrakuzic and others on May 22, 2008, in U.S. District Court for the Middle District of Florida. The other defendants were Michigan resident Anthony Cimini Sr., California securities lawyer Carmine Bua, Las Vegas residents Philip Pritchard and Pietro Cimino, and Florida resident Dante Panella.

The scheme began in June, 2005, when Mr. Mrakuzic allegedly arranged for his company, Quantumvest Holdings Ltd., to receive a promissory note purportedly showing that it was owed money by Global Development's predecessor. "Importantly, the draft Note was

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

backdated by more than two years to December 2002, and included a provision granting the Noteholder the option to convert the debt into shares of Old Mission's stock," the complaint read. Global Development's lawyer, Mr. Bua, then authored a legal opinion allowing the note to be converted into 2.7 million unrestricted shares of the company, the SEC claims. He did this "despite a multitude of red flags pointing to a fraudulent scheme to evade the registration requirements," according to the SEC. These included a note agreement signed by somebody who was not a director or officer of the company on the date the agreement was signed.

The SEC claimed that Mr. Mrakuzic transferred half the stock to Mr. Panella. The two men then allegedly made $1.2-million and $1.1-million dumping the company, as it issued misleading news releases that boosted the price from $1.79 to $5.15. The SEC claims Mr. Pritchard, the company's chief executive officer, wrote a news release on Aug. 1, 2005, claiming that the company had more than $67-million in current projects, and that defence contracting firm Halliburton had bought its products.

At the same time, Mr. Panella allegedly arranged for a newsletter called The Grip to tout the stock. The SEC said The Grip published an article on Aug. 1, 2005, that falsely stated that Global Development had booked $67-million in sales, and it predicted the stock would go to $20. The SEC said the false news had "an immediate and substantial impact on the market demand for Global's stock." On the first day of trading, the company closed at $1.80. "Within three weeks, the price increased to $5.15 per share and daily trading volume peaked at more than 900,000 shares," the SEC said.

In addition to the pump-and-dump allegations, the SEC alleged that the company misappropriated investor money. According to the complaint, Global Development raised $2.1-million privately in July, 2005, telling investors that it had a $67-million contract backlog. The work included one contract worth $28-million with a company called Atlantic Land. The SEC said Global Development did not disclose that Atlantic Land was in fact owned by Mr. Cimino, who was also Global Development's president. The company allegedly said it would use investor money for salaries, equipment purchases, rent and other expenses. Instead, Mr. Pritchard and Mr. Cimino used the money to buy themselves residential properties, including a condominium at the Palms Casino in Las Vegas, the SEC claimed. They also used $1-million to pay for high-end Mercedes vehicles, according to the complaint.

The SEC sought penny stock bans, disgorgement of profits and appropriate civil penalties. It acknowledged the assistance of the B.C. Securities Commission in filing the case.

Mrakuzic's answer

Mr. Mrakuzic filed his answer to the complaint on Dec. 16, 2008. Most of the document provides bare denials of the allegations. He admits that his company, Quantumvest, sold shares of Global Development through a Canadian brokerage, and that he relied on an opinion prepared by Mr. Bua that said the shares could be traded. "Mrakuzic was a foreseeable third-party beneficiary of the legal opinion authored by Defendant Bua, an experienced securities law attorney, and Mrakuzic was entitled to rely upon that legal opinion," the answer reads. He also says that Quantumvest legitimately purchased a convertible debt security from a noteholder in a private sale. He later converted that security into the tradeable shares. Mr. Mrakuzic asks that the court "find in his favour and that Plaintiff will take nothing on its claims."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

IDA fined Mrakuzic

The SEC case is not the first time a regulator has made allegations against Mr. Mrakuzic.
Between 1990 and 2000, he worked at Wolverton Securities Ltd. and Pacific International
Securities Inc. He was fired by PI for allowing a client to circumvent a debt, and later
fined $30,000 (Canadian) by the Investment Dealers Association for the same transaction.

PI first disciplined him in January, 1999, after he executed 30 undeclared short sales
in a client's account, including four stocks he sold short contrary to direct instructions
from his supervisor. PI made him donate $2,500 (Canadian) to charity after it discovered
the sales.

One year later, PI discovered that he had helped a client circumvent a debt owed to the
brokerage. The client had wanted to transfer shares to PI and have Mr. Mrakuzic sell
them, but the client's account had a debit of $61,449 (Canadian). To get around this,
Mr. Mrakuzic allowed the client to deposit the shares in the account of Mr. Mrakuzic's
father. He then sold the stock from the account and sent the proceeds to the U.S.

PI fired him when it found out what he did, and the IDA eventually investigated the case
as well. On Feb. 3, 2004, he agreed to pay $30,000 (Canadian) to settle the case and
to a one-year ban from working in the brokerage industry. According to BCSC records,
he has not worked at a Vancouver brokerage since.

Word Count: 1395
1/19/09 CANSTCKWTH 19:18:00
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/19/09 Can. Stockwatch 19:18:00

                        Canada StockWatch
                Copyright 2009 Canjex Publishing Ltd.

                        **January 19, 2009**

               GDVE SEC target Mrakuzic denies wrongdoing
                Ex-Vancouver broker defends fraud charges

SEC target Darko Mrakuzic, a former Vancouver broker, denies any wrongdoing in the alleged
Global Development & Environmental Resources Inc. pump-and-dump. He claims he relied
on a lawyer's opinion when he converted a note into free-trading shares.

Global Development & Environmental Resources (:GDVE) Monday January 19 2009 - Street
Wire

See U.S. Securities and Exchange Commission (:*SEC) Street Wire

by Mike Caswell

Former Vancouver broker Darko Mrakuzic has filed his answer to allegations that he
participated in the pump-and-dump of Global Development & Environmental Resources Inc.,
a pink sheets company. He denies any wrongdoing, and says he relied on opinions provided
by the company's lawyer and transfer agent.

The U.S. Securities and Exchange Commission alleged that Mr. Mrakuzic fraudulently
acquired 2.7 million shares of Global Development. It said he did this by having the
company **backdate** a promissory note by two years, which allowed him to convert the note
into free-trading shares. He then sold those shares for $1.2-million as others promoted
the stock, the SEC claimed. (All figures are in U.S. dollars.) In his answer, Mr. Mrakuzic
says that he relied on advice provided by the company's lawyer and transfer agent that
the shares "were issued properly, without restrictive legend, in a transaction exempt
from registration under the federal securities laws."

The SEC's complaint

The SEC filed civil fraud charges against Mr. Mrakuzic and others on May 22, 2008, in
U.S. District Court for the Middle District of Florida. The other defendants were Michigan
resident Anthony Cimini Sr., California securities lawyer Carmine Bua, Las Vegas
residents Philip Pritchard and Pietro Cimino, and Florida resident Dante Panella.

The scheme began in June, 2005, when Mr. Mrakuzic allegedly arranged for his company,
Quantumvest Holdings Ltd., to receive a promissory note purportedly showing that it was

            © 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

owed money by Global Development's predecessor. "Importantly, the draft Note was backdated by more than two years to December 2002, and included a provision granting the Noteholder the option to convert the debt into shares of Old Mission's stock," the complaint read. Global Development's lawyer, Mr. Bua, then authored a legal opinion allowing the note to be converted into 2.7 million unrestricted shares of the company, the SEC claims. He did this "despite a multitude of red flags pointing to a fraudulent scheme to evade the registration requirements," according to the SEC. These included a note agreement signed by somebody who was not a director or officer of the company on the date the agreement was signed.

The SEC claimed that Mr. Mrakuzic transferred half the stock to Mr. Panella. The two men then allegedly made $1.2-million and $1.1-million dumping the company, as it issued misleading news releases that boosted the price from $1.79 to $5.15. The SEC claims Mr. Pritchard, the company's chief executive officer, wrote a news release on Aug. 1, 2005, claiming that the company had more than $67-million in current projects, and that defence contracting firm Halliburton had bought its products.

At the same time, Mr. Panella allegedly arranged for a newsletter called The Grip to tout the stock. The SEC said The Grip published an article on Aug. 1, 2005, that falsely stated that Global Development had booked $67-million in sales, and it predicted the stock would go to $20. The SEC said the false news had "an immediate and substantial impact on the market demand for Global's stock." On the first day of trading, the company closed at $1.80. "Within three weeks, the price increased to $5.15 per share and daily trading volume peaked at more than 900,000 shares," the SEC said.

In addition to the pump-and-dump allegations, the SEC alleged that the company misappropriated investor money. According to the complaint, Global Development raised $2.1-million privately in July, 2005, telling investors that it had a $67-million contract backlog. The work included one contract worth $28-million with a company called Atlantic Land. The SEC said Global Development did not disclose that Atlantic Land was in fact owned by Mr. Cimino, who was also Global Development's president. The company allegedly said it would use investor money for salaries, equipment purchases, rent and other expenses. Instead, Mr. Pritchard and Mr. Cimino used the money to buy themselves residential properties, including a condominium at the Palms Casino in Las Vegas, the SEC claimed. They also used $1-million to pay for high-end Mercedes vehicles, according to the complaint.

The SEC sought penny stock bans, disgorgement of profits and appropriate civil penalties. It acknowledged the assistance of the B.C. Securities Commission in filing the case.

Mrakuzic's answer

Mr. Mrakuzic filed his answer to the complaint on Dec. 16, 2008. Most of the document provides bare denials of the allegations. He admits that his company, Quantumvest, sold shares of Global Development through a Canadian brokerage, and that he relied on an opinion prepared by Mr. Bua that said the shares could be traded. "Mrakuzic was a foreseeable third-party beneficiary of the legal opinion authored by Defendant Bua, an experienced securities law attorney, and Mrakuzic was entitled to rely upon that legal opinion," the answer reads. He also says that Quantumvest legitimately purchased a convertible debt security from a noteholder in a private sale. He later converted that security into the tradeable shares. Mr. Mrakuzic asks that the court "find in his favour

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

and that Plaintiff will take nothing on its claims."

IDA fined Mrakuzic

The SEC case is not the first time a regulator has made allegations against Mr. Mrakuzic.
Between 1990 and 2000, he worked at Wolverton Securities Ltd. and Pacific International
Securities Inc. He was fired by PI for allowing a client to circumvent a debt, and later
fined $30,000 (Canadian) by the Investment Dealers Association for the same transaction.

PI first disciplined him in January, 1999, after he executed 30 undeclared short sales
in a client's account, including four stocks he sold short contrary to direct instructions
from his supervisor. PI made him donate $2,500 (Canadian) to charity after it discovered
the sales.

One year later, PI discovered that he had helped a client circumvent a debt owed to the
brokerage. The client had wanted to transfer shares to PI and have Mr. Mrakuzic sell
them, but the client's account had a debit of $61,449 (Canadian). To get around this,
Mr. Mrakuzic allowed the client to deposit the shares in the account of Mr. Mrakuzic's
father. He then sold the stock from the account and sent the proceeds to the U.S.

PI fired him when it found out what he did, and the IDA eventually investigated the case
as well. On Feb. 3, 2004, he agreed to pay $30,000 (Canadian) to settle the case and
to a one-year ban from working in the brokerage industry. According to BCSC records,
he has not worked at a Vancouver brokerage since.

Word Count: 1396
1/19/09 CANSTCKWTH 19:18:00
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/19/09 Wall St. Transcript - Fulltext Interviews 04:04:51

Wall Street Transcript - Fulltext Interviews
Copyright 2009 The Wall Street Transcript. All rights reserved. Republication or
redistribution of Wall Street Transcript content, including by caching, framing or
similar means, is expressly prohibited without the prior written consent of The Wall
Street Transcript

**January 19, 2009**

ROUNDTABLE FORUM: BIOTECHNOLOGY: AN UPDATE

Jan. 12, 2009 (The Wall Street Transcript delivered by Newstex) --

Ticker: AEZS
Ticker: AIS
Ticker: ALXA
Ticker: CELG
Ticker: GILD
Ticker: ONXX
Ticker: VRTX
Ticker: ZGEN
Sector: Biotechnology

KEVIN DEGEETER is a Senior Analyst at H.C. Wainwright & Co., Inc., responsible

for coverage of specialty pharmaceutical and biotechnology stocks with a market
capitalization between $50 million and $2 billion. His coverage universe focuses
on rheumatology, infectious disease, and anti-infective drugs. Prior to joining
H.C. Wainwright, he was an Analyst at Dawson James and Natexis Bleichroeder with
responsibility for small capitalization biotechnology stocks. Earlier in his
career, he worked on the sell side with J.P Morgan and PaineWebber and on the
buy side with Manning & Napier Advisors.
JASON KANTOR joined RBC (NYSE:RY) Capital Markets in 2005 as a Managing Director and
Biotechnology Equity Research Analyst. Previously, he was a Managing Director
and Senior Biotechnology Analyst at WR Hambrecht + Co from 2002 to 2005, and
Vice President in equity research at J.P. Morgan Chase & Co. (NYSE:JPM) from 1998 to
2002.
Previous equity research assignments also include Salomon Smith Barney and
Josephthal Lyon & Ross. Dr. Kantor's healthcare expertise covers several
important categories including oncology, cardiology, antibody technology, and
infectious disease. In 2004, Fortune magazine ranked Dr. Kantor as an "All-Star
Analyst," and The Wall Street Journal ranked him number two in its "Best on Wall
Street Survey." He received his BA cum laude in Biology from the University of
California, San Diego and his PhD in Cell and Developmental Biology from Harvard

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

University.
HOWARD LIANG joined the biotech team at Leerink Swann & Company, Inc., as a
Director in September 2005, covering biotech companies with an oncology focus.
He came to Leerink from A.G. Edwards where he was a Senior Biotechnology
Analyst. His prior Wall Street experience included JMP Securities as a Senior
Biotechnology Analyst and Prudential Securities (NYSE:PRU) , where he was an Associate
to an
Institutional Investor-ranked major pharma Analyst. Before that, he spent eight
years at Abbott Labs (NYSE:ABT)  where he was a senior scientist and a member of one
of the
industry's leading structure-based drug discovery teams. During his career as a
scientist, he authored papers in prestigious journals including Nature, Science,
and Proceedings of the National Academy of Sciences. He obtained his MBA and PhD
in Biochemistry and Molecular biology, both from the University of Chicago. His
undergraduate degree is a BS in Chemistry from Beijing University.


MODERATED by Terry J. McEvoy
TWST: Jason, what has gone on in the biotech space from a stock market
perspective year to date?
Dr. Kantor: I think that the first quarter of this year was the tail-end of what
was about a 12-month rally in the group, and things were pretty ugly from March
until very late in the summer. We are now beginning to see the sector turn
around a little bit, and you can see that in the BTK Index, and I also think
that some of the recent outperformance is pretty broad-based. One of the things
that might be triggering that is an increase in M&A activity; we have seen a
couple of recent transactions that are notable. In addition, I think that there
have been some investors rewarded significantly for taking some risk. We have
seen some really significant performance on positive clinical data and positive
regulatory news. Those are good signs. We are also seeing stocks hold up well in
the face of the negative news, such as Genentech's (NYSE:DNA)  (DNA) recent quarter.
So I
think that all of those are good bullish signs for the sector. We will see
whether or not it's sustainable going to the end of the year and into next year.
TWST: Kevin, what's your take on how the market has treated the space so far
this year?
Mr. DeGeeter: I think that Jason's points are spot on. The one thing I would add
is that we are seeing a pretty big divergence between big cap names such as
Amgen (AMGN) and Genentech, which are back around the levels we reached in April
before the sector sold off, and the smaller cap arena where the stocks are still
considerably below the levels achieved in the spring. We are looking for market
cap rotation over the near term with a little better performance in the small
cap names.
TWST: Howard, what's your take on what we have seen so far this year?
Mr. Liang: I very much agree with the comments that have been made so far,
especially that the small caps probably have more to go.
TWST: What's going to drive it? Is it just because they have underperformed?
Mr. Liang: Yes. To me, investors appear to be more willing to take a longer time
horizon, so things are generally very favorable for small caps.
TWST: Howard, Jason mentioned that we have seen increased M&A activity in this
space. What's driving that at this point?
Mr. Liang: Fundamentally, a product tends to be worth more to a bigger company
than to a smaller company, simply because when you have an existing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

infrastructure and you add a new product on top of that, it tends to be quite accretive. So, in general, I think that any M&A going on is probably for that reason. We are also seeing a lot of demand for late stage products because both Big Pharma and Big Biotech are looking for new products to add to the growth. Last year, we also had this foreign tax repatriation. Big Pharma has already announced that there has been $82 billion repatriated that could be used, in part, for M&A. I think that all of that is favorable for continued M&A activity.

TWST: Jason, do you see more M&A activity over and above what we have already seen?

Dr. Kantor: Yes, I think that there is a lot of room for more of the same. There are a couple of things that I would note. One is that not only has there been more M&A from public company to public company, but there have also been a lot more private companies getting taken out. I think that you are seeing a greater willingness from managements and VCs to use M&A as an exit strategy, especially when the capital markets don't look so attractive. But all of the same things that were previously mentioned are really playing in here. Companies want more products. There are more small cap companies with later stage products, so more and more M&A looks like the way to go for a lot of these names.

TWST: Is it mainly Big Pharma that is generating this, or are we seeing M&A within biotech?

Dr. Kantor: There have been quite a large number of transactions in Big Biotech. We have seen most recently Gilead Sciences (NASDAQ:GILD) (GILD) and Myogen (MYOG). We have

seen Biogen Idec (NASDAQ:BIIB) (BIIB) and Conforma. We saw Gilead and Corus Pharma earlier.

Amgen has been very acquisitive. They just bought a private company as well. Pretty much all of the big biotechs are in the game too.

TWST: Kevin, what are your thoughts on what is happening on the M&A front here?

Mr. DeGeeter: Most companies, correctly, are pursuing a multiple-shots-on-goal strategy with a number of programs. As the programs move toward market, they often don't neatly fit together from a scientific or commercial perspective. We are seeing a fair number of companies divesting non-core programs once it looks like the lead product is ready to take off. Biotech companies are finally beginning to behave a little more like traditional companies and are developing a commercial focus.

TWST: So it's a general portfolio cleanup?

Mr. DeGeeter: That's exactly right.

Mr. Liang: What we are already seeing, in addition to larger caps acquiring smaller companies, is that we have a lot of these largely single-product biotech companies, such as Millennium (MLNM), and in those situations, when you add a second product, it makes a lot of sense because of the leverage. I think that we are going to have more and more of those as more and more companies have products on the market and build up a commercial franchise. In those cases, adding a second product can really enhance the value of the existing franchise. In part for that reason, I think that we will see more interest in leveraging the existing commercial infrastructure. Layering it onto an existing franchise can add to the EPS. We will probably see more and more of those.

TWST: Kevin, as you look at the space today, where do you see the opportunities from a product point of view? What is leading the pack at this point?

Mr. DeGeeter: From a product perspective, the last several years have been about oncology, oncology, and oncology. I don't want to call it an inflection point - I still think oncology will be a very important segment of the market - but we are seeing greater interest in companies targeting autoimmune disease and, to a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

lesser extent, infectious diseases. However, I don't think that investors have shifted their focus yet. Oncology names still tend to generate the most interest.

TWST: Is that because there are so many players in oncology and it's reasonably far along?

Mr. DeGeeter: It's very competitive - there is no question about it. Frankly, for many companies focused on the oncology area, there is a fair amount of scientific overlap with autoimmune indications such as lupus and rheumatoid arthritis. It's not a big leap of faith. Products may initially be developed for a B-cell malignancy but may turn out to be more interesting in an autoimmune indication, from both a scientific and a commercial perspective.

TWST: Howard, as you look at the space, where do you see the opportunities?

Mr. Liang: I agree that there will be an expansion out of oncology, which has been somewhat of a stronghold for biotech. We have seen more and more Big Pharma getting into the oncology field, so certainly that's getting more competitive. In terms of other areas, hepatitis C is an area that has gotten a lot of investor attention. That is certainly an area with a lot of unmet medical needs. We could have some products developed primarily at biotech companies that would change the standard of care of treatment in that setting. I view that as one of the few opportunities in biotech where you can change the standard of care in a big therapeutic category. Other areas include anti-infectives and perhaps antibiotics. I think that there has been a significant rise in resistant bacteria. I believe that's where we will see more and more need. It's an area where there has been underdevelopment by Big Pharma. So those two would probably be the ones that I would point out.

TWST: Jason, where do you see the opportunities over the next couple of years?

Dr. Kantor: I think that a lot of it has been covered. Biotech has been the most successful in the niche markets - oncology, hospital antibiotics, antivirals, and anti-coagulants - anything that is sold to a relatively small group of doctors. We are probably going to see some opportunity develop in some of the big pharmaceutical markets, whether it's hyperlipidemia or metabolic diseases. I think that Big Pharma is going to be continually looking for biotech companies to partner with or acquire in these major market spaces. In biotech, I don't think that most of these companies are ready to go out and build huge sales forces to address these markets. We have seen some very large licensing deals and M&A activity around some of the core pharma markets that biotech is trying to get in. I don't think that there is any place within the drug industry where biotech is not currently having an impact, or where there is no room for the biotech industry to grow.

TWST: Jason, with all of this M&A activity going on, is biotech able to attract the venture capital or the capital it needs to support R&D at this point?

Dr. Kantor: The short answer to that question is yes, there continues to be access to capital. It comes in waves. Certainly, I wouldn't view today's marketplace as being particularly conducive to fundraising, but companies continue to go out there and raise money. VCs continue to put money to work. I think that the M&A actually helps, because it puts examples of very quick return on investments out there. It also helps to set valuation floors for stocks, in terms of what a pharmaceutical company is willing to pay for something. I don't think that there is any shortage of funds to develop good drugs.

TWST: Howard, any thoughts on fund availability?

Mr. Liang: I totally agree. It's actually more and more the case that when a biotech company has a good product, investors have become more and more sophisticated in finding these opportunities. I think that it used to be the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

case that when you had a product, you almost needed to have validation from Big Pharma before some investors would be willing to put in money. Nowadays, it's almost the opposite. Investors almost encourage the company to take a product further on its own so that the investors can capture more of the upside. Over the last 20-30 years, I think that the investment community has become more sophisticated in terms of their ability to identify opportunities in biotech. I believe that you do have these relatively ready funds that will invest in these products, even when they are in the early stage.

TWST: Kevin, what are your thoughts on capital availability as we look forward?

Mr. DeGeeter: I would argue that the market is pretty healthy, but it has changed over the last several years. If there is a level of scientific validation, the VCs are still eager to put up the capital, but they are definitely more risk averse and less interested in companies with unproven science. However, maturation of the pipe market and the prevalence of reverse mergers in the sector are two parallel themes that, if anything, make it easier for companies to access capital.

TWST: So it's not a problem to support new product R&D as we look forward?

Mr. DeGeeter: There is more than enough money for companies, sometimes of suspect quality.

TWST: Kevin, has the industry been affected at all by the whole backdating options issue? Is it likely to be an issue in this space?

Mr. DeGeeter: There is enough volatility in a typical biotech stock that there is little reason to **backdate** options. I just don't see it as an issue. Hopefully, I am right.

TWST: Howard, do you have any thoughts on possible backdating issues in this space?

Mr. Liang: I don't see it as a huge issue either. For the most part, the variance for a biotech company's stock price would be so large. It all depends on the fundamentals - the products have driven the economic incentive for managers, as well as the payout.

TWST: Jason, how has the fall season, with lots of conferences and product announcements, shaped up relative to expectations so far?

Dr. Kantor: I wouldn't want to overstate the concept of seasonality here, but some of the themes that I would focus on are with the FDA and with data so far. The FDA has been very unpredictable. We have seen several delays at the FDA. This has been problematic in the industry. In terms of the data that's rolling out, I think that there has been a pretty steady flow throughout the year of late stage clinical development, and I think that the problem in 2006 is that the majority of late stage clinical announcements to date have been negative. It has scared a lot of people away from these binary risk stories. We are just now beginning to see people get a little bit more interested in that as we see people getting rewarded for taking risk, as we saw with Acorda (ACOR) and New River Pharmaceuticals (NRPH). On the positive side, these stocks have more than doubled and continue to rise. I wouldn't want to overstate what might be coming at some of these conferences, but there is certainly a lot of data coming.

TWST: Kevin, as you look at the announcements so far, how have they shaped up relative to expectations?

Mr. DeGeeter: It has been a mixed bag, as it always is in the drug sector. Every company is its own product story. You get some winners and you get some losers in the mix. Fundamentally, I agree with Jason's observation that for the first time in several years, investors are getting paid for taking risk. The market is encouraging investors to take on binary risk. In the past two or three years, we have been getting a 50% rise on positive news and getting decimated with

negative news. That wasn't an attractive tradeoff. With the current market, investors are getting paid for taking on more risk.

TWST: Howard, do you see the same thing with risk being more rewarded now?

Mr. Liang: Yes, but obviously it's case by case. I think that part of that dynamic is that for most of these binary events, you have people taking positions on both sides. Certainly, depending on the outcome, the reaction tends to be amplified.

TWST: It was mentioned earlier that the FDA has been a little unpredictable. Do you see the same thing, Howard?

Mr. Liang: I think that it has always been very difficult to predict the FDA. The issue is that we don't know all the facts. I think that once all of the facts have been laid on the table, it's probably not difficult to understand why the FDA took the action it did. I don't think you have seen a lot of ups and downs at the FDA, except for a period a couple of years ago. Overall, I think that the FDA is quite consistent in their approach, but sometimes it's a lack of information that prevents the right judgment on the part of the market.

TWST: Jason, is the FDA becoming more difficult to deal with and more demanding?

Dr. Kantor: That's hard to say. We're not dealing with the FDA; we're kind of observing the FDA. I would echo the previous comment that capital markets typically don't have all the information that they need. I think that's one of the reasons why we have seen a rise in companies going for the special protocol assessments. It helps to give investors some visibility that there actually is a formal agreement in place between a company and the FDA. Otherwise, you really have nothing to go on except the word of the company that they have a good relationship with the FDA and are in some form of agreement.

There have been some unusual, or at least unexpected, delays in some of the approvals that we have seen. Most recently, this occurred with Genentech's Avastin for breast cancer. They had to go back and reassess the data from the ECOG study. That is certainly an interesting development from the FDA. It's not entirely unexpected, but in the past, these intergroup studies have been sufficient for getting drugs approved. Certainly, part of everybody's strategy in oncology is to use these cooperative groups. I think that this is going to cause some ripples in the industry. But I wouldn't say that there is any overarching change at the FDA that you could point to and say, "Here's where there's more risk." We are seeing more biotech companies come to the FDA and we are seeing more drugs hit bumps in the road.

TWST: Kevin, what are your thoughts on the FDA?

Mr. DeGeeter: I agree with what the other two analysts have said. The only observation I would make - and this is truly at the margin - is that due to the Vioxx debacle, there has been a shift back toward a focus on safety. In general, I find that it's easier to assess the overall efficacy profile than the overall safety profile, given what companies allow you to see. The information that investors see on efficacy tends to be a little more complete than the information that is presented on safety. To the extent that safety is incrementally more important at the FDA, I think that it is even harder as an investor to handicap regulatory decisions without all of the data.

Dr. Kantor: Going back to the earlier point about where the opportunities for biotech outside of oncology are, this is going to be one of the tricky pitfalls for biotech to deal with. When you are dealing in oncology, safety is very much of a secondary issue to efficacy. As you move into some of these bigger markets where patients are, in general, healthier and their lives are not threatened in the same way, the balance turns more toward safety. That's a harder thing to assess, as we have just discussed. As biotech tries to expand outside of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

oncology, there is going to be a lot more risk.

TWST: Jason, as you talk with investors at this point, what seems to be the key issue or concern regarding this space?

Dr. Kantor: I don't think that I can point to any one overarching concern; it depends on whether you are talking to a generalist or a healthcare specialist, in terms of whether people are looking sector-wide or company-specific. People are worried about drug pricing, especially in oncology. People are worried about the FDA, whether that makes sense or not. People are worried about the competition for the larger companies, biogenerics or otherwise. These are some of the larger industry issues that people think about and get concerned over. But on any given day, certainly that mix changes.

TWST: Kevin, what seems to be the hot issue or issues among investors?

Mr. DeGeeter: Most of the investors I deal with don't look at the sector from a top-down perspective, and I would argue that that's a tough way to make money in the group. Every company has its own issues and they don't tend to correlate with any big picture themes.

TWST: Howard, what do investors worry about in this space?

Mr. Liang: I totally agree with the comments made so far. I can't really point to any thematic concerns. Some investors have mentioned political risk in terms of the upcoming election to some extent. Again, I don't think it's a huge concern, but it's something that is certainly on some investors' minds. In addition, there is concern about reimbursement and drug pricing with oncology drugs. There is a changing reimbursement environment, as insurers are becoming more sophisticated in controlling costs.

TWST: Howard, are you finding investors interested in this space?

Mr. Liang: Yes. We have ups and downs, and lately we have seen more interest in the space.

TWST: Jason, are you finding investors interested in biotech stocks?

Dr. Kantor: I am a little biased since I talk to mostly dedicated healthcare and biotech investors, but yes, the sector has been performing much better for the last couple of weeks or months, and I think that that has gotten people interested in the sector again.

TWST: Kevin, what is your perspective on that? Are investors returning and looking again?

Mr. DeGeeter: Yes, interest is definitely up from the summer, but that doesn't say much. This summer was as dead as I have seen in a while. Investors have come back to what I would consider a baseline level of interest. I don't think we are at a point that suggests the group has excessive interest and is getting frothy.

TWST: Kevin, given that, what are you telling investors to do at this point?

Mr. DeGeeter: We are telling investors to look for companies with several important events coming up in the next three to six months to take advantage of an increased appetite for risk and binary events. I think the opportunity to pick up high quality names that don't have an immediate catalyst was back in the summer when valuations were severely depressed. At these levels, we feel investors will need a catalyst - either positive or negative - to get paid.

TWST: Jason, what are you telling investors to do?

Dr. Kantor: In contrast to Kevin, I am a little more risk averse. I still view the downside from these events as being pretty heinous. We are telling investors to primarily be in companies that actually do have products on the market, where you have earnings and earnings growth stories. From a historic perspective right now, you are really not paying a lot for the kind of growth that you are getting from the biotech industry. The p/e's are certainly at the low end of where they have been, and PEGs are even lower than that. So whether it's some of the bigger

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

cap names like a Gilead or a Genentech, or some of the smaller, emerging
profitable stories like Cubist Pharmaceuticals (NASDAQ:CBST) (CBST) or The Medicines
Company (NASDAQ:MDCO)
(MDCO), I think that these are the ones that are very investable. Clearly, with
the smaller names where you might have a binary outcome, you could get some
really remarkable rewards like we recently saw with Acorda and others. It's just
not where I would be putting the majority of investment dollars in biotech.
TWST: Howard, what is your position on the space?
Mr. Liang: It's probably the function of my coverage universe, but I tend to
look at companies that, over a six- to 12-month horizon, could have a
significant change in their fundamentals, either through a new product getting
to the pipeline or clinical trial data. So I would agree with Kevin that you
probably need to take some risk to get reward. Again, it's probably a function
of the group that I cover.
TWST: Kevin, within that group, what are your top names at this point?
Mr. DeGeeter: We still like ZymoGenetics (NASDAQ:ZGEN) (ZGEN, Strong Buy rating). They
put up
some good thrombin data back in September and I don't think the market has fully
digested the news. I like their early and mid-stage pipeline, which I think will
generate some positive news flow at the ACR (American College of Rheumatology)
and ASH (American Society of Hypertension) meetings this year, and at ASCO
(American Society of Oncology) next year.
Another one is AEterna Zentaris (NASDAQ:AEZS) (TSX:AEZ) (AEZS, Strong Buy rating).
They are going
through a restructuring and are spinning off their nutrition business and
creating a pure play drug company. The company has a nice oncology franchise and
two products in Phase III for BPH. It looks pretty cheap to me here.
Thirdly, we like a specialty pharma name, Antares Pharma (AMEX:AIS) (AIS, Strong Buy
rating)(H.C. Wainwright has received a fee from Antares for investment banking
services). They have several niche products, a transdermal gel platform and a
needle-free injection technology. Companies such as Antares that can offer
alternative delivery mechanisms for biologics, vaccines and macromolecules will
be among the few winners from biogenerics. We've already seen evidence of this
trend approval of inhaled insulin. Biogenerics are coming to market in Europe
and will eventually arrive in the United States.
TWST: Howard, what are your top names?
Mr. Liang: We have talked about the names that potentially have catalysts in the
next few months. One of those would be Vertex (VRTX). They have a product for
hepatitis C that could potentially be the first in the class of new direct
antivirals. I think that it would offer a tremendous improvement, especially
when added on to the standard treatment. At this point, we still need to get
more experience and more safety data. But I think that once we pass that point
in the next few months and once we get some proof of clinical cure data in the
first half of next year, this could be a product that really changes the
standard of care of hepatitis C, which is obviously a very big market.
Another name would be Onyx Pharmaceuticals (NASDAQ:ONXX) (ONXX). We will see some
clinical
data this winter and perhaps another trial by the middle of next year. This is a
product where there is binary risk, but you do have multiple shots because there
is more than one indication. In my view, that provides a better risk/reward
profile.
A larger name is Celgene (NASDAQ:CELG) (CELG). We may be entering an environment where
investors are looking for growth. That is a name where there is a dominant

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

franchise with limited competition, and we can see fairly consistent growth over time.

TWST: Jason, what are your top picks at this juncture?

Dr. Kantor: My top pick is still Gilead Sciences. It's one of the bigger cap names in biotech, and really the franchise leader in HIV treatment with potentially some new drugs in other areas of HIV, as well as hepatitis C and others. The things that I like about Gilead are the revenue growth, the fact that it's really an industry leader in terms of their HIV franchise, and most interesting, it's one of the only biotech companies that has competed head to head against Big Pharma in their sweet spot, which is small molecule oral drugs. It has been able to beat them scientifically, clinically and commercially, and I think that we will see that continue. That is definitely my top pick.

In the small cap space, there is a name that I would throw out there because I don't think that it's very well appreciated. It's a relatively new issue. It's Alexza Pharmaceuticals (ALXA). It's a company with a novel drug delivery system for delivering small molecules through the lung to achieve very, very rapid onset of action of drugs. They are using it to develop several neurologic drugs that would otherwise have to be delivered by the intravenous route of administration. They have four drugs in the clinic. They own all the rights to their drugs. Their lead drug has Phase II proof of concept. It's in a Phase IIb for migraine. I think that there is a lot of value there that has yet to be appreciated by the market.

TWST: What's it going to take for the market to pay more attention?

Dr. Kantor: As with most new issues, you have to generate some new news flow post-IPO to get people to pay attention. The ongoing clinical trials really ought to begin to develop data in 2007.

TWST: Jason, you mentioned a relatively new company here. Is there a backlog of IPOs in this space?

Dr. Kantor: Yes, there are several companies in registration. Some of the trends that we are seeing are companies coming out that look a little more mature than some of the companies have in the past; perhaps it's more data, having already signed a major pharmaceuticals partnership, or companies with strong balance sheets. These are some of the trends that I am seeing among the private companies that are considering going public.

TWST: Kevin, any thoughts on a pipeline of IPOs here?

Mr. DeGeeter: I agree 100% with Jason. There is definitely a backlog, but the bar is pretty high for registered IPOs. These are still reasonably mature companies compared to the boom of the late 1990s. I think we are seeing some companies choosing to avoid the traditional IPO and merging with a company that has blown up and is little more than cash and a shell.

TWST: Howard, any thoughts on the IPO pipeline in this space?

Mr. Liang: We tend to see more of these product plays, as opposed to platform companies in the recent IPOs. That is probably consistent with shifts overall to more products and to the more revenue-driven theme that we see in biotech in general. You have to sell a product in order to make money, obviously.

TWST: Jason, are there any names in your coverage to be wary of, where things are iffy?

Dr. Kantor: There is a lot of iffiness throughout the sector. However, right now, I don't have any companies that I have rated underperform at the moment.

TWST: Kevin, are there any names to worry about?

Mr. DeGeeter: There are a couple that I dislike with a passion, but there is nothing that I have a sell on.

TWST: Howard, do you have any sells?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. Liang: No, sorry, it's going to be three for three.
TWST: Kevin, is there anything else that we should touch on regarding the outlook for biotech?
Mr. DeGeeter: I still think that this is a healthy and very fragmented sector. More companies are reaching an inflection point where either the lead product is successful and they move forward, or it's not and they merge and disappear. I think that trend is here to stay. Biotech is still an incredibly broad and diverse industry. At any given time, there are dozens of stocks that look great and dozens of stocks that I wouldn't touch with a 10-foot pole.
TWST: Howard, is there anything else that we should touch on?
Mr. Liang: I would echo the comment that there is a lot of fragmentation in biotech. I used to follow the pharmaceutical sector. The pharmaceutical industry is considered one of the most fragmented industries, but when you look at biotech, it's obviously a lot more fragmented than the pharmaceutical industry. The point is that I think there is a lot of room for consolidation.
TWST: Jason, do you have any closing comments?
Dr. Kantor: I would echo what has already been said. One has to always keep the upside in mind here and why we are all interested in biotech and biopharmaceuticals in general. This is an extremely high margin business. It's one where markets are extremely well protected through both patents and through the FDA regulatory process. Once they get approved, these drugs are enormous cash cows and huge growth drivers for these companies. There is a ton of risk in the sector and we have seen a lot of that play out over the last couple of years. I think that a diversified approach to looking at this sector can provide some very exciting rewards to investors.
TWST: So do not despair because they do not perform well for a while?
Dr. Kantor: No, certainly despair is everywhere. But this is not a sector that lends itself to sector analyses. This is a sector made up of hundreds of individual stories, any of which could be huge winners. The key is to try to pick the winners out of the bunch. The fact that the sector as a whole is moving up or down has more to do with people's view of risk premiums in the market and less to do with what is actually going on in the sector.
TWST: Thank you. (TJM)
Note: Opinions and recommendations are as of 10/24/06.
KEVIN DEGEETER
H.C. Wainwright & Co., Inc.
52 Vanderbilt Avenue
12th Floor
New York, NY 10017
(212) 856-5700
JASON KANTOR
RBC Capital Markets
Two Embarcadero Drive
Suite 1200
San Francisco, CA 94111
(415) 633-8565
HOWARD LIANG
Leerink Swann & Company, Inc.
One Federal Street
37th Floor
Boston, MA 02110
(617) 918-4857

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Newstex ID: TWST-0001-31125802

Word Count: 6670
1/19/09 WALLSTTRNFIN 04:04:51
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/10/09 L.A. Times 2
2009 WLNR 507086

Los Angeles Times
Copyright 2009 Los Angeles Times

**January 10, 2009**

Section: Business

Broadcom ex-CEO loses e-mail ruling

Wire

An e-mail in which Broadcom Corp. co-founder Henry T. Nicholas III allegedly talks about a drug binge can be used as evidence during his criminal trial, a federal judge ruled.

Lawyers for Nicholas, an Orange County and Silicon Valley billionaire, had argued that the 2002 message to his estranged wife was privileged because it was a personal communication.

However, U.S. District Judge Cormac J. Carney noted that the e-mail was written on a Broadcom computer, passed among Broadcom executives, turned over to federal investigators and mentioned in a newspaper article.

"The court cannot keep secret what is already public," Carney wrote in a ruling unsealed Thursday.

Nicholas is accused of conspiring to **backdate** $2.2 billion in employee stock options. He and former Broadcom Chief Financial Officer William Ruehle have pleaded not guilty to charges of conspiring to commit accounting and securities fraud.

Nicholas also has pleaded not guilty in a separate case to drug charges, including allegations that he slipped ecstasy into the drinks of business associates.

EDITION: Home Edition

Word Count: 213
1/10/09 LATIMES 2
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/9/09 AP Alert - CA 19:28:11

                              AP Alert - California
       Copyright 2009 The Associated Press. All rights reserved. This material may not be
                     published, broadcast, rewritten or redistributed.

                                **January 9, 2009**

                  Judge: E-mail about drugs OK in Broadcom case

SANTA ANA, Calif._An e-mail in which Broadcom Corp. co-founder Henry T. Nicholas III
allegedly talks about a drug binge can be used as evidence during his criminal trial,
a federal judge ruled.

Lawyers for Nicholas, an Orange County and Silicon Valley billionaire, had argued that
the 2002 message to his estranged wife was privileged because it was a personal
communication.

However, U.S. District Judge Cormac J. Carney noted the e-mail was written on a Broadcom
computer, passed among Broadcom executives, turned over to federal investigators and
mentioned in a newspaper article.

"The court cannot keep secret what is already public," Carney wrote in a ruling unsealed
Thursday.

The e-mail was written nine months before Nicholas resigned from Broadcom. It was first
reported in November by The Orange County Register, which said it was obtained from a
former Broadcom employee with access to the former CEO's e-mail.

The message said Nicholas had been on a drug binge that left him "not fully functioning"
to run the computer chip manufacturer, the newspaper reported.

Nicholas is accused of conspiring to **backdate** $2.2 billion in employee stock options.
He and former Broadcom Chief Financial Officer William Ruehle have pleaded not guilty
to charges of conspiring to commit accounting and securities fraud.

Nicholas also has pleaded not guilty in a separate case to drug charges, including
allegations that he slipped ecstasy into the drinks of business associates.

The 1,800-word e-mail was sent to Stacy Nicholas, who later divorced Nicholas. The
Register said it talks about using "huge quantities of caffeine and ephedrine" and smaller
amounts of cocaine and methamphetamine to stay awake during a marathon weekend as Broadcom
negotiated an acquisition.

It also mentioned abusing drugs for "a solid week" after the event and worries that drug use was damaging the company, the newspaper said.

"Fortunately, those results take at least a year to show up on our financial performance," it said. "However, I am willing to lie to get the key people in place so that I can extract myself from Broadcom as soon as possible."

In his ruling, Carney said the e-mail can be used to contradict testimony by Nicholas if he takes the stand at his upcoming securities fraud trial.

The jury's "interest in finding the truth may outweigh Dr. Nicholas' confidentiality in a troubled marriage," Carney wrote.

Word Count: 478
1/9/09 APALERTCA 19:28:11
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/9/09 AP DataStream 19:38:03

AP DataStream
Copyright 2009 The Associated Press. All rights reserved. This material may not be
published, broadcast, rewritten or redistributed.

**January 9, 2009**

Judge: E-mail about drugs OK in Broadcom case

SANTA ANA, Calif._An e-mail in which Broadcom Corp. co-founder Henry T. Nicholas III
allegedly talks about a drug binge can be used as evidence during his criminal trial,
a federal judge ruled.

Lawyers for Nicholas, an Orange County and Silicon Valley billionaire, had argued that
the 2002 message to his estranged wife was privileged because it was a personal
communication.

However, U.S. District Judge Cormac J. Carney noted the e-mail was written on a Broadcom
computer, passed among Broadcom executives, turned over to federal investigators and
mentioned in a newspaper article.

"The court cannot keep secret what is already public," Carney wrote in a ruling unsealed
Thursday.

The e-mail was written nine months before Nicholas resigned from Broadcom. It was first
reported in November by The Orange County Register, which said it was obtained from a
former Broadcom employee with access to the former CEO's e-mail.

The message said Nicholas had been on a drug binge that left him "not fully functioning"
to run the computer chip manufacturer, the newspaper reported.

Nicholas is accused of conspiring to **backdate** $2.2 billion in employee stock options.
He and former Broadcom Chief Financial Officer William Ruehle have pleaded not guilty
to charges of conspiring to commit accounting and securities fraud.

Nicholas also has pleaded not guilty in a separate case to drug charges, including
allegations that he slipped ecstasy into the drinks of business associates.

The 1,800-word e-mail was sent to Stacy Nicholas, who later divorced Nicholas. The
Register said it talks about using "huge quantities of caffeine and ephedrine" and smaller
amounts of cocaine and methamphetamine to stay awake during a marathon weekend as Broadcom
negotiated an acquisition.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

It also mentioned abusing drugs for "a solid week" after the event and worries that drug use was damaging the company, the newspaper said.

"Fortunately, those results take at least a year to show up on our financial performance," it said. "However, I am willing to lie to get the key people in place so that I can extract myself from Broadcom as soon as possible."

In his ruling, Carney said the e-mail can be used to contradict testimony by Nicholas if he takes the stand at his upcoming securities fraud trial.

The jury's "interest in finding the truth may outweigh Dr. Nicholas' confidentiality in a troubled marriage," Carney wrote.

Word Count: 478
1/9/09 APDATASTREAM 19:38:03
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


1/9/09 Associated Press (AP) Newswires 19:38:07

AP Online
Copyright 2009 The Associated Press. All rights reserved. This material may not be
published, broadcast, rewritten or redistributed.

**January 9, 2009**

Judge: E-mail about drugs OK in Broadcom case

SANTA ANA, Calif._An e-mail in which Broadcom Corp. co-founder Henry T. Nicholas III
allegedly talks about a drug binge can be used as evidence during his criminal trial,
a federal judge ruled.

Lawyers for Nicholas, an Orange County and Silicon Valley billionaire, had argued that
the 2002 message to his estranged wife was privileged because it was a personal
communication.

However, U.S. District Judge Cormac J. Carney noted the e-mail was written on a Broadcom
computer, passed among Broadcom executives, turned over to federal investigators and
mentioned in a newspaper article.

"The court cannot keep secret what is already public," Carney wrote in a ruling unsealed
Thursday.

The e-mail was written nine months before Nicholas resigned from Broadcom. It was first
reported in November by The Orange County Register, which said it was obtained from a
former Broadcom employee with access to the former CEO's e-mail.

The message said Nicholas had been on a drug binge that left him "not fully functioning"
to run the computer chip manufacturer, the newspaper reported.

Nicholas is accused of conspiring to **backdate** $2.2 billion in employee stock options.
He and former Broadcom Chief Financial Officer William Ruehle have pleaded not guilty
to charges of conspiring to commit accounting and securities fraud.

Nicholas also has pleaded not guilty in a separate case to drug charges, including
allegations that he slipped ecstasy into the drinks of business associates.

The 1,800-word e-mail was sent to Stacy Nicholas, who later divorced Nicholas. The
Register said it talks about using "huge quantities of caffeine and ephedrine" and smaller
amounts of cocaine and methamphetamine to stay awake during a marathon weekend as Broadcom
negotiated an acquisition.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

It also mentioned abusing drugs for "a solid week" after the event and worries that drug use was damaging the company, the newspaper said.

"Fortunately, those results take at least a year to show up on our financial performance," it said. "However, I am willing to lie to get the key people in place so that I can extract myself from Broadcom as soon as possible."

In his ruling, Carney said the e-mail can be used to contradict testimony by Nicholas if he takes the stand at his upcoming securities fraud trial.

The jury's "interest in finding the truth may outweigh Dr. Nicholas' confidentiality in a troubled marriage," Carney wrote.

Word Count: 478
1/9/09 APWIRES 19:38:07
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.