UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIPC MANAGEMENT, INC., | CASE NO. CV 08-04310 MMM (PLAx) |
| Plaintiff, | |
| vs. | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| INCREDIBLE PIZZA CO., INC.; INCREDIBLE PIZZA FRANCHISE GROUP, LLC; and CJM RACING, LLC, | |
| Defendants. | |

Plaintiff JIPC Management, Inc. ("JIPC") filed this trademark infringement and unfair competition action against defendants Incredible Pizza Co., Inc. Incredible Pizza Franchise Group, LLC ("IPFG"), and CJM Racing, LLC on June 30, 2008.[1] JIPC licenses and manages restaurants in California under the name "John's Incredible Pizza Co." The restaurants offer all-you-can-eat pizza buffets in an entertainment complex featuring theme rooms, video games, miniature golf, and bumper cars. IPC and IPFG license and manage similar all-you can eat pizza restaurants and entertainment complexes in other parts of the United States.

JIPC asserts that defendants' recent use of the name "Incredible Pizza Company" in

---

[1]CJM was subsequently dismissed as a defendant.

California infringes its rights in the marks "Incredible Pizza Co." and "John's Incredible Pizza Co."

## I. FACTUAL BACKGROUND

### A. Undisputed Facts

JIPC is in the business of licensing and managing restaurants under the name "John's Incredible Pizza Co." The restaurants offer all-you-can-eat buffets of pizza, pasta, salad, and desserts, in an entertainment complex featuring theme rooms, video games, redemption games, miniature golf, bumper cars, and go-karts.[2] John Parlet is JIPC's founder, president and CEO.[3] The first John's Incredible Pizza Co. store opened in Victorville, California in September 1997.[4] It was owned and operated by John's Incredible Pizza Co., Inc. ("JIPC, Inc."), a California corporation formed by Parlet on June 3, 1997.[5] On May 11, 1998, Parlet formed JIPC for the purpose of controlling the "John's Incredible Pizza Co." brand's intellectual property and serving as managing entity for the stores.[6] Since that time, JIPC has continuously managed each of the John's Incredible Pizza Co. stores from the date the store opened to the present, under agreements with the entities that own the stores.[7] JIPC, Inc. remains the owner of the Victorville store, but manages the store pursuant to an agreement with JIPC, Inc.[8] Since 2003, Parlets' former wife,

---

[2] Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Partial Summary Judgment ("Pl.'s Facts"), ¶¶ 1-2; Defendants' Statement of Genuine Issues of Material Fact in Support of Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def.'s Facts"), ¶¶ 1-2.

[3] Pl.'s Facts, ¶ 4; Def.'s Facts, ¶ 4.

[4] Pl.'s Facts, ¶ 9; Def.'s Facts, ¶ 9.

[5] Pl.'s Facts, ¶ 13; Def.'s Facts, ¶ 13.

[6] Pl.'s Facts, ¶ 15; Def.'s Facts, ¶ 15.

[7] Pl.'s Facts, ¶ 17.

[8] Pl.'s Facts, ¶ 22.

Betty Parlet, has owned JIPC, Inc.[9] There are currently eight John's Incredible Pizza Co. stores operating in California.[10] JIPC has obtained federal registration for its "John's Incredible Pizza Co." mark and "John's Incredible Pizza Co. All You Can Eat Food & Fun" mark and design.[11]

### B. Procedural Background

JIPC filed its complaint on June 30, 2008, and sought a preliminary injunction on July 7, 2008. The court declined to enter an injunction on August 26, 2008. Defendants filed a motion for summary judgment on April 27, 2009. JIPC filed a motion for summary judgment on May 12, 2009. This order addresses JIPC's motion.

JIPC seeks partial summary judgment in the form of a declaration that it is the owner of the mark "John's Incredible Pizza," and has standing to assert claims based on that mark.[12] Defendants counter that JIPC, Inc., not JIPC, is the owner of the marks. JIPC also seeks summary judgment on defendants' second, third, fourth, and fifth counterclaims. Defendants' second and third counterclaims seek cancellation of JIPC's registration of the "John's Incredible Pizza Co. All You Can Eat Food & Fun!" mark and design (registration nos. 3,099,682 and 3,061,612). Their fourth and fifth counterclaims seek cancellation of JIPC's registration of the "John's Incredible Pizza Co." mark (registration nos. 3,058,427 and 3,025,377). The counterclaims allege that in the applications for registration of the marks, Parlet falsely claimed

---

[9]Pl.'s Facts, ¶ 21; Def.'s Facts, ¶ 21.

[10]Pl.'s Facts, ¶ 6; Def.'s Facts, ¶ 6. These stores are located in Victorville, California (opened September 1997); Bakersfield, California (opened November 1998); Fresno, California (opened June 2000); Stockton, California (opened August 2002); Modesto, California (opened July 2003); Montclair, California (opened January 2005); Roseville, California (opened March 2007); and Riverside, California (opened October 2007). (*Id.*)

[11]Pl.'s Facts, ¶ 8.

[12]JIPC also seeks a declaration that it is the owner of the "Incredible Pizza Co" mark and has standing to assert claims based on that mark. This aspect of JIPC's motion must be denied given the court's determination, in its order on defendants' summary judgment motion, that JIPC has adduced no evidence that it ever used the mark "Incredible Pizza Co." standing alone, and thus has no rights in the mark independent of its rights in "John's Incredible Pizza Co."

that JIPC was their owner. As noted, defendants contend that JIPC, Inc., not JIPC, is the owner of the marks and seek cancellation based on fraud. Finally, JIPC argues that it is entitled to summary judgment on defendants' claim that the case is "exceptional" and that they are entitled to attorneys' fees under 15 U.S.C. § 1117(a).

## II. DISCUSSION

### A. Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits or moving papers is insufficient to meet this burden, or raise genuine issues of fact defeating summary judgment. See *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

"It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179,

1181 (9th Cir. 1988). "At the summary judgment stage," however, courts "do not focus on the admissibility of the evidence's form. [They] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001), and *Fed. Deposit Ins. Corp. v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991)); see *Cutrona v. Sun Health Corp.*, No. CV 06-2184-PHX-MHM, 2008 WL 4446710, *7 (D. Ariz. Sept. 30, 2008) (on summary judgment, "hearsay is admissible if there is any way to present it in an admissible form at trial"); see also *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form").

In judging the evidence presented in support of or opposition to summary judgment, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).

Rule 56(d) governs situations in which a party moves for summary judgment on less than all of a claim. It provides:

> "If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts – including items of damages or other relief – are not genuinely at issue. The facts so specified must be treated as established in the action." FED.R.CIV.PROC. 56(d).

See also *id.*, FED.R.CIV.PROC. 56(a) ("A party claiming relief may move, with or without supporting affidavits, for summary judgment on *all or part* of the claim" (emphasis added)); see also *Harris Technical Sales, Inc. v. Eagle Test Systems, Inc.*, No. 06-02471-PHX-RCB, 2008 WL 343260, *10 (D. Ariz. Feb. 5, 2008) (noting that "Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . ."). "As the Advisory Committee Notes to the 1946 amendment to Rule 56 observe: 'The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the

case. This adjudication . . . serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact.'" *Rotorex Co., Inc. v. Kingsbury Corp.*, 42 F.Supp.2d 563, 570-71 (D. Md. 1999) (quoting Advisory Committee Notes).

**B. Standard Governing Motions for Summary Judgment Involving Contract Interpretation**

In general "summary judgment is appropriate [in contract interpretation cases] only if the contract or the contract provision in question is unambiguous." See *Northwest Acceptance Corp. v. Lynnwood Equipment, Inc.*, 841 F.2d 918, 920 (9th Cir. 1988) (quoting *National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) (quoting *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981)). The rationale for this rule is that "ambiguity in a contract raises a question of intent, which is a question of fact precluding summary judgment." *National Union*, 701 F.2d at 97. "The usual statement of the rule, however, assumes that there is at least some evidentiary support for competing interpretations of the contract's language." *Id.* Where there is no evidentiary support for the interpretation urged by a party, summary judgment against that party is appropriate, even if the contract is ambiguous on its face. *Id.* ("National cannot rely on the mere possibility of a factual dispute as to intent to avert summary judgment. Nor can it expect the district court to draw inferences favorable to it when they are wholly unsupported. National failed to raise a genuine issue of material fact as to the contract's proper interpretation. Summary judgment was appropriate"); see *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 159 (2d Cir. 2000) ("This Court may resolve the ambiguity in the contractual language as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so[ ] one[-]sided that no reasonable factfinder could decide contrary to one party's interpretation"); *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746-47 (2d Cir. 1999) ("As with any other factual issue, however, the court may resolve ambiguity in contractual language as a matter 'of law' if 'the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary,'" quoting *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 8 (1st Cir. 1985)

(alteration original)); *Unicom Systems, Inc. v. Electronic Data Systems, Corp.*, No. CV 04-6716 AHM (RZx), 2005 WL 5801534, *8 (C.D. Cal. Nov. 1, 2005) ("Where a party presents no evidence in support of its contract interpretation, summary judgment is appropriate"); see also *Ferguson v. Lion Holding, Inc.*, 478 F.Supp.2d 455, 468 (S.D.N.Y. 2007) ("In rare instances, summary judgment will be appropriate where there exists a contractual ambiguity, yet the relevant extrinsic evidence is so one-sided as to compel a finding as a matter of law," citing *Compagnie Financiere*, 232 F.3d at 159); Joseph M. Perillo, CALAMARI & PERILLO ON CONTRACTS § 3.15, at 164 (5th ed. 2003) ("Where . . . extrinsic evidence is introduced in aid of interpretation of a writing, the question of meaning is left to the jury except where, after taking the extrinsic evidence into account, the meaning is so clear that . . . the question is treated as one of law" (footnotes omitted)). As the Ninth Circuit has explained:

> "If we find a contract to be ambiguous, we 'ordinarily' are hesitant to grant summary judgment 'because differing views of the intent of parties will raise genuine issues of material fact.' *Maffei v. Northern Ins. Co.*, 12 F.3d 892, 898 (9th Cir.1993). This circuit has not, however, adopted a rigid rule prohibiting reference to extrinsic evidence in resolving a contractual ambiguity on a summary judgment motion. See, e.g., *International Bhd. of Elec. Workers Local 47 v. Southern Cal. Edison Co.*, 880 F.2d 104, 107 (9th Cir.1989) (examining parol evidence on summary judgment motion in effort to reconcile conflicting contract provisions). Rather, '[c]onstruing all evidence in the light most favorable to, and making all reasonable inferences in favor of, the non-moving party,' we have sought to determine whether the ambiguity could be resolved in a manner consistent with the non-moving party's claim. *Id*. Only if the ambiguity could be so resolved would summary judgment be denied. *Id.*" *San Diego Gas & Elec. Co. v. Canadian Hunter Marketing Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997).

**C. Whether There is a Triable Issue of Fact Regarding the Meaning of the Assignment Agreement Between JIPC, Inc. & JIPC**

The issues on which JIPC seeks summary judgment turn on whether JIPC or JIPC, Inc.

is the owner of the trademarks in question. It is undisputed that JIPC, Inc. used the name "John's Incredible Pizza Co." before JIPC. JIPC argues, however, that JIPC, Inc. transferred all rights in "John's Incredible Pizza Co.," including all trademark rights, on March 31, 1999.[13] JIPC and JIPC, Inc. executed two contracts on that date. In the first, denominated a "Trademark Assignment Agreement," JIPC, Inc. assigned to JIPC "all of [the] right, title, and interest in and to the Tradename ['John's Incredible Pizza Co.'], including all goodwill associated therewith, free from any notice or claim asserted or threatened by any third party due to the infringement of any trade name, trademark, service mark, copyright, or license of any person or organization."[14] In the second, captioned a "Tradename License Agreement," JIPC licensed all rights to the "tradename" back to JIPC, Inc.[15] Parlet signed both contracts on behalf of JIPC and JIPC, Inc.

JIPC contends that Parlet's "intent and understanding" in signing the assignment agreement for JIPC and JIPC, Inc. was that it "transferred rights to both the John's Incredible Pizza Co. name and mark."[16] JIPC proffers Parlet's declaration, in which he states that "[o]n March 31, 1999, JIPC, Inc. transferred to JIPC by written assignment all right, title, and interest in the John's Incredible Pizza Co. name, including all trademark rights in the name."[17] JIPC contends that the language of the license agreement confirms the term "tradename," as used in the assignment agreement, includes trademark rights.[18] It notes that the license agreement provides that the "[l]icensee will not commence the use of the Tradename until it has taken all actions and obtained all registrations in the Territory which are required of trademark and service mark

---

[13] Pl.'s Facts, ¶ 23.

[14] Declaration of Betty Parlet in Support of Motion for Partial Summary Judgment ("B. Parlet Decl."), Exh. 1.

[15] *Id.*, Exh. 2.

[16] Memorandum in Support of Motion for Partial Summary Judgment ("Mot.") at 4.

[17] Declaration of John Parlet ("Parlet Decl."), ¶ 18.

[18] Mot. at 10.

8

licensees and trademark and service mark users."[19] JIPC asserts that its practice of licensing trademark rights to subsequent stores confirms the parties' understanding that the assignment included trademark rights.

Defendants counter that trade name and trademark are distinct concepts. They assert that the March 31, 1999 assignment agreement transferred rights only to the trade name "John's Incredible Pizza Co." and did not assign any trademark rights. They also contend that the agreement is not reasonably susceptible to the interpretation Parlet puts on it.[20]

Defendants are correct that trade names and trademarks are "technically distinct." See *Accuride Intern., Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir. 1989). "Trade names symbolize the reputation of a business as a whole. In contrast, trademarks and service marks are designed to identify and distinguish a company's goods and services." *Id.* (citing *New West Corp. v. NYM Co.*, 595 F.2d 1194, 1201 (9th Cir. 1979)).[21] "As a practical matter, courts are rarely called upon to distinguish between trade names, trademarks and service marks. Trade names often function as trademarks or service marks as well." *Id.* "The major legal distinction between trademarks and trade names is that trade names cannot be registered and are therefore not protected under 15 U.S.C. § 1114." *Id.* (citing *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1163 (11th Cir. 1982)). Analogous actions for trade name infringement may be brought under section 43(a) of the Lanham Act, however. *Id.* (citing *New West*, 595 F.2d at 1198-1201, and *Walt-West Enterprises, Inc. v. Gannett Co.*, 695 F.2d 1050, 1054 n. 6 (7th Cir. 1982)).

---

[19]B. Parlet Decl., Exh. 2.

[20]Opp. at 9.

[21]The Lanham Act defines a trade name as "any name used by a person to identify his or her business or vocation." 15 U.S.C. § 1127. A trademark includes "any word, name, symbol, or device, or any combination thereof – (1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter, to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Id.*

The assignment agreement states that it is governed by California law.[22] "Under California law, the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting." *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002) (citing CAL. CIV. CODE § 1636, and *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal.App.4th 445, 474 (1998)). "When a contract is reduced to writing, this intent 'is to be ascertained from the writing alone, if possible.'" *Id.* (citing CAL. CIV. CODE § 1639, and *Brinton v. Bankers Pension Servs., Inc.*, 76 Cal.App.4th 550, 559 (1999)).

Because the words of a written instrument "often lack a clear meaning apart from the context in which the words were written," however, "courts may preliminarily consider any extrinsic evidence offered by the parties." *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 989-90 (9th Cir. 2006). "'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'" *Id.* at 989 (quoting *Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37 (1968), and citing *United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988)). "'If the court decides, after consideration of this evidence, that the language of a contract, in the light of all the circumstances, is "fairly susceptible of either one of the two interpretations contended for," extrinsic evidence relevant to prove either of such meanings is admissible.'" *Id.* at 990 (quoting *Pacific Gas*, 69 Cal.2d at 38-40, and citing *U.S. Cellular Invest. Co.*, 281 F.3d at 939). "Extrinsic evidence includes testimony regarding the circumstances in which a contract was written, the subsequent conduct of the parties, and the common usage of particular terms in a given industry." *Id.* (citing *Pacific Gas*, 69 Cal.2d at 38-39; *U.S. Cellular Invest. Co.*, 281 F.3d at 937, and *United Cal. Bank v. THC Financial Corp.*, 557 F.2d 1351, 1360 (9th Cir. 1977)).

As noted, the March 1999 "Tradename Assignment Agreement" conveyed to JIPC "all of

---

[22] B. Parlet Decl., Exh. 1.

[the] right, title, and interest in and to the Tradename, including all goodwill associated therewith, free from any notice or claim asserted or threatened by any third party due to the infringement of any trade name, trademark, service mark, copyright, or license of any person or organization."[23] The contract did not explicitly convey rights in the John's Incredible Pizza Co. trademark to JIPC. The term "name," however, is incorporated in the Lanham Act's definition of a trademark. See 15 U.S.C. § 1127. Moreover, the agreement refers both to a specific "Tradename" and non-specific "trade name" in a single clause, suggesting that the two terms have a different meaning. Because the agreement is ambiguous on its face and reasonably susceptible to multiple interpretations, the court will consider extrinsic evidence regarding JIPC, Inc.'s and JIPC's intent at the time they executed the agreement.[24]

One type of extrinsic evidence that is relevant in interpreting the assignment agreement is the "Tradename License Agreement" the parties executed contemporaneously. "'Where two or more written *instruments* are executed contemporaneously, with reference to each other, for the purpose of attaining a preconceived object, they must all be construed together, and effect given if possible to the purpose intended to be accomplished.'" *Harm v. Frasher*, 181 Cal.App.2d 405, 412-13 (1960) (quoting *Burnett v. Piercy*, 149 Cal. 178, 189 (1906) (emphasis original in *Frasher*); see also CAL. CIV. CODE § 1642 ("Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together"); *Deluca v. Massachusetts Mut. Life Ins. Co.*, CV 05-0632 OWW DLB, 2005 WL 1562033, *6 (E.D. Cal. June 28, 2005) ("'The general principle of joint consideration of several instruments as one

---

[23]*Id.*

[24]Cf. *Miller*, 454 F.3d at 990 ("The 1956 license agreement conveyed to GMP 'the right and license to use the name and likeness of Glenn Miller . . . in connection with the business activities of [GMP].' The license agreement does not explicitly convey to GMP either the right to license any existing Glenn Miller trademark or Glenn Miller's publicity rights, or both. However, the terms 'name' and/or 'likeness' are found in both the Lanham Act definition of a trademark and in the definitions of California's statutory and common law rights to publicity. Because the 1956 agreement is ambiguous on its face and is reasonably susceptible to multiple interpretations, extrinsic evidence is admissible to prove the parties' intent when they executed the agreement," citing *Pacific Gas*, 69 Cal.2d at 38-40).

agreement is applicable whether they expressly refer to each other or it appears from extrinsic evidence that they were executed as a part of one transaction,'" quoting *Frasher*, 181 Cal.App.2d at 413).

The assignment agreement states that "[i]n further consideration for the assignment contemplated by this Agreement, Assignee shall, concurrently with the execution of this Agreement, execute a License Agreement in form appended hereto as Exhibit A."[25] Because the assignment expressly references the license agreement, it is appropriate to consider the two contracts together. The license agreement provides, as a condition of "use of the Tradename," that JIPC, Inc., the licensee, "will not commence the use of the Tradename until it has taken all actions and obtained all registrations in the Territory which are required of trademark and service mark licensees or trademark and service mark users or which Licensor otherwise deems desirable."[26] If the assignment and license agreements pertained only to the John's Incredible Pizza Co. trade name, there would be no reason to require that the licensee ensure it had complied with all requirements of 'trademark and service mark' users. It thus appears that the parties intended that the assignment would encompass the John's Incredible Pizza Co. trademark as well as the trade name.

Additionally, Parlet states that it was the parties' intention to transfer rights to both the name and the trademark.[27] This interpretation of the assignment is borne out by the parties' subsequent conduct, i.e., that JIPC has licensed use of the John's Incredible Pizza Co. trademark to other JIPC stores.[28]

The fact that it is common to use the terms "trade name" and "trademark" interchangeably further supports JIPC's interpretation that the agreement assigned rights in both the John's Incredible Pizza Co. trademark and trade name. See, e.g., *Union Nat. Bank of Texas, Laredo,*

---

[25]*Id.*

[26]*Id.*, Exh. 2.

[27]Parlet Decl., P 18.

[28]Pl.'s Facts, ¶ 17.

12

*Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839, 841 n. 2 (5th Cir. 1990) ("For purposes of this opinion the term 'trademark' includes trade names and service marks. . . . There are differences between each classification with respect to registrability, etc. under the Lanham Act, but the terms are often used interchangeably and such differences as do exist are not relevant to our decision in this case," citing *Blinded Vet. Ass'n v. Blinded Am. Vet. Foundation*, 872 F.2d 1035, 1040 n. 11 (D.C. Cir. 1989) ("[W]e denote as a 'trademark' the name of a product, service or business enterprise that may be appropriated to the use of one party under the common law or the Lanham Act")); *Accuride Intern., Inc.*, 871 F.2d at 1535 ("[T]he Ninth Circuit has said that '[t]rade name infringement . . . is based on considerations similar to trade-mark infringement,' and that both 'preclude one from using another's distinctive mark or name if it will cause a likelihood of confusion or deception as to the origin of the goods,'" quoting *New West*, 595 F.2d at 1201, and citing *West Des Moines State Bank v. Hawkeye Bancorp.*, 722 F.2d 411, 413 (8th Cir. 1983) ("[t]rade names (business names) are under modern law accorded the same protection as trademarks"); *Walt-West Enterprises*, 695 F.2d at 1054 n. 6 (using "the terms trademark, service mark and trade name interchangeably in conformity with contemporary judicial parlance"); *Blacks In Government v. National Ass'n of Blacks Within Government*, 601 F.Supp. 225, 227 (D.D.C. 1983) ("the law protecting trademark infringement is essentially the same as that protecting commercial and corporate trade names")); 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 4:14 (noting that, for practical purposes, trademarks, trade names and service marks "are subject to the same substantive rules of validity and infringement").

Considering the extrinsic evidence in the record, the court concludes that no reasonable factfinder could resolve the ambiguity in the contract in favor of defendants' proffered interpretation, i.e., that Parlet intended for JIPC, Inc. to retain trademark rights to "John's Incredible Pizza Co." and transfer only rights to the trade name to JIPC. Defendants adduce no evidence that Parlet had such an intent. Nor do they explain what Parlet could have intended to achieve by causing JIPC Inc. to transfer only rights to the trade name to JIPC, and having JIPC immediately license them back to JIPC, Inc. Parlet's uncontroverted declaration indicates that he formed JIPC in 1998 for "the purpose of controlling the John's Incredible Pizza Co. brand's

intellectual property and serving as the managing entity for all John's incredible Pizza Co. Stores."[29] Since the assignment agreement was executed, JIPC has continually licensed rights to the "John's Incredible Pizza Co." trademark to third parties.[30] JIPC, Inc., by contrast, has engaged in no licensing activity since then. The evidence demonstrates, in fact, that JIPC, Inc. has taken no further action in relation to the "John's Incredible Pizza Co." brand beyond ownership of the Victorville store. JIPC, moreover, has managed that store for JIPC, Inc. Evidence of the entities' conduct, therefore, compels the conclusion that Parlet, who controlled both entities at the time of the assignment, intended for JIPC to receive JIPC, Inc.'s trademark rights in "John's Incredible Pizza Co." and assume responsibility for licensing those rights. Other extrinsic evidence, including Parlet's declaration and the language of the JIPC-JIPC, Inc. licensing agreement, reinforces this conclusion.[31]

*National Union*, 701 F.2d 95, supports the court's conclusion that there is only one reasonable interpretation of the ambiguous provisions in the assignment agreement. In *National Union*, the court interpreted an insurance agreement between the defendant insurance company and the insured; plaintiff was the insured's equitable subrogor and sought to recover from the carrier its contribution to the settlement of a claim against the insured. *Id.* at 95-96. The parties disputed whether the policy limit was $300,000 or $10,000. *Id.* Both parties to the contract agreed that the limit was $10,000. *Id.* at 96. The district court considered evidence of the history of the insured's

---

[29]Pl.'s Facts, ¶ 15.

[30]*Id.*, ¶ 17.

[31]Defendants argue that Parlet's statements are not credible because of differences between his declaration in support of this motion and his declaration in support of JIPC's motion for preliminary injunction. In the latter declaration, Parlet stated that the parties' intent was to transfer all rights, including trademark rights, to the name "John's Incredible Pizza Co." In his current declaration, Parlet states that the parties understood they were transferring rights to "John's Incredible Pizza Co." and "all other names or marks then in use by JIPC, Inc. that included the word 'Incredible.'" (Parlet Decl., ¶ 19.) While there is some potential inconsistency between these statements, both consistently assert that the parties intended to transfer trademark rights to "John's Incredible Pizza Co." To this extent, there is no conflict, and thus no issue regarding a possible sham declaration that the court need resolve.

14

coverage proffered by the insurer, and concluded that the parties had agreed to a $10,000 limit. *Id.* Plaintiff offered no evidence contradicting the insurer's "amply supported version of the history of [the insured's] insurance coverage in general and the development of th[e] contract [at issue] in particular." *Id.* Based on the record evidence, the Ninth Circuit held that the district court had properly entered summary judgment for the carrier. *Id.* at 97.

Here, as in *National Union*, both parties to the contract are in agreement regarding its meaning. This meaning, moreover, is amply supported by uncontroverted evidence of the history of JIPC's dealings with JIPC, Inc. and third parties. Like the defendant in *National Union*, defendants here cite no evidence that the parties intended to adopt the interpretation of the contract they advance. As a result, there is no triable issue of fact concerning the meaning of the assignment agreement. See *id.*; see also, e.g., *Maron v. Foster Wheeler Corp.*, No. C 95-0686 SI, 2002 WL 102605, *4 (N.D. Cal. Jan. 17, 2002) (finding no triable issue of fact where "[p]laintiffs . . . offered no relevant evidence that the provision imposed a disclosure requirement on Wong, and defendants . . . introduced ample evidence to the contrary").

Pursuant to Rule 56(d), therefore, the court finds established for purposes of trial the fact that the March 31, 1999 assignment agreement assigned JIPC, Inc.'s trademark rights in "John's Incredible Pizza Co." to JIPC, such that JIPC has standing to assert trademark rights in "John's Incredible Pizza." Because defendants' second, third, fourth, and fifth counterclaims are based on an allegation that JIPC, Inc., rather than JIPC, owned the trademark rights at the time Parlet filed applications on JIPC's behalf with the USPTO, JIPC is entitled to summary judgment on those counterclaims.

### D. Whether JIPC Is Entitled to Partial Summary Judgment on Defendants' Right to Attorneys' Fees

JIPC argues that it is entitled to have summary judgment entered in its favor on defendants' claim that this case is not "exceptional" within the meaning of 15 U.S.C. § 1117(a). Section 1117(a) provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Although the text of § 1117(a) is directed to a plaintiff's right to recover attorney's fees, the Ninth Circuit has determined that a prevailing defendant in an

15

infringement action may recover fees "when the case is *either* 'groundless, unreasonable, vexatious, *or* pursued in bad faith.'" *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1156 (9th Cir. 2002) (emphasis original) (quoting *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 881 (9th Cir. 1999) (emphasis added)).

In determining whether an award of fees is appropriate, the court looks to the totality of the circumstances. See *Int'l Bus. Advisors Ltd. v. Payless Drug Stores Northwest Inc.*, 27 U.S.P.Q.2d 1053, 1055 (N.D. Cal. 1993); see also *Stephen W. Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 827 (9th Cir. 1997) ("While a finding that the losing party has acted in bad faith may provide evidence that the case is exceptional, other exceptional circumstances may warrant a fee award," citing *FASA Corp. v. Playmates Toys, Inc.*, 108 F.3d 140, 143 (7th Cir. 1997)). Courts consider factors such as the merit of plaintiff's legal claims, see *Cairns*, 202 F.3d at 1156; *Societe Civile Succession Richard Guiono v. Beseder Inc.*, CV 03-1310 PHX MHM, 2007 WL 3238703, *13 (D. Ariz. Oct. 31, 2007) ("[T]he fact that the Rima Defendants' did not move for summary judgment on this claim sooner does not somehow excuse the groundless and unreasonable nature of Plaintiff's claim"), and plaintiff's conduct during the course of the litigation, including conduct respecting discovery and settlement. See *Matrix Motor Co., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 120 Fed. Appx. 30, 32 (9th Cir. Jan. 5, 2005) (Unpub. Disp.); *Int'l Bus. Advisors Ltd.*, 27 U.S.P.Q.2d at 1055 ("For cases to be considered 'exceptional' under Section 35(a) of the Lanham Act, the inappropriate conduct may be found not only in the events leading up to the lawsuit, but also in the conduct during the litigation," citing *Viola Sportswear, Inc. v. Mimun*, 574 F.Supp. 619, 621 (E.D.N.Y. 1983)).

To determine whether a prevailing defendant is entitled to attorneys' fees because a case is exceptional, the court must several factors, including the merits of plaintiff's claims. The fact that JIPC did not misrepresent its ownership of rights in the "John's Incredible Pizza Co." mark does not necessarily mean that it acted reasonably and in good faith in asserting affirmative claims against defendants based on those rights. Thus, consideration of defendants' right to attorneys' fees is best reserved for resolution after JIPC's affirmative claims have been decided on the merits. Absent a merits determination, the court cannot say whether JIPC's pursuit of the claims was

"groundless, unreasonable, vexatious, or . . . in bad faith." *Cairns*, 292 F.3d at 1156.

### III. CONCLUSION

For the reasons stated, the court grants JIPC's motion for partial summary judgment in part and denies it in part. The court grants JIPC's motion for summary judgment on defendants' second, third, fourth and fifth counterclaims. In addition, it concludes that the fact that the March 31, 1999 assignment agreement assigned JIPC, Inc.'s trademark rights in "John's Incredible Pizza Co." to JIPC, and that JIPC has standing to assert those rights is established for purposes of trial. The court denies plaintiff's motion for summary judgment on the issue of defendants' entitlement to attorneys' fees if they are found to be the prevailing parties.

DATED: June 29, 2009

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE