# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 08-04310 MMM (PLAx) | Date | July 14, 2009 |

Title    *JIPC Management, Inc. v. Incredible Pizza Co., Inc., et al.*

Present: The Honorable    MARGARET M. MORROW

| ANEL HUERTA | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

Proceedings:        Order Regarding Parties' Motions *in Limine*

## I. BACKGROUND

Plaintiff JIPC Management, Inc. ("JIPC") filed this trademark infringement and unfair competition action against defendants Incredible Pizza Co., Inc. ("IPC"), Incredible Pizza Franchise Group, LLC ("IPFG"), and CJM Racing, LLC on June 30, 2008.[1]  JIPC licenses and manages restaurants in California under the name "John's Incredible Pizza Co."  The restaurants offer all-you-can-eat pizza buffets in an entertainment complex featuring theme rooms, video games, miniature golf, and bumper cars.  IPC and IPFG license and manage similar all-you can eat pizza restaurants and entertainment complexes in other parts of the United States.

JIPC asserts that defendants' recent use of the name "Incredible Pizza Company" in connection with their sponsorship of a NASCAR race car that appears in nationally televised races infringes its rights in the marks "Incredible Pizza Co." and "John's Incredible Pizza Co."  Defendants filed counterclaims, seeking cancellation of plaintiffs' trademark registrations, a declaration of non-infringement, a declaration that JIPC does not own any rights in the mark "Incredible Pizza Co." standing alone, i.e., without the addition of "John's," and attorneys' fees.

On June 24, 2009, the court granted in part and denied in part defendants' motion for summary judgment.  The court granted summary judgment in defendants' favor on their claim seeking a

---

[1]CJM was subsequently dismissed as a defendant.

declaration that JIPC does not own any rights in the mark "Incredible Pizza Co." In addition, the court found established for purposes of trial that: (1) JIPC's market penetration does not extend into any states in which defendants currently operate restaurants; (2) that JIPC is not entitled to injunctive relief with respect to defendants' use of their IPC mark in those states; (3) that JIPC has not suffered damage as a result of defendants' use of their marks in those states; and (4) that JIPC has not lost any sales as a result of defendants' conduct. Also on June 24, 2009, the court granted in part and denied in part JIPC's motion for partial summary judgment. The court granted summary judgment in JIPC's favor on defendants' trademark cancellation claims. It also found established for purposes of trial that JIPC had standing to assert trademark rights in "John's Incredible Pizza Co.," based on a March 31, 1999 assignment agreement between JIPC and John's Incredible Pizza Co., Inc ("JIPC, Inc.").

Trial is set to begin on August 25, 2009. In anticipation of the evidence that may be presented at trial, plaintiff has filed one motion *in limine* and defendants has filed eleven motions *in limine*.

## II. DISCUSSION

### A.    Defendants' Motion to Exclude the Reports and Testimony of JIPC's Expert

Defendants move to exclude reports prepared by JIPC's expert witness, Dr. Bruce Isaacson, and to preclude Isaacson from testifying, asserting that: (1) Isaacson's reports "are not supported by any concrete evidence or data"; (2) Isaacson offers conclusions on issues properly decided by the jury; (3) Isaacson's analysis is not likely to assist the trier of fact; (4) Isaacson's conclusions are speculative; (5) Isaacson's qualifications are inadequate; (6) Isaacson's May 15, 2009 "sur-rebuttal" report was disclosed after the rebuttal expert disclosure deadline; and (7) the analysis in the May 15 report does not follow accepted principles or support Isaacson's conclusions.[2]

### 1.    Standard Governing Admissibility of Expert Testimony

Under the Federal Rules of Evidence,

"[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702.

See also *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) ("[Rule 702] consists of three

---

[2]Defendants' Motion in Limine No. 1 ("Def.'s MIL #1") at 1.

distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion"); *Sterner v. U.S. Drug Enforcement Agency*, 467 F.Supp.2d 1017, 1033 (S.D. Cal. 2006) ("There are three basic requirements that must be met before expert testimony can be admitted. First, the evidence must be useful to a finder of fact. Second, the expert witness must be qualified to provide this testimony. Third, the proposed evidence must be reliable or trustworthy" (citations omitted)).

Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). In conducting this preliminary assessment, the trial court is vested with broad discretion. See, e.g., *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly erroneous").

"The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. CV 02-2258 JM (AJB), 2007 WL 935703, *4 (S.D. Cal. Mar. 7, 2007) (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999), in turn citing *Daubert*, 509 U.S. at 592 n. 10)); see also *Walker v. Contra Costa County*, No. C 03-3723 TEH, 2006 WL 3371438, *1 (N.D. Cal. Nov. 21, 2006) (same, citing *Bourjaily v. United States*, 483 U.S. 171, 172 (1987), and *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).[3]

"In determining whether expert testimony is admissible under Rule 702," however,"the district court must keep in mind Rule 702's broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (internal quotation marks omitted); see also *Jinro Am. Inc. v. Secure Invests ., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001) ("Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony" (internal quotation marks omitted)).

## 1.    Whether Isaacson's Testimony Is Admissible

Isaacson's report states that he is the president of a "marketing research and consulting firm."[4] He has an MBA and doctorate in business administration from the Harvard Graduate School

---

[3]This showing must be by a preponderance of the evidence. See *Daubert*, 509 U.S. at 594 n. 10 (citing *Bourjaily*, 483 U.S. at 175-76).

[4]*Id.*, Exh. 1 ("Isaacson Report") at 1.

of Business Administration, and has thirty four years of market research experience.[5] Isaacson states that in preparing his report, he reviewed "legal documents . . . relevant websites and online search engine results; displays of retailers/restaurants in relevant product categories; sample marketing materials . . . and published literature and cases relevant to the issues and theories in this matter."[6] Based on his review of these materials, Isaacson opines that "it is likely that a substantial number of consumers and/or potential customers of John's Incredible Pizza Company [ ] restaurants could believe that JIPC is the same, connected or affiliated with the restaurant chain America's Incredible Pizza Company."[7] He "conclude[s] that the likelihood of confusion is lower as long as the two companies operate in separate markets, but that two events have made it substantially more likely that IPC will have a presence in markets where previously only JIPC operated," specifically defendants' sponsorship of a NASCAR racer and the fact that "IPC is or may be selling franchises within the market area of JIPC's restaurants."[8]

Isaacson offers opinions regarding application of several of the *Sleekcraft* factors relevant in assessing likelihood of confusion: "My analysis has focused on items such as the proximity or relatedness of the brands and their offerings; the marks' similarity in appearance, sound, and meaning; the strength of the JIPC and IPC brands among the relevant set of customers; the marketing and advertising channels used to promote the brands; and the degree of care likely exercised by consumers."[9] As this statement indicates, his testimony consists largely of personal observations and conclusions respecting factual issues within the province of the lay jury. See *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 398 (9th Cir.) (stating, in a trademark infringement case, that "[t]he similarity or dissimilarity of these two words is a matter easily evaluated by laymen within the realm of their common knowledge and experience. It is highly doubtful that expert testimony on the subject, of the type presented by the affidavit, would be of any real assistance to the trier of fact. Certainly it would be well within the discretion of the trial judge to exclude the expert opinion evidence under Fed.R.Evid. 702"), cert. denied, 459 U.S. 967 (1982); *Patsy's Italian Restaurant,*

---

[5]For these reasons, the court agrees with JIPC that Isaacson is qualified to testify regarding marketing. See *Patsy's Italian Restaurant, Inc. v. Banas*, 531 F.Supp.2d 483, 484 n. 2 (E.D.N.Y. 2008) ("Wallace's qualifications include over twenty-five years of experience working in brand marketing, publication of articles in the *Wall Street Journal*[,] the *New York Times*, and involvement in various academic activities. . . . I therefore agree with Patsy's Italian Restaurant that Wallace is qualified to render expert opinions on brand marketing"). "[T]he fact that [Isaacson] is a valid expert is not dispositive of [defendants'] motion in limine," however. See *id.*

[6]*Id.* at 3.

[7]*Id.*

[8]*Id.*

[9]*Id.* at 4.

4

*Inc. v. Banas*, 531 F.Supp.2d 483, 486 (E.D.N.Y. 2008) ("[T]estimony based solely on Wallace's personal opinion on the issue of likelihood of confusion should not be permitted because it would usurp the jury's role in making fact determinations," citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994)); see also *Pharmacia Corp. v. Alcon Laboratories, Inc.*, 201 F.Supp.2d 335, 377 (D.N.J. 2002) ("The opinions of Dr. Eisenberg and Mr. Di Domizio with regard to the likelihood of confusion between Travatan and Xalatan are based primarily on a subjective evaluation of the marks in light of their experience in the pharmaceutical industry (Di Domizio) or as an ophthalmologist (Eisenberg). There are no reported trademark cases in which a court has based its findings of a likelihood of confusion or dilution on the types of 'opinions' on which Pharmacia relies. The bases for these opinions stand in stark contrast to the survey conducted by Professor Shari S. Diamond, J.D., Ph. D., which demonstrates persuasively a confusion rate of 1.5%").

To the extent that Isaacson's testimony constitutes his personal opinion regarding application of the *Sleekcraft* factors, the court concludes that it will not assist the trier of fact and that it is therefore properly excluded. See *Playboy Enterprises, Inc. v. Terri Welles, Inc.*, 78 F.Supp.2d 1066, 1082 (S.D. Cal.1999) ("[T]he court will not allow Mr. Sterne to render a legal opinion on whether, based on all the *Sleekcraft* factors, there is a likelihood of confusion"), aff'd in part, rev'd in part on other grounds, 279 F.3d 796, (9th Cir. 2002). Although courts have expressed concern as to whether "expert testimony is required or useful to resolve a factual issue determined by viewing the two marks from the perspective of an ordinary consumer of the goods or services," *New Colt Holding Corp. v. RJG Holdings of Florida, Inc.*, No. Civ.3:02CV173(PCD), 2003 WL 23508131, *3 (D. Conn. Aug. 11, 2003), they have drawn a distinction between that type of testimony and testimony regarding "the characteristics of the ordinary consumer," finding that the latter may be useful to the trier of fact. *Id.*; see also *Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 333 F.Supp.2d 239, 249 n. 17 (D. Del. 2004) (considering expert testimony on the degree of care exercised by customers choosing credit cards, but not on the likelihood of confusion between two cards). Testimony regarding the habits or characteristics of consumers concerns a subject beyond the knowledge of lay jurors and may assist them in understanding consumer reactions to the marks at issue. The court will therefore permit Isaacson to testify regarding the characteristics of relevant consumers,[10] but not to opine on the ultimate likelihood of confusion between the parties' marks.[11]

---

[10]Defendants argue that because Isaacson's background is in marketing and not consumer psychology, he is not qualified to testify regarding consumer behavior. There is clearly substantial overlap between the two areas, however, and the court concludes that Isaacson's substantial marketing experience qualifies him to testify regarding consumer behavior in relation to trademarks. The fact that he may not be specifically trained or experienced in consumer psychology, as opposed to marketing, goes to the weight of his testimony rather than its admissibility.

[11]The court is cognizant that Rule 704(a) of the Federal Rules of Evidence permits experts to offer opinions on the ultimate issue of fact to be decided by the jury. See FED. R. EVID. 704(a) (". . . [T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact"). Experts cannot, however, offer

opinions regarding the ultimate issue of law to be decided by the jury. See, e.g., *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1059-60 (9th Cir. 2008) ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law," quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (ultimate issue of law in insurance bad faith case was "bad faith"); *YKK Corp. v. Jungwoo Zipper Co., Ltd.*, 213 F.Supp.2d 1195, 1203 (C.D. Cal. 2002) ("Expert testimony is required to be within the scope of the proffered expert's expertise. By opining on the likelihood of confusion based on the *Sleekcraft* factors, the Anson Report draws a legal conclusion. While Fed.R.Evid. Rule 704 abolished the so-called 'ultimate issue' rule, '[i]n general, testimony about a legal conclusion, or the legal implications of evidence is inadmissable under Rule 704.' 4 WEINSTEIN'S FEDERAL EVIDENCE § 704.04[1] (Matthew Bender ed.2001); see also *United States v. Weitzenhoff*, 1 F.3d 1523, 1531 (9th Cir.1993), *modified on other grounds*, 35 F.3d 1275 (9th Cir. 1994); Advisory Committee Note to Rule 704. The expert's legal conclusions are unhelpful because they 'suppl[y] the jury with no information other than the witness's view of how the verdict should read.' 4 WEINSTEIN'S FEDERAL EVIDENCE § 704.4[2][a] at 704-12"); *Playboy Enterprises*, 78 F.Supp.2d at 1082 ("Expert testimony consisting of legal conclusions regarding the 'likelihood of confusion' or Ms. Welles' 'fair' or 'descriptive' use are inappropriate subjects for expert testimony and as such, are inadmissible"). The court in *Playboy Enterprises* drew a distinction between testimony regarding ultimate likelihood of confusion in light of the S*leekcraft* factors and testimony as to "the state of affairs" regarding those factors; while the latter is a factual issue on which expert testimony may be appropriate depending on the circumstances, it concluded that the former was a legal conclusion reserved for the jury through application of the law to the facts. See *Playboy Enterprises*, 78 F.Supp.2d at 1082 (observing in the context of a motion for summary judgment that "the court will assume as true Mr. Sterne's expert opinion on what is the state of affairs regarding each *Sleekcraft* factor, but the court will not allow Mr. Sterne to render a legal opinion on whether, based on all the *Sleekcraft* factors, there is a likelihood of confusion"); see also *YKK Corp.*, 213 F.Supp.2d at 1203 (" [T]he Court will not consider Anson's legal conclusions, although his opinions on the individual foundational facts, i.e. the individual *Sleekcraft* factors are admissible and will be considered").

Additionally, expert testimony can be excluded if the court finds that it will not be of assistance to the trier of fact. See *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir.), amended by 246 F.3d 1150 (9th Cir. 2001) ("expert testimony must . . . address an issue beyond the common knowledge of the average layman"); see also *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002); *Icon Enterprises Intern., Inc. v. American Products Co.*, No. CV 04-1240 SVW (PLAx), 2004 WL 5644805, *5-6 (C.D. Cal. Oct. 7, 2004) ("[T]o the extent that the jury in a trademark action is being asked to assess the strength or distinctiveness of a mark and/or the likelihood of consumer confusion, both of which are evaluated from the perspective of the consuming public, an untrained layman is perfectly qualified to decide the issue without enlightenment from those having a specialized understanding of trademark law. Moreover, given 'the aura of authority experts often exude,' an

To clarify the permissible extent of Isaacson's testimony, the court reviews the individual sections of Isaacson's report below.

Isaacson first opines that "a consumer who encounters America's Incredible Pizza Company in the marketplace may infer that a subsequently encountered John's Incredible Pizza Co. is a franchise or local operation of America's Incredible Pizza Company or Incredible Pizza Company."[12] He bases this conclusion on the principle that possessive names create "an impression of proprietorship."[13] Jurors can certainly understand, based on their knowledge of basic grammar and without the assistance of expert testimony, that possessives convey ownership. To the extent that Isaacson can testify, based on market research, that in the context of franchises, use of a possessive creates a strong "impression of proprietorship" in consumers' minds, however, such testimony would relate to consumer characteristics rather than his personal view of likelihood of confusion. If Isaacson can offer this type of market research-based opinion, therefore, he may testify regarding the effect that using possessives in trademarks or trade names has on consumers.

Isaacson next opines that the most prominent element of both parties' marks is "Incredible Pizza Co.," and that consumers are therefore likely to confuse the marks.[14] While preceded by technical language, such as "consumers make visual excursions from the center of the stimulus to process other information which may be relevant due to a connection to attention-grabbing factors, such as visual contrast, or an active goal, such as looking for nutrition information on a label,"[15] Isaacson essentially offers a personal and subjective opinion regarding the prominent elements of the marks. Jurors can examine the marks without the aid of Isaacson's opinion to determine which aspects of them are most prominent. See *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 570 (S.D.N.Y. 2007) (adopting a special master's recommendation that an expert report be excluded because "Dr. Holub's highly technical report and testimony on the similarity of colors between the parties' handbags would not be helpful to the jury because the jury members can observe for themselves whether Dooney & Bourke's mark is confusingly similar to Louis Vuitton's Multicolore Monogram mark. The jury can make that determination without the help of an expert and certainly

---

expert's conclusion that a mark is weak or strong has the potential to unduly influence the jury. Thus, the Court grants Plaintiff's motion to exclude the expert testimony of Richard Wallen," citing *Elsayed Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1063-64 (9th Cir. 2002)). To the extent likelihood of confusion is a purely factual issue, this provides the basis for the court's exclusionary rulings here, quoting .

[12]*Id.* at 7.

[13]*Id.* at 7.

[14]*Id.* at 8.

[15]*Id.*

without the expert's 'digital photography . . . technical jargon and colorimeter approximation'"); cf. *Trouble v. Wet Seal, Inc.*, 179 F.Supp.2d 291, 303 (S.D.N.Y. 2001) ("Comparing products and store appearances is something the average trier of fact can perform without the assistance of [an expert witness]"). Isaacson may not, therefore, testify that the marks are similar.

To the extent supported by his expert report and deposition testimony, however, he may testify regarding the manner in which consumers perceive and mentally process trademarks. For example, Isaacson opines in his report that "[c]onsumers . . . typically pay less attention to backgrounds, such as the pizza slice in IPC's logo, or the globe in JIPC's logo."[16] Isaacson may offer this opinion and discuss the principles applied to reach it. He may not, however, testify that, in his opinion, the degree of attention given to backgrounds supports a finding of likelihood of confusion in this case.

At oral argument, counsel for JIPC argued that Isaacson should be permitted to opine, based on this portion of his report, that the words "John's" and "Incredible Pizza Co." generate two separate impressions. As stated in Isaccson's report, this is his personal impression of the mark; it is not testimony about the characteristics of consumers or about how consumers generally view trademarks. The court therefore concludes that Isaacson may not offer testimony regarding the different impressions created by the parties' marks.

Next, Isaacson purports to apply "associative network theory" to comparison of the parties' marks.[17] He opines that "to the extent the JIPC mark and brand involve the distinct and identifying concept of 'Incredible Pizza Co.,' the appearance of marketing materials and images of a race car bearing a prominent sponsor logo spelling "Incredible Pizza" is highly likely to evoke the JIPC brand in the modes of relevant customers"; "to the extent that JIPC has built a strong and recognizable brand and commercial presence, the . . . race car with Incredible Pizza lettering is all the more likely to evoke the JIPC brand."[18] Isaacson's conclusions, however, are common sense concepts not outside the understanding of a lay juror. Moreover, Isaacson's observations are essentially repetitions of the law governing likelihood of confusion under *Sleekcraft*. The court will instruct the jury that the distinctiveness of a mark and the strength of a mark are considerations in determining likelihood of the confusion; it is not the job of an expert witness to do so, particularly one who is not qualified to offer legal opinions. See *Nationwide Transp. Fin.*, 523 F.3d at 1059-60; *Hangarter*, 373 F.3d at 1016; *YKK Corp.*, 213 F.Supp.2d at 1203; *Playboy Enterprises*, 78 F.Supp.2d at 1082.[19]

---

[16]*Id.* at 8.

[17]*Id.* at 11.

[18]*Id.*

[19]At oral argument, JIPC's attorney argued that Isaacson's testimony regarding "brand naming conventions" would assist the trier of fact. Having reexamined Isaacson's report, it appears that

Isaacson also applies a framework designated the "marketing mix" model. According to Isaacson, this consists of "4P's" used to target specific customer markets: product, price, place, and promotion. Isaacson states that both companies seek customers looking for "a moderately priced restaurant and entertainment experience."[20] He notes that the companies operate in different geographic areas, but states that the broadcast of NASCAR races "may have already created potential confusion, as indicated in court documents and in the declaration of John Parlet regarding an email received from John Wyson, dated June 25, 2008."[21] Isaacson observes that "[f]or each individual who writes a letter or email asking a question or expressing dissatisfaction, there [are] many others who are also likely to have the same question or dissatisfaction but who have not taken time to communicate. Therefore, there may already be consumers. . . who could believe that JIPC is the same, connected or affiliated with IPC." This speculation based on examination of a single email does not involve application of accepted scientific principles and is not helpful to jurors. Jurors can determine what conclusions should be drawn from an email like Wyson's without the need for expert testimony. See *Trouble*, 179 F.Supp.2d at 303 (excluding expert testimony on customer statements allegedly showing confusion because "a trier of fact can assess customer statements evidencing confusion").

Applying the "product" aspect of the "4P's," Isaacson opines that "the [parties'] products have similar product offerings, atmosphere, and brand name," and that "these factors increase the likelihood that a substantial number of customers and potential customers of JIPC believe the two companies are the same, or connected or affiliated."[22] The jury can compare the parties' services on its own and determine whether they are similar. See *id*. ("Comparing products . . . is something the average trier of fact can perform" without expert testimony). If, in a deposition or elsewhere, Isaacson has offered opinions based on market research regarding the conclusions consumers form as a result of product similarities, he may offer those opinions. Otherwise, his conclusion that product similarities increase the likelihood that consumers will believe the parties' restaurants are affiliated is simply the expression of a personal view that will not aid the trier of fact.

Isaacson next notes that the price at which the parties offer their products is similar, and concludes that "[c]ustomers and potential customers thinking about a restaurant where they can obtain food such as pizza, pasta, and dessert in a buffet-style setting at inexpensive prices could

---

counsel was referencing the portion of the report discussed in text. The court believes that any benefit to the jury from such testimony would be outweighed by the risk of confusion, given the resemblance of "brand naming conventions" to legat test represented by the *Sleekcraft* factors.

[20]*Id*. at 14.

[21]*Id*. at 15.

[22]*Id*. at 17.

potentially think of either company and the similarity would make it more difficult to distinguish between the two restaurants."[23] A juror does not need expert testimony to compare the restaurants' prices or to know that similarly priced restaurants are more alike than restaurants whose prices are substantially different from each other.

Isaacson also concludes that "the aspects of place are similar for both companies" because "both restaurants operate large facilities, typically organized into different rooms, each with a specific theme or atmosphere."[24] The size and structure of the parties' restaurants are factual issues jurors can determine without the need for expert testimony. Further, jurors know that large, multi-room restaurants are more alike than small restaurants and large restaurants. See *id.* ("Comparing . . . store appearances is something the average trier of fact can perform").

Turning to "promotion," Isaacson opines that the parties use similar marketing channels. A juror can hear evidence regarding the parties' marketing channels and decide if they are similar. Similarly, jurors do not need to hear Isaacson's opinion that both companies use a "family friendly" "tone and look" in their advertising materials in order to compare the restaurants' "tone and look."[25]

Isaacson finally concludes that the parties' services involve the same "purchase behavior."[26] He explains that "a consumer driving by either of [the parties'] locations might see the signage and decide to stop in and eat, without requiring any further research other than observation of the exterior of the restaurant."[27] The court concludes that this aspect of Isaacson's report is an appropriate subject for expert testimony. Based on his market research background, Isaacson may opine at trial regarding the degree of care exercised by consumers when selecting restaurants. See *Chase Manhattan*, 333 F.Supp.2d at 248-49 (considering expert testimony on degree of care exercised by consumers).

### 2. Whether Isaacson's Sur-Rebuttal Report is Admissible

On May 15, 2009, JIPC submitted a second report by Isaacson, purportedly in response to the rebuttal report of defendants' expert Dr. Itamar Simonson.[28] The expert discovery cut-off date

---

[23]*Id.* at 18.

[24]*Id.*

[25]*Id.* at 19.

[26]*Id.*

[27]*Id.* at 20

[28]Def.'s MIL #1, Exh. 2 ("Isaacson Sur-rebuttal").

set by the court was May 8, 2009. Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure provides that "[a] party must make [expert] disclosures at the times and in the sequence that the court orders." The sanction for failing to comply with Rule 26 is set forth in Rule 37. That rule provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless" FED.R.CIV.PROC. 37(c)(1); see also *Yeti by Molly v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed. . . . This particular subsection, implemented in the 1993 amendments to the Rules, is a recognized broadening of the sanctioning power. . . . The Advisory Committee Notes describe it as a 'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material. . . .' *Courts have upheld the sanction even when a litigant's entire cause of action or defense has been precluded. . .*" (emphasis added)).

It is the obligation of the party facing sanctions to show that its failure to comply with Rule 26(a) was either justified or harmless. *Yeti*, 259 F.3d at 1107; accord *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 310 F.3d 592, 596 (4th Cir. 2003) (the burden is on the party facing sanctions to prove harmlessness); *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001) (same); *Finely v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996) (same). "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid-America Table Wares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1361 (7th Cir. 1996).

To the extent that Isaacson's May 15 report contains information not contained in his original report, the information was not timely disclosed, and must be excluded at trial unless JIPC can demonstrate that its untimeliness was justified or harmless.[29] Isaacson's sur-rebuttal contains two sections. The first section responds to Simonson's criticisms of Isaacson's report.[30] The second, while purportedly responding to Simonson, in fact presents analysis of new data not included in the original report.[31] In this section of the report, Isaacson analyzes 420 customer comment cards filed out by JIPC customers, 805 emails sent to JIPC, and online reviews of JIPC and IPC, and concludes that is a likelihood of confusion between the parties' marks.[32]

---

[29]JIPC maintains that the report was timely without acknowledging the expert discovery cut-off date set by the court.

[30]*Id.* at 3-12.

[31]*Id.* at 12-22.

[32]*Id.* at 14, 20.

In its opposition, JIPC argues that the untimely disclosure of the May 15 report was harmless. They note that defendants deposed Isaacson on May 27, and argue that defendants therefore had adequate opportunity to review the report and examine Isaacson regarding any new material contained therein.[33] Defendants' reply does not assert that they suffered prejudice as a result of the untimely disclosure of Isaacson's report. Moreover, as defendants deposed Isaacson on May 27, it appears that neither party considered themselves to be bound by the discovery deadlines set by the court. In light of these considerations, the court concludes that JIPC has met its burden of demonstrating that its late disclosure of the report was harmless.

This does not end the court's inquiry, however. To the extent that the sur-rebuttal report responds to criticisms of Isaacson's original report, this testimony will be admissible to the extent that the criticisms address aspects of the original report that the court has found to be admissible. To the extent Isaacson responds to criticisms of opinions that the court has found to be inadmissible, he may not offer those responses at trial. The second section of Isaacson's report, on the other hand, presents new analysis based on data not discussed in the original report. Defendants argue that this aspect of the report does not apply reliable principles. The report does not cite any authority indicating that examination of a limited sample of comments by self-selected customers who choose to fill out comment cards or post reviews on the internet is an accepted method of measuring likelihood of confusion. JIPC appears to concede that Isaacson's methods are not an accepted manner of measuring likelihood of confusion; indeed, it states that "Dr. Isaacson has repeatedly explained that his analysis does not purport to measure likelihood of confusion."[34] Isaacson too contends that his analysis was not intended to measure likelihood of confusion.[35] Instead, JIPC asserts, Isaacson simply gauged "how consumers express the name of JIPC."[36] This is plainly a mischaracterization of Isaacson's original report.[37] However, as JIPC contends that the data will not be offered to show likelihood of confusion, the court will consider whether the evidence is admissible for the purpose identified by JIPC.

---

[33]Opposition to Defendants' Motion in Limine No. 1 ("Opp. to MIL #1") at 21.

[34]*Id.* at 22.

[35]Declaration of Dr. Bruce R. Isaacson ("Isaacson Decl."), ¶ 17.

[36]*Id.*

[37]See Isaacson Sur-rebuttal at 20 ("This relatively large dataset reflects a much fuller picture of how consumers express the name of JIPC. The data imply that another chain sharing the 'Incredible Pizza Company' part of their name and operating in the same market as JIPC would be confusing for customers. . . .").

Isaacson maintains that his methods constitute "a form of observational research."[38] According to Isaacson, "[i]t is a common practice in marketing and litigation-support research to examine data provided by respondents answer[ing] in their own words, so we may better understand consumer motivation, behaviors, and attitudes."[39] He used this technique, he asserts, "to observe how consumers and others refer to JIPC."[40] Because JIPC seeks to offer this portion of Isaacson's testimony solely to establish how customers "express the name of JIPC," the testimony does not address a subject outside lay jurors' understanding. It appears that Isaacson read the comment cards and identified the words used to refer to JIPC's restaurants. Jurors are certainly capable of reading the comment cards and observing how customers "express the name of JIPC." Cf. *Trouble*, 179 F.Supp.2d at 303 (excluding expert testimony on customer statements allegedly showing confusion because "a trier of fact can assess customer statements evidencing confusion").

More fundamentally, the relevance of the manner in which customers "express" JIPC's name to any issue other than likelihood of confusion is uncertain. As JIPC asserts that the analysis is not offered to show likelihood of confusion – because the methodology is neither reliable or the type of sampling experts in the field typically conduct – the court believes that permitting JIPC to introduce the data for the purpose of establishing how customers refer to JIPC would needlessly confuse the issues and mislead the jury. The court therefore concludes that Isaacson's testimony regarding his analysis of the comment cards and other data in the second section of the May 15 report are inadmissible.[41] See FED.R.EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").[42] Whether the comment cards themselves are admissible depends on their

---

[38]Isaacson Decl., ¶ 20.

[39]*Id.*, ¶ 19.

[40]*Id.*, ¶ 20.

[41]JIPC argued at the hearing that Isaacson's analysis of the comment cards should be admitted to respond to the testimony of defendants' rebuttal expert, Simonson, that, based on his examination of online reviews, customers refer to JIPC's restaurants as "John's." This aspect of Simonson's expert report was intended to respond to Isaacson's conclusion that there was a likelihood of conclusion between the marks, not to his opinions regarding consumer behavior. As opinions regarding consumer behavior are the only type of testimony the court will permit Isaacson to offer, Simonson's discussion of online reviews will not be appropriate rebuttal. Accordingly, Isaacson's analysis of the comment cards is inadmissible for purposes of responding to testimony by Simonsen that will not be offered.

[42]The court in *Patsy's Italian Restaurant* faced a similar situation. The plaintiff proffered an expert report addressing the likelihood of confusion. When the defendant attacked the report's

content, in light of the hearsay analysis below.

For the reasons stated, the court grants defendants' motion to exclude Isaacson's reports and testimony with the exceptions noted in the foregoing section.

**B.      Defendants' Motion to Exclude "Evidence from Other Litigation"**

Defendants' second motion in limine seeks exclusion of "any evidence [JIPC] may intend to offer" from prior litigation involving IPC and/or its founder Rick Barsness.[43] Because of the manner in which the parties' pleadings have framed the issues, the court is for the most part unable to rule on the motion at this time.

Defendants' motion seeks exclusion of a broadly defined category of evidence: "any evidence [JIPC] may intend to offer from [three] unrelated prior matters. . . entitled *Mr. Gatti's Inc. v. Madison Scott, et al.* before the District Court of Kerr County, Texas, *Bread of Life Pizza, Inc., et al. v. Mr. Gatti's Inc.*, filed before the U.S. District Court in and for the Northern District of Texas, Amarillo Division, and *Richard A. Barsness et al. v. Mr. Gatti's Inc.*, before the U.S. District Court in and for the Western District of Missouri."[44]   The joint exhibit list submitted by the parties includes only two exhibits from these actions, a motion for summary judgment filed by Barsness in *Mr. Gatti's v. Scott* and the transcript of Barsness' deposition in one of the cases.  The transcript in turn apparently contains a transcript of a recorded telephone conversation between Barsness and Parlet.[45]

Defendants contend that JIPC will offer evidence regarding the prior actions in an improper attempt to attack Barsness' character for truthfulness via extrinsic evidence.  They also maintain that,

_____

methodology as an improper measure of the likelihood of confusion, the plaintiff maintained that the report was not offered to prove likelihood of confusion, but to show the "overall commercial impression" of the parties' marks.  531 F.Supp.2d at 486.  The court rejected the plaintiff's attempt to re-label discredited likelihood of confusion evidence as evidence of the marks' "overall commercial impression."  *Id.*  It found the evidence inadmissible for the proffered purpose under Rule 403: "[I]t is unclear how Wallace would testify about the 'overall commercial impression' of the parties' marks without necessarily drawing conclusions about their similarity.  Even if such testimony were relevant and useful to the jury, its minimal probative value is substantially outweighed by the danger of unfair prejudice and misleading of the jury about the related issue of likelihood of confusion").

[43]Defendants' Motion in Limine No. 2 ("Def.'s MIL #2") at 3.

[44]*Id.*

[45]The joint exhibit list does not identify in which case the deposition was taken.  The telephone call was apparently recorded by Barsness, and that recording was played at Barsness' deposition.

if such evidence is relevant for another purpose, it is substantially more prejudicial than probative.[46] Defendants do not identify any specific document or evidence JIPC intends to introduce. Rather, they speculate regarding evidence plaintiff might seek to admit. For example, defendants state that JIPC may attempt to introduce the findings of fact and conclusion of law rendered by an arbitration panel in one of the Texas cases, although the document does not appear on the parties' joint exhibit list.

In response, JIPC states that it does not intend to offer any evidence from the prior matters to attack Barsness' credibility. It maintains, however, that the prior litigation constitutes "a veritable treasure trove of testimony, documents and other evidence . . . that is highly relevant to key issues," including defendants' bad faith in adopting plaintiffs' marks.[47] It does not identify this evidence,[48] however, nor are any documents other than the motion for summary judgment in *Scott* and the Barsness deposition transcript listed on the joint exhibit list. Because JIPC did not identify any documents beyond these two as exhibits in the case, it has waived its right to offer any other than those two as evidence at trial.[49]

As respects the motion for summary judgment filed by Barsness in the *Scott* litigation, JIPC argues that it is relevant because it refers at one point to JIPC as "Incredible Pizza." JIPC argues that this is evidence that the public associates JIPC's restaurants with the name "Incredible Pizza," without "John's."[50] The use of a shortened name to refer to a company in a legal brief is not

---

[46]*Id.* at 5-6.

[47]Opposition to Defendants' Motion in Limine No. 2 ("Opp. to Def.'s MIL #2") at 3.

[48]Although JIPC attaches nine documents from the *Mr. Gatti's* cases to its opposition as exhibits, its brief provides no information as to why they are relevant or admissible in this action. Given its lack of argument on the point, it is unclear whether JIPC seeks to offer the exhibits at trial. The point is, in any event, moot. As the documents do not appear on the joint exhibit list, the court concludes that JIPC has waived its right to offer them.

[49]One document not identified on the joint exhibit list is the findings of fact and conclusions of law prepared by the arbitrators. JIPC states that it does not intend to introduce this document. Nonetheless, it argues that such evidence is admissible to establish "that the October 14, 1999 transfer of Barsness' company, RPM Productions, Inc., to Madison Scott was achieved through a sale of RPM stock and not through a mere sale of certain assets." (*Id.* at 4.) Although not entirely clear, JIPC apparently believes this fact is relevant to rebut defendants' affirmative defense of laches. Defendants have stated, however, that they do not intend to pursue laches as an affirmative defense at trial. In any event, although JIPC offers argument regarding the document's admissibility, it did not include the document on the joint exhibit list, and has therefore waived its right to introduce it at trial.

[50]*Id.* at 6.

relevant in assessing whether the public associates JIPC's stores with the name "Incredible Pizza."[51] JIPC also argues that the pleading is relevant to rebut defendants' claim that JIPC's founder "copied numerous ideas from the pizza buffet and games concept that Barsness first developed at Mr. Gatti's."[52] This claim is not at issue in this action; the parties' dispute concerns their trademarks, not any alleged "copying" of a "pizza buffet and games concept." The motion for summary judgment is thus irrelevant and inadmissible, and will be excluded at trial. See Fed.R.Evid 402 ("Evidence which is not relevant is not admissible").

In their reply, defendants argue that the deposition transcript included on the joint exhibit list should be excluded. Despite its inclusion on the exhibit list, defendants' moving papers did not specifically address this item. Instead, they argued that documents not appearing on the exhibit list, which they speculated JIPC might offer, were inadmissible.[53] JIPC therefore had no opportunity to argue the relevance of the transcript, and the court cannot address it at this time. The court directs the parties to meet and confer concerning the admissibility of the deposition transcript by July 20, 2009. If the parties are unable to resolve the issue in good faith, defendants may file a motion *in limine* containing specific arguments directed at the admissibility of the transcript July 24, 2009. JIPC may file opposition by July 31, 2009.[54] There will be no reply or hearing unless the court determines that either a reply or hearing is necessary.

## C. Defendants' Motion to Exclude "Evidence of Alleged Actual Confusion"

Defendants' next motion seeks to exclude three categories of evidence that it contends are not admissible to prove actual confusion: (1) testimony by Parlet and other JIPC employees regarding encounters with confused customers; (2) email and internet queries received by JIPC; and (3) "comment cards" filled out by JIPC customers.[55] Defendants also argue that evidence of confusion prior to 2008 is not relevant.

---

[51]As noted, moreover, the court has already granted partial summary judgment for defendants establishing that JIPC has no trademark rights in the phrase "Incredible Pizza Co." standing alone.

[52]*Id.* at 6.

[53]At this stage, defendants should not be filing motions *in limine* based on speculation as to the evidence JIPC intends to present. Rather, defendants should know what exhibits JIPC intends to introduce based on the parties' meet and confer sessions and the exhibits that are included on the joint exhibit list, and should file motions directed at specific items on that list.

[54]The court concludes below that certain portions of the recorded telephone conversation played during Barsness' deposition constitute settlement communications that are inadmissible under Rule 408 if offered to prove liability. The parties are directed not to reargue this issue.

[55]Defendants' Motion in Limine No. 3 ("Def.'s MIL #3")

## 1. Testimony from Employees

Defendants argue that testimony from Parlet and other JIPC employees regarding customer confusion is inadmissible hearsay. See FED.R.EVID 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); 802 ("Hearsay is not admissible except as provided by these rules . . ."). Defendants contend that to be admissible, the customer himself must testify. Although courts are split on the issue, defendants' argument is the minority positon. As the district court in *CytoSport, Inc. v. Vital Pharmaceuticals, Inc.*, No. CIV. S-08-2632 FCD/GGH, 2009 WL 1444535, *15 (E.D. Cal. May 6, 2009), recently explained:

> "The Ninth Circuit has not specifically addressed the issue, and the circuit courts are split with respect to whether employee testimony regarding consumer confusion is hearsay. However, the majority opinion is that such testimony is not hearsay. 'Although at least one circuit court has held that such evidence is inadmissible hearsay, the majority of circuit courts that have considered this issue have . . . found that such evidence is admissible.' *Conversive, Inc. v. Conversagent, Inc.*, 433 F.Supp.2d 1079, 1091 (C.D.Cal. 2006). Specifically, only the Eighth Circuit has held such testimony to be inadmissible. *Duluth News-Tribune v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th Cir.1996). In contrast, the Second, Third, Fourth, and Fifth Circuits have all held that such evidence is admissible. *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003-04 (2d Cir.1997) (statements regarding consumer confusion were not offered to show the truth of the matter asserted and were offered to show the state of mind of the declarant consumers); *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1160 n. 10 (5th Cir.1982) (same); *Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 133 (3d Cir. 2004) (same); *Lyons Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (same).

> "Typically, courts agreeing with the majority opinion conclude that employee testimony regarding consumer confusion is not being offered for the truth of the matter asserted by the confused consumer (the out-of-court declarant), but rather for the fact that the confusing statement was observed by the employee. 'If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of the matter asserted, and the statement is not hearsay.' *Mustang Motels, Inc. v. Patel*, [226 U.S.P.Q. 526, 527 n. 1 (C.D. Cal. 1985)]. Additionally and/or alternatively, some courts hold that an employee's testimony of confused consumers is evidence of the consumers' then-existing state of mind (confusion), which also is not hearsay. See e.g., *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d at 993 (hearsay admissible under Fed.R.Evid. 803(3))."

The court agrees with the majority position. In general, out of court statements by confused customers are not offered for the truth of the matter asserted, and are therefore not hearsay.[56] The court therefore denies defendants' motion to the extent that it seeks a general prohibition on testimony regarding confused customers by JIPC's employees.

## 2.    Emails and Internet Queries

Defendants next assert that emails and Internet queries should be excluded because they are hearsay. Additionally, they contend that, even if the material is not hearsay, it is not relevant to prove confusion because it does not indicate whether a customer's confusion was the result of similarity between the marks or carelessness by the customer.

Defendants' motion is based on the proposition that evidence of actual contained in emails or internet queries is always hearsay. In support of this proposition, they rely on the statement in *Duluth News-Tribune v. Mesabi Publishing Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996), that "vague evidence of misdirected phone calls and mail is hearsay of a particularly unreliable nature given the lack of an opportunity for cross-examination of the caller or sender regarding the reason for the 'confusion.'" The court's analysis of the hearsay issue in *Duluth News-Tribune* was somewhat cursory. It did not identify the "matter asserted" in the mail or telephone calls, nor analyze whether the communications were offered to prove the truth of the matter asserted in them. Moreover, as noted, *Duluth* adopts the minority view. The principles discussed in evaluating the admissibility of employee testimony apply equally to properly authenticated emails containing out of court statements by confused customers. There is no *per se* rule that emails reflecting customer confusion are hearsay. Whether a particular email is hearsay turns on application of general hearsay principles to

---

[56]This general principle may not always apply. For example, if a JIPC employee testified that a customer said: "I am confused whether JIPC and IPC are the same company," the testimony would be inadmissible hearsay because it would be offered for the truth of the matter asserted, i.e., that the customer was confused. Most out of court statements indicating customer confusion do not take this form, however. Rather, they tend to be inquiries or comments about defendant's product or service directed to plaintiff, or vice versa. Inquiries regarding one company's product or service directed to another company are not assertions of fact. Comments regarding one company's product or service directed to another company reflect the customer's mistaken belief regarding the source of the product; they are not offered to show that the customer's view regarding the product was correct. In *CytoSport*, 2009 WL 1444535 at *15, for example, the court held that testimony by plaintiff's employee that a customer complained to him about the taste of defendant's product was admissible. It concluded that the evidence was not being offered to prove that the customer in fact disliked defendant's product, but to show his state of mind, i.e., the fact that he complained to plaintiff's employee showed that he believed plaintiff had manufactured the product. Had the evidence had been admitted to prove that the product was actually unappealing to consumers (or to show that plaintiff had been damaged by association with an inferior product), it would have been hearsay.

the content of the individual email.

Defendants did not address specific items of evidence in their motion, but argued that the court should exclude all emails, internet queries and comment cards. Because the admissibility of such evidence is an individualized and fact-specific inquiry, and because defendants provide no information regarding the content of the emails or Internet queries, the court is unable to determine the admissibility of particular items of evidence at this time. Defendants assert that their motion is framed in broad terms because JIPC "intentionally lumps all of its documentary evidence of alleged actual confusion into two exhibits, one labeled "Customer Confusion Correspondence" and another labeled "Confusion Emails and Website Inquireies."[57] As a result, they maintain that JIPC "should not be heard to complain about the breadth of what Defendants seek exclude, when Plaintiff fails to separately identify and list its own evidence."[58]

The court agrees with defendants that the description of the exhibits on the exhibit list is inadequate. Defendants ignore the fact, however, that the exhibit list is a joint pleading. The obligation to file a proper exhibit list falls on both parties; defendants should have raised their objections to the breadth of the exhibit descriptions during the parties' meet and confer session. Moreover, defendants should now have copies of the individual exhibits in their possession. Thus, they should have been able to address specifically the individual documents JIPC intends to offer at trial and make individualized arguments regarding them.

The only emails that defendants specifically identify are those attached as exhibits to their motion. Although they provide copies of the documents, defendants offer no analysis regarding any of them. The first is an email to JIPC from the manager of a hotel in Tulsa, Oklahoma, which asks: "Do you have a new location in Tulsa, OK? If so, what is the phone number?" The second is an email from a sender who identifies herself as "a business/accounting student currently at Oral Roberts University in Tulsa, Oklahoma." The individual states that she is "int[e]rested in either starting and managing a pizza place in the Los Ang[e]les county area," and requests "any information on your company that will help us." The third email is from "a student at Oklahoma State University in Stillwater, OK" to JIPC. The student states that she is working on "a group project that includes places or improvements that Stillwater needs," including possibly an "entertainment center." She notes that she and her "group . . . ha[ve] to produce a budget," and continues: "I was wondering if I could find out from you how much start up capital is, running the food portion, etc." A JIPC employee responded with the information the student requested; the response asked how the student had come to hear of John's Incredible Pizza Co. The student replied: "[W]e have an Incredible Pizza in Tulsa, OK where I'm from so when I was looking for information I went to google and typed in Incredible Pizza and found your website." The final email defendants attach an inquiry from a customer, which states: "do you have a incredible pizza in Tulsa Oklahoma?

---

[57]Reply in Support of Defendants' Motion in Limine No. 3 at 2.

[58]*Id.*

If so, why is it soooo [sic] hard to get the number or address do you want our money?"

The first and fourth emails simply ask whether JIPC has a location in Tulsa; they make no factual assertions. The inquiries reflect the correspondents' belief that JIPC operated defendants' Tulsa restaurant. JIPC is not seeking to prove that it operates a restaurant in Tulsa, however. Clearly, therefore, the emails would be offered to show the state of mind of the authors, and are not hearsay.

The analysis of the two students' emails is more complex. First, the relevance of the requests for information to the likelihood of confusion question is unclear. Neither student references a JIPC location in Oklahoma. They simply ask for information regardig JIPC's business. JIPC's argument appears to rest on the inference that, because the students were located in Oklahoma, where defendants operate restaurants, they likely associated JIPC with defendants' stores. To draw this inference, a jury would have to accept the truth of the students' assertions, i.e., that the first student was "a business/accounting student currently at Oral Roberts University in Tulsa, Oklahoma," and that the second student was "a student at Oklahoma State University in Stillwater, OK." Stated differently, JIPC's argument that these emails are relevant depends on the fact that they were sent by individuals located in Oklahoma. The only evidence that the senders are, in fact, located in Oklahoma is their assertion that this is the case. The emails are therefore hearsay if admitted to prove customer confusion. Because JIPC has not established that a hearsay exception applies, the documents are inadmissible. In addition, the statement in the Oklahoma State student's follow-up email that "I was looking for information I went to google and typed in Incredible Pizza and found your website" is classic hearsay. It is being no offered to prove the facts asserted, i.e., that the student actually performed the Google search described.

Defendants also contend that even if not hearsay, email queries are not admissible because "it is equally likely that [the senders of the messages] sent their inquiries or comments 'because they were inattentive or careless, as opposed to being actually confused.'" In support, it cites *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 635 (6th Cir. 2002). The court accepts for purposes of analysis defendants' premise that it is equally likely that a customer asking whether JIPC had a store in Oklahoma inadvertently sent an email intended for IPC to JIPC as it is that the customer believed JIPC and IPC were the same company or otherwise affiliated. Accepting this premise, the fact that an item of evidence is equally susceptible to an interpretation favorable to defendants as it is to an interpretation favorable to JIPC is not a reason to exclude it. Indeed, *Therma-Scan* supports this conclusion. The court there expressed the opinion that the email correspondents may have been careless rather than confused in discussing the evidence's weight, not its admissibility. It did not consider the messages at issue inadmissible for purposes of summary judgment; rather, it accepted them into evidence, but concluded that they "provide[d] only weak support for finding a likelihood

of confusion." *Id.*[59]

As the court's analysis of the exhibits attached to defendants' motion demonstrates, the admissibility of emails or Internet inquiries allegedly showing customer confusion depends upon the content of the particular communication. The first and fourth emails attached to defendants' motion are admissible. The second and third are inadmissible

The court has already directed the parties to meet and confer regarding their exhibits by July 20. During that session, the parties are directed to make a good faith attempt to resolve the issues raised by defendants' third motion. If the parties are unable to do so, defendants may file a motion *in limine* containing specific arguments regarding individual exhibits by July 24, 2009. JIPC may file opposition by July 31, 2009. There will be no reply or hearing unless the court determines that either a reply or hearing is necessary.

### 3.    Comment Cards

JIPC states that it does not intend to offer customer comment cards to prove actual confusion.[60] The court therefore denies defendants' motion as moot to the extent it seeks to exclude comment cards for purposes of proving actual confusion.

### 4.    Evidence of Confusion Prior to 2008

Defendants argue that, since JIPC's position is that there was no likelihood of confusion prior to 2008, evidence of actual confusion prior to 2008 is irrelevant. However, actual confusion is only one factor analyzed in determining likelihood of confusion. See *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979); see also *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (reciting the eight *Sleekcraft* factors). As likelihood of confusion depends on the totality of relevant factors, it is possible that there was no likelihood of confusion supporting a claim for infringement prior to 2008 even though incidents of actual confusion occurred prior to 2008. As the parties' marks have not changed significantly since 2008, incidents of actual confusion prior to

---

[59]Similarly, defendants' citation to *Toys "R" Us, Inc. v. Lamps R Us*, 219 U.S.P.Q. 340 (T.T.A.B.) is misplaced. There, the T.T.A.B. addressed testimony by a Toys "R" Us employee that customers had asked him why Toys "R" Us was closed when Lamps R Us was open, and stated: "Aren't you affiliated with them?" *Id.* at 345. Defendants cite the T.T.A.B.'s statement that "there [was] nothing to indicate whether the reason for the question as to affiliation was the result of the similarity of the marks" in support of their request that the court exclude JIPC's evidence. As in *Therma-Scan*, the T.T.A.B. did not hold that the evidence was inadmissible; it simply commented on its weight. *Id.* ("[A]lthough admissible, we do not find that the evidence has much probative value on the issue of likelihood of confusion").

[60]Opposition to Defendants' Motion in Limine No. 3 at 4.

2008 are relevant to prove a present likelihood of confusion. If JIPC were to rely heavily on evidence of actual confusion prior to 2008 to prove its case, this of course would provide strong support for an affirmative defense of laches. Defendants, however, have chosen to abandon this defense.

In sum, the court grants defendants' motion to the extent it seeks to exclude the second and third emails attached as exhibits to the motion; the court denies the balance of the motion and directs the parties to meet and confer as stated above.

### D. Defendants' Motion to Exclude Reference to "Incredible Marks"

Defendants next seek an order precluding JIPC from referring to its trademarks as the "Incredible Marks," on the ground that the term would confuse the jury.[61] JIPC states that it does not intend to refer to its marks as the "Incredible Marks," and that its attorney advised defense counsel of this fact prior to the filing of defendants' motion *in limine*.[62] The court therefore denies the motion as moot to the extent it seeks to preclude JIPC's counsel from using the phrase "Incredible Marks" in questioning witnesses or arguing the case to the jury. Defendants' reply asserts that they are not satisfied with counsel's concession because they seek to preclude JIPC's witnesses from using the phrase "Incredible Marks" as well. JIPC offers no reason as to why an order precluding its witnesses from referring its marks as the "Incredible Marks" should not be entered. Because references by witnesses to the "Incredible Marks" might mislead the jury to believe that JIPC has rights in the mark "Incredible Pizza Co.," standing alone, the court concludes that it is appropriate to preclude witnesses as well as counsel from using the term. It therefore grants defendants' motion.

### E. Defendants' Motion to Exclude Evidence of Damages Occurring Prior to Plaintiffs' Assertion of Claims

In their fifth motion *in limine*, defendants argue that JIPC should not be allowed to offer evidence of damages caused by actions prior to the date JIPC claims its cause of action ripened.[63] In opposing defendants' motion for summary judgment on their affirmative defense of laches, JIPC argued that it had no legal claim for infringement until April 2008, after defendants began offering franchises for sale in California and after they sponsored a NASCAR race car that displayed IPC's mark in races broadcast on national television. In response to defendants' motion, JIPC reiterates its position that it was not damaged until races including the IPC-sponsored car were broadcast

---

[61]Defendants' Motion in Limine No. 4.

[62]Plaintiff's Opposition to Defendants' Motion in Limine No. 2

[63]Defendants' Motion in Limine No. 5 ("Def.'s MIL #5).

beginning in March 2008.[64]

Defendants seek to exclude evidence of their actions prior to 2008 for purposes other than proving damages, however. Defendants contend that "evidence [of] . . . the adoption of the IPC Mark in 1999, or any uses of the IPC Mark before 2008 that do not relate to California" is irrelevant.[65] Although not relevant to show that JIPC was damaged, IPC's actions prior to 2008 may be relevant for other purposes. JIPC states, for example, that it intends to present evidence that Barsness knowingly adopted a mark similar to JIPC's mark. Such evidence would be relevant in assessing the likelihood of confusion between the parties' marks. See *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979); see also *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (reciting the eight *Sleekcraft* factors). Defendants' motion is therefore denied. If JIPC presents evidence of defendants' use of their marks prior to March 2008, defendants may seek an appropriate limiting instruction if they believe one is required.

### F. Defendants' Motion to Exclude Evidence of Confusion Experienced by Non-Consumers

Defendants also seek to preclude JIPC from offering evidence of "instances of confusion by contractors and vendors who have business relationships with [JIPC], as well as other unnamed third parties," on the ground that such evidence is irrelevant.[66] Specifically, defendants seek to exclude evidence that an unidentified contractor at a trade show told JIPC's founder John Parlet that he had seen "your race car" on television; testimony by E. Brooks Lilly, a vendor of "point of sale/ticketing systems to the entertainment industry," that he "frequently" encounters confusion between the parties "at trade shows and during sales calls" among "employees, owners and operators" of family

---

[64]Plaintiff's Opposition to Defendants' Motion in Limine No. 5.

[65]Def.'s MIL#5 at 5.

[66]Defendants' Motion in Limine No. 6 ("Def.'s MIL #6) at 3. As a further basis for excluding at least some of this evidence, defendants assert that testimony regarding confusion experienced by individuals other than the witness is inadmissible hearsay. As the court has explained, whether statements indicating confusion on the part of out of court declarants are hearsay depends on whether the factfinder must accept the truth of the statement to conclude that the declarant was confused. It will generally not be necessary to accept the truth of the matter asserted to infer that the declarant was confused. As analysis of some of the emails evidencing confusion demonstrates, however, this is not always the case. Because the nature of the testimony regarding confusion by out of court declarants that JIPC intends to offer is for the most part not clear, the court cannot definitively analyze whether it is hearsay. The court therefore directs JIPC to make an offer of proof by July 27, 2009 regarding the testimony of all witnesses who it anticipates will testify to statements by third parties evidencing confusion. Defendants may file a response by August 3, 2008. There will be no reply or hearing unless the court determines that either a reply or hearing is necessary.

entertainment venues and vendors serving family entertainment centers; testimony by Larry Turner, who provided financing to JIPC in 2000, that after losing contact with JIPC, he encountered defendants' site via a Google search and believed it to have originated with JIPC; testimony that John Wyson, JIPC's accountant, that he was confused by the IPC-sponsored car; and testimony that an IPC employee requested a transfer to the JIPC store in Bakersfield.[67]

Courts have reached different conclusions regarding the relevance of evidence of confusion among non-consumers. In *Icon Enterprises Intern., Inc.*, 2004 WL 5644805 at \*15-17, the court offered a thorough analysis of this issue. It explained that "[s]ince '[t]he test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks,' *Dreamwerks Production Group v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir.1998) (emphasis added), statements by a retailer or distributor that he or she was confused do[ ] not necessarily show confusion by consumers." *Id.* at \*15. The court noted, however, that "several circuits and courts ha[d] held that such evidence [was] probative of consumer confusion." *Id.* (citing *Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1265 (Fed. Cir. 1995); *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 384 (7th Cir. 1976); *Beacon Mut. Ins. Co. v. Onebeacon Ins. Group*, 376 F.3d 8, 16 (1st Cir. 2004); *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F.Supp.2d 273, 297 (S.D.N.Y. 2002); and *CSC Brands LP v. Herdez Corp.*, 191 F.Supp.2d 1145, 1152 (E.D. Cal. 2001)). Nonetheless, the *Icon Enterprises* court explained, "[t]he Ninth Circuit. . . ha[d] never embraced the theory that a showing of actual confusion on the part of retailers or distributors is, *ipso facto*, probative of actual consumer confusion because retailers and distributors, being members of the trade, are less likely to be confused." *Id.* at \*16. The court next examined the Ninth Circuit's opinion in *Japan Telecom, Inc. v. Japan Telecom American, Inc.*, 28 F.3d 866, 874 (9th Cir. 2002), which addressed whether declarations from plaintiff's business partners were relevant to prove that plaintiff's mark had attained secondary meaning. The Ninth Circuit stated:

> "Although all the declarants claim to have the sort of mental recognition that's characteristic of secondary meaning, Japan Telecom has not come forward with evidence that they formed this recognition for any reason other than their personal relationships with Japan Telecom or its president. Consequently, their declarations are not persuasive evidence that a significant number of consumers have formed a similar mental association. Had they formed their mental association with Japan

---

[67]*Id.* at 3-5. As Turner appears on JIPC's witness list, his testimony regarding his own confusion will not present any hearsay issues. If the extent of the contractor's statement to Parlet was that he saw "Parlet's" car, Parlet may testify regarding this statement without raising any hearsay issues; such a statement would not be admitted to prove that the contractor in fact saw a car sponsored by JIPC, but to prove that the contractor was confused regarding the sponsor of the car. The court does not have sufficient detail regarding the remainder of the potential evidence to determine whether it would constitute hearsay.

Telecom because of some stimulus that was just as likely to affect members of the buying public as it was likely to affect them (such as advertising), their declarations would have been more persuasive." *Id.* at 875 (internal citations omitted)

The *Icon Enterprises* court reasoned that

> "although it involved the use of actual confusion evidence in a somewhat different context, *Japan Telecom* suggests that the Ninth Circuit is skeptical of the proposition that confusion on the part of dealers is necessarily probative or reflective of consumer attitudes. Rather, *Japan Telecom* suggests that the Ninth Circuit would look to the circumstances giving rise to the dealer's confusion to determine whether, under similar circumstances, an ordinary consumer would be as likely to be confused." *Icon Enterprises*, 2004 WL 5644805 at *17.

Employing this approach, the court declined to admit testimony regarding confusion on the part of a retailer because "the circumstances giving rise to his confusion . . . [were] not the circumstances under which an ordinary consumer is likely to encounter Defendants' product." *Id.* On the other hand, it admitted evidence of confusion by a different retailer who was "confused after seeing an ad for [the product] in a [ ] catalogue" because "a consumer is likely to encounter Defendants' product in the same context." *Id.*

Although the *Icon Enterprises* court relied on the Ninth Circuit's decision in *Japan Telecom*, the probative value of dealer/industry insider testimony would appear to differ where the issue is likelihood of consumer confusion rather than acquisition of secondary meaning. In the latter context, dealers and industry insiders are likely more attuned to trademarks as source identifiers than the general public because they know the industry and have ongoing business relationships with some of the companies involved. Thus, their knowledge of the connection between a trademark and a company's products may not be highly probative of the fact that consumers are equally aware of the link. By contrast, when assessing likelihood of consumer confusion, dealers and industry insiders should, as a general matter, be less confused about the association of a particular mark with a particular company than ordinary consumers given their greater knowledge of the industry and the companies in it. To the extent dealers and other insiders are confused, therefore, this may suggest that consumers too will likely be confused. Despite these differences, the court agrees with the *Icon Enterprises* court that ultimately the probative value of evidence of dealer confusion turns on whether the circumstances in which the dealer encountered the mark are similar to those in which consumers generally encounter the mark.[68]

---

[68]Relying on commentary by McCarthy, JIPC argues that confusion among suppliers and other business associates can support a finding of infringement independent of customer confusion. 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 23:5. The law in the Ninth Circuit, however, is that customer confusion is the ultimate inquiry in the likelihood of

Defendants' motion identifies two individuals, Wyson and a contractor, who experienced confusion after viewing the IPC-sponsored car on television. Because a potential consumer would encounter defendants' mark in the same context – i.e., watching an auto race during leisure time – these individuals' confusion is relevant to the likelihood of confusion analysis. Similarly, because Turner's confusion resulted from his use of Google, a search engine regularly employed by consumers to look for restaurants, his confusion is relevant as well. The court cannot assess the relevance of the remaining witnesses identified because it does not know the circumstances under which they encountered the marks. No information is provided, for example, regarding the manner in which the IPC employee who requested a transfer to Modesto encountered the parties' marks.[69] Similarly, the description of Lilly's testimony provided in the pleadings is not specific enough to allow the court to assess the relevance of the confusion he allegedly encountered during "trade shows and sales calls." Thus, the court directs JIPC to file an offer of proof by July 27, 2009 detailing the substance of these witnesses' testimony if intends to call them as a witness to establish likelihood of confusion. JIPC's offer of proof should also detail the testimony of other witnesses, such as Parlet, from whom it intends to elicit testimony regarding out of court statements evidencing actual confusion. Defendants may file a reply by August 3, 2009. The court will rule on the admissibility of the witnesses' testimony after receiving JIPC's offer of proof and defendants' brief. The court denies the balance of the motion.

## G.     Motion to Exclude Evidence of Harm Outside Plaintiff's Market Areas

confusion analysis; confusion among non-consumers is relevant only to the extent it establishes that actual consumers are likely to be confused. See *Rearden LLC v. Rearden Commerce, Inc.*, 597 F.Supp.2d 1006, 1023 (N.D. Cal. Jan. 27, 2009) ("Nearly every example in the record implicates a vendor or an industry insider. The critical determination for finding a likelihood of confusion is whether *prospective purchasers* are likely to be deceived, regardless of the experiences of vendors, industry insiders, and job-seekers," citing *Accuride Intern., Inc. v. Accuride Corp.*, 871 F.2d 1531, 1535 (9th Cir. 1989) ("The critical focus of the likelihood of confusion inquiry is . . . the effect of defendant's usage of the name on prospective purchasers in the marketplace"); see also *id.* at 1023 n. 9 ("Plaintiffs argue that confusion of investors, vendors, and suppliers can support a finding of infringement, even in the absence of consumer confusion. Plaintiffs rely upon a treatise, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, section 23:5. While the treatise reports some cases in which courts considered the confusion of non-consumers, its discussion is notably devoid of any Ninth Circuit case law suggesting that non-consumer confusion is relevant. This court is bound to apply the law of the Ninth Circuit, whose precedents clearly hold that the key inquiry is confusion of prospective purchasers"). Further, JIPC claims that the event that gave rise to its cause of action was IPC's sponsorship of the car, a marketing move clearly directed at consumers rather than industry insiders.

[69]If the employee in question was a low-level employee, such as a pizza cook or hostess, he or she likely did not participate in trade shows or conferences, and is thus likely to have encountered the parties' marks in the same context as an ordinary consumer.

Defendants argue that plaintiff should not be permitted to present evidence that it experienced harm in states other than California, because such evidence is irrelevant.[70] Defendants raised a similar argument in their motion for summary judgment, contending that JIPC did not experience harm outside California. The court rejected this argument. While the court concluded that JIPC did not experience any harm in the states where defendants currently operate restaurants, it concluded that triable issues of fact remained regarding JIPC's harm in other areas, and most particularly, in the states surrounding California. This ruling would preclude JIPC from presenting evidence that it suffered harm in the states where defendants presently operate. To the extent defendants' motion seeks to preclude evidence related to additional states, however, it is denied.

### H. Motion to Exclude Evidence of Bad Faith

In their eighth motion *in limine*, defendants argue that because JIPC claims it had no cause of action prior to 2008, evidence indicating that defendants engaged in bad faith conduct prior to 2008 is irrelevant. Defendants contend that "[i]f any prior adoption and use did not trade upon any rights or reputation of [JIPC], and it consequently had no legal claim, it would be improper and legally illogical to try to characterize such prior adoption, use or intent as being in bad faith."[71] Plaintiff intends to offer evidence that Barsness acted with the intent to confuse in adopting the IPC mark. As explained in the court's discussion of defendant's fifth motion *in limine*, bad faith adoption of a mark is relevant to the likelihood of confusion analysis. Reduced to its essence, defendants' argument is that because plaintiff claims there was no likelihood of confusion before 2008, any adoption of a mark prior to 2008 could not have been in bad faith. This argument – that where there is no likelihood of confusion, there can be no bad faith – rests on the mistaken assumption that bad faith automatically gives rise to a likelihood of confusion. This is not the case, as likelihood of confusion is based on a multi-factor test. See *Sleekcraft*, 599 F.2d at 349. Because the alleged infringer's intent is only one factor in the likelihood of confusion analysis, a present likelihood of confusion may not exist even where an infringer adopts a mark with the subjective intent to cause confusion.

Defendants' suggestion is illogical for another reason. Defendants propose that bad faith in adopting a mark is irrelevant if it occurs prior to the time a plaintiff's claim arises. A trademark infringement plaintiff's claim does not arise until, at a minimum, there has been some use of the mark in commerce. A defendant's *intent* in adopting a mark, by definition, always precedes the defendant's use of the mark. In other words, under defendants' analysis, bad faith would never be relevant to likelihood of confusion. *Sleekcraft*, of course, holds to the contrary that bad faith is relevant to likelihood of confusion.

---

[70]Defendants' Motion in Limine No. 7 ("Def.'s MIL #7") at 3-4.

[71]Defendants' Motion in Limine No. 8 ("Def.'s MIL #8") at 4.

Defendants specifically seek to exclude evidence of a May 2000 telephone conversation between Parlet and Barsness regarding the names of the parties' restaurants. This appears to be the conversation discussed in the court's order on defendants' motion for summary judgment in which Parlet told Barsness: "I asked you not to use the name and I'll continue to ask you not to use the name." In response, Barsness asked Parlet for "some of part of the country" in which he could use the name. Barsness' comments could support an inference that he adopted the mark in bad faith, as they suggest he believed it was improper to use the mark without Parlet's approval. Given this fact, the conversation is not irrelevant or inadmissible simply because it took place prior to 2008.

Defendants also seek to exclude evidence of alleged bad faith other than Barsness' adoption of the mark. First, they seek to exclude evidence regarding the *Mr. Gatti's* cases as probative of bad faith.[72] The court has already addressed the admissibility of this evidence. Defendants also seek exclude any evidence that they engaged in fraud in applying for their marks; any evidence of bad faith by defendants in registering the domain name < incrediblepizza.com >, and any evidence of franchising efforts not directed at California.[73] Evidence of bad faith by defendants after their adoption of their marks would not necessarily be relevant to likelihood of confusion, as the intent factor focuses on the alleged infringer's intent in adopting the mark at issue. Defendants, however, have asserted an unclean hands defense. They have therefore placed their good faith at issue, as "[t]he doctrine of unclean hands also may be relaxed if defendant has been guilty of misconduct that is more unconscionable than that committed by plaintiff." *Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*, 149 F.3d 85, 90 (2d. Cir. 1998) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2946).

Defendants' unclean hands defense is equitable, however, and committed to the discretion of the court; there is no right to jury trial on this defense. See *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir.1996) ("A litigant is not entitled to have a jury resolve a disputed affirmative defense if the defense is equitable in nature"); see also *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001) ("[T]here is no right to a jury on the equitable defense of laches"); accord *Price v. Fox Entertainment Group, Inc.*, No. 05 Civ. 5259(SAS), 2007 WL 1498321, *1 (S.D.N.Y. May 22, 2007) ("A number of courts have held that those equitable defenses are "committed to the sound discretion of the court. This is so even though [b]oth defenses ultimately depend on underlying factual determinations. That simply means that any testimony regarding the equitable defenses would be heard by the Court, not a jury" (footnotes omitted and internal quotation marks omitted)).

Defendants have requested that the court bifurcate trial of liability and their affirmative defenses. Under the circumstances, the court concludes that bifurcation is appropriate, at least as

---

[72]*Id.* at 4-5.

[73]This last objection does not appear to pertain to bad faith, but as defendants have raised the issue, the court addresses it in the context of this motion.

respects defendants' unclean hands defense. The unclean hands defense places both parties' good or bad faith at issue in ways that are not relevant to a finding of liability for trademark infringement.[74] Presenting evidence on these issues would pose a risk of prejudice and confuse the jury. See FED.R.CIV.PROC. 42(b) (court may order separate trial "to avoid prejudice"). In addition, resolution of defendants' unclean hands defense will be unnecessary if they prevail on the issue of liability. As it appears the parties intend to present substantial evidence of bad faith potentially relevant only to defendants' unclean hands defense, bifurcation is warranted "to expedite and economize" the disposition of this action. See *id.*; cf. *Danjaq*, 263 F.3d at 961 ("One favored purpose of bifurcation is to accomplish just what the district court sought to do here – avoiding a difficult question by first dealing with an easier, dispositive issue"). Evidence of bad faith not relevant to liability will therefore not be admitted during the first phase of trial.

In sum, defendants are not entitled to a broad order excluding all evidence of bad faith prior to 2008. Evidence of Barsness' bad faith in adopting the IPC marks is relevant in assessing likelihood of confusion. Defendants are not entitled to have evidence of franchising efforts not directed at California excluded; the court has already held that JIPC's claims are not limited to California, but include a broader market area that constitutes its "zone of expansion."

The court directs JIPC to make an offer of proof as to any admissible evidence it intends to offer to prove Barsness' bad faith in adopting the IPC marks by July 27, 2009. Defendants may file a response by August 3, 2009. Defendants' motion is denied to the extent it seeks an order excluding all evidence of bad faith, but granted as to evidence of bad faith relevant only to unclean hands. This evidence will be admitted in a subsequent court trial on defendants' unclean hands defense, if such a trial is necessary.

## I.      Motion to Exclude Joyce Julius Reports

Defendants ask the court to exclude a series of "sponsor reports" created by media research company Joyce Julius & Associates, Inc. ("Joyce Julius), which document the amount of exposure achieved by IPC and other NASCAR sponsors during broadcasts of NASCAR events.[75] Defendants produced some of the documents to JIPC during discovery pursuant to Rule 33(d) of the Federal Rules of Civil Procedure.[76] See FED.R.CIV.PROC. 33(d) ("If the answer to an interrogatory may be

---

[74]As noted, Barsness' bad faith in adopting the mark is relevant to the likelihood of confusion analysis; by contrast, allegations of bad faith not related to adoption of the mark may be relevant to unclean hands but are not relevant in assessing likelihood of confusion.

[75]Defendants' Motion in Limine No. 9 ("Def.'s MIL #9").

[76]Defendants contend that JIPC obtained some of the documents from CJM Racing rather than from them, but appear to admit that they produced at least a portion of them during discovery. The parties' positions on the issue are somewhat contradictory and neither party has provided clear

determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by . . . giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries").[77] Defendants contend that the reports are hearsay if offered for the truth of the matters asserted therein. JIPC indicates that it intends to offer the reports as proof of the amount of "corrective advertising" damages to which it is entitled; it does not dispute that the reports constitute hearsay, but argues that they are admissible under the business records exception of Rule 803(6), the "market reports" exception of Rule 803(17), and the residual exception.[78] In their reply, defendants assert that the reports are not relevant to JIPC's damages.

### 1.    Whether the Reports Are Relevant

Because defendants did not raise a relevance objection until their reply, the court cannot adequately address it at this time. As relevance is a threshold issue for admissibility, the court offers a few comments before examining the parties' arguments regarding the hearsay question. Defendants contend that the reports are not relevant in proving JIPC's damages because they do not reflect the actual value of defendants' NASCAR sponsorship. They cite the statement included at the end of each report: "This proprietary research analysis provides an accurate documentation of the clear in-focus exposure received during in-broadcast portions of the particular television broadcast(s). The assessed value for this exposure is related to the estimated or non-discounted commercial rate for the designated telecast and is for comparison purposes only."[79] Defendants focus on the statement that the reports are "for comparison purposes only." The meaning of this statement is difficult to ascertain out of context; the court, of course, lacks context as defendants have submitted copies of the reports that have their substantive content redacted. It appears, however, that the reports purport to reflect accurately the amount of exposure time achieved by sponsors' marks. The value of this exposure is apparently calculated in relation to the estimated cost to advertise on the particular NASCAR broadcast in question. The disclaimer that the reports are "for comparison purposes only" does not render the value information irrelevant. Rather, the disclaimer states that the information is "accurate" as to the amount of exposure the marks received, a fact that may be relevant irrespective of the reports' estimate of the sponsorship's value. As to the estimated values, the reports describe their methodology in calculating the values; the fact that the values are estimated for "comparative purposes" may go to the weight of the evidence, but it does

_____

information as to how JIPC obtained the documents.

[77]Opposition to Defendants' Motion in Limine No. 9 ("Opp. to MIL #9") at 2.

[78]*Id.* at 2-5.

[79]Reply in Support of Defendants' Motion in Limine No. 9, Exh. 1.

not make the evidence irrelevant.[80]

## 2. Whether the Sponsor Reports are Business Records under Rule 803(6)

Rule 803(6) denominates as non-hearsay

"[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

"The proponent of the business records must satisfy the foundational requirements of the business records exception." *Tongil Co., Ltd. v. Vessel Hyundai Innovator*, 968 F.2d 999, 1000 (9th Cir. 1992).

Defendants assert that JIPC has not identified a custodian of records or "other qualified witness" from Joyce Julius whose testimony will satisfy the foundational requirements of the business records exception and support admission of the reports. *Id.* at 1000 ("Rule 803(6) explicitly provides that the foundational requirements must be 'shown by the testimony of the custodian or other qualified witness'").[81] JIPC counters that the reports are admissible because "IPC undoubtedly relies on these reports in determining its return on investment"; that IPC "would have a substantial interest in ensuring that such reports are accurate"; and the reports "were more likely than not maintained in IPC's files in the course of its regularly conducted business activity."[82] It is unclear whether JIPC believes its speculation in this regard suffices to establish the requirements of the business records exception, or whether it intends to establish the foundational requirements through a witness from IPC. If it relies merely on speculation, this is insufficient. JIPC may, however, be able to prove the foundational requirements through a witness from IPC. Defendants contend that an IPC witness will lack knowledge as to whether the reports were "made at or near the time by, or from information transmitted by, a person with knowledge." See FED.R.EVID. 803(6). The Ninth

---

[80]Further, as discussed below, defendants have conceded the relevance of the documents they have produced in response to interrogatories.

[81]Def.'s MIL #9 at 4.

[82]Opp. to MIL #9 at 3.

Circuit appears, however, to have relaxed this foundational requirement in cases where a party to litigation receives business records from a third party, and has a "substantial interest in the accuracy of the bills." In *MRT Construction Inc. v. Hardrives, Inc.*, 158 F.3d 478, 483 (9th Cir. 1998), the court explained: "This circuit has held that records a business receives from others are admissible under Federal Rule of Evidence 803(6) when those records are kept in the regular course of that business, relied upon by that business, and where that business has a substantial interest in the accuracy of the records," citing *United States v. Childs*, 5 F.3d 1328, 1333-34, 1334 n. 3 (9th Cir.1993)). The court upheld the admission of business records offered through a witness affiliated with a party that had not created but had received the records, without requiring proof that the records had been "made at or near the time by, or from information transmitted by, a person with knowledge." *Id.*; accord *United States v. Parker*, 749 F.2d 628, 633 (11th Cir.1984) ("That the witness and his company had neither prepared the certificate nor had first-hand knowledge of the preparation does not contravene Rule 803(6)"). These cases appear to conclude that a party's substantial interest in the accuracy of a business record obtained from a third party provides a sufficient substitute for the foundational requirement that the person who prepared the document had or received first-knowledge of its contents. Thus, if JIPC can establish through a foundational witness at trial that defendants kept the reports and relied on them in the regular course of business, and that defendants had a substantial interest in their accuracy, it can admit the documents as business records under Rule 803(6).

JIPC also contends that the reports are admissible as business records because IPC produced them pursuant to Rule 33(d). The fact that a party produces a document under Rule 33(d) does not mean that the document qualifies as a business record under Rule 803(6). See *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 505 F.Supp. 1190, 1236 (E.D. Pa. 1980) ("Plaintiffs contend that by producing the diaries and memoranda pursuant to F.R.Civ.P. 33(c) the defendants have conceded that they are business records. They rely in this respect upon the language of Rule 33(c), of the Civil Rules which is entitled 'Option to Produce Business Records.'[83]. . . The first problem with this argument is that the answers to the interrogatories make clear that the defendants are not conceding that the materials produced are business records within the meaning of 803(6). Secondly, we think that the bar and the courts would be startled if they were retrospectively to find that a production under Rule 33(c) constituted an admission that everything that was produced qualified as a record of regularly conducted activity within the meaning of F.R.E. 803(6). There is nothing in the language of Rule 33(c) which suggests that the very specific requirements of 803(6) are waived by its invocation"). Thus, production under Rule 33(d) does not by itself establish the foundation for admission of a document as a business record.

### 3.     Whether the Reports Constitute Party Admissions

Although JIPC did not raise the issue, the reports may also be admissible as an adoptive

---

[83]The provision entitled "Option to Produce Business Records" is now numbered 33(d).

admission by a party opponent under Rule 801(d)(2)(B). The rule provides that "a statement of which [a] party has manifested an adoption or belief in its truth" is "not hearsay" if offered against the party. *Zenith* addressed this issue in detail:

> "One of the most interesting questions posed in regard to 801(d)(2) admissions is the extent to which production of documents in response to interrogatories, as permitted under F.R.Civ.P. 33(c), constitutes an 'admission of' or 'adoption of' the contents of the documents so produced. Written answers to interrogatories may be utilized as admissions, although they are not conclusive on the issues addressed. We agree with the Court in *National Research Development Corp. v. Great Lakes Carbon Corp.*, 410 F.Supp. 1108, [1113 n. 20] ([D. Del.] 1975) that 'the language of each interrogatory and the wording of the corresponding reply becomes significant' when it is not the written answers themselves, but documents referenced in the answers or produced in lieu of such answers, which the opposing party seeks to use. . . . [T]he only issues conceded by such an 'admission' are issues specifically addressed in the question, and responded to by the document." *Id.* at 1244.

The history of the reports' production presented by the parties is somewhat muddled. It appears, however that at least some of the documents were produced in response to the following interrogatories:

> "State the annual advertising value of Your sponsorship of [CJM] Racing, from the date the sponsorship began to the present."

> "State the amount of time the IPC Marks were visible during television and streaming video broadcasts of NASCAR events during 2008 and 2009."

> "State the number of times the IPC Marks were mentioned during audio, television, and streaming video broadcasts of NASCAR events during 2008 and 2009."[84]

Defendants did not provide a substantive written response to these questions, but stated for each question that they would "make available relevant and non-privileged documents responsive to this interrogatory, if any exist."[85] To the extent the reports were produced in response to these questions, they may constitute adoptive admissions regarding the value of defendants' sponsorship and the exposure achieved by defendants' marks. It is not possible to determine at this time whether the adoptive admission concept provides a basis for admission of the reports, particularly given defendants' representation at the hearing that their clients do not regularly receive the reports, maintain them in their files, or rely on them in a manner that manifests a belief in the truth of the

---

[84]Opp. to Def.'s MIL #9 , Exh. 1.

[85]*Id.*

report's contents.  Unless JIPC can establish that defendants adopted the reports as true statements, they will not be admissible as party admissions.

### 4.    Whether the Reports Are Admissible Under Rule 803(17)

JIPC next argues that the reports are admissible under Rule 803(17).[86]  This Rule denominates as non-hearsay "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations."  "The type of publications contemplated by Rule 803(17) are those which deal with compilations of objective facts not requiring for their statement, a subjective analysis of other facts."  *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, No. CIV 87-987 PHX RCB, 1990 WL 126500, *4 (D. Ariz. July 25, 1990); see also FED.R.EVID. 803, Advisory Committee Notes, 1972 Revision, Note to Paragraph 17 (listing "newspaper market reports, telephone directories, and city directories" as types of evidence admissible under Rule 803(17)).

Defendants have attached copies of the reports as exhibits to their reply, but have redacted all substantive content.  Because neither party has produced unredacted copies of the reports in question, the court cannot determine whether they are the sort of publication that falls within Rule 803(17).  Based on the redacted copies, however, it appears likely that they are not.  Rather than a published compilation generally relied on by "persons in particular occupations," such as stock reports, the reports here seem to have been specially prepared for a narrow segment of interested parties, i.e., businesses with NASCAR sponsorship.  Moreover, they do not appear to be objective compilations of easily ascertainable facts of the sort contemplated by the ule; rather, they contain conclusions reached after analysis by a specialized marketing research company.  If JIPC nonetheless believes that the reports fall within Rule 803(17), it may submit unredacted copies of any of the reports that not otherwise admissible as party admissions under seal by July 15, 2009 at 5:00 p.m., so that the court can determine the applicability of Rule 803(17).

### 5.    Whether the Reports Are Admissible Under the Residual Exception

JIPC finally contends that the reports are admissible under the residual exception, Rule 807.[87]  As the Ninth Circuit has explained:

> "Hearsay evidence sought to be admitted under Rule 807 must have circumstantial guarantees of trustworthiness equivalent to the listed exceptions to the hearsay rule. See *United States v. Fowlie*, 24 F.3d 1059, 1069 (9th Cir.1994).  Furthermore, the statement must (1) be evidence of a material fact; (2) be more probative on the point for which it is offered than any other evidence which the proponent can procure

---

[86]*Id.* at 3-4.

[87]*Id.* at 4-5.

through reasonable efforts; and (3) serve the general purposes of the Rules of evidence and the interests of justice by its admission into evidence." *United States v. Sanchez-Lima*, 161 F.3d 545 (9th Cir. 1998) (citing FED.R.EVID. 807).

The exception "is to be used rarely and in exceptional circumstances." *Fong v. American Airlines*, Inc., 626 F.2d 759 (9th Cir.1980).

JIPC asserts in conclusory fashion that "because the information in the sponsor reports [is] accurate and reliable, and relied upon by IPC in making future advertising decisions, admitting the sponsor reports under [the residual] exception will not offend the principles behind the Federal Rules of Evidence."[88] This argument is insufficient to establish that the reports have adequate guarantees of trustworthiness. At a minimum, the court would have to review unredacted copies of the reports and be presented with concrete evidence of the circumstances surrounding their production before it could conclude that the guarantees of trustworthiness requirement was met. See *F.T.C. v. Figgie Intern., Inc.*, 994 F.2d 595, 608 (9th Cir. 1993) ("District courts must make detailed findings when admitting evidence under [the residual exception]").

Even if the court concluded that the reports had guarantees of trustworthiness, moreover, JIPC has not demonstrated that they are more probative on the point for which they will be offered than other evidence JIPC could reasonably have procured. JIPC has not explained why it was unable to obtain other evidence of the harm it suffered as a result of the NASCAR broadcasts more probative than the reports; this is particularly puzzling since it appears that the reports are only indirectly probative of plaintiffs' damages. JIPC does not explain why it could not have retained a marketing expert to assess the cost of a "corrective advertising" program to remedy its alleged harm. It appears that JIPC's lack of more probative evidence is simply the result of the litigation strategy it adopted. For this reason, the court finds that there are no "exceptional circumstances" justifying application of the residual exception and will not admit the reports under Rule 807.[89]

In sum, the reports will be inadmissible under the business records exception unless JIPC can produce a qualified witness to a lay a foundation for their admission. They are inadmissible under the residual exception as well. Those reports produced in response to interrogatories pursuant to Rule 33(d) will be admissible for specific points as adoptive admissions if JIPC can establish that

---

[88]*Id.*

[89]The court denies JIPC's request that discovery be reopened to permit it to take the deposition of a representative of IPC or a representative of Joyce Julius "for the limited purpose of obtaining the necessary testimony" to lay a foundation for the admissibility of the reports. (Opp. to MIL #9 at 5.) It appears that JIPC's intent to rely on the reports as proof of its damages is the result of a late change in litigation strategy. The court thus does not believe that JIPC's inability to lay a foundation for those reports, if any, that are not admissible as adoptive admissions warrants reopening discovery on the eve of trial.

defendants manifested a belief in the truth of the reports. JIPC may submit copies of the reports for the court's inspection if it wishes to pursue introduction of them under Rule 803(17). The court will make a final decision regarding the applicability of Rule 803(17) once the deadline for submission of unredacted copies of the reports has passed.

### J.    Defendants' Motion to Exclude Settlement Communications

Defendants move to exclude as inadmissible under Rule 408 exhibits that they contend are settlement communications. Specifically, defendants seek exclusion of letters from defendants' counsel to JIPC's counsel dated March 31, 2004 and January 28, 2005; letters from JIPC's counsel to defendants' counsel dated April 22, 2005 and February 15, 2008; email exchanges between counsel dated August 27, 2004 and August 1, 2005; and the transcript of Parlet's and Barsness' 2000 telephone conversation, previously discussed in connection with defendants' eighth motion.[90] JIPC argues that the 2000 telephone conversation and the March 31, 2004 letter are not settlement communications. It also asserts that the exhibits are not offered to prove liability but to rebut defendants' affirmative defense of laches.

Rule 408 provides:

"(a) Prohibited uses.– Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:

(1) furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses. – This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution."

In its order on defendants' motion for summary judgment, the court concluded that the March 31, 2004 letter did not constitute a settlement communication under Rule 408, as it simply refused JIPC's demand that defendants cease their alleged infringement. Although that is the position taken in the majority of the letter, defendants note that the final paragraph of the letter states: "Solely for the purposes of exploring an amicable resolution of this matter, IPCI would be willing to consider

---

[90]Defendants' Motion in Limine No. 10 ("Def.'s MIL #10") at 3.

offering your client exclusive rights to operate under its name in all of the California markets where it is currently operating."[91] This statement was not previously brought to the court's attention; having considered it, the court now concludes that the letter is properly classified as a settlement communication; the statement reflects an offer by IPC to give up rights to use its marks in certain areas of California in order to resolve the dispute that had arisen.

The 2000 telephone conversation between Parlet and Barsness appears, at least in part, to constitute a settlement communication, however.[92] Barsness stated: "I would still like to come to terms with you somehow on that issue [i.e., the restaurants' names] if we could break apart some part of land or some part of the country and say, you know, 'Okay, Rick, it's all right for you to use the name in this part of the country and I'll use it over in this part of the country.'"[93] Parlet rejected Barsness' suggestion that the parties divide the country into territories; Barsness continued to press the idea but Parlet remained adamant that Barsness should select a different name. This portion of the conversation constitutes a settlement communication. The parties' discussion indicates that they had an ongoing dispute regarding Barsness' right to use the name; Barsness introduces the subject by asking, "[D]o you and I need to talk anymore about the name issue?"[94] Although neither party had initiated litigation, there was clearly a difference of opinion between them as to their respective rights. See *Affiliated Manufacturers, Inc. v. Aluminum Co. of America*, 56 F.3d 521, 526-28 (3d Cir. 1995) (stating that "Rule 408 has been interpreted as applicable to an actual dispute, or at least an apparent difference of view between the parties concerning the validity or amount of a claim," and that "the meaning of 'dispute' as employed in the rule includes both litigation and less formal stages of a dispute"). Barsness offered consideration, i.e., relinquishment of a claimed right to use the "Incredible Pizza Company" name in certain parts of the country, in an attempt to settle the parties' dispute. This portion of the conversation is therefore a settlement communication.

At the hearing, JIPC argued that defendants have waived their right to seek exclusion of this conversation under Rule 408, citing the fact that defendants' counterclaim included references to Barsness' suggestion that the parties agree to a territorial division in support of their affirmative counterclaim. Defendants also cited this portion of the conversation in their statement of uncontroverted facts supporting their motion for summary judgment. Under these circumstances, the court concludes that defendants have waived any objection to admissibility of the conversation under Rule 408. See *Stainton v. Tarantino*, 637 F.Supp. 1051, 1082 (E.D. Pa. 1986) (plaintiffs waived right to object to testimony regarding a settlement conversation after introducing notes from the conversation into evidence); see also *Eisenberg v. University of New Mexico*, 936 F.2d 1131, 1134 (10th Cir. 1991) ("Ms. Torres offered the affidavit to the court, as factfinder, in support of her

---

[91]Reply in Support of Defendants' Motion in Limine No. 10 ("Reply to Def.'s MIL #10") at 3.

[92]Neither party has provided a complete copy of the transcript of theh call; both simply refer to the portion of the conversation reproduced in paragraph 44 of JIPC's amended complaint.

[93]First Amended Complaint, ¶ 44.

[94]*Id.*

allegations of impropriety on the part of the law clerk. . . . We conclude that Ms. Torres waived any claim to Rule 408 protection by her own submission of the affidavit to the court"); *A.A.B. Joint Venture v. United States*, 77 Fed. Cl. 702, 706 (2007) ("The law is clear that a party offering evidence 'opens the door' and waives its right to object to the entry of that evidence. The immediate effect of introducing evidence is the loss of the right to exclude the evidence or to claim that admitting the evidence was other than harmless error," citing *United States v. Washington*, 434 F.3d 7, 11 (1st Cir. 2006)).

The remaining communications, which JIPC concedes are settlement communications, are inadmissible to prove liability. JIPC argues, however, that it seeks to offer evidence of settlement communications to rebut defendants' affirmative defense of laches rather than to establish liability. As defendants have abandoned this defense, the letters are no longer relevant for that purpose. The court has examined the settlement communications at issue and has been unable to identify any issue other than liability to which they might be relevant.[95] The court therefore grants defendants' motion, except as respects the 2000 telephone conversation between Parlet and Barsness. If JIPC believes any of the communications excluded by this order are admissible at the liability phase of trial for any purpose not addressed in this order, it may submit an offer of proof by July 27, 2009. Defendants may file a reply by August 3, 2009.

### K.    Defendants' Motion to Exclude Evidence of Actual Confusion After 2002

Defendants' final motion seeks to exclude evidence of actual confusion that occurred after 2002. Defendants assert that JIPC's tagline "All You Can Eat Food & Fun," adopted in 2002, is

---

[95]Multiple courts have concluded that settlement communications offered to prove willfulness are inadmissible under Rule 408. See *National Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1197 (Fed. Cir. 1995) (affirming the district court's exclusion of evidence of settlement negotiations to prove willfulness); *Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc.*, 898 F.Supp. 1334, 1341 (N.D. Iowa 1995) ("Defendants . . . suggest, for example, that the settlement agreements might be relevant to the issues of their willfulness in infringing the patents, because the settlement agreements suggest that plaintiff had concerns about the risks of the patents being held invalid or uninfringed. However, the court has serious doubts that the patentee's desire to settle infringement claims to avoid these or other risks of litigation establish the alleged infringer's good faith belief that it was not infringing the patent, which is the critical element of the willfulness inquiry"), appeal dismissed, 101 F.3d 712 (Fed. Cir. 1996); *Baltimore Therapeutic Equipment Co. v. Loredan Biomedical, Inc.*, Civ. No. S 89-1085-GEB, 1993 WL 129781, *36 (E.D. Cal. 1993) ("On October 16, 1992, the Court ruled that the Limbach Letter fell within the purview of Rule 408 on the basis that it was intended to be part of the negotiations toward compromise. . . . The Court also ruled that although the Limbach Letter was relevant for some 'other purpose', i.e., the parties' state of mind, it should nevertheless be excluded. The Court reasoned that the purpose for which BTE sought to admit the Limbach Letter was so closely intertwined with the claims sought to be settled that admitting the evidence would undercut the Rule's policy of encouraging settlement"); see also *Austin v. Cornell University*, 891 F.Supp.740, 750-51 (N.D.N.Y. 1990) (excluding evidence of settlement negotiations offered to prove the fact that defendants' discrimination was willful, and justified an award of punitive damages), abrogated on other grounds, *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995).

similar to the tagline "Great Food, Fun, Family & Friends," which defendants have used since 1999. As a result, defendants claim, it is "impossible to determine" whether any confusion experienced by customers after 2002 was the result of the allegedly similar taglines or other similarities in the parties' marks.[96] The court cannot accept this argument. Far from being "impossible," the court believes a jury is capable of examining the parties' marks and determining which, if any, elements of them are likely to result in confusion. A jury might find, for example, that the taglines on which defendants focus are far less prominent than other components of the marks, i.e., the words "John's Incredible Pizza Co." and "Incredible Pizza Company." Defendants are free to argue to the jury that the taglines are the actual source of confusion between the marks. Their motion, however, is denied.

## L. Plaintiff's Motion to Exclude Evidence of a Backdating "Scheme"

JIPC moves to preclude defendants from presenting argument and evidence regarding an alleged "scheme" by JIPC to manufacture documents.[97] Defendants contend that JIPC has engaged in a "longstanding and continuing practice of backdating license agreements" "in a[n] inequitable and improper attempt to broaden its 'family' of so-called marks."[98] They assert that JIPC updated the original March 31, 1999 assignment agreement between it and JIPC, Inc. in order to assign *nunc pro tunc* marks that were not actually in use in 1999. According to defendants, this course of conduct is relevant to their affirmative defenses of unclean hands and abandonment. They also contend the alleged scheme is relevant to their entitlement to attorneys' fees.

### 1. Whether the "Scheme" Is Relevant to Defendants' Unclean Hands Defense

"Unclean hands is a defense to a Lanham Act infringement suit. To prevail, the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987) (citation omitted); see also *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997). To the extent defendants claim JIPC acted inequitably in "backdating" the assignment of trademarks other than those at issue, such as "Experience the Incredible," the conduct does not relate to JIPC's claims. As the specifics of the alleged backdating scheme are obscure, however, the court cannot determine the extent to which it purportedly relates to the marks at issue in this litigation. Because unclean hands is an equitable defense that will be tried to the court following a phase one trial on liability, the court need not reach the issue at this time. See *International Olympic Comm. v. San Francisco Arts & Athletics*, 789 F.2d 1319, 1322 n. 1 (9th Cir.1986) (identifying unclean hands as an equitable defense in trademark infringement cases).

### 2. Whether the "Scheme" Is Relevant to the Affirmative Defense of Abandonment

---

[96]Defendants' Motion in Limine No. 11 at 3.

[97]Plaintiff's Motion in Limine ("Pl.'s MIL").

[98]Opposition to Plaintiff's Motion in Limine ("Opp. to Pl.'s MIL") at 5.

Defendants assert the relevance of the alleged backdating scheme to this defense "cannot be seriously in dispute,"[99] but offer no further explanation or analysis of their position. It appears, however, that they intend to rely on a theory that JIPC has abandoned the marks at issue by granting "naked" licenses to entities that operate "John's Incredible Pizza Co." restaurants.

"[C]ourts have found abandonment . . . when a trademark owner enters into a 'naked' license, which is a 'grant of permission to use [the trademark owner's] mark without attendant provisions to protect the quality of the goods or services provided under the licensed mark.'" *Blue Magic Products, Inc. v. Blue Magic, Inc.*, No. Civ. S-001155WBSJFM, 2001 WL 34098657, *5 (E.D. Cal. Sept. 5, 2001) (alteration original, quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1017 (9th Cir.1985)). The Ninth Circuit has explained that:

> "[W]here the licensor fails to exercise adequate quality control over the licensee, a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark. Such abandonment is purely an 'involuntary' forfeiture of trademark rights, for it need not be shown that the trademark owner had any subjective intent to abandon the mark." *Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002) (citations and internal quotation marks omitted).

Defendants do not explain how a scheme to backdate assignment agreements between JIPC and JIPC, Inc. is relevant to prove that JIPC failed to maintain adequate control over the quality of the restaurants operated by different affiliated entities to which it licensed the marks. Absent further explication of this theory, the court concludes that the evidence is not relevant to defendants' abandonment defense.[100]

### 3.    Whether Defendants' Request for Attorneys' Fees Provides an Adequate Basis for Admitting Evidence of the "Scheme" at Trial

Defendants also assert, again in conclusory fashion, that the alleged backdating scheme is relevant to their entitlement to attorneys' fees.[101] The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Although the text of § 1117(a) is directed to a plaintiff's right to recover attorneys' fees, the Ninth Circuit has held that a prevailing defendant in an infringement action may recover fees "when the case is either 'groundless, unreasonable, vexatious, or pursued in bad faith.'" *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1156 (9th Cir. 2002) (quoting *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 881 (9th Cir. 1999)). As the court has already determined that JIPC obtained a valid

---

[99]*Id.* at 8

[100]Defendants do not intend to offer evidence of the backdating scheme to support their remaining affirmative defenses – i.e., trademark misuse and estoppel.

[101]*Id.*

assignment of the marks on which its claim is based, the relevance of defendants' allegations to their entitlement to fees is uncertain. In any event, the court will determine defendants' right to fees after trial, if necessary; defendants' entitlement to fees has no bearing on the evidence admissible at trial.

For the reasons stated, the court grants JIPC's motion *in limine*.

## III. CONCLUSION

For the reasons stated, the court grants defendants' motion to exclude Isaacson's testimony with the exceptions noted above. It grants defendants' motion to exclude evidence from other litigation, with the exception of Barsness' deposition transcript from the *Mr. Gatti's* litigation; as to this item, it directs the parties to meet and confer as summarized below. The court grants defendants' motion to exclude evidence of actual confusion to the extent it seeks to exclude the second and third emails attached as exhibits to the motion, but denies the balance of the motion, and directs the parties to meet and confer regarding the issues raised by the motion.

The court grants defendants' motion to preclude JIPC's lawyers and witnesses from referring to the "Incredible Marks." It denies defendants' motion to exclude evidence of damages prior to JIPC's assertion of claims in 2008. The court also denies defendants' motion to exclude evidence of confusion by non-consumers; however, it directs JIPC to file an offer of proof regarding the issues raised by the motion, as outlined below. The court also denies defendants' motion to exclude evidence of harm outside JIPC's market areas, subject to the limitations imposed by the court's summary judgment order , and defendants' motion to exclude evidence of actual confusion after 2002.

The court denies defendants' motion to exclude evidence of bad faith the extent it seeks an order excluding all evidence of bad faith, but grants the motion as respects evidence of bad faith relevant only to unclean hands; the court directs defendants to file an offer of proof regarding evidence of bad faith as described below. To the extent the court later determines that JIPC is entitled to a jury trial on unclean hands, it may seek reconsideration of this ruling.

As respects defendants' motion to exclude the Joyce Julius reports, the reports will be inadmissible under the business records exception unless JIPC can produce a qualified witness to a lay a foundation for their admission. Those reports produced under Rule 33(d) in response to interrogatories will be admissible for specific points as adoptive admissions if JIPC can establish that defendants' conduct manifested a belief in the truth of the reports. The court finds the reports inadmissible under the residual exception, and, based on the present record, under Rule 803(17) as well. JIPC may submit copies of the reports for the court's inspection if it wishes to offer them under Rule 803(17), as set forth below.

The court grants defendants' motion to exclude settlement communications, with the exception of the 2000 telephone conversation between Parlet and Barsness; as to that conversation, the court concludes that defendants have waived the protection of Rule 408 and that evidence of the conversation is admissible. The court directs JIPC to file an offer of proof regarding any other

settlement communications it intends to offer for a purpose other than to establish liability, as discussed below. Finally, it grants JIPC's motion to exclude evidence of an alleged backdating "scheme."

JIPC may submit unredacted copies of any Joyce Julius reports that not otherwise admissible as party admissions under seal by July 15, 2009 at 5:00 p.m., so that the court can determine the applicability of Rule 803(17). The court directs the parties to meet and confer regarding the following evidentiary issues by July 20, 2009: the admissibility of Barsness' deposition transcript from the *Mr. Gatti's* litigation; and hearsay issues regarding statements evidencing consumer confusion other than the four emails on which the court has ruled. If the parties are unable to resolve any of these issues in good faith, defendants may file a motion or motions *in limine* by July 24, 2009, which should contain specific arguments directed at individual items of evidence. JIPC may file oppositions by July 31, 2009. There will be no replies or hearing unless the court determines that either replies or a hearing are necessary.

The court directs JIPC to file offers of proof by July 27, 2009: (1) detailing the substance of the testimony it will elicit from witnesses it intends to call to establish confusion among non-consumers; and (2) describing any settlement communications it intends to offer for purposes other than to establish liability, bad faith or willfulness. Defendants may file replies by August 3, 2009. The court will rule on the admissibility of the witnesses' testimony after receiving JIPC's offer of proof and defendants' brief. The court directs defendants to file an offer of proof by July 27, 2009 regarding evidence it intends to offer to establish Barsness' bad faith in adopting the IPC marks. JIPC may file a reply by August 3, 2009.